UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
MARIBEL BAEZ; FELIPA CRUZ; RD., ON BEHALF OF :
HER MINOR CHILD, A.S.; on their own behalf and :
on behalf of all others similarly situated; :
UPPER MANHATTAN TOGETHER, INC.; and :
SOUTH BRONX CHURCHES SPONSORING :
COMMITTEE, INC., :
                                                      Plaintiffs, :
                                                           : 13 Civ. 8916 (WHP)
    vs. :
NEW YORK CITY HOUSING AUTHORITY, :
                                                 Defendant. :
------------------------------------------------------------------------x

**DECLARATION OF STEVEN M. EDWARDS IN SUPPORT OF
PLAINTIFFS' MOTION TO ENFORCE STIPULATION AND ORDER**

      I, STEVEN M. EDWARDS, declare under penalty of perjury that the following is true and correct:

      1.      I am a member of the bar of the State of New York and am admitted to the United States District Court for the Southern District of New York. I am a partner in Hogan Lovells US LLP ("Hogan Lovells"), co-counsel to the National Center for Law and Economic Justice ("NCLEJ") and the Natural Resources Defense Council ("NRDC") in the above-captioned matter. I am fully familiar with the facts and proceedings in this case. I submit this declaration in support of Plaintiffs' Motion to Enforce the Stipulation and Order entered on April 17, 2014 ("Order").

1

2. Annexed as Exhibit 1 is a true and correct copy of a letter from Donna M. Murphy to Greg Bass dated September 30, 2014, attaching the first set of quarterly reports provided by defendant New York City Housing Authority ("NYCHA") to Plaintiffs.

3. Annexed as Exhibit 2 is a true and correct copy of a letter from Donna M. Murphy to Greg Bass dated February 20, 2015, attaching the second set of quarterly reports provided by NYCHA to Plaintiffs.

4. Annexed as Exhibit 3 is a true and correct copy of a letter from Donna M. Murphy to Greg Bass dated March 31, 2015, attaching the third set of quarterly reports provided by NYCHA to Plaintiffs.

5. Annexed as Exhibit 4 is a true and correct copy of a report issued by the New York City Comptroller entitled "Audit Report on Efforts by the New York City Housing Authority to Maximize Federal Funding, Enhance Revenue, and Achieve Cost Savings." The report is offered to show that NYCHA failed to take advantage of $692 million in incentives and subsidies.

6. Annexed as Exhibit 5 is a true and correct copy of a letter from Ralph M. Iannuzzi, NYCHA Inspector General, sent on behalf of Mark J. Peters, Commissioner of the New York City Department of Investigation, to Shola Olatoye, Chair and Chief Executive Officer of NYCHA. The letter attaches the Mold/Mildew and Moisture Control Section from NYCHA's Standard Procedure Manual. It is offered to show the results of an independent review of NYCHA's mold abatement procedures and practices.

7. With the assistance of one of my associates, I have reviewed and analyzed each of the three quarterly reports. Each report contains a spreadsheet, apparently provided pursuant to 10(a) of the Order, which lists all work orders for that reporting period. The first quarterly

report, covering May through July 2014, includes 10,327 seven-day work orders and 193 fifteen-day work orders. The second quarterly report, covering August through October 2014, includes 13,389 seven-day work orders and 103 fifteen-day work orders. Finally, the third quarterly report, covering November 2014 through January 2015, includes 11,059 seven-day work orders and 111 fifteen-day work orders. Thus, seven-day work orders account for over 98% of all work orders reported by NYCHA.

8. The data presented in these reports is inconsistent and non-uniform. For example, in the first and third quarterly reports, NYCHA provided a column entitled "Immediate Parent" which enabled us to link parent work orders with their respective children for each repair request. The second quarterly report omitted this "Immediate Parent" information. The second and third quarterly reports also contain a column labeled "status date," but this column is omitted from the first quarterly report. The second quarterly report includes timestamps for the creation, close, and status dates, but the first and third quarterly reports omit these timestamps. In addition, only the first quarterly report contains information identifying the particular address and apartment for each complaint. NYCHA also sometimes included work orders labeled "cancelled" as part of its average service calculation, but sometimes it did not. In the third quarterly report, and only the third quarterly report, NYCHA rounded all service levels to whole days, while in the first and second quarterly reports, the data shows fractional days for all repairs.

9. Thus, to analyze this data, we had to normalize it. We excluded work orders which were not marked as "closed," as well as those entries that were labeled "created in error" or "duplicate" in all three reports. We also excluded those work orders that were marked with a code that indicated NYCHA never gained access to the apartment, such as "resident not home," "resident refused," "resident cancelled," "no adult," or "move out." Finally we excluded entries

that did not have a value in the "days to complete" column or otherwise could not be normalized within the data set.

