```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x
MARIBEL BAEZ; FELIPA CRUZ; RD., ON BEHALF OF          :
HER MINOR CHILD, A.S.; on their own behalf and        :
on behalf of all others similarly situated;           :
UPPER MANHATTAN TOGETHER, INC.; and                   :
SOUTH BRONX CHURCHES SPONSORING                       :
COMMITTEE, INC.,                                      :
                                                      :
                        Plaintiffs,                   :
                                                      :   13 Civ. 8916 (WHP)
             vs.                                      :
                                                      :
NEW YORK CITY HOUSING AUTHORITY,                      :
                                                      :
                        Defendant.                    :
                                                      :
---------------------------------------------------------------------x
```

## DECLARATION OF RAY LOPEZ IN SUPPORT OF
## PLAINTIFFS' MOTION TO ENFORCE STIPULATION AND ORDER

I, RAY LOPEZ, declare under penalty of perjury that the following is true and correct:

1. I am the Director of the Environmental Health and Family Asthma Program at the Little Sisters of the Assumption Family Health Service, a non-profit organization serving New York City residents, particularly those in East Harlem. The Environmental Health and Family Asthma Program works specifically with tenants who have asthma and other respiratory health problems. I submit this declaration in support of Plaintiff's Motion to Enforce the Stipulation and Order entered on April 17, 2014 ("Order").

### The Work of Little Sisters of the Assumption Family Health Service

2. The Little Sisters of the Assumption is a Roman Catholic religious organization founded in France in 1866. The mission of the organization is to serve and care for the poor and sick in their homes. In 1891, the Little Sisters of the Assumption moved to the Lower East Side

1

in New York to continue its mission, and, in 1958, the Little Sisters relocated to East Harlem. In 1970, Little Sisters of the Assumption Family Health Service ("LSA") was established as a non-profit organization and began incorporating a model of engaging the community while assisting impoverished members of that same community with their health and housing needs.

3. In the 1990s, LSA and other organizations working in public health became increasingly aware of the high incidence of asthma and related respiratory illnesses among the vulnerable populations in New York City with whom they worked. LSA traced the cause of many of these problems to the housing conditions of their clients, many of whom lived in low-income and public housing where they were exposed to cockroach infestation, mold, and excessive moisture.

4. In 1997, LSA was awarded a grant by Mt. Sinai Hospital to create a program that would identify the causes of respiratory illness in people's homes and work with those affected to improve their living situations. As a result of the grant, LSA created the Environmental Health and Family Asthma Program, which included a full-time community health worker position to interact directly with tenants suffering from respiratory problems, help them identify the factors in their homes contributing to their health issues, and work with the tenants to fix the hazardous conditions. The community health worker's responsibilities include teaching the tenants how to identify mold and prevent future mold growth. Many of the tenants seen by the community health worker were referred to LSA by hospitals, such as Mt. Sinai, where the tenants had received emergency care for their respiratory health issues.

**My Work for LSA in the Environmental Health and Family Asthma Program**

5.      In July 2001, I was hired on a part-time basis to serve as the community health worker for LSA. I took on the position full-time on September 10, 2001. Not long after I was hired, I began training with Bill Sothern, a certified industrial hygienist and the founder of Microecologies, a private firm that inspects New York area homes and businesses in order to identify and remove environmental hazards including mold, smoke, lead, and chemical vapors. In the early days of my employment, I also shadowed a number of Microecologies employees as they conducted inspections of homes and businesses. During these inspections, I was trained to identify mold and excessive moisture, including through the use of a moisture meter that reads moisture levels inside of walls. Separately, in October and November 2001, I received comprehensive training on asthma by the New York City Department of Health ("DOH"). The training included an education on the pathophysiology of asthma, asthma triggers, medications, alternative therapies, asthma control, and available resources for individuals with asthma. In the asthma triggers section of the training, I learned the effects of mold and excessive moisture on individuals with asthma. I was then responsible for training other community workers at LSA using the knowledge I had gained working alongside the Microecologies team and through the DOH training.

