UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
MARIBEL BAEZ; FELIPA CRUZ; RD., ON BEHALF OF :
HER MINOR CHILD, A.S.; on their own behalf and :
on behalf of all others similarly situated; :
UPPER MANHATTAN TOGETHER, INC.; and :
SOUTH BRONX CHURCHES SPONSORING :
COMMITTEE, INC., :
 :
                    Plaintiffs, :
 : 13 Civ. 8916 (WHP)
  vs. :
 :
NEW YORK CITY HOUSING AUTHORITY, :
 :
                    Defendant. :
 :
------------------------------------------------------------------------x

## DECLARATION OF MICHAEL STANLEY IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE STIPULATION AND ORDER

I, MICHAEL STANLEY, declare under penalty of perjury that the following is true and correct:

1. I am the lead organizer for Upper Manhattan Together, Inc. ("Manhattan Together") and the South Bronx Churches Sponsoring Committee, Inc. ("SBC"), non-profit organizations that have, among other things, helped tenants of New York City Housing Authority ("NYCHA") advocate for their rights. I submit this Declaration in support of the Plaintiffs' Motion to Enforce the Stipulation and Order. This Court approved the Stipulation and Order of Settlement ("Order") on April 17, 2014.

2. Manhattan Together is a non-partisan nonprofit organization comprised of diverse member institutions, including religious congregations of many faiths and community

1

organizations, which organize individuals in the New York area to achieve important community improvements relating to health and wellbeing. For the past 15 years, Manhattan Together and its predecessor organizations have helped public housing tenants advocate to advance and protect their right to safe, healthy, and livable housing.

3. SBC was founded in 1987 by congregations of different faith traditions to effect social change in the South Bronx. Like Manhattan Together, SBC has a long history of helping public housing tenants in pushing for critical repairs to their apartments. Manhattan Together and SBC are part of a larger network of organizations called Metro Industrial Areas Foundation ("IAF").

4. I began my career in community organizing in 1996, when I started volunteering for IAF's affiliates in Baltimore and Philadelphia. From 1996 through 2001, I worked on employment issues, housing issues, and worker organizing. I became a professional community organizer for IAF in February 2003. Between 2003 and June 2013, I worked with IAF's affiliates in Long Island, Brooklyn, and Queens, on issues of public safety, flooding, public health, and housing, among others.

### My Work with Manhattan Together and SBC as a Community Organizer for NYCHA Tenants Suffering from Mold and Moisture Problems

5. On July 1, 2013, I began working for Manhattan Together and SBC to organize public housing tenants in New York City. As part of our organizing efforts, volunteer leaders from Manhattan Together and SBC and I have spoken with hundreds of tenants who have suffered the negative health effects of mold and excessive moisture in their NYCHA apartments and have helped these tenants push for repairs in their apartments. From July 2013 through the









organizations, which organize individuals in the New York area to achieve important community improvements relating to health and wellbeing. For the past 15 years, Manhattan Together and its predecessor organizations have helped public housing tenants advocate to advance and protect their right to safe, healthy, and livable housing.

3. SBC was founded in 1987 by congregations of different faith traditions to effect social change in the South Bronx. Like Manhattan Together, SBC has a long history of helping public housing tenants in pushing for critical repairs to their apartments. Manhattan Together and SBC are part of a larger network of organizations called Metro Industrial Areas Foundation ("IAF").

4. I began my career in community organizing in 1996, when I started volunteering for IAF's affiliates in Baltimore and Philadelphia. From 1996 through 2001, I worked on employment issues, housing issues, and worker organizing. I became a professional community organizer for IAF in February 2003. Between 2003 and June 2013, I worked with IAF's affiliates in Long Island, Brooklyn, and Queens, on issues of public safety, flooding, public health, and housing, among others.

### My Work with Manhattan Together and SBC as a Community Organizer for NYCHA Tenants Suffering from Mold and Moisture Problems

5. On July 1, 2013, I began working for Manhattan Together and SBC to organize public housing tenants in New York City. As part of our organizing efforts, volunteer leaders from Manhattan Together and SBC and I have spoken with hundreds of tenants who have suffered the negative health effects of mold and excessive moisture in their NYCHA apartments and have helped these tenants push for repairs in their apartments. From July 2013 through the

present day, I have worked closely with Ray Lopez, Director of the Environmental Health Program of the Little Sisters of the Assumption Family Health Service ("LSA"), a member organization of Manhattan Together, to monitor and document the mold and moisture problems in the apartments of numerous tenants, including the apartments of the named individual Plaintiffs in the above-captioned case.

