UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
MARIBEL BAEZ; FELIPA CRUZ; R.D., ON BEHALF
OF HER MINOR CHILD, A.S.; on their own behalf
and on behalf of all others similarly situated;
UPPER MANHATTAN TOGETHER, INC.; and                    Civ. No. 13-8916 (WHP)
SOUTH BRONX CHURCHES SPONSORING
COMMITTEE, INC.,

                              Plaintiffs,

                                                       DECLARATION OF BRIAN CLARKE
                                                       IN OPPOSITION TO PLAINTIFFS'
                                                       MOTION TO HOLD NYCHA IN
       · v.                                            CONTEMPT FOR VIOLATION OF
                                                       THE STIPULATION AND ORDER
NEW YORK CITY HOUSING AUTHORITY,

                              Defendant.
------------------------------------------------------------------------x

        BRIAN CLARKE, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury that the

following is true and correct:

        1.      I have been employed by defendant New York City Housing Authority ("NYCHA")

since 1996. I hold the position of Senior Vice President for Operations.   Prior to January 2015, I

held the position of Vice President for Operations.   I make this declaration in opposition to

plaintiffs' motion for an order holding NYCHA in contempt for violation of the Stipulation and

Order in the above-captioned matter based on personal knowledge and the books and records of

NYCHA.

**NYCHA's Precarious Financial Condition**

        2.      NYCHA is the largest and oldest public housing authority in the United States.  It

houses over 400,000 residents of New York City in approximately 178,000 units.  It is composed of

328 developments containing almost 2,600 buildings.  Over 60% of NYCHA's buildings are over

50 years old.

                                             1

3.      Public housing is primarily funded through the U.S. Department of Housing and Urban Development ("HUD"). Since the 1990's the federal government has steadily disinvested in public housing. NYCHA has been disproportionately affected by this disinvestment due to its size, the age and height of its buildings, high construction costs and higher operating costs. Dramatic cuts in HUD's annual capital funding to public housing authorities ("PHAs"), a cumulative loss of $1.16 billion for NYCHA since 2001, mean that NYCHA's buildings continue to age without adequate resources for much needed repairs and renovations. In addition, between 1998 and 2003, the City and State of New York eliminated operating funding for over 20,000 City- and State-built units, leaving NYCHA to stretch its declining federal subsidy over those units.

4.      In funding diversification efforts, NYCHA worked with the New York City Housing Development Corporation ("HDC") to issue low interest debt to fund its capital improvement needs. In 2005, NYCHA, through HDC, issued a $300 million "Bond A" and, in 2013, issued a $700 million "Bond B" which included $500 million for capital improvement work. Bond B allowed NYCHA to expedite building envelope improvements at 33 developments to benefit approximately 60,000 residents.

5.      Operating shortfalls in recent years have ranged between $53 million and $170 million. NYCHA's projected annual operating deficit is expected to grow from $98 million in 2015 to over $400 million in 2025. In addition, NYCHA has an unmet capital need of $16.9 billion. Because NYCHA has had to spend operating reserves in the absence of other funding, its operating reserves are dangerously low (approximately four weeks) and federal receivership remains a possibility absent drastic action.

2

*NextGeneration NYCHA*

6.     To address NYCHA's fiscal crisis, on May 19, 2015, NYCHA announced *NextGeneration NYCHA*, a long-term strategic plan to stabilize NYCHA and improve residents' quality of life. Improving NYCHA's performance and accountability and preserving public and affordable housing stock are among the top priorities of the plan. The *NextGeneration NYCHA* plan is attached as Exhibit A.

7.     Among the strategies of *NextGeneration NYCHA* are faster repairs and transparency around performance. In January 2015, NYCHA launched the Optimal Property Management Operating Model ("OPMOM") system to empower local property managers at 18 developments spanning 22,386 units to perform budgeting, purchasing and hiring. NYCHA will ultimately identify best practices from OPMOM and deliver them to all other public housing developments by 2016. As part of *NextGeneration NYCHA,* NYCHA intends to refocus its performance measure away from individual work orders to completion time for a reported complaint.

8.     Under the administration of Mayor DiBlasio, the City of New York has waived the annual payment of approximately $70 million to the City of New York Police Department previous required under a Memorandum of Understanding. Beginning in fiscal year 2015, the City will relieve NYCHA of the Payment in Lieu of Taxes ("PILOT") it has paid annually. Waiver of these payments will enable NYCHA to re-allocate such funds.

**Addressing the Root Causes of Mold**

9.     In October 2012, approximately 200 NYCHA buildings suffered severe damage during Superstorm Sandy. NYCHA pursued funding from, *inter alia*, the Federal Emergency Management Agency ("FEMA") to repair and upgrade developments in Brooklyn, Manhattan and Queens damaged by Superstorm Sandy. In March 2015, FEMA issued a $3 billion grant which will

enable NYCHA to construct elevated boilers, install flood barrier systems and stand-by generators, and perform other critical repairs and resiliency measures to better protect the 80,000 affected residents. The funds will also be used to repair doors, walls, floors, playground equipment and fencing still damaged after the storm. Work will begin in Summer 2015 and will take 18 to 48 months to complete.

