UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

MARIBEL BAEZ; FELIPA CRUZ; RD., ON BEHALF OF    :
HER MINOR CHILD, A.S.; on their own behalf and    :
on behalf of all others similarly situated;    :
UPPER MANHATTAN TOGETHER, INC.; and    :
SOUTH BRONX CHURCHES SPONSORING    :
COMMITTEE, INC.,    :
    :
    Plaintiffs,    :
    :    13 Civ. 8916 (WHP)
    vs.    :
    :
NEW YORK CITY HOUSING AUTHORITY,    :
    :
    Defendant.    :
    :

------------------------------------------------------------------------x

## SECOND SUPPLEMENTAL DECLARATION OF STEVEN M. EDWARDS IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF

I, STEVEN M. EDWARDS, declare under penalty of perjury that the following is true and correct:

1.    I am a member of the bar of the State of New York and am admitted to the United States District Court for the Southern District of New York.  I am a partner in Hogan Lovells US LLP ("Hogan Lovells"), co-counsel to the National Center for Law and Economic Justice ("NCLEJ") and the Natural Resources Defense Council ("NRDC") in the above-captioned matter.  I am fully familiar with the facts and proceedings in this case.  I submit this additional declaration in connection with Plaintiffs' Supplemental Brief in Support of Plaintiffs' Motion to Enforce the Stipulation and Order entered on April 17, 2014 ("Order").

1

2.      Annexed as Exhibit 1 is a true and correct copy of a letter from Donna M. Murphy to Greg Bass dated June 29, 2015, attaching the fourth set of quarterly reports (the "Fourth Quarter Report") provided by defendant New York City Housing Authority ("NYCHA") to Plaintiffs.

3.      With the assistance of one of my associates, I have reviewed and analyzed the Fourth Quarter Report.  Like the first three quarterly reports, this report contains a spreadsheet, apparently provided pursuant to ¶ 10(a) of the Order, which lists mold or excessive moisture work orders created during the February 1, 2015, to April 30, 2015, reporting period.  The Fourth Quarter Report includes 10,633 closed seven-day work orders and sixty closed fifteen-day work orders.  Thus, seven-day work orders account for over 99% of all work orders reported by NYCHA.

4.      Each of NYCHA's quarterly reports has been presented in a different format such that none of its reports uniformly includes the same types of data in the same layout.  For example, in the Fourth Quarter Report, NYCHA has eliminated the column that labels each work order as either a "parent" or "child" work order.  Nevertheless, NYCHA includes in this quarter's report a number in the "Immediate Parent" column which allows us to link parent and child work orders.  In addition, in the Fourth Quarter Report, NYCHA reverted to its practice in the First and Second Quarter Reports of reporting the "days to complete" for each work order in fractions of a day, instead of rounding to the nearest whole day as it had done in the Third Quarter Report.  Finally, as with the Third Quarter Report, but not the First and Second Quarter Reports, NYCHA excluded from the average service level calculations those work orders where

2

the resident was not home or the resident refused to grant the NYCHA worker access to the apartment.

5.     Thus, to analyze the closed work orders in the fourth quarter data, we had to normalize them with those of the first three quarters.  As we had in done in analyzing the prior reports, we excluded from our calculation of NYCHA's average service level in the fourth quarter those work orders that were labeled "created in error" or "duplicate."  We also excluded those work orders that had no value in the "days to complete" column and work orders that indicated that NYCHA did not gain access to the apartment, such as "no adult," "cancelled for weather," and "resident cancelled."  With these exclusions, in total, there were 10,324 closed seven-day work orders and fifty closed fifteen-day work orders.

6.     After normalizing the data, we combined parent work orders with their respective child or children work orders based on matching "Immediate Parent" numbers, if any existed, into single repairs to calculate NYCHA's average service level.  Once linked, we determined that there were 7,295 seven-day work orders and fifty fifteen-day work orders in the Fourth Quarter Report.  If any work order in the parent-child group had a fifteen-day work order associated with it, we considered the overall combined work order as a fifteen-day repair to give NYCHA the benefit of the doubt.

7.     In the Fourth Quarter Report, we found that 367 child work orders had no matching parents.  For 206 of these work orders, we were able to trace the "orphan" work order back to a parent in a prior quarter.  These parent-child pairs tended to have some of the longer service levels we have found so far: We identified six parent-child families that were over 97

3

days to complete, the longest of which was 133 days.  Consistent with our previous analyses, we treated these 367 orphan work orders as individual parent work orders for purposes of calculating NYCHA's service level in the fourth quarter.

8.      Once parents and children were combined, we calculated the adjusted service level by summing the total days for all work orders (i.e. the sum of the "Days to Complete" column) and then dividing that sum by the number of parent-child families (which was a lower number than NYCHA calculated, given that our calculation combined separate, matching parent and child work orders).  When the parent-child links are taken into account, NYCHA's average service level in the fourth quarter for seven-day work orders is 9.0 days per work order and NYCHA's average service level for fifteen-day work orders is 11.1 days per work order.  Even excluding the worst 5% of the work orders, NYCHA is still non-compliant for seven-day work orders: The shortest 95% of combined parent-child work orders have an average service level of 7.4 days to complete.  Based on the data provided by NYCHA, it appears that NYCHA is in compliance with the Order as to fifteen-day work orders, although these work orders represent less than 1% of the reported work orders.

