UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
MARIBEL BAEZ; FELIPA CRUZ; R.D., ON BEHALF OF :
HER MINOR CHILD, A.S.; on their own behalf and :
on behalf of all others similarly situated; :
UPPER MANHATTAN TOGETHER, INC.; and :
SOUTH BRONX CHURCHES SPONSORING :
COMMITTEE, INC., :
 :
                   Plaintiffs, :
 : 13 Civ. 8916 (WHP)
   vs. :
 :
NEW YORK CITY HOUSING AUTHORITY, :
 :
                  Defendant. :
 :
------------------------------------------------------------------------x

## CORRECTED DECLARATION OF STEVEN M. EDWARDS IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS

STEVEN M. EDWARDS, an attorney duly admitted to practice in this Court, hereby declares under penalty of perjury as follows:

      1.     I am of counsel to Quinn Emanuel Urquhart & Sullivan, LLP; prior to January 1, 2016, I was a partner at Hogan Lovells US LLP ("Hogan Lovells"), co-counsel for plaintiffs in this action. I make this declaration in support of Plaintiffs' Motion for Attorneys' Fees and Costs in connection with their motion to enforce the April 17, 2014 Stipulation and Order between Plaintiffs and the New York City Housing Authority ("NYCHA") (the "Stipulation and Order"). The purpose of this declaration is to provide an overview of the work performed by Hogan Lovells in connection with the motion. I have personal knowledge of the facts stated herein.

1

2.      I am a director and treasurer of the National Center for Law and Economic Justice ("NCLEJ"), one of the counsel of record that originally brought this case.  In September 2014, the executive director of NCLEJ sent out a request for law firms to assist NCLEJ and the National Resources Defense Council ("NRDC"), the other counsel of record at time, in connection with a motion to enforce the Stipulation and Order.  I volunteered myself and my firm, Hogan Lovells (together with NCLEJ and NRDC, "Plaintiffs' Counsel").

3.      I recruited several associates to work with me on the case, and on September 30, 2014, we met with representatives of NCLEJ and NRDC to discuss the issues.  At that time, there appeared to be two main issues: (1) NYCHA's position that the seven and fifteen-day deadlines in the Stipulation and Order applied to individual work orders, as opposed to the time to complete repairs and (2) the community organizers' concern that conditions in the NYCHA apartments had worsened and repairs were not being completed in a timely or adequate fashion.

4.      As a first step, I drafted an outline of what a motion to enforce the settlement might look like and directed our associates to research legal issues identified in the outline.  I also expanded the associate team so that we would have enough people to inspect a sufficient number of apartments to determine conditions on the ground.  In assembling this team, one of the things I looked for were lawyers who had Spanish language skills because some of the tenants do not speak English.

5.      Shortly after our initial meeting with co-counsel, we received copies of NYCHA's first set of quarterly reports required under the Stipulation and Order.  Those reports claimed that NYCHA was in compliance with the Stipulation and Order, but they also reported a "reoccurrence" rate of 34%.  Because the reports were voluminous and difficult to understand, I asked two of my associates to analyze the reports in detail.  At this point, four work streams

developed that continued throughout our work on the motion to enforce: (1) analysis of the legal issues; (2) inspections of the apartments; (3) analysis of the reports; and (4) drafting of the motion to enforce and supporting papers. Each of these work streams required substantial commitment and effort.

6. On November 5, 2014, my team and I met with representatives of NCLEJ and NRDC to receive training on inspecting apartments for mold. Throughout November, members of my team and I went to the South Bronx, East Harlem, and Lower East Side and visited thirty-four apartments, finding that thirty had mold or signs of excessive moisture damage. We prepared reports on our findings, which were summarized in my declaration dated April 22, 2015 submitted in support of the motion to enforce.

7. Through the end of 2014 and the beginning of 2015, we assisted co-counsel in drafting notices of breach and performed further analysis of NYCHA's quarterly reports. One of the things we realized was that when "parent" and "child" work orders were linked together, the average time to complete seven-day repairs exceeded seven days. When we asked NYCHA about this, it responded by eliminating the linkage between parent and child work orders in a subsequent report. NYCHA also steadfastly refused to offer any meaningful solution to the underlying problems, particularly the reoccurrence rate which approximated 30%.

8. Seeing no prospect for an acceptable resolution without intervention of the Court, we began to draft the motion to enforce. On March 6, 2015, we sent a letter to the Court seeking permission to file the motion (Dkt. 26). On April 2, 2015, the Court held a conference and gave us leave to proceed (Dkt. 31).

