**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARIBEL BAEZ; FELIPA CRUZ; R.D., ON
BEHALF OF HER MINOR CHILD, A.S.; on
their own behalf and on behalf of all others
similarly situated; UPPER MANHATTAN
TOGETHER, INC.; and SOUTH BRONX
CHURCHES SPONSORING COMMITTEE,
INC.,

               Plaintiff,

               v.                         No. 13 Civ. 8916 (WHP)

NEW YORK HOUSING AUTHORITY,

               Defendant.

**DECLARATION OF STEVEN M. EDWARDS IN SUPPORT OF PLAINTIFFS'
MOTION FOR AN ORDER APPROVING MODIFIED AMENDED STIPULATION AND
ORDER OF SETTLEMENT**

I, Steven M. Edwards, declare under penalty of perjury that the following is true and correct:

1.      I am an attorney with the law firm Quinn Emanuel Urquhart & Sullivan, LLP, counsel for Plaintiffs, and am duly admitted to practice in this Court.  I submit this declaration in support of Plaintiffs' Motion for an Order Approving Modified Amended Stipulation and Order of Settlement, filed August 31, 2018.  I have personal knowledge of the facts set forth herein.

2.      According to the website of the New York Housing Authority ("NYCHA"), NYCHA has 176,066 public housing apartments in 2,462 buildings, housing 174,282 families and 396,581 authorized residents.  A true and correct printout of this webpage is attached as **Exhibit 1.**  NYCHA has acknowledged that exposure to mold is associated with an increased risk for asthma, as have other New York City government entities.  (Dkt. #11 at 20) ("Operations

1

& Maintenance Policy for Mold & Moisture Control in Residential Buildings," attached as Exhibit A to Stipulation and Order of Settlement). For example, the Office of the New York City Public Advocate issued a report in 2006 stating that "[e]xposure to sufficient quantities of any kind of indoor mold is likely to aggravate asthma conditions and provoke other severe allergic reactions. An additional long-term effect of mold exposure is that it can increase a child's chances of becoming asthmatic; even fetal exposure can increase the risk of developing asthma." A true and correct copy of this report, "Unhealthy Exposure: Mold in New York City Homes," is attached as **Exhibit 2.** NYCHA has also admitted that 150,000 NYCHA residents, including 35,000 children under the age of fifteen, live in developments located in "asthma hotspots" that generate the highest rates of asthma-related emergency room visits in New York City. A true and correct copy of this report, "NextGeneration NYCHA Sustainability Agenda," is attached as **Exhibit 3.** Plaintiffs have estimated that approximately 25,000 children living in NYCHA housing have asthma. (Dkt. #7, ¶ 10.)

3.     I first became involved in this case in September 2014, when it appeared that NYCHA was not complying with the Original Consent Decree.[1] One of the things that struck me was NYCHA's apparent indifference to the problem of mold. NYCHA's focus was on marketing programs such as "NextGeneration NYCHA," instead of developing timely and effective mold and excess moisture remediation techniques. (*E.g.*, Dkt. ##59, 82.) As far as I could tell, NYCHA had done little or nothing to improve its procedures and protocols for effectively remediating mold and excessive moisture in order to comply with the Original Consent Decree.

---

[1]     Capitalized terms not defined herein shall have the meaning given to them in Plaintiffs' Memorandum in Support of Their Motion for an Order Approving Modified Amended Stipulation and Order of Settlement.

4.      I was also concerned about NYCHA's obstructionist tactics.  For example, after Plaintiffs demonstrated to NYCHA that once parent and child work orders were linked, it was not complying with the seven-day time limit to complete simple repairs, NYCHA responded by eliminating the information that enabled us to link parent and child work orders.  In another episode, NYCHA claimed at the hearing on the motion to enforce the Original Consent Decree that it did not have certain spreadsheets that had been prepared by community organizers and sent to persons at the highest level of the organization, thus suggesting that those spreadsheets had simply been discarded.  In yet another episode, NYCHA insisted on inspecting the apartments identified in those spreadsheets and then filed an affidavit concerning the results of those inspections that was demonstrably false.  (Dkt. #86.)

5.      After the Court announced that it would appoint a Special Master, Plaintiffs suggested that the Special Master be given certain adjudicatory powers and the ability to permit discovery.  (Dkt. # 92.)  In Plaintiffs' view, holding NYCHA strictly accountable for breaches of the performance requirements in the Original Consent Decree would force NYCHA to develop better procedures and protocols for effectively remediating mold and excessive moisture.  The Court decided to take a different approach and appointed Professor Francis McGovern as the Special Master to investigate NYCHA's failure to comply with the Original Consent Decree and to make recommendations for corrective action.  (Dkt. # 96.)