10. After normalizing the data, we paired parent work orders with their respective child work orders, if any existed, into single repairs to calculate NYCHA's average service level. As mentioned above, we could only do this for the first and third quarterly reports. Once linked, we determined that there were 6,722 seven-day work orders in the first quarterly report and 7,086 seven-day work orders in the third quarterly report. If any work order in the parent-child group had a fifteen-day work order associated with it, we considered the overall combined work order as a fifteen-day repair to give NYCHA the benefit of the doubt. Because no "immediate parent" column was provided in the second quarterly report, we were unable to match parent and children work orders, and were therefore unable to calculate NYCHA's adjusted average service level for that quarter.

11. Once parents and children were paired, we calculated the adjusted service level by summing the total days for all work orders (i.e. the sum of the "Days to Complete" column) and then dividing that sum by the number of work orders (which was a lower number than that which NYCHA calculated, given that our calculation combined separate, matching parent and child work orders). Using this method, we determined that NYCHA's average service level in the first quarter report increased from 6.8 days, as reported by NYCHA, to 8.7 days per repair. In the third quarter, NYCHA's average service level increased from the reported 6.3 days to 9.5 days per repair. The service levels for the first and third quarters therefore exceed the seven-day average required by the Order. Based on the data provided by NYCHA, it appears NYCHA is in compliance with the order as to fifteen day repairs, although these work orders represent less than 2% of the reported work orders.

12. NYCHA's spreadsheets contain a significant number of work orders which have codes that indicate that no work was performed. These codes denote work orders where, for example, repairs were apparently complete on arrival; where the resident corrected the problem; where the resident failed to schedule the repair, moved out, or cancelled; or where the complaint was determined to be "unfounded." We have asked NYCHA for definitions of these codes, but NYCHA has not yet provided them. Based on our assumptions of the codes' meaning, we analyzed the data to determine NYCHA's average service level when such "no-work" work orders are excluded.

13. For this calculation, we included only those work orders where it indicated that NYCHA performed at least some work towards repairing the mold or excessive moisture: In the first quarterly report, 21.7% of the work orders are labeled "abated;" 7.8% are labeled "cleaned;" 0.3% are labeled "painted;" 5.9% are labeled "removed;" and 3.5% are labeled repaired, replaced, or installed. Thus, 39.2% of the individual work orders were labeled with a remedy code that indicates some work was actually performed. More than 60.8% of all work orders in the first quarterly report indicate that no work was done towards repairing the mold or excessive moisture: 14.4% of these are labeled "null," 13.2% are labeled "unfounded," and 33.2% are labeled "verified."

14. In the second quarterly report, 25.0% of the work orders are labeled "abated;" 7.8% are labeled "cleaned;" 0.1% are labeled "painted;" 5.3% are labeled "removed;" and 2.1% are labeled repaired, replaced, or installed. Thus, 40.3% of the individual work orders were labeled with a remedy code that indicates some work was actually performed. 59.7% of all work orders in the second quarter indicate that no work was performed: 15.4% of these are labeled "null," 9.2% are labeled "unfounded," and 35.1% are labeled "verified."

5

15. In the third quarterly report, 30.0% of the work orders are labeled "abated;" 8.5% are labeled "cleaned;" 0.1% are labeled "painted;" 5.2% are labeled "removed;" and 2.0% are labeled repaired, replaced, or installed. Thus, 45.9% of the individual work orders were labeled with a remedy code that indicates some work was actually performed. 54.1% of all work orders in the second quarter indicate that no work was performed: 11.4% of these are labeled "null," 1.4% are labeled "unfounded," and 41.4% are labeled "verified."

16. In total, across all three quarters, only 41.7% of the work orders indicate that work was done, and 58.3% indicate that no work was done.

17. When we combine parent and child work orders for the first and third quarters and exclude work orders where no work was performed, the average service level per repair increased to 9.4 days in the first quarter and 10.9 in the third quarter. Again, as noted above, we were unable to perform this calculation for the second quarter because NYCHA has not provided us with the "Immediate Parent" column in the second quarterly report.

18. In addition, we looked at the number of seven-day work orders that were closed in more than fifteen days. Combining parent and child work orders, there were 1,102 work orders in the first quarter and 1,318 work orders in the third quarter that were closed in more than fifteen days. We do not have the ability to link parent and child work orders for the second quarter, but if we make the conservative assumption that at least 1,000 work orders took more than fifteen days in the second quarter as well, it appears that the total number of work orders closed in more than fifteen days exceeds 3,000. In some cases it took more than ninety days for NYCHA to close a work order. Similarly, we determined the percentages of repairs that are closed within seven days, fifteen days, and above fifteen days. In the first quarter, NYCHA closed 63.4% of its repairs within seven days, 20.2% within fifteen days and 16.4% were closed

in more than fifteen days. In the third quarter, 54.6% of repairs were closed within seven days, 26.8% were closed within fifteen days and 18.6% were closed in more than fifteen days.