6.      As part of my work in the Environmental Health and Family Asthma Program, and through collaboration with others at LSA, I developed a program for assisting tenants who suffer from asthma. Under this model, when a tenant is referred to the organization, I or another community health worker from my team contact the tenant and his or her family and collect more information about the individual's asthma conditions. An LSA team member will then visit the home to identify possible environmental causes of the respiratory illness. Once any

problematic environmental factors are identified, a team of LSA employees begins work in the apartment to remediate the asthma-triggering conditions, in partnership with and alongside the members of the affected family.

7. When the program was first put into effect, we were working with about thirty different families. Since the program's inception, we have worked with over 2000 families affected by asthma. A little more than fifty percent of our clients have been residents in New York public housing.

8. In August 2004, I was promoted to program manager and by June 2008, I was promoted again to my current position at LSA, Director of the Environmental Health and Family Asthma Program. As Director, I am responsible for supervising other community workers. This entails discussing specific tenant issues with the workers before they visit with tenants; debriefing with the workers and reviewing their notes after the visits; and conducting weekly meetings to track goals and progress. I still frequently conduct tenant visits myself, and I shadow my workers periodically to provide feedback on their knowledge and communications with clients.

### LSA's Collaboration with Manhattan Together and South Bronx Churches

9. In 2001, the Metro Industrial Areas Foundation ("IAF"), a large network of local faith- and community-based organizations that conduct tenant organizing around housing issues, reached out to me to discuss potential collaboration. Two such IAF organizations were Upper Manhattan Together, Inc. ("Manhattan Together" or "MT") and South Bronx Churches Sponsoring Committee, Inc. ("SBC"), with which LSA developed a close working relationship as a result of the collaboration. MT and SBC began to act as important sources of referrals for clients who suffered from asthma and were in need of our assistance. Moreover, IAF, MT, and

4

SBC had developed contacts with NYCHA management, which were helpful for LSA in advocating on behalf of tenants affected by mold and related conditions.

10.    As a result of the collaboration, LSA developed a system in the fall of 2001 in which LSA created lists of NYCHA apartments requiring immediate attention to mold and excessive moisture issues by NYCHA management.  LSA would then send the lists to the management contacts developed by MT, SBC, and IAF.  During the early years of working with NYCHA in this way, NYCHA management responded to the lists and would organize quarterly meetings among NYCHA borough directors, NYCHA staff, LSA, MT, SBC, and IAF.  Tenants were also invited to the meetings to discuss the specific issues they had in their homes.  The meetings were successful in that borough directors would then refer the mold and excessive moisture concerns to the respective development managers, who would then work with building managers in addressing the mold issues.  Over the years, however, as borough directors left NYCHA and were replaced, we found that our meetings with NYCHA management became less effective; every time a new director started, an introduction to the issues would begin anew.  NYCHA management stopped responding to our lists of tenant repairs in a timely fashion, and delay became the norm.  Our clients in NYCHA housing experienced increased difficulty in having their mold, excessive moisture, and other issues addressed by NYCHA.

11.    By late 2011, it became clear that working to improve tenant conditions through communications with the borough directors was an ineffective method of securing timely remediation.  Contacting local NYCHA personnel directly was not a viable option either.  It sometimes took multiple attempts and several hours to reach local NYCHA development contacts, such as housing assistants and managers, to inform them of the mold issues, because our calls were often transferred from one office to another or routinely disconnected.  When we

were finally able to secure an appointment for repairs, NYCHA workers would often miss the scheduled appointment or come at a different time. If repairs were actually completed, they were frequently subpar, involving only superficial work like scraping and painting, and did not address the underlying source of moisture. In many tenants' homes, the mold often returned in a matter of weeks.