6. Since July 2013, I, along with volunteers for Manhattan Together and SBC, have visited hundreds of apartments of NYCHA tenants. Attached as Exhibits 1 and 2 are spreadsheets of the sort that we maintain in the regular course of business to document conditions in the tenants' apartments based both on these visits as well as information communicated to us by the tenants. For confidentiality purposes, in all of the Exhibits to this declaration, the names of the tenants are replaced by initials, and the apartment numbers, work order ticket numbers, and tenant phone numbers are removed, but we have shared the spreadsheets which are attached as Exhibit 1 and 2 in their original, un-redacted form with NYCHA in the course of our advocacy efforts for these tenants.

7. To compile the information in the spreadsheets, I, the volunteers for Manhattan Together and SBC, and LSA staff frequently visit the apartments of tenants, speak with them about their experiences, and take photographs of aspects of the apartments that need repair. As soon as possible after these conversations, I will put the information I have received into a spreadsheet such as those attached as Exhibits 1 and 2 to this declaration. The volunteers and I often update the spreadsheets with information that is received when we follow up with the residents by in-person visits, phone or email. All of the developments with the tenants' apartments regarding the work that is done to address mold, moisture or any other issue is

recorded in the spreadsheets regularly as we speak with the tenants. We also routinely track in these spreadsheets any communications we have had with NYCHA staff regarding the problems in each tenant's apartment. As an employee of Manhattan Together and SBC, one of my job responsibilities is to ensure that these spreadsheets are routinely updated.

8.      Through these tenant interactions, I have observed significant mold and excessive moisture problems, such as cracking, peeling and bubbling paint; buckling, crumbling, bulging, and sweating walls; and leakages. I have witnessed flooding in one tenant's apartment, and additional tenants have reported instances of flooding in their apartments to me when I visited their apartments or in conversations on the phone. I also have seen bathroom ceilings that are largely covered with black mold and, in the worst instance I can recall, I visited an apartment on August 29, 2014 with a bathroom with a broken wall through which flies and the smell of raw sewage were entering the apartment. In that instance, the tenant and the leaders and staff of Manhattan Together and SBC had been reporting this problem to NYCHA since the fall of 2013, but the problem was remediated only after we brought Mr. Carlos Laboy-Diaz, NYCHA's former Executive Vice President of Operations, to visit the apartment personally in September 2014. In addition, in many apartments the ventilation system in the bathroom does not function, which I confirmed by holding a piece of tissue paper up to the vent to see whether it is pulling air strongly enough to hold the paper in place. This is a test to determine whether the bathroom vent is working that was shown to me by Ray Lopez.

9.      Having visited scores of apartments and spoken with well over 100 NYCHA tenants since July 2013, I have observed several clear patterns in NYCHA's responses to mold and moisture problems, and in the vast majority of cases these patterns have continued even after

entry of the Order. Through my experience in speaking with and advocating on behalf of tenants, I know that NYCHA employees deny the presence of mold far too often. When NYCHA employees admit that mold is present, they usually blame the occurrence of mold on the tenant having taken hot showers with the door closed, refuse to investigate the underlying source of moisture resulting in mold, or insist that painting over the mold or wiping it with a cleaning solution is sufficient abatement. NYCHA employees also fail to show up for scheduled appointments for repairs, or show up but do not knock on the tenant's door and then leave a note on the door suggesting the tenant was not home at the time they arrived. At other times, NYCHA employees come to inspect the mold but do nothing to fix it. Even where NYCHA does attempt to fix the mold problem, in many instances the tenants report that the mold returns within a few weeks or months. Set forth below are a number of examples that support my observations with respect to the patterns in NYCHA's responses to mold and moisture problems.

**Manhattan Together and SBC's Interactions with NYCHA Following the Class Action Settlement**

10. After the Court entered the Order on April 17, 2014, Manhattan Together, SBC, and LSA worked from late May 2014 through October 2014 to cultivate a relationship with Mr. Laboy-Diaz, NYCHA's former Executive Vice President of Operations, who seemed willing to push for repairs in the apartments. We also continued to monitor and document the status of mold and moisture remediation in apartments in Manhattan and the Bronx, as we had done before. Despite our advocacy, the overwhelming majority of tenants, organizers, and leaders still reported lengthy delays in effecting repairs, missed appointments by NYCHA staff, and incomplete or poor workmanship in remediating the mold and excessive moisture.