10.     NYCHA has also pursued capital support from the City and State of New York to fund a vital roof replacement program, which will directly impact one of the primary causes of mold. Roof replacement has multiple benefits in that it improves safety, prevents leaks, mold and asbestos problems, and significantly decreases maintenance work orders. Roof replacement is directly related to the integrity of a building's envelope and is critical to addressing the root causes of mold and excessive moisture. NYCHA's analysis of three developments where roofs were replaced reflected that work orders normally associated with mold abatement work decreased by an average of 56 percent.

11.     The City has committed to provide $100 million per year for the next three years and called upon the State to match the funds. The City's first $100 million will be spent on replacing roofs at 66 buildings housing nearly 13,000 residents that have high numbers of maintenance work orders for leak repairs, painting and mold. The buildings are at the following Developments: Queensbridge North, Queensbridge South, Albany I & II, Sheepshead Bay and Parkside. Work commenced this month.

12.     In April 2015, the New York State legislature set aside $100 million to assist NYCHA with public housing modernization and improvement. NYCHA has requested that these funds be earmarked for roof repair and replacement and, consistent with the State's conditions, entered into a management agreement with the Dormitory Authority of the State of New York

4

("DASNY") to scope, procure and administer those funds. NYCHA had conducted physical assessments of development roofs in 2006, 2011 and 2014 and rated each on a numerical scale from one (good) to five (beyond its useful life). If permitted, NYCHA will use the $100 million to replace or repair 123 roofs at 18 developments containing the worst roofs in NYCHA's portfolio. Attached as Exhibit B is a copy of the State Capital Revitalization Plan: Roof Replacement, dated April 10, 2015.

13. NYCHA anticipates that its continuing strategies to address the root causes of mold and excessive moisture will positively impact the reported recurrence rate, as well as the overall number of work orders related to mold and excessive moisture.

**Negotiation of the Stipulation**

14. In 2013, I, along with Luis Ponce and lead attorney Steven J. Rappaport participated on behalf of NYCHA in settlement discussions with plaintiffs regarding their proposed lawsuit concerning mold and excessive moisture in NYCHA's public housing developments.

15. Throughout the time of these negotiations, NYCHA utilized a computerized asset management system called Maximo to manage its repair and maintenance work orders. At NYCHA, a work order schedules "a repair" for "a condition." Multiple repairs for multiple conditions require multiple work orders. During the negotiations, the parties discussed Maximo and NYCHA's work order process and NYCHA made it clear that individual work orders are generated for each trade or craft. A parent work order is the initial task or primary work called in by the resident and any additional work is defined on a child work order and assigned to an appropriate craft. Crafts include the following titles: Glazier, Lead Investigator, Painter, Welder, Supervisor of Grounds, Asbestos Hazard Investigator, Electrician, Elevator Mechanic, Machinist, Maintenance Worker, Vendor, Asbestos Handler, Plasterer, Plumber, Caretaker, Heating Plant Technician,

5

Carpenter, Motor Grader Operator, Bricklayer, Roofer, Housing Exterminator, Lead Abatement Worker, Technical Services 504, Dispatcher and Dispatcher (Supervisor).

16.     To familiarize plaintiffs with NYCHA's Maximo system, NYCHA arranged for an onsite presentation at NYCHA's offices on August 16, 2013.   Albert Huang from Natural Resources Defense Council and Marc Cohan and Cary LaCheen from the National Center for Law and Economic Justice were scheduled to attend the presentation and a call-in number was made available for those who could not be present.

17.     While NYCHA shares plaintiffs' goal of improving services to residents and recognizes the importance of addressing mold and excessive moisture, we were always mindful during these negotiations of NYCHA's financial and budgetary concerns and the Maximo system and we did not agree to terms with which NYCHA could not operationally meet.

18.     NYCHA did not agree that only one work order will be generated in response to a mold or excessive moisture complaint and that NYCHA must complete all work associated with that work order within seven days on average for simple repairs and 15 days on average for complex repairs as plaintiffs' contend.   Rather, NYCHA agreed to process 95% of the mold and excessive moisture-related work orders in an average of no more than seven (7) days for simple repairs that can be done by a maintenance worker in a single visit or fifteen (15) days for relatively complex repairs that need skilled trades or other specialized staff to address and may require multiple visits, excluding conditions related to capital improvements or where the tenant does not provide access.   NYCHA felt it was meeting this standard and could continue to meet this standard.

19.     I understand that plaintiffs have requested that the Court impose a requirement that NYCHA complete all work related to a complaint within 14 days for simple repairs and 21 days for complex repairs. In negotiating the stipulation, we were cognizant of the fact that there will always

6

be outliers and, therefore, the service level is an average of the lowest 95% of the work orders. NYCHA did not, and never would have, agreed to a requirement that every work order be completed with a 14- or 21-day period. NYCHA could not realistically comply with such a term.

20.     Attached as Exhibit C is the NYCHA Standard Procedure 040:14:1, Mold, Mildew and Moisture Control in NYCHA Buildings, which was effective May 21, 2014 and was reissued on June 3, 2015.

**Moisture Meter Pilot Program**

21.     Paragraph 15 of the Stipulation provides that NYCHA would engage in a pilot program to evaluate the moisture meters if the City were to make funds available for the program. The City did not make funds available for that program and, therefore, NYCHA's obligations under paragraph 15 were never triggered. As set forth above and in *NextGeneration NYCHA*, NYCHA has continued its efforts to obtain capital funding to make changes which will have a large scale impact on mold remediation in apartments.

Dated: New York, New York
      June 12, 2015

                                         Brian Clarke

7