9.      As with the first three quarters, NYCHA's Fourth Quarter Report contains a significant number of work orders that have codes that indicate that no work was performed. These codes denote work orders where, for example, repairs were apparently complete on arrival, the resident corrected the problem, the resident failed to schedule the repair, or the complaint was determined to be "unfounded."  As of the filing of this declaration, NYCHA has not yet provided definitions for these codes to Plaintiffs pursuant to this Court's July 10, 2015

4

bench order.  *See* Transcript of Oral Argument on July 10, 2015 ("Oral Argument Tr."), annexed hereto as Exhibit 2, at 37:16-17.  Based on our assumptions of the codes' meaning, we analyzed the data to determine NYCHA's average service level in the fourth quarter when such "no-work" work orders are excluded.

10.      For this calculation, we included only those work orders where the report indicated that NYCHA performed at least some work toward repairing the mold or excessive moisture: In the Fourth Quarter Report, 31.96% of the work orders are labeled "abated"; 7.08% are labeled "cleaned"; 0.14% is labeled "painted"; 6.98% are labeled "removed"; and 3.45% are labeled with variations of the terms "repaired," "replaced," or "installed."  Thus, approximately only 49.61% of the work orders were labeled with a remedy code that indicates some work was actually performed.  On the other hand, approximately 50.39% of all work orders in the Fourth Quarter Report indicate that no work was done toward repairing the mold or excessive moisture: 9.69% of these include work orders labeled "complete on arrival," "resident corrected," "previously corrected," "unsafe conditions," "cancelled because of weather," "WMATL" (a non-obvious acronym), "resident failed to schedule," "move out," "cancelled," or "unfounded"; and 40.70% are labeled "verified."

11.      When we combine parent and child work orders for the fourth quarter and exclude work orders where no work was performed, the average service level per repair for seven-day work orders increases to 10.1 days.  Even excluding the worst 5% of the work orders, the average service level is 8.5 days.

12.     Replicating our analysis for the first three quarters, we again looked at the number of seven-day work orders that were closed in more than fifteen days.  Combining parent and child work orders, there were 1,171 seven-day parent-child families that were closed in more than fifteen days.  Similarly, we determined the percentages of seven-day parent-child families that are closed within seven days, within fifteen days, and above fifteen days.  In the fourth quarter, 58.04% were closed within seven days, 25.91% were closed within fifteen days, and 16.05% were closed in more than fifteen days.  The longest individual work order opened and closed within the fourth quarter was eighty-three days.

13.     The Fourth Quarter Report contained 10,633 closed work orders, and NYCHA reported that 3,256 of these are Level II or Level III work orders (*see* Ex. 1 at the chart detailing the total number of closed work orders reported in post-closed work order contacts summary for the fourth quarter), which represents approximately 30%.  Thus, almost 70% of the work orders reported in the Fourth Quarter Report are Level I, which is the case for all three quarters generally.

14.     On July 13, 2015, I e-mailed Donna Murphy, counsel for NYCHA, to request information about certain anomalies in the fourth quarter data relative to the third quarter data, the process for the post-closure customer contacts including, but not limited to, what questions were asked of tenants, and why NYCHA made significantly more calls relative to the number of work orders in the fourth quarter.  I also asked for copies of the call records from the post-closure contacts.  In response to my e-mail, Ms. Murphy e-mailed only supposed "directions" provided to NYCHA Customer Call Center callers regarding the procedure to follow when

conducting the follow-up survey.  The directions simply describe the computer processes the callers must follow, such as instructing that "All Agents should Log into Siebel and have that window open during the survey," and "If call is answered update tab, and proceed to questions. If call is not successful update Log accordingly and place any information in the comments section."  None of the information provided in these directions sheds light on the actual questions asked of the tenants, which is what I specifically requested.  The e-mail does indicate that Customer Call Center callers are instructed to ask whether tenants are "satisfied" with NYCHA's repairs, in addition to whether mold had reoccurred.  NYCHA did not provide information on tenants' responses to the question regarding satisfaction in any of the four quarterly reports.  My e-mail to Ms. Murphy on July 13, 2015, as well as Ms. Murphy's response and the attached directions are annexed hereto as Exhibit 3.