9. The motion papers, which we filed on April 22, 2015, consisted of a memorandum, twelve declarations and more than twenty exhibits (Dkts. 35–49). The

declarations included statements from seven tenants and two community organizers, which our associates spent considerable time preparing. The associates also dealt with many other tenants in the process of obtaining the tenant declarations that were ultimately filed. This work included multiple visits with potential tenant declarants, both in their homes and in our offices, consultations with community organizers, verification of work order ticket numbers and repairs, and documentation of apartment conditions.

10. My declaration filed in support of the motion to enforce detailed the extensive statistical analysis of the quarterly reports performed in house, including data normalization, pairing of parent and child work orders, determining average service levels and range of service levels, and analyzing work orders where no work was actually performed. As explained in that declaration, because of the lack of uniformity of the reports provided by NYCHA, as well as their volume and inconsistencies in the recordkeeping, two of my associates spent many hours reviewing, analyzing, and verifying the figures included in our motion. In addition, I spent significant time reviewing these reports and the associates' analyses prior to filing. While most of that analyses was initially done at Hogan Lovells, the plan was to have an expert verify and expand upon that work. Unfortunately, that expert died shortly before our papers were due, so we retained HuronLegal + Consilio (formerly known as HuronLegal, "Huron") as a non-testifying consultant to verify our results. Time constraints precluded using Huron as a testifying expert, but their assistance to verify our analysis and provide additional support was important to the motion.

11. We retained Huron after interviewing several consulting firms. We chose Huron based on its qualifications and rates, which we found quite reasonable. In particular, Huron agreed to charge a reduced blended rate for their services of $195.00 per hour because this was a

public interest matter. Huron also agreed to staff the project with two well qualified data analysts—Morgan García-Lamarca, an Analytics Technical Manager, and Kyle Moss, an associate. *See* Resume of Morgan García-Lamarca, attached hereto as Exhibit 1 and Resume of Kyle Moss, attached hereto as Exhibit 2. They assisted our team by further normalizing the data and loading it into an SQL database, linking parent work orders with child work orders, and executing statistical queries.

12. While this analysis was underway, Hogan Lovells began work drafting the motion to enforce. Our team consisted of the following people:

   a. Fourth-year associate Erin Meyer, who was also serving as our firm pro bono associate, coordinated the voluminous declarations from NCLEJ, NRDC, community organizers, and tenants. In particular, she and the other associates interviewed the community organizers multiple times, and reviewed the organizations' records for inclusion in our motion to enforce. Ms. Meyer also conducted several tenant interviews in their homes, and followed up regarding these visits with tenants, NYCHA's repair hotline, and community organizers.

   b. Third-year associate Pooja Boisture drafted the brief and reviewed portions of the brief drafted by first-year associates Casey Downing, Dianne Milner, and Laura Sayler. She personally conducted and reviewed research conducted by the first-year associates. She also reviewed and revised the tenant and community organizer declarations. Ms. Boisture conducted several tenant and community organizer interviews in tenant homes, as well as at Hogan Lovells's and the community organizers' offices, and coordinated the tenant site visits. Ms. Boisture followed up regarding these visits with tenants, NYCHA's repair hotline,

and community organizers. The first-year associates reported directly to her regarding the visits, research, and the declarations. Ms. Boisture was also responsible for reviewing all of the quarterly reports and the analysis of the reports performed by first-year associate Laura Sayler, as detailed below, to ensure that Plaintiffs' overall analysis of the reports was accurately summarized.

c. First-year associates Casey Downing, Dianne Milner, and Ms. Sayler conducted the majority of the tenant interviews. Typically, the associates would plan to visit two or three apartments in a particular development with community organizers. Visits required a few hours to both inspect each apartment and discuss the mold and excessive moisture issues with each tenant. Mr. Downing, Ms. Milner, and Ms. Sayler followed up regarding these visits with tenants, NYCHA's repair hotline, and community organizers. All three first-year associates worked closely with the tenants to draft the declarations included in the report. In addition, the first-year associates conducted legal research in support of our motion. For each of these projects, the associate would typically compose an "email memorandum" with their findings which was reviewed by Ms. Boisture or me. Finally, as mentioned above, along with Ms. Boisture, Ms. Sayler conducted our in-house analysis of the reports provided by NYCHA. Ms. Sayler's analysis required significant time to normalize the data, compose formulas in Excel to organize the data, and perform calculations. Ms. Sayler also coordinated with our original expert and our non-testifying consultant Huron to perform additional calculations and verify previous analyses using special statistical programming.

13.     I led the team by formulating the basic strategy, selecting the arguments we were going to make, editing and finalizing drafts, coordinating with co-counsel, and communicating with the Court.  I relied extensively on co-counsel in developing arguments for the Court.  One of the main issues was the proper interpretation of the Stipulation and Order, and I received substantial input and help from NRDC on that point, since they were involved in the negotiation of the Stipulation and Order, and we were not.  We also relied extensively on NCLEJ for their expertise on the Americans with Disabilities Act and their knowledge of the issues surrounding mold.