6.      Since the Special Master was appointed on February 1, 2016, Plaintiffs have met with him and NYCHA more than twenty times.  Those meetings have generally taken place in a large conference room at NYCHA, with approximately ten people present from each side.  The exchanges have been vigorous and lively, and Plaintiffs have asked many questions in an effort to understand the causes and potential solutions to NYCHA's mold and excessive moisture

problems.  Plaintiffs have also made site visits and met with the Special Master and NYCHA in

small groups to discuss certain issues in great detail.  It is fair to say that both the Special Master

and Plaintiffs have developed considerable expertise with respect to mold remediation at

NYCHA as a result of their work on this case.

7.      Identifying the institutional obstacles precluding NYCHA from effectively and

timely abating mold and excessive moisture and attempting to find solutions to remove those

obstacles has been a herculean task. As a result of the Special Master's efforts, NYCHA has been

able to make significant progress in developing advanced procedures and protocols for

remediating mold and excessive moisture.  Plaintiffs worked closely with Microecologies and

NYCHA on this effort.

8.      Very early on, when it became apparent that NYCHA did not have the expertise

required to effectively remediate mold and excessive moisture, Plaintiffs urged the Special

Master to retain Microecologies, mold remediation experts with whom Plaintiffs had worked in

the past.  NYCHA also hired its own expert, Steven Winter Associates ("Winter"), to advise it on

the problem.  Winter inspected a number of buildings and concluded, among other things, that

they were structurally sound enough to make it worthwhile to attempt to fix the problem.  Winter

also noted that in the twelve buildings they inspected, they found only one working roof fan

(most buildings have multiple roof fans).  Winter recommended that the fans be repaired and run

as much as possible.  Microecologies concurred and suggested that the fans be run 24/7.

9.      To perform its work, Microecologies conducted a number of site visits and

participated in repair efforts by NYCHA workers, including wall breaks.  Among other things,

Microecologies found that when asbestos was removed a number of years ago, the pipes were

not reinsulated.  This caused condensation-related moisture to form around the joints and to leak

through the walls into apartments, causing mold.  Microecologies recommended reinsulating the

pipes wherever possible.  Microecologies also found that NYCHA was not sealing toilets

properly, causing water to leak into apartments below.

10.     Microecologies spent almost a year developing new procedures and protocols for

remediating mold and excessive moisture in NYCHA apartments.  Microecologies and NYCHA

also developed a training program for instructing workers on how to use these techniques.

Plaintiffs and the Special Master worked closely with Microecologies and NYCHA on these

efforts.

11.     NYCHA also developed an application for a handheld device that workers could

use to methodically diagnose mold and excessive moisture problems.  The handheld device takes

the worker through a series of automated steps that enables the worker, at the time of inspection,

to diagnose the problem, recommend the next steps to effectively remediate the mold or

excessive moisture, and generate work orders for getting the process underway.

12.     In mid-2017, NYCHA began a pilot project to test the effectiveness of the new

remediation techniques and the handheld by comparing the results in a group of intervention

buildings where workers used the new techniques and the handheld to the results in a group of

control buildings where workers used NYCHA's traditional remediation methods.  NYCHA

retained Matthew Perzanowski, an Associate Professor of Environmental Health Sciences at

Columbia University's Mailman School of Public Health, to analyze the results.  That effort is

still underway, but NYCHA has agreed to implement the new procedures and protocols,

including use of the handheld device, regardless of the results.

13.     At one point, Professor Perzanowski observed that the reoccurrence rates seemed

to be lower in buildings in which the roof fans were run consistently.  It is my recollection that I

asked him whether he concurred with the recommendation that the roof fans be run 24/7, and he did.  Notwithstanding the recommendations from three experts, NYCHA continued to delay implementing running the roof fans 24/7 until January 2018, when the Special Master literally yelled at NYCHA and threatened to get a court order if NYCHA did not do it right away.

14.    The Special Master has not issued any reports and recommendations, but it is our understanding that the Special Master has provided oral reports to the Court along the way.  He did circulate a draft report in September 2017 that outlines some of the major problems at NYCHA insofar as mold is concerned and the steps that are being taken to deal with them.  A true and correct copy of the Special Master's draft Overview of Interim Report, dated September 27, 2017, is attached as **Exhibit 4**.  According to the Special Master's draft report, these "fundamental problems" included "the absence of systematic methodologies for mold eradication; a lack of systematic training for maintenance workers and skilled trades for mold eradication; [and] inadequate accountability to ensure that systematic mold eradication methodologies are performed."  In addition, the Special Master's draft report indicated that "there are virtually universal ventilation problems" and concluded that "[o]ptimal mold eradication will involve operation of all [roof] fans for 24 hours a day at a level of 25 cfm's (cubic feet per minute)."