19. In each report, NYCHA also reported its average reoccurrence rate. In the first quarter NYCHA reported that mold reoccurred in 34% of the homes with which NYCHA was able to make follow-up contact. In the second quarter, the report on closed work order closure contacts states that mold recurred in 41% of the homes contacted. For the third quarter, the report on closed work order closure contacts states that tenants reported the mold reoccurred in 27% of the homes contacted. This works out to an average of 34% for the three quarterly periods.

20. The reports provided by NYCHA on February 20, 2015 included a report pursuant to Paragraph 10(c) of the Order, which related to the first quarter, which ended July 31, 2014. NYCHA also provided the reasonable accommodation-related information required by Paragraph 11, although it was more than 100 days late and redacted the names of the tenants, thereby making it impossible for Plaintiffs to follow up with them. With regard to the additional reporting requirements in the Order, NYCHA has not provided a report pursuant to Paragraph 10(b) of the Order, which was due on January 1, 2015.

21. Between November 13, 2014, and February 12, 2015, a team of attorneys and law clerks from Hogan Lovells working under my supervision inspected thirty-four NYCHA apartments located in Manhattan and the Bronx, along with community organizers from the non-profit organizations Little Sisters of the Assumption Family Health Services and Manhattan Together. I personally participated in some of the inspections. During the inspections, members of the Hogan Lovells team interviewed the tenants regarding the mold or excessive moisture in their apartments. The Hogan Lovells attorneys and law clerks recorded information (including thoughts and mental impressions) by hand during the interviews, and subsequently typed their

notes and electronically stored this information. The Hogan Lovells attorneys also compiled this information (excluding thoughts and mental impressions) into an Excel spreadsheet. The spreadsheet, attached to this declaration as Exhibit 6, summarizes the frequency of issues relating to mold and excessive moisture observed by the Hogan Lovells attorneys in the thirty-four apartments.

22. Of the thirty-four NYCHA apartments inspected by the Hogan Lovells team in November 2014, thirty had mold or visible excessive moisture damage at the time of the visit. Out of the remaining four apartments, NYCHA had recently performed some maintenance work in three apartments to remediate the issues of mold and excessive moisture, and at the time of the visit, no mold or excessive moisture was readily apparent. In one case, though NYCHA had recently performed remediation of the mold, the mold reappeared by the time of the apartment inspection by Hogan Lovells.

23. Tenants in twenty-two of the apartments visited reported to the Hogan Lovells attorneys that mold and/or excessive moisture damage had been a persistent issue for more than three years. Tenants in seven apartments reported that mold or excessive moisture damage in their apartments had been a persistent issue for one to three years. Tenants in three apartments reported that they had dealt with mold or excessive moisture issues in their apartments for six to twelve months, and tenants in two apartments reported mold or excessive moisture problems that began in the last six months.

24. Tenants in all thirty-four of the apartments visited reported mold or excessive moisture currently or recently in the bathrooms of their apartment, including the four in which NYCHA had recently performed some maintenance work. Often, tenants reported mold or excessive moisture in the portions of their hallways adjacent to the bathrooms as well.

25. Tenants reported significant damage to the walls and ceilings in their apartments: Cracking walls or ceilings were reported in twenty-five apartments; bubbling of the paint or drywall was reported in twenty-one apartments; staining of the walls or celling from mold was reported in twenty-five apartments; sweating of the walls was reported in twenty apartments; crumbling walls were reported in seventeen apartments; and peeling paint was reported in twenty-one apartments.

26. Of the apartments visited, the Hogan Lovells attorneys saw only three that had windows in the bathroom. Of the thirty-one apartments that had a vent—but no window—in the bathroom, the Hogan Lovells attorneys determined that seventeen had vents that did not function properly. In twenty-eight apartments, the Hogan Lovells attorneys noticed that the bathroom vents were dirty or clogged.

27. Tenants in thirty-one of the apartments visited stated that they had reported the mold or excessive moisture condition to NYCHA. Although tenants in twenty-four of the apartments reported that NYCHA had contacted them in some way in response to their complaint, only four reported that NYCHA had recently remediated the mold or excessive moisture issues. No tenant reported that NYCHA enclosed the work area or used dust suppression methods while making mold repairs.


April 22, 2015                                             /s/ *Steven Edwards*
Date                                                       Steven M. Edwards