### The *Baez* Class Action

12. After years of dealing with these difficulties, I began brainstorming with organizers and leaders at MT, SBC, and other IAF-affiliated organizations on what actions could be taken to address our clients' ongoing mold and excessive moisture issues. We were referred to the Natural Resources Defense Council ("NRDC"), and then the National Center for Law and Economic Justice ("NCLEJ"), two organizations that had prior experience with bringing federal lawsuits against public entities on behalf of those suffering from ailments such as asthma. After consulting with these groups, we collectively decided to bring a lawsuit on behalf of our clients, and others in similar positions, charging NYCHA with violations of the Americans with Disabilities Act, the Rehabilitation Act of 1973, the Fair Housing Amendments Act of 1988, and New York State Human Rights Law, due to NYCHA's inability to address housing conditions that negatively affected the health of those tenants who suffer from asthma.

13. In response to our threatened lawsuit, the Mayor's office called for a series of meetings to be held among NYCHA, NRDC, NCLEJ, and various leaders of community groups, including me, in an attempt to resolve the issues without litigation. These meetings were convened periodically over the second half of 2013. During the meetings, the NRDC and NCLEJ attorneys and the community leaders negotiated two principal subjects with NYCHA: (1) the revision of NYCHA's mold and moisture remediation policies, including the time within

which NYCHA would be required to respond to mold and excessive moisture complaints; and (2) a revised process through which tenants could request reasonable accommodation for their respiratory health issues. Under this second category, the NRDC and NCLEJ attorneys and the community group leaders negotiated for policies that required NYCHA to train its staff on the new reasonable accommodation procedures and to revise tenant forms to reflect these new procedures.

14. My specific suggested revisions to NYCHA's mold and moisture remediation policies included clarifying which types of mold and excessive moisture issues could be remedied by NYCHA maintenance staff and which should be referred to skilled trades and technical services for more extensive work. Additionally, I drafted language that instructed NYCHA workers on the common signs and indicators of excessive moisture and mold. In these edits, I broadened the old policy language, which emphasized that workers only look for visible mold on tenants' walls; under my revisions, workers would also have to look for damage such as blistering of paint, cracks, and crumbling of plaster.

15. The negotiations culminated in an agreement between the parties that a suit would still be filed on behalf of three named Plaintiffs who were NYCHA tenants that suffered from asthma, and others similarly situated. And then, as agreed, shortly after the filing of the lawsuit, a proposed settlement agreed to by the parties would be filed. The settlement agreement laid out NYCHA's responsibilities regarding mold and moisture remediation going forward. This settlement was ordered by Judge Pauley in April 2014.

16. It was my understanding, at the time the settlement was reached, that the settlement required NYCHA to begin implementing necessary changes immediately. The first change involved updating the NYCHA policy manual on mold abatement with information on how to first identify and fix the root causes of mold as well as how to subsequently and effectively remediate mold conditions. Secondly, NYCHA was required to train NYCHA maintenance workers on the new policy manual procedures.

17. A third outcome of the settlement, as I understood it, was that NYCHA workers were now required to complete mold and excessive moisture repairs within a specific timeline, depending on the nature of the repair. If the underlying mold issues required simple repairs, such as unclogging a vent or fixing a leaky sink, and could be completed in a single visit by a maintenance worker, the time for completing the work would be seven days on average. For mold issues requiring more complex repairs, those necessitating multiple visits by different tradesmen, the time for completion of all work would be fifteen days on average. I understood that, for this second category, the need for several visits might necessitate the opening of parent and child work orders. Even so, it was always my understanding that, regardless of the number of work orders, all complex work would be completed within an average of fifteen days.

18. We did not understand the settlement agreement to mean that NYCHA could be in compliance so long as each individual work order, whether parent or child, was completed within the seven- or fifteen-day deadline. Such a reading of the settlement agreement would mean that, depending on how many trades a mold repair required, completion of the work could stretch out for weeks, or even months—all the while, tenants would be exposed to the harmful moisture and mold conditions. Had we thought NYCHA would interpret the settlement in this way, neither I nor any of the other community leaders would have agreed to it. Being subjected

to conditions of mold and excessive moisture for a period of seven- or fifteen-days is bad enough for the tenants.