11. In addition, the apartments of the named Plaintiffs were not fixed as soon as possible, even though this was specifically required by the Order. All of the named Plaintiffs had submitted requests for accommodations related to mold and moisture problems prior to the filing of the Complaint in this case in December 2013. Yet, as described below, named Plaintiff Felipa Cruz still has mold and moisture problems in her apartment at the time of this declaration, and the mold and moisture problems in the apartment of named Plaintiff Maribel Baez were not resolved until August 2014.

12. On July 29, 2014, I, and other members of Manhattan Together and SBC including Reverend Getulio Cruz, Pastor of Monte Sion Christian Church, Ray Lopez of LSA, Oscar and Felipa Cruz, and a few others met with Mr. Laboy-Diaz at LSA's offices to discuss the mold and moisture issues that tenants had reported since the Order was entered, among other tenant housing issues. Approximately ten NYCHA tenants were present at this meeting, and they discussed their specific issues with Mr. Laboy-Diaz. Mr. Laboy-Diaz stated that the information he had received from his own employees about the problems with these particular tenants' apartments did not accurately reflect the tenants' reports to him that day, but that he found the tenants' stories to be credible. Mr. Laboy-Diaz went on to say that he believed some of the NYCHA employees were not being honest with him in their reports, and asked that we keep documenting the condition of the apartments and which repairs were or were not made so he might be able to keep track of when his employees were not telling the truth.

13. On September 4, 2014, I, along with several SBC leaders and two LSA staff members, took Mr. Laboy-Diaz, Mr. Michael Iezza (Administrator, Skilled Trades, NYCHA) and other NYCHA staff through sixteen apartments that had mold and moisture problems in the

Melrose, Butler, and Morris Houses in the Bronx. Mr. Laboy-Diaz agreed that in twelve of these apartments, serious work would have to be done to identify the underlying source of the moisture. In the remaining four, he did not believe any serious moisture remediation needed to be done. A list of these sixteen apartments, with the names of the tenants appearing as initials and the apartment and telephone numbers redacted for confidentiality purposes, is attached to this declaration as Exhibit 3.

14. Based on my subsequent visits to these apartments and telephone conversations with the tenants, I believe that NYCHA fully resolved the mold and moisture-related problems in only seven of the sixteen apartments I visited with Mr. Laboy-Diaz—and in four of those seven apartments, the tenants reported that the repairs took more than six months to complete. For example, in the apartment of tenant J.W., despite having reported in early September 2014 the water leak in her apartment, NYCHA did not fully complete the repairs in her apartment until late March 2015. In the apartment of tenant M.S., NYCHA employees came to her apartment three times, insisting that they should paint over the mold and refusing to investigate the source of the moisture causing the mold. It was only when Father Francis Skelly, an SBC leader who was also the tenant's priest, and I emailed NYCHA several times between September 2014 and late November 2014 that NYCHA employees finally identified the leak causing the mold and repaired it.

15. I have tried to intercede directly with NYCHA on behalf of numerous tenants who have turned to Manhattan Together and SBC for help in getting NYCHA to remediate the mold and moisture problems in their apartments. I describe below in greater detail a few of my direct interactions with NYCHA on behalf of some of these individual tenants.

**My Advocacy on Behalf of Named Plaintiff Felipa Cruz to Get NYCHA to Repair the Mold and Moisture Problem in Mrs. Cruz's Apartment**

16.     In July 2014, I emailed Mr. Laboy-Diaz and Mr. Brian Honan (Director, State and City Legislative Affairs, NYCHA) to inform them of the status of a number of NYCHA apartments in which the tenants continued to experience a variety of problems, including but not limited to mold and excessive moisture problems. I sent them two spreadsheets of apartments in need of repairs for various problems, forty-three of which had mold and excessive moisture problems. This spreadsheet is attached as Exhibit 1. I emailed Mr. Laboy-Diaz and Mr. Honan because even though NYCHA seemed to be performing a larger number of repairs than had been done prior to the Order, in most cases these repairs were ineffective and many tenants were still reporting to me that NYCHA employees refused or failed to identify the source of the excessive moisture, even where there was visible mold. Tenants were also reporting to me that NYCHA workers would come to their homes and merely scrape off the mold or paint over it with mold resistant paint, and that the mold was growing back within months, if not weeks.