15.     Annexed as Exhibit 4 is a compilation of the post-closure contact summaries provided by NYCHA pursuant to Paragraph 6 of the Order, as well as a compilation of the post-closure contact detail provided by NYCHA, for each of the first four quarters.  This exhibit includes the post-closure contact detail for the third quarter, which was inadvertently omitted from my initial declaration.  The post-closure contact detail is inconsistent from quarter to quarter.  In the second quarter, NYCHA provided some of the dates of the contacts; in the other quarters it did not.  Also, in the second quarter NYCHA indicated whether the tenant responded "yes" or "no" to the question asking about the reoccurrence of mold; the reports for the other quarters reflect only the "no" answers.  None of the post-closure contact reports provides tenants' names or contact information so that Plaintiffs can follow up with tenants.  In addition,

the summary reports show that, prior to the fourth quarter, NYCHA made relatively few post-closure calls in the first sixty days, even though the Order requires them, and the number of calls increased dramatically in the fourth quarter.  NYCHA only called 2% of closed Level II and Level III work orders within 60 days in the first quarter, 3% in the second quarter and 26% in the third quarter, while it called 86% within 60 days in the fourth quarter, as determined by dividing the number in the "Total Work Orders Called Within 60 Days of Work order Closure" column by that in the "Total Mold Work Orders (WOs) Closed" column.  NYCHA attempted to reach 56% of the closed Level II and Level III work orders in the first quarter, 70% in the second quarter, 62% in the third quarter, and 97% in the fourth quarter, as determined by dividing the number in the "Total Unique Work Order Calls" column by that in the "Total Mold Work Orders (WOs) Closed" column.  *See* Ex. 4.  In my e-mail of July 13, 2015, I asked Ms. Murphy to explain why NYCHA made significantly more call attempts relative to the number of work orders in the fourth quarter, but she did not do so.  *See* Ex. 3.

16.     In the fourth quarter, NYCHA also reported that mold reoccurred in 22% of the households with which NYCHA was able to make follow-up contact.  *See* Ex. 4.  NYCHA's average reoccurrence rate across the first four quarters is 31% (based on a 34% reoccurrence rate in the first quarter, a 41% reoccurrence rate in the second quarter, a 27% reoccurrence rate in the third quarter and a 22% reoccurrence rate in the fourth quarter).  *Id.*  The number of reoccurrences in the fourth quarter, 508, is up from 387 in the third quarter, and the number of reoccurrences relative to closed work orders, as opposed to calls, is also up: 11% of closed work orders in the third quarter led to reoccurrence (387 reports of reoccurrence divided by 3,508 total

closed work orders), and 15.6% of closed work orders in the fourth quarter led to reoccurrence (508 reports of reoccurrence divided by 3,256 total closed work orders)—which represents a 70% jump (11% divided by 15.6%). *Id.*

17.    I indicated at the oral argument held on July 10, 2015, that I would provide the Court with the e-mails sent to NYCHA officials that attached unredacted versions of the spreadsheets that were annexed as Exhibits 1 and 2 to the Declaration of Michael Stanley dated April 22, 2015 (Doc. 40). Oral Argument Tr. at 36:3-7. Annexed as Exhibit 5 is a true and correct copy of an e-mail dated July 9, 2014, from Michael Stanley, the lead organizer for Upper Manhattan Together, Inc. and the South Bronx Churches Sponsoring Committee, Inc., to various NYCHA officials attaching spreadsheets documenting conditions in NYCHA apartments. Annexed as Exhibit 6 is a true and correct copy of an e-mail dated December 11, 2014, from Michael Stanley to various NYCHA officials attaching a spreadsheet documenting conditions in NYCHA apartments. Annexed as Exhibit 7 is a true and correct copy of an e-mail dated February 17, 2015, from Michael Stanley to various NYCHA officials attaching a spreadsheet documenting conditions in NYCHA apartments. Annexed as Exhibit 8 is a true and correct copy of an e-mail dated February 18, 2015, sent on behalf of Michael Stanley by his colleague, Ray Lopez, the Director of the Environmental Health and Family Asthma Program at Little Sisters of the Assumption Family Health Service, Inc., to various NYCHA officials attaching a spreadsheet documenting conditions in NYCHA apartments. Annexed as Exhibit 9 is a true and correct copy of an e-mail dated March 10, 2015, sent on behalf of Michael Stanley by his colleague Grant Lindsay, the lead organizer for the Metro-Industrial Areas Foundation affiliate East Brooklyn

Congregations, to various NYCHA officials attaching spreadsheets documenting conditions in NYCHA apartments. We have redacted tenant names, addresses, telephone numbers, and work order ticket numbers from these e-mails. Every one of these e-mails was sent to Brian Clarke, NYCHA's Senior Vice President for Operations, who submitted a declaration in this action (Doc. 59). Several of these e-mails were also addressed to Luis Ponce, NYCHA's Senior Vice President of Operations Support Services, who also submitted a declaration in this action (Doc. 58). One of the e-mails, Exhibit 9, was even sent to Shola Olatoye, Chair and Chief Executive Officer of NYCHA. That NYCHA could not find these spreadsheets, which were sent to people at the highest level of NYCHA during an ongoing litigation, is troubling to say the least. Plaintiffs will send unredacted copies of these spreadsheets to NYCHA again once a Protective Order has been entered in this action.

18.    Annexed as Exhibit 10 is the "Audit Report on the New York City Housing Authority's Maintenance and Repair Practices" released by the New York City Office of the Comptroller on July 13, 2015.

19.    With regard to the additional reporting requirements in the Order, none of the four quarterly submissions included a report pursuant to Paragraph 10(b) of the Order, which was due on January 1, 2015.


July 24, 2015                              /s/ Steven M. Edwards
Date                                      Steven M. Edwards


10