14.     The Court heard oral argument on the motion to enforce on July 10, 2015, which we prepared for by performing additional research and conducting a moot.  At the argument, the results of NYCHA's Fourth Quarterly reports came up, and the Court gave the parties leave to file supplemental responses to address that report.  On July 24, 2015, we filed that supplemental response (Dkt. 68).  On August 20, 2015, we submitted a second supplemental response to address the Fifth Quarterly Report, which was received August 14, 2015 (Dkt. 72).

15.     In the fall of 2015, after the motion to enforce had been fully briefed, argued, and submitted, NYCHA notified us that it planned to inspect the apartments identified in the community organizers' declarations as having mold.  We requested that we be given notice and an opportunity to be present at the inspections because the tenants, as class members, are our clients.  NYCHA, however, rejected that request.  Accordingly, we drafted and filed a proposed order to show cause seeking that relief.  NYCHA responded by changing its position and agreeing to provide notice, an opportunity to be present, and copies of the inspection reports. NYCHA's inspection program was so disorganized and haphazard that it proved to be difficult to be present for most of the inspections.  The community representatives were able to attend some

of the inspections, however, and we were able to monitor the inspections by debriefing the community representatives and some of the tenants, as well as by reviewing the inspection reports.

16. On September 23, 2015, NYCHA filed two declarations purporting to describe its efforts (Dkts. 82–83). Instead of summarizing the inspections or submitting the inspection reports, however, these two declarations completely mischaracterized the community organizers' original declarations. We filed a response on October 7, 2015, pointing out the mischaracterizations of the community organizers' declarations and providing the actual results of the inspections, as well as follow-up efforts on our part which showed that NYCHA's breaches of the Order were continuing (Dkts. 84–86).

17. Thereafter, we began to contact special master candidates and researched certain legal issues regarding special masters. The Court issued its decision granting the motion to enforce on December 15, 2015. Plaintiffs have limited this fee application to time spent from September 1, 2014 through December 15, 2015, when the Court issued its decision, but reserve the right to make further applications for fees and expenses incurred after December 15, 2015, as appropriate.

18. As is evident from the time records, Hogan Lovells attorneys dedicated significant portions of their overall hours billed during this time period to this matter. The time the associates and I spent on this case took away time that would have been spent on other billable matters.

19. All of our work is reflected in time and cost records attached to the Corrected Declaration of David Dunn in Support of Motion for Attorneys' Fees and Costs dated March 22,

2016.  Mr. Dunn is a current partner at Hogan Lovells.  The Corrected Dunn Declaration also includes biographical information about each associate that worked with me on this case.

20. As for my own experience, I was partner at Hogan Lovells from 2000 to 2015.  There, my practice focused on complex commercial litigation, including representation of clients in antitrust matters, contract disputes, fraud claims, insurance coverage, intellectual property disputes, and securities litigation.  I have served as president of the Federal Bar Council, co-founder and past president of the Federal Bar Council American Inn of Court, and the Advisory Committee for Civil Rules in the Southern and Eastern Districts of New York.  I also dedicate significant time to pro bono and volunteer work.  In addition to my position as treasurer for NCLEJ, I am a board member and former president of Nazareth Housing, an organization which provides housing to the homeless, and a member of the advisory board of the Pro Bono Partnership and of Legal Services NYC.  Prior to joining Hogan Lovells, I was a founding partner at Davis Weber & Edwards (and its predecessors) from 1980–2000, and an associate at Cravath Swaine & Moore from 1972–1980.  I received my B.A. from the University of Iowa and my J.D. from University of Virginia Law School in 1972, where I was Notes and Decisions Editor of the Law Review, Order of the Coif, and graduated in the top 3% of my class.

21. Prior to making this motion, I sent counsel for NYCHA a copy of our time records and suggested that we try to reach an agreement on the fees and disbursements that we should be entitled to in connection with the motion to enforce.  A copy of my letter to Donna Murphy, dated March 4, 2015, is annexed as Exhibit 3.  Counsel for NYCHA did not respond to my request.

22. As I have repeatedly argued to the Court throughout this litigation, even though our clients are low-income people living in public housing, we believe that they are entitled to

the same standard of care as people who live in luxury apartments when it comes to issues such as mold.  Consistent with that, we have provided our clients the same level of representation that we would provide to a regular fee-paying client.  We have done so even though we took on this case as a pro bono matter with no expectation of recovery unless we were successful.  As a result of our efforts, thousands of people who suffer from asthma may finally be free of harmful conditions that seriously threaten their health.



DATED:   New York, New York
              March 22, 2016


                                                            */s/  Steven M. Edwards*
                                                                Steven M. Edwards