15.    NYCHA has also admitted that it has problems successfully remediating mold and excessive moisture, and at one point circulated a document that outlined some of those "pain points," a true and correct copy of which is attached as **Exhibit 5**.  NYCHA has called its efforts to deal with those problems its "Mold Busters" program, and has developed a timeline for rolling out that program, which began with a revision of its Standard Procedure.  The old Standard Procedure was attached to the Original Consent Decree as Exhibit A, and a Revised Standard

Procedure – incorporating the new procedures and protocols developed by Microecologies – has been incorporated into the Revised Consent Decree.

16.     In the aftermath of the Court's Order of December 15, 2015, finding NYCHA in breach of the Original Consent Decree and ordering NYCHA to comply, NYCHA began to provide periodic reports showing that it was complying with both the seven-day and fifteen-day remediation requirements of the Original Consent Decree.  The biggest problem appeared to be the reoccurrence rates, which were going up.  It was not until March of this year that Plaintiffs discovered that NYCHA's periodic reports were inaccurate, as outlined in the Declaration of Neil Steinkamp in support of this motion.

17.     Because the biggest problem appeared to be the reoccurrence rates, the new procedures and protocols, as well as the pilot study, focused primarily on how to reduce reoccurrence rates, as opposed to making the repairs timelier.  Now that we have discovered that there is a problem with the timeliness of fifteen-day repairs, we expect to focus on that in the next phase of our work.  The largest issue appears to be NYCHA's scheduling system, which is completely manual.  The time required to do the actual work to complete a repair is significantly less than fifteen days in most cases.

18.     Throughout 2017, we had periodic discussions with NYCHA and the Special Master about how we were going to memorialize the progress we had made and turn it into an enforceable order.  The Original Consent Decree was scheduled to expire on April 17, 2018, and it was clear, at that point, that there would be much left to be done.  We suggested to NYCHA that we should negotiate permanent relief or a Revised Consent Decree, and NYCHA and the Special Master agreed.  We also suggested that there be an Independent Ombudsperson, and

NYCHA's former general counsel agreed with that.  In late 2017, we began to draft a Revised

Consent Decree.

19.     In January 2018, NYCHA informed us that it would not be able to fully

implement its "Mold Busters" program until 2019.  In February 2018, NYCHA projected that

full implementation would not be possible until 2020 and gave us a timeline of the

implementation dates.  Needless to say, we were unhappy that we were being informed of these

delays so close to the Original Consent Decree's expiration date.  We were concerned that

NYCHA was doing exactly what it had done in the earlier phases of the case:  waiting out the

clock so that it could do little or nothing before the expiration date.  We were alarmed at the

news of this delay in implementation and were also concerned that NYCHA's clear and

continuous breaches of the Original Consent Decree would go un-remedied if nothing was done

before the expiration date of the Original Consent Decree.

20.     On February 2, 2018, we sent NYCHA a proposal for injunctive relief and said

we would move for that relief unless we could negotiate a Revised Consent Decree.  The Special

Master urged the parties to negotiate and played an active role in the negotiation.  In addition to

attempting to achieve compromises, the Special Master weighed in with positions of his own.

Among other things, he insisted that the procedures and protocols section include a timeline for

NYCHA to complete the various steps of the "Mold Busters" program and that NYCHA certify

the completion of each step.

21.     During the course of the negotiations, we gave NYCHA a Revised Consent

Decree that included detailed provisions dedicated to procedures and protocols, as well as

periodic reports.  NYCHA responded by saying that it needed more time to study Plaintiffs'

proposals, but agreed to a process whereby NYCHA would submit its position by a deadline,

Plaintiffs would respond, and the Special Master would act as final arbiter regarding any outstanding issues.  The parties applied that approach to the Revised Standard Procedure, which has been finalized and submitted to the Court.

22.     Two related issues that came up during the negotiations were who would appoint the Independent Data Analyst, the Independent Mold Analyst, and the Ombudsperson, and what role the Court would play.  The Special Master was in communication with the Court, and so we looked to him for guidance on these issues.  On April 11, 2018, the Special Master reported that he had discussed the Revised Consent Decree with the Court, and the Court had expressed concern about certain aspects of it.  On April 12, 2018, the parties discussed these concerns with the Special Master and agreed to modify the Revised Consent Decree to obviate the Court's concerns.  The parties later submitted a modified Revised Consent Decree to the Special Master, which he filed with the Court on July 24, 2018.  (Dkt. # 193-1.)  We hope that the modified decree is responsive to the Court's concerns.