### LSA's Interactions with NYCHA Following the *Baez* Class Action Settlement

19. Since April 2014, when the settlement was finalized, LSA has maintained regular contact with forty-three NYCHA tenants to monitor whether NYCHA has complied with the terms of the settlement agreement in timely remediating issues of mold and excessive moisture. Attached to this declaration as Exhibit 1 is a list of the forty-three NYCHA tenants whom LSA has monitored, excerpted from a larger list of LSA clients; full names, apartment numbers, and work order ticket numbers are omitted from this list for confidentiality purposes. In speaking with these tenants and visiting their homes regularly, LSA workers determined that, since the settlement agreement was entered, NYCHA effectively remediated mold and excessive moisture in only eight apartments. In another fifteen, we found that the mold repairs were incomplete, and in the remaining twenty, the mold and excessive moisture issues had not been addressed by NYCHA at all. In the following paragraphs, I provide examples of the tenant interactions I and other LSA community health workers have had; these interactions support my observations with respect to the trends in NYCHA's response to mold and moisture problems subsequent to April 2014.

20. One of the tenants with whom I have remained in contact is R.D., a named Plaintiff in the class action, whose minor child has asthma. The bathroom in R.D.'s apartment has severe mold and excessive moisture issues that were always only superficially addressed by NYCHA. In fact, R.D. is at the center of an NBC Dateline Investigative Report entitled "Breathless," available online at http://www.nbcnews.com/video/dateline/53993240, that highlights the magnitude of mold issues in R.D.'s home and the related seriousness of R.D.'s

daughter's asthma. Following the Dateline report, and before the Order was entered by the Court, NYCHA actually broke down R.D.'s bathroom walls, repaired a leak, and re-plastered her bathroom. NYCHA's repairs were incompletely made, however, because R.D. informed me on May 2, 2014 that black mold had returned to her bathroom ceiling, and that NYCHA had taken no steps to further remediate the mold.

21.     By June 3, 2014, NYCHA had still done nothing more than send a housing manager to look at the mold in R.D.'s bathroom. R.D. then reported to me that NYCHA staff returned on June 18, 2014 to look at her bathroom again, at which time they determined that they would clean the mold, paint, clear the vent, and provide a portable vent. However, because the NYCHA workers saw no "visible leak," they did nothing further to identify the underlying cause of the mold. On July 19, 2014, NYCHA staff painted the bathroom with what they described as "mold-proof" paint and gave R.D. a bottle of "Mold Armor" to spray on the mold if it returned, instructing her that she could purchase additional Mold Armor at Home Depot if needed. They again insisted that there was no leak.

22.     Because painting over the mold without identifying its underlying cause is not a sufficient remedy, Michael Stanley, Lead Organizer of MT, emailed Mr. Carlos Laboy-Diaz, who was then the Executive Vice President of Operations at NYCHA, on July 25, 2014 and attached a report that I had drafted detailing NYCHA's July 19, 2014 visit to R.D.'s apartment; I was copied on the email. In this email, Michael Stanley alerted Mr. Laboy-Diaz to the fact that no leaks had been fixed in R.D.'s apartment. As predicted, the mold returned to R.D.'s home shortly thereafter. On March 9, 2015, R.D. reported that the mold had reappeared on the ceiling in her bathroom, just as before, and that her bathroom faucet continued to leak. R.D. also reported that her kitchen was infested with roaches and that the roaches trigger her daughter's

asthma. Michael Stanley emailed Melania Allen, the Property Management Director for Bronx County at NYCHA, and Brian Clarke, Senior Vice President for Operations at NYCHA, on March 13, 2015, copying me on the email, to report that the mold had reoccurred in R.D.'s home and that R.D.'s daughter had been experiencing even more serious breathing problems than before.

23. Many other clients of ours repeatedly face similar outcomes to those of R.D. In conversations with tenants over the past year, it has become clear that many NYCHA maintenance workers have not been properly trained in the agency's new mold and moisture removal policies. We have found that it is common for NYCHA to respond to tenant complaints of mold by painting over or cleaning visible mold without attempting to determine the underlying source of the mold. After these quick fixes are performed, NYCHA considers the problem resolved and will not return to the apartment, even when our clients inform them that the mold is recurring.