17.     I also specifically informed Mr. Laboy-Diaz and Mr. Honan of flooding that had occurred on July 23 and 24, 2014 in the kitchen and living room of the apartment of named Plaintiff Felipa Cruz, who has asthma. Mrs. Cruz and her husband, Oscar, were told by NYHCA at various times that the flooding was a result of a clogged bathtub on the floor above them, a broken pipe in the wall, and pools of rainwater that gathered on the roof of the building. After the July 29, 2014 meeting at LSA's offices with Mr. Laboy-Diaz and his staff, and after Mr. Laboy-Diaz agreed to send a representative to Mrs. Cruz's apartment to monitor the repair work, NYCHA workers inserted a metal basket with a hose into the apartment that would collect and

flush moisture out of the apartment, and they sealed the pipes coming into and out of the apartment to keep it from flooding in the future. After these repairs were made, it appeared that the problem had been solved. However, it turned out that NYCHA had failed to prevent the mold from recurring. Because of excessive moisture, the mold in Mrs. Cruz's home reappeared in early December 2014 in various places throughout the bathroom. I emailed Mr. Brian Clarke (Senior Vice President for Operations, NYCHA) and Mr. Luis Ponce (Senior Vice President for Operations Support Services, NYCHA) on December 11, 2014 to inform them that the mold had recurred in Mrs. Cruz's apartment. By December 19, 2014, NYCHA employees had done nothing more than attempt to wipe away the mold. In addition to failing to identify or remediate the cause of the mold, the NYCHA employees told Mrs. Cruz that they would not address the moisture problem in her kitchen wall that was causing the paint to bulge and bubble until March 3, 2015—far longer than seven or fifteen days after Mrs. Cruz had reported the problem.

       18.      Mr. Cruz, Mrs. Cruz, and I continued to follow up with NYCHA employees to impress upon them that the repairs should be made sooner. In January 2015, NYCHA opened the wall in the kitchen where the paint was bubbling. They replaced the electrical wiring in the wall, which was rusted from moisture, and placed metal bars and metal sheets behind the wall to seal it off from moisture before closing it back up with cement. They did not repaint the wall at this time. On February 4, 2015, NYCHA employees visited Mrs. Cruz's apartment to verify that the light switches were still functioning after the repairs had been made to the wall and the wiring replaced. While these NYCHA employees were checking the light switches, Mr. and Mrs. Cruz saw a note from another NYCHA employee appear under their door, stating that the employee had come to plaster the wall, but because no one was home, the plastering would be

9

postponed until March 14, 2015. In fact, Mr. and Mrs. Cruz were in the apartment along with the other NYCHA employees at the time the note was slipped under the door, and the only required repair that remained was repainting, not plastering. A NYCHA employee then told Mr. and Mrs. Cruz that their appointment for repainting was scheduled for early April 2015.

19. Based on Mr. Cruz's report to me of what had occurred on February 4, 2015, on February 13, 2015, I emailed Ms. Melania Allen (Property Management Director, Bronx County, NYCHA), Mr. Clarke, and several other NYCHA employees to inform them about the events of February 4, 2015 and to insist that NYCHA schedule an earlier appointment with Mrs. Cruz for the repainting. Ms. Allen agreed to send a NYCHA employee to repaint the wall on February 20, 2015. I emailed Ms. Allen in the morning on February 20, 2015 to remind her of the appointment, but Ms. Allen took no action in response. After I sent Ms. Allen a second email in the early afternoon, this time copying Mr. Clarke on the email, a NYCHA employee arrived at the apartment to repaint the wall in the late afternoon. As of February 20, 2015, it seemed that the repairs to the mold and moisture problem in Mrs. Cruz's apartment were finally completed, but it had taken persistent complaints to NYCHA by Mr. Cruz, Mrs. Cruz, and me to fully resolve the problem.

20. Much to our dismay, by March 11, 2015, the mold had started to reappear on the bathroom ceiling in Mrs. Cruz's apartment, likely because the vent in the bathroom had stopped working. On March 11, 2015, I emailed Mr. Clarke to inform him that despite the repairs NYCHA had previously made, the mold had recurred. I asked him to send NYCHA staff to repair the vent in the bathroom. Approximately two weeks later, NYCHA staff fixed the vent and scrubbed off the mold. However, on April 8, 2015, I personally visited Mrs. Cruz's

apartment and saw that the mold had grown back. In addition, a crack developed in the wall, and there was still a significant amount of dirt in the vent.