23.     The Court also expressed concern that there could be a proliferation of appeals from the Ombudsperson's rulings.  The parties have attempted to address that concern in the modified Revised Consent Decree filed with the Court on July 24, 2018.  NYCHA has agreed that there will be no appeals from orders pursuant to paragraph 25 of the Revised Consent Decree, which would be expected to be the bulk of the Ombudsperson's work.  NYCHA can appeal an order pursuant to paragraph 26, which deals with additional relief, including contempt.  Those order are limited to situations in which NYCHA fails to use best efforts and acts in bad faith, and it does so on a systematic basis.  We expect such appeals will be extremely rare, if they occur at all.  For there to be an appeal pursuant to paragraph 26, there must be (i) a breach by NYCHA of the seven-day or fifteen-day requirement; (ii) a failure by NYCHA to use best efforts

or bad faith; (ii) a determination by the Ombudsperson that relief under paragraph 25 is inadequate; (iii) a finding that NYCHA has been committing these breaches on a systematic basis; (iv) a finding by the Ombudsperson that relief under paragraph 26 is appropriate; and (v) a decision by NYCHA to appeal even though the Ombudsperson will have found that NYCHA has failed to use best efforts or has acted in bad faith and has done so on a systematic basis.  We anticipate – and hope – that it will be rare for the Ombudsperson to make such a finding and rarer yet that NYCHA would chose to appeal.

24.     Establishing an Ombudsperson position is the most important part of the Revised Consent Decree as far as Plaintiffs are concerned.  It provides concrete relief for NYCHA residents who are suffering as a result of NYCHA's failure to comply with its obligations.  Many of those residents are people with asthma, for whom timely and effective relief is essential.  The Ombudsperson will perform the function that is currently being performed by community organizers, including those from South Bronx Churches and Manhattan Together.  These organizers receive complaints from NYCHA residents and follow up with NYCHA, but this system is unsustainable and insufficient: most of these organizers are volunteers, many of the complaints do not get to them, and they do not have the power to force NYCHA to do anything.  Institutionalizing this role in the form of an Ombudsperson will provide needed resources to carry out this work and will give teeth to NYCHA's obligations under the Revised Consent Decree.  It is anticipated that the Special Master will determine the Ombudsperson's procedures and compensation, with input from the parties, after the Ombudsperson has been appointed.

25.     As noted above, Plaintiffs believe that one reason for the lack of progress under the Original Consent Decree was that NYCHA hoped it could run out the clock and let the decree expire before it had to take significant action.  The jurisdictional provision of the Revised

Consent Decree is designed to prevent that from happening again.  NYCHA cannot escape its obligations under the Revised Consent Decree unless it can demonstrate compliance and convince the Court that the Revised Consent Decree is no longer needed.  The parties discussed whether the level of compliance should be substantial compliance or something lower or higher and agreed that the Revised Consent Decree should simply say "compliance," leaving it to the Court to decide, based on all the facts and circumstances, whether NYCHA's compliance is sufficient to justify vacating the decree.

26.     The Court has also raised concerns about the circumstances of the filing of the Revised Consent Decree on April 6, 2018.  Before Plaintiffs' counsel could sign off on the Revised Consent Decree, they had to get approval from the Plaintiff groups that have been guiding counsel's work in this case.  That involved about twenty-five people.  At this point, the press had already started making inquiries, and we were concerned that if we held off on filing, there would be stories written about the Revised Consent Decree without having the benefit of the actual decree.  After discussions between NYCHA, Plaintiffs, and the Special Master, a consensus was reached that the best approach would be to have the Special Master file the Revised Consent Decree with the Court.  NYCHA assured Plaintiffs that all relevant people at NYCHA, including the new interim chair, Stanley Brezenoff, had signed off.

27.     Plaintiffs strongly believe that the Revised Consent Decree is in the best interests of the class.  A lot of work has been done over the last four years, but a lot remains to be done. If the Revised Consent Decree is not approved, the efforts to achieve the institutional reform necessary for NYCHA to effectively remediate mold and excessive moisture will be derailed, and many of the benefits of the hard work of an extremely dedicated team of lawyers and clients – as well as the Special Master – may be lost.

11

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

New York, New York
August 31, 2018

<u>/s/ Steven M. Edwards</u>
Steven M. Edwards