24. P.G. is another LSA client with similar issues. P.G. has been an LSA client since December 2011, when she lived in NYCHA housing in East Harlem; her children were enrolled in our asthma program. In May 2013, P.G. moved to NYCHA housing on the Lower East Side, where she currently lives. I have kept in touch with P.G. since then, and I visited and inspected her apartment on the Lower East Side on June 18, 2013. As P.G. informed me, P.G. called NYCHA repeatedly throughout 2013 and 2014 to report that mold was growing along her bathroom ceiling. After repeated calls, NYCHA workers finally came to the apartment in the summer of 2014, but all they did for the mold in the bathroom was wipe down the walls and ceiling, and then paint over them. By October 2014, mold reappeared around the caulking area of the bathtub and in spots on the ceiling. Within several months, the mold had grown across the

ceiling in the bathroom and was now surrounding the pipes that go from the ceiling to the wall. P.G. has made repeated calls to NYCHA, asking them to come and address the mold problem.

25. In a recent conversation with P.G., she told me that on or about March 2, 2015, a new supervisor of NYCHA maintenance came unannounced to P.G.'s apartment to verify the mold conditions in her apartment. P.G. showed the supervisor the brown mold spots on the bathroom ceiling and windowsill. The NYCHA supervisor did not do any work during that visit, but within a few days, a NYCHA worker came to the apartment and cleaned the mold on the ceiling with a rag and a strong-smelling cleaning solution. After the worker wiped down the mold, he left the cleaning solution with P.G. and told her to use it if the mold later returned. When I spoke with P.G. about a month after this visit, the mold had already reappeared on the bathroom ceiling.

26. Unfortunately, the experiences of R.D. and P.G. are not unique among NYCHA tenants. At this point, a year after the consent decree was entered, the community leaders from MT and SBC and I believe that NYCHA has failed to fulfill its responsibilities under the settlement agreement. NYCHA has failed to train its workers on how to properly remediate the underlying cause of mold and excessive moisture. Moreover, NYCHA is not completing the necessary repairs within the timelines required by the settlement agreement.

27. Because of our concerns about NYCHA's implementation of settlement agreement terms beginning in the summer of 2014, leaders from MT and SBC and I reached out to Mr. Laboy-Diaz and several other NYCHA executives to see if they would be interested in meeting with us and hearing from our clients. On July 29, 2014, Mr. Laboy-Diaz came to LSA's office in East Harlem to speak with a number of our clients about the status of their home repairs. At this meeting, Mr. Laboy-Diaz assured us that NYCHA workers had all been properly

trained in the new policies regarding the remediation of mold and moisture, and that the workers would be addressing the underlying causes of the mold when they visited the tenants' homes.

28.     Two days later, on July 31, 2014, I visited the home of Mrs. Felipa Cruz, a named Plaintiff in the class action, and her husband Mr. Oscar Cruz with Mr. Charles Pawson, a Director at NYCHA.  During this visit, one maintenance worker, two plasterers, and a team from NYCHA's Tech Services accompanied Mr. Pawson and me to conduct supervised repairs.  The NYCHA team began working in the bathroom right away.  A NYCHA technical services worker inspected the bathroom and determined that the underlying source of the water damage in the hallway was a leak behind the bathroom wall.  A NYCHA-contracted plasterer then properly opened the wall, and the technical services worker identified the leak as originating from the neighbor's bathroom.  Then, that same day, a NYCHA worker fixed the leak.  By the end of the next day, the plasterer closed the wall and then the wall was painted.  Within the course of a few days, the cause of the mold had been identified, remediated, and the wall repaired.  After the leak in the bathroom had been addressed, the NYCHA workers moved on to addressing issues in the kitchen and hallway.  From this supervised visit, it became readily apparent to me that NYCHA had the capability to make timely repairs if they were being supervised.  That NYCHA workers could complete all of this work within such a short amount of time flies in the face of NYCHA's claim that work by different tradesmen requires separate, spaced-out visits to an apartment.