21. On the morning of April 20, 2015, Mr. and Mrs. Cruz reported to me by telephone that the mold had spread. Based on this report and what I had seen on April 8, 2015, I emailed Ms. Allen and Mr. Clarke on April 20, 2015 to insist that they verify and fix the source of the moisture causing the mold problem in the bathroom because merely scrubbing the mold was not a sufficient remedy. I spoke with Mr. and Mrs. Cruz again on April 21, 2015, and they informed me that a NYCHA maintenance worker had come to the apartment around 2pm on April 20, 2015. This NYCHA worker observed that the bathroom walls and hallway walls outside the bathroom were very warm, and told Mr. and Mrs. Cruz that this heat indicated that there was a problem. The worker said that he would check on something and come back in an hour, but he never returned. Instead, he called later to say that he believed there was a problem in the basement of the apartment complex, and that this was causing the problem in Mr. and Mrs. Cruz's apartment, and he would come back the next day. On April 21, NYCHA maintenance workers came to the apartment again to check the status of the walls, and went to the basement, where they observed gaps in the walls in the boiler room that were letting heat out. They then returned to Mr. and Mrs. Cruz's apartment, told Mr. and Mrs. Cruz what they had observed in the basement, and said they would come back later in the week to correct the issue. On April 22, despite the fact that Mr. Cruz had asked the NYCHA employees to call him ahead of time, NYCHA employees came to the apartment without an appointment when Mr. and Mrs. Cruz were out, according to their children. They cleaned the vent in the bathroom but left no contact

information at which they could be reached for more information about the problem in the basement.

22.  The Court's Order required NYCHA to complete "as soon as possible" all mold and moisture repairs in the apartments of residents brought to NYCHA's attention by Plaintiffs' counsel who, like Mrs. Cruz, had previously submitted to NYCHA requests for accommodation related to mold and moisture problems.  Nearly a year after the Court's Order was entered, Mrs. Cruz still has mold and moisture problems in her bathroom despite numerous complaints to NYCHA because NYCHA's "repairs" have been ineffective in preventing the mold from recurring.

### My Advocacy on Behalf of Named Plaintiff Maribel Baez to Get NYCHA to Repair the Mold and Moisture Problem in Mrs. Baez's Apartment

23.  Maribel Baez is the only named Plaintiff whose mold and moisture problems appear to have been fully remediated at the present date, but it was not without a significant amount of advocacy to hold NYCHA accountable.  In January 2014, Ms. Baez told me that NYCHA merely scraped, plastered, and painted the water-damaged bathroom walls and ceiling in her apartment.  By March 2014, Ms. Baez reported to me that falling plaster, peeling paint, and mold had recurred in the bathroom.  By May 2014, NYCHA had not done any additional work to address the mold and moisture issues in Ms. Baez's apartment even though we had reported to NYCHA that the problems had recurred.  It was not until July 1, 2014 that I received confirmation from Ms. Baez that NYCHA had given her an appointment for August 6, 2014. However, NYCHA had informed Ms. Baez that this appointment was only for the purpose of painting over the mold.  I emailed Mr. Laboy-Diaz on July 25, 2014 explaining that the visible

mold in Ms. Baez's bathroom was getting worse and NYCHA's plan to merely paint over it—without addressing the water leak causing it—would not be an adequate remedy.

24. On August 13, 2014, while NYCHA workers were in Ms. Baez's apartment, I left a voice message and emailed Mr. Laboy-Diaz and Ms. Allen because Ms. Baez had reported to me that the NYCHA workers were only scraping the mold and painting. Despite visible mold, the NYCHA staff refused to search for the source of the moisture. I spoke to the NYCHA staff in Ms. Baez's apartment by phone, and they told me that their boss, Mr. Daniel Hermina, instructed them only to scrape and paint. I told the workers to stop scraping the wall because I knew the wall had a serious excessive moisture problem. I then called Ms. Allen and told her that there is a moisture problem and that the workers should be fixing the underlying moisture problem rather than merely scraping mold from the wall. The workers did not stop scraping the wall until a supervisor arrived at the apartment and observed that the wall was wet—indeed, water bubbles were coming through the wall where it had been scraped—and instructed the workers to stop. At that point I emailed Mr. Laboy-Diaz again and urged him to personally visit Ms. Baez's apartment.