29.     On August 15, 2014, I visited the homes of three more of our clients in the Bronx, including that of named Plaintiff Maribel Baez.  At Ms. Baez's apartment, I met Mr. Tom Basic, who works at NYCHA technical services and specializes in finding leaks.  Mr. Basic opened up the ceiling in Ms. Baez's bathroom and located a source of the leak.  He promised that a NYCHA repair worker would replace the pipe in the wall later the same day and also check the

13

bathrooms in the apartments above Ms. Baez's for other possible moisture sources.  Indeed, the pipe was replaced that day, and then on the following Monday, a NYCHA worker re-plastered the wall where it had been opened.  Based on my observations that day, I believe that NYCHA undertook the proper steps to effectively abate the mold and excessive moisture issues in Ms. Baez's apartment.  Indeed, when I checked-in with Ms. Baez recently, she informed me that the mold had not recurred in her bathroom.

30. Then, on August 25, 2014, Mr. Laboy-Diaz, Mr. Pawson, and others from NYCHA accompanied me and several of my co-workers on the tenant home inspections in East Harlem.  Sheila Pinckney, a Manhattan Borough Director, also attended the tenant inspections with us.  We began at the Wagner Houses, where Mr. Laboy-Diaz made a point to confirm with his repair team that NYCHA protocols were being followed in making repairs.

31. After the Wagner Houses, we then moved on to the Jefferson Houses.  There, we visited the home of a tenant named R.R.  R.R. had water damage and mold in his bedroom.  There was also an awful odor in the lobby of the building, possibly resulting from sewage back-up in the basement.  Mr. Pawson said that he believed the mold was caused by an issue on the roof, and he was going to look into unclogging a drain on the roof.  When I checked-in with R.R. in November 2014 to ask if the issue had been resolved, he said that the mold issues had been taken care of on September 22 and 23, 2014, but that there was still a bad smell originating from the basement.

32. A couple of weeks after our visit to the Wagner and Jefferson Houses, on September 4, 2014, Mr. Laboy-Diaz accompanied LSA workers, Michael Stanley, and Melania Allen to additional tenant inspections.  Mr. Laboy-Diaz brought members of his technical services team to the September 4, 2014 tenant apartment inspections.  When LSA workers began

using moisture detectors to determine the level of moisture in the walls of certain apartments, the NYCHA repair team began questioning the use of the meters, proclaiming that the meters were ineffective.  However, since my training on moisture meters with Bill Sothern of Microecologies, LSA has consistently used moisture meters to identify moisture within the walls, finding them to be the most accurate tool aside from actually opening the walls.  Many of the apartments visited with Mr. Laboy-Diaz that day were in bad shape and overrun with mold, and it was clear that maintenance workers had not been doing their jobs in remediating mold and moisture.  According to my co-workers, Mr. Laboy-Diaz became visibly frustrated that the correct procedures were not being followed.  Later, Mr. Laboy-Diaz assured LSA that, moving forward, NYCHA workers would undertake the correct procedures in addressing mold and moisture problems in tenants' homes, including remediating the underlying causes.

33.   Despite what seemed like positive developments during these visits, in the fall of 2014, I learned from Michael Stanley that Mr. Laboy-Diaz may no longer work at NYCHA.  When I investigated online, I discovered a new NYCHA organizational chart, in which Mr. Laboy-Diaz's name no longer appeared.  Attached as Exhibit 2 to this declaration is an organizational chart from August 2014 that shows Mr. Laboy-Diaz's name as well as one from October 2014 where his name is absent.  Though Michael Stanley and I tried to continue communication with other NYCHA leaders we had previously worked with, such as Mr. Pawson and Mr. Clarke, these individuals were not very responsive to our emails.  The subsequent months have revealed that NYCHA's practices after the settlement agreement was reached are not very different from those before it, and that the proper procedures are followed only when NYCHA executives or community workers like me are present.  Since LSA's visits with Mr. Laboy-Diaz, we have heard from additional tenants that NYCHA still fails in making effective

and timely repairs. Meanwhile, our clients continue to face recurring issues of mold and excessive moisture and live in conditions that exacerbate their asthma.

Dated this 21 day of April, 2015.

By: _____
Ray Lopez