25. On August 14, 2014, a NYCHA official reported that they would fix the leak the next day and would consent to monitoring by a representative of LSA. The following day, Mr. Tom Basic, who is a NYCHA tech services employee, and several NYCHA workers, went to Ms. Baez's apartment, opened the wall to find a leak, replaced some pipes, and resealed the wall. Ray Lopez of LSA and Father Skelly, who acted as monitors to the process, came to the apartment after the wall had been opened, and Mr. Basic explained the work that was being done

13

and what was going to be done to their satisfaction. Recent conversations with Ms. Baez confirmed that the mold had not returned since this work was done.

### My Advocacy on Behalf of Wanda R. to Get NYCHA to Repair the Mold and Moisture Problem in Wanda R.'s Apartment

26. On September 4, 2014, I accompanied Mr. Laboy-Diaz and LSA staff members on a visit to the apartment of Wanda R. and her fifty-eight-year-old mother. Ms. R.'s mother, thirteen-year-old son, and seven-year-old daughter, all of whom live together in the apartment, have asthma. I brought Mr. Laboy-Diaz to Ms. R.'s apartment because her bathroom and kitchen were covered in mold, and water sporadically came out of the kitchen sink drain and spilled onto the floor. Mr. Laboy-Diaz acknowledged to me that NYCHA would address the moisture problem in the kitchen and admitted that there was still a mold problem in the bathroom despite the fact that NYCHA employees had just cleaned the mold in the bathroom on August 29, 2014. Mr. Laboy-Diaz told me that fixing the fan in the bathroom might ameliorate the mold. And although the LSA staff members in attendance agreed that fixing the fan could solve the problem, they noted that a full scraping and removal of the mold and painting would also be necessary. The LSA staff also suggested that there could be another source of the moisture besides the inoperable fan and NYCHA should further investigate this.

27. In November 2014, I contacted Mr. Clarke and Mr. Ponce because NYCHA had not yet properly remediated the mold that had persisted in Ms. R.'s apartment. Despite my efforts to intervene on Ms. R.'s behalf, when I visited her apartment on April 15, 2015 I saw red spots of mold growing back on her bathroom ceiling. Even though the mold continues to grow and spread in Ms. R.'s apartment, Ms. R. has told me that NYCHA denied that it is in fact mold, insisting instead that it is merely "dirt" or stains from hot water.

**Additional Recent Tenant Monitoring**

28.     Most recently, between November 2014 and March 2015, I and other employees, and volunteer leaders of SBC and Manhattan Together have been in contact with hundreds of tenants in NYCHA apartments in the Bronx and Manhattan, of which 128 have complained to NYCHA about problems relating to mold and moisture. Four spreadsheets reflecting the problems we have documented in these and other apartments we have monitored are attached to this declaration as Exhibit 2. For confidentiality purposes, the names of the tenants are replaced by initials and the apartment numbers and work order ticket numbers are removed. Of these 128 apartments, the tenants in only twenty-two have reported that NYCHA maintenance workers repaired the mold or moisture problems in a satisfactory way such that the problems have not recurred. In another forty-four of these apartments, NYCHA made some repairs, but serious mold and moisture problems remain. In sixteen of the 128 apartments, the tenants lodged mold or moisture complaints for the first time in March 2015, and as of March 10, it remained to be seen whether any repairs will be made in a timeframe consistent with that required under the Order. In the remaining forty-six apartments, the tenants reported that NYCHA has not taken any effective action to address the mold or moisture problems.

29.     In my experience, NYCHA's response to the vast majority of mold and excessive moisture complaints is deficient and has not improved since entry of the Order. NYCHA's responsiveness to tenants' complaints of mold and excessive moisture appears to correlate to my and other community organizers' involvement. Based on reports from tenants, it seems like NYCHA is more likely to begin the process of remediation for mold and excessive moisture complaints when I or fellow community organizers personally get involved in advocating to

NYCHA on a tenant's behalf. Even then, the repair work is almost always slow and/or incomplete at best. The problems seem to stem from an overall culture of non-compliance within NYCHA, in which NYCHA defaults to either doing nothing or making superficial repairs.

Dated this 22 day of April, 2015.

By: /s/ Michael Stanley
Michael Stanley