**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MARIBEL BAEZ; FELIPA CRUZ; R.D., ON
BEHALF OF HER MINOR CHILD, A.S.; on
their own behalf and on behalf of all others
similarly situated; UPPER MANHATTAN
TOGETHER, INC.; and SOUTH BRONX
CHURCHES SPONSORING COMMITTEE,
INC.,

        Plaintiff,

        v.

NEW YORK HOUSING AUTHORITY,

        Defendant.

No. 13 Civ. 8916 (WHP)

**DECLARATION OF ERIN M. MEYER**
**IN SUPPORT OF PLAINTIFFS'MOTION FOR AN ORDER APPROVING**
**MODIFIED AMENDED STIPULATION AND ORDER OF SETTLEMENT**

I, Erin M. Meyer, declare under penalty of perjury that the following is true and correct:

1.      I am an attorney with the law firm Proskauer Rose LLP, pro bono co-counsel for

Plaintiffs Maribel Baez, Felipa Cruz, and R.D., on behalf her minor child, A.S., on their own

behalf and on behalf of all others similarly situated; and for Upper Manhattan Together, Inc., and

South Bronx Churches Sponsoring Committee, Inc. ("Plaintiffs"), in this action against the New

York City Housing Authority ("NYCHA"). I am admitted to practice in this Court, and I

respectfully submit this declaration in support of Plaintiffs' Motion for an Order Approving

Modified Amended Stipulation and Order of Settlement, filed August 31, 2018.

2.      I became pro bono co-counsel to the Natural Resources Defense Council

("NRDC") and the National Center for Law and Economic Justice ("NCLEJ") in or around

1

September 2014, while I was employed by my previous law firm, and I have continuously served as pro bono co-counsel on this case since that time.

### Developing Mold Remediation Protocols with the Special Master and Microecologies

3.      On February 1, 2016, the Court appointed Professor Francis McGovern to serve as Special Master in this litigation.  (Dkt. #96.)  The Court authorized the Special Master to investigate NYCHA's failure to comply with the Original Consent Decree[1] entered on April 17, 2014 (Dkt. #11) and to recommend remedial actions to the Court.

4.      Since the Special Master was appointed, the parties have met with him more than twenty times to discuss NYCHA's ongoing breaches of the Original Consent Decree and the steps that NYCHA should take to cure those breaches.

5.      In or around the summer of 2016, the parties began to work with the Special Master's expert, Bill Sothern, the founder of Microecologies, to design new and improved procedures and protocols to remediate mold and excessive moisture.  Mr. Sothern is a nationally recognized authority in indoor environmental health with more than twenty years of experience in this field and is certified as an industrial hygienist by the American Board of Industrial Hygiene.  Plaintiffs recommended Mr. Sothern to the Special Master because NRDC had known of Microecologies' reputation as the best in the business and knew that Microecologies had expertise in investigating mold and moisture problems in NYCHA's buildings in particular. Indeed, NRDC had hired Microecologies to inspect the mold and/or excessive moisture problems in the apartments of the named plaintiffs in *Baez* at the outset of the litigation.  Plaintiffs believed that Microecologies would provide the expertise that both Plaintiffs and NYCHA lacked in terms

---

[1]      Capitalized terms not defined herein shall have the meaning given to them in Plaintiffs' Memorandum in Support of Their Motion for an Order Approving Modified Amended Stipulation and Order of Settlement.

of identifying the root causes of mold and excessive moisture in NYCHA housing and developing appropriate remediation methods to address those root causes. The Special Master formally engaged Microecologies as a neutral expert on March 30, 2017. (Dkt. #145.)

6.      After conducting numerous inspections and root cause analyses in NYCHA apartments affected by mold and excessive moisture and discussing these issues in-depth with NYCHA personnel, Microecologies recommended a number of improved protocols for identifying mold, excessive moisture, and water damage, diagnosing the root causes of these problems, and identifying the proper remediation methods.

7.      To test the effectiveness of Microecologies' proposed protocols, NYCHA agreed to utilize them in ten NYCHA developments as part of a "Mold Busters" pilot project. In connection with this limited rollout of the new protocols, NYCHA retained Matthew Perzanowski, Associate Professor of Environmental Health Sciences at Columbia University's Mailman School of Public Health, to design a study that would analyze the effectiveness of the new remediation protocols implemented in the "intervention group" buildings as compared to a "control group" of buildings in which NYCHA continued its usual remediation practices. A true and correct copy of Professor Perzanowski's Mold and Root-Cause Pilot Program study design, as transmitted by NYCHA to Plaintiffs in April 2017, is attached as **Exhibit 1**.

8.      In or around April 2017, NYCHA began training the employees who would be responsible for conducting inspections and root cause analyses for mold, excessive moisture, and water damage in the pilot project intervention buildings using a handheld application that NYCHA created for this purpose. I attended one of these training programs, led by Microecologies, NYCHA's Deputy Director Anthony Marotta, and NYCHA's consultant Steven

Winter Associates, on or about April 14, 2017. A true and correct copy of the PowerPoint presentation from this training program is attached as **Exhibit 2**.

9. NYCHA officially launched the pilot project on May 1, 2017, but the first two months of this limited rollout were marred by flawed data collection, inconsistent implementation of the new protocols, a refusal to adopt certain protocols that Microecologies had stressed were critical to preventing the reoccurrence of mold, and an overall lack of transparency. A true and correct copy of a letter dated June 28, 2017, in which Plaintiffs conveyed these concerns to the Special Master, is attached as **Exhibit 3**.

10. On September 27, 2017, the Special Master issued a draft Overview of Interim Report in which he indicated that "there are virtually universal ventilation problems" and concluded that "[o]ptimal mold eradication will involve operation of all [roof] fans for 24 hours a day at a level of 25 cfm's (cubic feet per minute)." This was not the first time NYCHA had been informed that the roof fans should be operated twenty-four hours per day. Microecologies had advised NYCHA as early as August 24, 2016, that based on Microecologies' inspections of NYCHA apartments suffering from mold and excessive moisture, "it may be appropriate to recommend that the rooftop fans be replaced/modified to provide significantly greater airflow." A true and correct copy of Microecologies' e-mail dated August 24, 2016, is attached as **Exhibit 4**.

11. By May 25, 2017, Microecologies advised NYCHA that "all rooftop exhaust fans [should] be operated 24/7" in the pilot project intervention buildings. Microecologies also noted that NYCHA's own consultant, Steven Winter Associates, had similarly advised NYCHA to ensure that there is adequate air flow from rooftop exhaust fans. A true and correct copy of Microecologies' e-mail dated May 25, 2017, is attached as **Exhibit 5**.

12.     On August 2, 2017, after having completed more than 100 apartment inspections, Microecologies estimated that as many as half of NYCHA's roof fans were not functional and observed an "extraordinarily high (>50%) prevalence of mold complaints/problems where inadequate exhaust ventilation is a root-cause of condensation-related mold." Microecologies strongly urged NYCHA to conduct a comprehensive evaluation of which roof fans were malfunctioning and to prioritize repairing or replacing those fans as part of its mold eradication program. A true and correct copy of Microecologies' August 2, 2017, e-mail with its attachment is attached as **Exhibit 6**.

13.     On December 6, 2017, Professor Perzanowski reported that his interim analysis of data collected from the pilot project between May 2017 and November 2017 revealed that there were statistically significant higher rates of mold reoccurrence in NYCHA developments that lacked adequate ventilation and statistically significant lower rates of mold reoccurrence in intervention developments in which the roof fans were being run twenty-four hours per day. A true and correct copy of Professor Perzanowski's Mold and Root-Cause Pilot Program Study Interim Report dated December 6, 2017, is attached as **Exhibit 7**.

14.     Despite Professor Perzanowski's findings and the recommendations made many months ago by Microecologies and the Special Master that NYCHA should run all of its roof fans twenty-four hours per day, NYCHA took no action until the Special Master threatened at a conference on January 18, 2018, to get a court order compelling NYCHA to run the fans. It was not until April 27, 2018, that NYCHA finally revised its policy to require that, as of June 1, 2018, roof fans would operate twenty-four hours per day in all buildings. A true and correct copy of NYCHA's Interim Guidance on Roof Fan Operation and Inspection dated April 27, 2018, is attached as **Exhibit 8**. NYCHA claimed on June 26, 2018, that 7,537 of its

approximately 8,000 roof fans were functioning properly (Dkt. #173 at 16), but NYCHA has yet to provide Plaintiffs with documentation to substantiate that claim.

15.    Although NYCHA had launched the Mold Busters program in the pilot project intervention buildings as far back as May 2017, NYCHA revealed to Plaintiffs at a conference with the Special Master on January 11, 2018, that NYCHA could not roll out the Mold Busters program NYCHA-wide until all of the relevant employees had been trained, and there was no way that NYCHA could finish that training until 2019 at the earliest because the training program would take at least one year to complete.  NYCHA then revealed to Plaintiffs at a subsequent conference with the Special Master in February 2018 that the long-touted Mold Busters program would not be fully operational NYCHA-wide until at least 2020.  NYCHA informed Plaintiffs that its new Standard Procedure for remediating mold and excessive moisture would not be ready for Plaintiffs' review until May 17, 2018; that revised computer programs, including an updated mold and moisture inspection application for NYCHA's handheld device, would not be ready until August 30, 2018; that NYCHA's periodic reports would not be revised and enhanced until December 31, 2018; and that the new training program would not be completed until December 23, 2019.  A true and correct copy of NYCHA's Mold Busters roll-out schedule is attached as **Exhibit 9**.

### NYCHA's Continuing Breaches

16.    Suspecting that NYCHA was not remediating mold and excessive moisture within the seven- and fifteen-day time parameters even though NYCHA's periodic reports purported to show that NYCHA was in compliance, Plaintiffs asked NYCHA for access to its Maximo database to search the underlying work order data and assess the accuracy of NYCHA's calculations.  NYCHA's former counsel refused this access.  In late January 2018, Plaintiffs

6

engaged forensic data analysts at Stout Risius Ross, LLC ("Stout") to help Plaintiffs uncover the inaccuracies in NYCHA's existing periodic reports and to develop recommendations for new and improved periodic reports that would meaningfully measure NYCHA's compliance with its mold and moisture remediation obligations.

17.    Stout's analysis revealed that NYCHA's periodic reports had understated NYCHA's average completion times for simple and complex mold repairs and that NYCHA was not in compliance with the Original Consent Decree's fifteen-day time parameter for complex repairs.  In particular, NYCHA had failed to include in its calculations of average completion times the work orders that were opened in one quarter but closed in a subsequent quarter.  After Plaintiffs presented Stout's findings to NYCHA and the Special Master, the Special Master directed NYCHA to investigate the errors in the periodic reports and provide an explanation.  On March 22, 2018, NYCHA's counsel admitted that there were "significant gaps in capturing all closed work orders" in the reports and that "this oversight was not recognized and addressed by NYCHA."  A true and correct copy of NYCHA's e-mail and letter to the Special Master dated March 22, 2018, is attached as **Exhibit 10**.

<u>**Negotiating the Revised Consent Decree**</u>

18.    Faced with four years of continuous breaches, the Original Consent Decree's impending expiration on April 17, 2018, and nothing from NYCHA other than a nonbinding commitment to roll out its Mold Busters program by 2020, Plaintiffs decided to move for relief. On February 2, 2018, Plaintiffs sent to NYCHA and the Special Master a draft "Proposed Order for Permanent Relief" dated February 1, 2018, which in subsequent drafts was renamed the "Proposed Order for Injunctive Relief."  Plaintiffs invited NYCHA, under the Special Master's supervision, to negotiate an agreement in lieu of motion practice.  A true and correct copy of

Plaintiffs' transmittal e-mail dated February 2, 2018, with the attached draft Proposed Order for Permanent Relief dated February 1, 2018, is attached as **Exhibit 11**.

19. Plaintiffs drafted the proposed order to address specific failings in NYCHA's performance under the Original Consent Decree. First, it aimed to provide relief for NYCHA residents directly suffering from NYCHA's continued breaches by limiting the time to complete repairs and by providing for the appointment of an independent Ombudsperson to whom residents could go if NYCHA failed to comply with its obligations. Second, it contained seven pages of detailed mold and moisture inspection and remediation protocols, which Plaintiffs believed NYCHA had already agreed to in dozens of prior meetings with Microecologies. Third, it included a detailed new reporting structure, based on Stout's recommendations, designed to produce more accurate and meaningful information about NYCHA's compliance, and it required that NYCHA certify the truthfulness of these reports under penalty of perjury. Fourth, it called for the appointment of an Independent Data Analyst – such as Stout – who could audit the new reports' accuracy, as well as an Independent Mold Analyst – such as Microecologies – who could monitor and improve the effectiveness of NYCHA's procedures and protocols, because Plaintiffs and the Special Master do not have the necessary expertise to perform those functions. Fifth, its terms bound NYCHA until NYCHA could show that it was in compliance and that the decree was therefore unnecessary. This final requirement was intended to ensure demonstration of a sustained track record of performance and to prevent NYCHA from simply delaying until the decree expired, as it had done under the Original Consent Decree.

20. To effectuate its provisions, the proposed order provided that the Special Master would issue reports and recommendations, to which NYCHA could object pursuant to Fed. R. Civ. P. 53(f). This ensured that the Court would maintain control over the process, including the

ability to make necessary modifications, while protecting NYCHA's due process rights. In short, the proposed order was designed to remedy NYCHA's breaches by accomplishing the Original Consent Decree's objectives: to effectively and timely remediate mold and excessive moisture.

21. On February 26, 2018, Plaintiffs sent NYCHA a revised draft of the proposed order, dated February 25, 2018, reflecting changes requested by NYCHA at a meeting with Plaintiffs and the Special Master on February 21, 2018. A true and correct copy of the transmittal e-mail dated February 26, 2018, the revised draft of the proposed order dated February 25, 2018, and the redline comparing it to the February 1, 2018, version are attached as **Exhibit 12**.

22. NYCHA did not provide written comments on the proposed order until March 13, 2018, more than a month after Plaintiffs had sent their initial proposal. True and correct copies of an e-mail from NYCHA's counsel dated March 13, 2018, and the attachment containing NYCHA's proposed edits to the proposed order are attached as **Exhibit 13**. In its response, NYCHA rejected the revised performance standards and modified procedures and protocols, proposing instead a "timetable for negotiations" on these matters, which is what appears in the Revised Consent Decree ultimately filed with the Court. Similarly, NYCHA refused to adopt the new periodic reports and instead proposed establishing only a process for developing those reports. Although NYCHA agreed in principle to having an Independent Data Analyst and an Independent Mold Analyst, it insisted that NYCHA, rather than the Special Master, select these individuals. Likewise, NYCHA consented to the appointment of an Ombudsperson, provided that the Ombudsperson would be a NYCHA employee that NYCHA would select. Finally, NYCHA asserted that the Revised Consent Decree should expire in December 2020, regardless whether NYCHA had achieved any measure of compliance with its terms.

23.     At first, Plaintiffs planned to reject NYCHA's proposals and seek relief from the Court.  At the Special Master's urging, however, Plaintiffs agreed to defer filing a letter seeking a pre-motion conference and to negotiate further with NYCHA instead.  Intensive negotiations ensued, throughout which the parties exchanged several drafts, and Plaintiffs made several concessions, including agreeing to revert to the Original Consent Decree's performance requirements, provided that NYCHA agree to use best efforts to complete repairs as quickly as possible where the time to repair exceeded the seven- or fifteen-day parameter.  Plaintiffs also agreed to NYCHA's proposed process for developing new procedures and protocols, provided that the protocols contained certain minimum requirements and addressed the problem with the roof fans, as well as to NYCHA's proposed process for developing new periodic reports. Plaintiffs took the position that the Special Master, after receiving input from the parties, should issue reports and recommendations under Fed. R. Civ. P. 53(f) appointing the Independent Data Analyst, the Independent Mold Analyst, and the Ombudsperson, all subject to the Court's approval.  Finally, to deter NYCHA from continuing to evade its obligations, Plaintiffs insisted that the Court should retain jurisdiction until NYCHA could demonstrate that it had complied with the Revised Consent Decree such that the decree was no longer needed.  True and correct copies of Plaintiffs' draft proposed order dated March 20, 2018, NYCHA's draft counter-proposal dated March 23, 2018, Plaintiffs' revised draft dated March 27, 2018, and Plaintiffs' further revised draft dated April 3, 2018, are attached as **Exhibits 14, 15, 16, and 17**, respectively, along with their transmittal e-mails.

24.     During the negotiations, the Special Master expressed his opinion on a number of issues.  He insisted, for example, that the procedures and protocols section of the proposed order should include a timeline for NYCHA to complete the various steps of its Mold Busters program

and that NYCHA certify the completion of each step. The Special Master also pressed the parties to agree that he should have the authority to appoint the Independent Data Analyst, Independent Mold Analyst, and Ombudsperson, without seeking the Court's prior approval.

25. The parties reached an agreement on the Revised Consent Decree on April 4, 2018, and Manhattan Together and South Bronx Churches obtained approval from their constituencies on April 5, 2018. A true and correct copy of the April 5, 2018, e-mail exchange confirming the parties' final agreement is attached as **Exhibit 18**. The Special Master filed the Revised Consent Decree with the Court on April 6, 2018. (Dkt. #166-1.)

## Public Comments on the Revised Consent Decree

26. The Special Master filed a modified version of the Revised Consent Decree on July 24, 2018 (Dkt. #193-1), and the Court entered an order on July 18, 2018, soliciting written comments on the proposed settlement from interested members of the public. (Dkt. #190.) My colleagues and I have reviewed the public comment letters received and have sorted them to the best of our abilities. By our count, the Court has received more than 150 letters of support from *Baez* class members who either personally suffer or have household members who suffer from asthma and who have experienced mold and/or excessive moisture problems in their NYCHA apartments. The Court also received approximately 350 additional letters from other NYCHA tenants and members of the public who have described their mold and/or excessive moisture problems and/or have voiced their support for the Revised Consent Decree. Several letters, described in greater detail below, appear to support the Revised Consent Decree while suggesting additional remedies for NYCHA's breaches, and we believe that only one letter was submitted in opposition to the Revised Consent Decree.

## Letter of Support from Class Representative Felipa Cruz

27.    Class Representative Felipa Cruz and her husband, Oscar Cruz, describe in their comment letter their "serious leak issues," including a leak that occurred in mid-July 2018.  I understand that the leak has recently been repaired, almost two months after it occurred.  They support the Revised Consent Decree because they believe it will help to solve the problems of "NYCHA's neglect" and "late repairs."  A true and correct copy of Oscar and Felipa Cruz's letter is available at COMMENTS_00400-03.[2]

## Letters of Support from Leaders of Manhattan Together and South Bronx Churches

28.    Father Francis Skelly, Reverend Getulio Cruz Jr., Father Sean McGillicuddy, Pastor Thomas McNamara, and Reverend Peter A. Mushi, religious leaders who are members of the institutional plaintiffs Manhattan Together and/or South Bronx Churches, also provided comment letters in support of the Revised Consent Decree.  These leaders have expressed support for the Revised Consent Decree as a necessary measure to force NYCHA to use improved mold remediation tools and procedures and to impose a greater degree of accountability through the appointment of an independent ombudsperson, mold expert, and data analyst to ensure NYCHA's compliance.  Many of the parishioners belonging to these religious institutions are NYCHA tenants afflicted by mold, excessive moisture, and respiratory illnesses, and the clergy who have written these letters of support have personal knowledge of the conditions in which these tenants live and NYCHA's failure to make effective and timely repairs.

---

[2]    The Bates numbers refer to the numbering the United States Attorney's Office for the Southern District of New York has applied to the letters it received on behalf of the Court.

29.     In particular, Father Skelly and Reverend Cruz have been involved in the *Baez*

case since its inception, and personally attended many of the meetings with the Special Master,

NYCHA, and Microecologies over the past two years.  They actively participated in developing

the new mold remediation protocols reflected in the Revised Standard Procedure (Dkt. #184),

and in drafting and negotiating the Revised Consent Decree.  Approximately twenty-four

NYCHA tenants, seven of whom suffer from asthma or respiratory disabilities or have household

members who do, signed onto Reverend Cruz's letter in further support.  Approximately thirty-

five NYCHA tenants, eleven of whom suffer from asthma or respiratory disabilities or have

household members who do, signed onto Father Skelly's letter in further support.  True and

correct copies of the letters of Father Skelly, Reverend Cruz, Father McGillicuddy, Pastor

McNamara, and Reverend Mushi are available at COMMENTS_02133-38; 00391-95; 01420-22;

01437-38; 01574-75.

30.     In addition, the Court has received a letter of support from Ray Lopez, a leader of

Manhattan Together and the Director of Environmental Health Services at Little Sisters of the

Assumption Family Health Service.  Mr. Lopez has previously filed two declarations (Dkt. ##39,

85) in this case and over the past seventeen years has personally visited and inspected thousands

of NYCHA apartments to advocate on behalf of tenants living in unsafe and unhealthy

conditions.  Mr. Lopez laid the groundwork for the filing of the *Baez* case and has remained

deeply involved in the case since then.  He has collaborated with Microecologies in designing

improved mold remediation protocols, attended many of the meetings with the Special Master,

and participated in drafting and negotiating the Revised Consent Decree.  He supports the

Revised Consent Decree because it contains much-improved mold remediation protocols,

including a requirement that NYCHA use moisture meters, and new measures such as the

appointment of an independent ombudsperson, mold expert, and data analyst to hold NYCHA accountable. A true and correct copy of Ray Lopez's letter is available at COMMENTS_01290-93.

**Letters of Support from NYCHA Class Members and Other Tenants**

31.     Approximately seventy-five NYCHA tenants who discussed the Revised Consent Decree with the *Baez* Class Counsel or pro bono co-counsel in person or by telephone in August 2018 submitted comment letters describing their mold and/or excessive moisture problems and/or their support for the Revised Consent Decree. True and correct copies of these letters are available at COMMENTS_00006-07; 00020-21; 00022-23; 00051-52; 00053-55; 00067-68; 00069-70; 00142-43; 00184-85; 00278-79; 00280-81; 00298-99; 00381-82; 00455-56; 00491-92; 00504-05; 00508-09; 00510-12; 00513-14; 00546-47; 00604-06; 00607-08; 00614-16; 00752-53; 00757-58; 00871-72; 00916-17; 00918-19; 00958-60; 01136-37; 01219-20; 01315-16; 01330-31; 01369-70; 01462-63; 01470-71; 01504-05; 01507-08; 01597-98; 01606-07; 01610-11; 01625-26; 01627-28; 01632-33; 01686-87; 01693-94; 01695-96; 01728-29; 01809-12; 01858-60; 01881-82; 01883-84; 01972-74; 01979-80; 01981-82; 01990-91; 01992-93; 02011-12; 02013-14; 02044-45; 02046-47; 02052-53; 02055-56; 02081-82; 02163-64; 02174-76; 02185-86; 02187-88; 02189-91; 02303-06; 02357-58; 02440-41; 02442-43; 02450-51; 02470-71. Of these tenants, approximately forty-two have asthma or have household members who do. These letters of support convey consistent themes that are also echoed in the hundreds of additional public comment letters submitted by tenants and other members of the public who did not personally discuss the Revised Consent Decree with the *Baez* counsel: Under the Original Consent Decree, NYCHA continued to apply merely cosmetic fixes to mold problems, such as cleaning and painting over the mold, such that the mold inevitably would reoccur. Relatedly, NYCHA

consistently fails to identify and abate the underlying moisture or leak that causes the mold to grow. The tenants feel that NYCHA has neglected and abandoned them, and worse still, has treated them like animals by knowingly causing them to live in extremely inhumane conditions. NYCHA tenants pay rent, sometimes more than one thousand dollars per month, and yet their apartments are riddled with mold and water leaks. The tenants have reported the mold and moisture problems to NYCHA numerous times, but NYCHA takes weeks, if not months or even years, to address the problems. NYCHA promises to make repairs, but then fails to show up for appointments or falsely claims that the tenant was not home during the appointment time. NYCHA makes multiple visits to accomplish repairs that could be done in a single visit or schedules and sends skilled trades workers in the wrong sequence. Above all, tenants are deeply concerned that the persistent mold and excessive moisture problems are seriously harming their health and that of their family, neighbors, and especially children.

32. These class members and other tenants support the Revised Consent Decree because it has the potential to force NYCHA to (i) use improved mold remediation protocols that will abate the root causes of mold and moisture in a manner that prevents reoccurrences; (ii) properly train its employees on these protocols; and (iii) implement both the protocols and the training by strict deadlines. Many class members and tenants also expressed support for the Revised Consent Decree because it will give them an independent Ombudsperson who can hold NYCHA accountable and help them obtain relief when NYCHA is unresponsive, too slow, or ineffective in addressing their mold and moisture problems. Overall, these class members and tenants expressed that action must be taken to correct NYCHA's failures and that the Revised Consent Decree represents a step in the right direction.

## Letter in Opposition to Revised Consent Decree

33.     In reviewing the public comment letters to the best of our abilities, my colleagues and I identified only one letter that we believe could be construed as a letter in opposition to the Revised Consent Decree.  The writer, a NYCHA tenant named Manatazach Mayam who identifies as an "Independent Priest" and does not claim to have asthma, mold, or excessive moisture issues, states that the *Baez* settlement is not a "good idea" and "should not be sustained" because it could "defy the sovereignty of the people as a whole who have free rights." The tenant opposes the U.S. settlement as well on the basis that a court-appointed monitor or ombudsperson could be "another scheme for NYCHA to have power to control and make decisions" that would be "unfair to laws that already exist" and "binding on the bodies in their jurisdiction."  The tenant posits, "as a Remedy," that the settlement should allow a tenant to receive "a Transfer to another apartment" or to be "compensated $10,000.00 or more plus moving expensive [sic]" and "compensated to the fullest for the tort."  A true and correct copy of Manatazach Mayam's letter is available at COMMENTS_01409-10.

34.     Plaintiffs believe that this tenant has misunderstood the Revised Consent Decree and that it should be approved notwithstanding this sole opposition letter found amongst hundreds of supportive letters.  The tenant appears to be concerned that the Revised Consent Decree would trample tenants' rights to bring individual actions against NYCHA, but nothing in the Revised Consent Decree prevents a tenant from filing housing court complaints or tort claims against NYCHA.  To the contrary, the Revised Consent Decree explicitly provides that "[n]o provision of this Order shall infringe upon an individual's right to challenge NYCHA's failure to provide an accommodation or to otherwise address conditions in his or her apartment in any appropriate administrative or court proceeding."  Revised Consent Decree ¶ 32.  Furthermore,

16

the Revised Consent Decree requires NYCHA to approve a tenant's request to be transferred to another apartment and to receive the highest transfer priority when a Capital Improvement is necessary to remediate the root cause of the mold or excessive moisture in the tenant's apartment. *Id.* ¶ 3(d). The Revised Consent Decree also empowers the Ombudsperson to issue an order requiring NYCHA to approve and assign the highest priority to an apartment transfer. *Id.* ¶ 25. The Revised Consent Decree does not require NYCHA to pay tenants a specific dollar amount of compensation, but it does permit the Ombudsperson to order "other appropriate relief" – which could include ordering monetary compensation to a resident as long as doing so would not have an adverse effect on the resident's continued eligibility for housing assistance – in instances where NYCHA has acted in bad faith or has failed to use its best efforts in connection with resolving mold and excessive moisture complaints under the Ombudsperson's investigation. *Id.* ¶ 26. Lastly, Plaintiffs rejected NYCHA's initial position that the Ombudsperson should be a NYCHA employee for the very reason that tenants would not trust the Ombudsperson to make impartial decisions and to hold NYCHA accountable unless the Ombudsperson was not affiliated with NYCHA. As a result, the Revised Consent Decree provides that the Ombudsperson must be independent. *Id.* ¶¶ 1(m), 22.

## Letters of Support Recommending Additional Remedies

35. Among the letters corroborating the mold and moisture problems in NYCHA housing and/or expressing support for the Revised Consent Decree were some that appear to criticize certain aspects of the Revised Consent Decree and/or suggest additional remedies for NYCHA's breaches.

36. Of these letters, we believe the one most critical of the Revised Consent Decree was written by Eneida Perez, a tenant who does not claim to have asthma, mold, or excessive

moisture, but who states that she has "been waiting for a plumber for over 6 months" because her "ceiling is falling in the bathroom" and that NYCHA has been unresponsive despite the fact that she has submitted more than ten maintenance requests for this issue. Ms. Perez expresses concern that the federal monitor proposed by the U.S. settlement and the Special Master existing under the *Baez* settlement are additional "salaried personal [sic] who, will do nothing, like all the workers in the NYCHA developments."

37.     Plaintiffs believe that, contrary to Ms. Perez's assertion, the Special Master has devoted a significant amount of time and effort toward analyzing the reasons for NYCHA's failure to comply with the Original Consent Decree and designing and testing improved methods for remediating mold and its root causes. Assuming Ms. Perez would similarly criticize the cost of the Ombudsperson – although she does not explicitly do so in her letter – Plaintiffs' response is that the Revised Consent Decree provides that selection of the Ombudsperson is subject to the Court's approval (*Id.* ¶ 22), and the Court may base its approval in part on the Court's assessment of the candidate's work ethic and the reasonableness of the candidate's proposed fees. Furthermore, the Revised Consent Decree requires that the Ombudsperson's monthly invoices be submitted to the Special Master for approval, which will safeguard against unreasonable expenditures. *Id.* ¶ 23. A true and correct copy of Eneida Perez's letter is available at COMMENTS_01720-21.

38.     My colleagues and I identified only four letters from *Baez* class members that appeared to be suggesting additional remedies:

    a.     The first, Latee J. Middleton, a NYCHA tenant who reports having asthma and being dissatisfied that it took NYCHA two-and-a-half months to fully remediate mold, water leakage, and flooding in her bathroom, wrote that "one of many solutions is to speed up the 'in

18

house' caretaker initiative program, as a first line of defense."  While the Revised Consent Decree does not specifically address an in-house caretaker initiative, it does require NYCHA to complete a training program regarding the Revised Standard Procedure by December 23, 2019 (*Id.* ¶ 7(c)), and NYCHA informed us during a meeting with the Special Master that the training program will include training specifically for NYCHA caretakers.  A true and correct copy of Latee J. Middleton's letter is available at COMMENTS_01478-79.

      b.     The second, NYCHA tenant Nicole Campbell, whose children have asthma and whose apartment has mold and excessive moisture problems, wrote that "Although I agree with the conditions set forth by the consent decrees in Baez v. NYCHA (13cv8916) and the United States v. NYCHA (18cv5213), more should be done."  She recommends that (i) there should be an independent monitoring system with tenants on the monitoring board; (ii) NYCHA should use better independent contractors rather than merely choosing the lowest bidder; (iii) NYCHA's books should be audited monthly; and (iv) managers who perform well should be acknowledged and rewarded.  Although the Revised Consent Decree does not establish a monitoring board, it envisions that tenants will participate in holding NYCHA accountable by reporting problems directly to the independent Ombudsperson who can investigate and intervene on behalf of individual tenants.  *Id.* ¶¶ 24-25.  The Revised Consent Decree empowers the Ombudsperson to hire independent contractors who are appropriately licensed and qualified to perform the work required.  *Id.* ¶ 25.  The Revised Consent Decree also establishes an Independent Data Analyst to audit NYCHA's periodic reports and review NYCHA's mold and excessive moisture data to ensure accuracy.  *Id.* ¶ 18.  The Revised Consent Decree does not specifically contemplate rewards for NYCHA managers, but nothing in the Revised Consent Decree prevents NYCHA

from rewarding or otherwise acknowledging its employees for a job well done. True and correct copies of Nicole Campbell's letters are available at COMMENTS_00285-87; 00288-90.

     c.     The third, NYCHA tenant Tina Johnson, whose children suffer from asthma and whose apartment has mold, wrote in support of the Revised Consent Decree because it provides a system for remedying NYCHA's pattern of neglect, including a "formal, transparent structure of oversight" to keep "NYCHA honest," and because it "requires residents [to] receive repairs on a schedule." Ms. Johnson questions how residents will know whether a repair should be categorized as "simple" or a "capital improvement" under the Revised Consent Decree. The Revised Consent Decree provides a definition for "Capital Improvement" and excludes certain types of repairs from being considered Capital Improvements. *Id.* ¶ 1(c). In addition, the Revised Consent Decree requires NYCHA to use its best efforts to perform all Capital Improvements necessary to remediate the root cause of mold or excessive moisture consistent with NYCHA's Capital Plan and retains Plaintiffs' right to challenge NYCHA's determination that a particular repair constitutes a Capital Improvement. *Id.* ¶ 3(d). A true and correct copy of Tina Johnson's letter is available at COMMENTS_01180-82.

     d.     The fourth, NYCHA tenant Jacklyne Michele Holmes, "agree[s] with the measures presented" in the Revised Consent Decree, but added that "[m]old abatement needs to be done per line . . . [because] [l]ocation of the apartments and leaks has a lot to do with mold being present on one line and being absent on another." She also requested the creation of a "Resident Information/Outreach Department" to inform residents of next steps. The Revised Standard Procedure specifically identifies "Leak in apartment above/beside" as a possible root cause that NYCHA's inspector will consider and select if appropriate when performing mold inspections using the application designed for NYCHA's handheld device. (Dkt. #184 at 12.)

The Revised Consent Decree also contemplates that NYCHA will undertake efforts to communicate the new Mold Busters program to all residents. Revised Consent Decree ¶ 7(e). A true and correct copy of Jacklyne Michele Holmes' letter is available at COMMENTS_01064-67.

39. Additional letters from tenants who are not members of the *Baez* class recommend various forms of relief, most of which is already addressed by the Revised Consent Decree:

a. Martha Rivera, a NYCHA tenant who reported "constant leaking in the bathroom" that she believes will lead to "mold growth," stated, "It's easy to tell a tenant, 'Oh! There's no mold here!' There would have to be an outside agency conducting the test." Plaintiffs agree that independent oversight is necessary to ensure that NYCHA fulfills its mold remediation obligations, and the Revised Consent Decree calls for the appointment of an Independent Mold Analyst who will perform quality assurance inspections of a statistically significant number of apartments on a quarterly basis. *Id.* ¶ 20. A true and correct copy of Martha Rivera's letter is available at COMMENTS_01891-93.

b. Current NYCHA tenant Gerline E. Harrison and former NYCHA tenant Rhonda E. Harrison submitted similar letters proposing that (i) NYCHA's time to complete repairs should be capped at thirty days; (ii) rent should be reduced if repairs are not made within thirty days or if tenants must expend their own money on repairs; and (iii) NYCHA residents should be able to vote on who the Ombudsperson will be, and the Ombudsperson's role should be term-limited and subject to re-election by the tenants. The Revised Consent Decree does not place a cap on the number of days to complete repairs, in part because Plaintiffs had previously proposed that remedy in their Motion to Enforce the Original Consent Decree (Dkt. #44), but the Court

declined to impose that remedy (Dkt. #88).  As stated above, the Revised Consent Decree

permits the Ombudsperson to provide "other appropriate relief," which may include rent

abatements.  Revised Consent Decree ¶ 26.  As to the selection of the Ombudsperson, the

Revised Consent Decree contemplates that the parties will propose candidates to the Special

Master who in turn will make a recommendation subject to the Court's approval.  *Id.* ¶ 22.

While it would not be administratively practical to conduct an election in which tenants vote to

select the Ombudsperson, Plaintiffs' counsel do expect to receive input from the *Baez*

institutional Plaintiffs and class members as to who should be nominated for the

Ombudsperson's role.  Furthermore, the Revised Consent Decree provides that the

Ombudsperson shall serve for such a period of time as the Special Master shall decide, which

contemplates that an underperforming Ombudsperson could have his or her role terminated.  *Id.*

True and correct copies of the letters of Gerline E. Harrison and Rhonda E. Harrison are

available at COMMENTS_00883-85; 00886-89.

  c.  NYCHA tenant Amy Ortega wrote, "I agree with [the] proposed settlement and

there should be a finance monitor. I have been dealing with my own mold and falling wall issues

for a very long [time]. I hope, like the proposed settlement, they are able to fix issues w/in [sic] 7

days."  It appears that Ms. Ortega may be conflating the U.S. settlement and the *Baez* settlement,

as the Revised Consent Decree, unlike the U.S. settlement, does not address issues of funding for

which a finance monitor may be warranted.  A true and correct copy of Amy Ortega's letter is

available at COMMENTS_01623.

  d.  NYCHA tenant Clara Frazier wrote, "I do believe there should be a skilled team

of court appointed staff under the Special Master and an Independent Party to . . . complet[e] the

task of eliminating . . . mold related issues . . . and the root of all problems to make sure there is

no reoccurrence in [a] timely manner." She recommends that when the repairs are done, "the supervisor should do a walk through the same or next day to make sure the repairs met the resident['s] expectations." Plaintiffs believe this concern is adequately addressed by the Revised Standard Procedure, incorporated by reference into the Revised Consent Decree, which provides that within five days of completing a mold, water damage, or moisture repair, NYCHA will automatically generate a quality assurance inspection work order that will trigger a NYCHA inspector to confirm that all of the work to remediate the condition and correct the root causes was satisfactorily completed. (Dkt. #184 at 20-23.) A true and correct copy of Clara Frazier's letter is available at COMMENTS_00666-67.

e.    NYCHA tenants Tony and Trisha Yancey stated that they "agree with the settlement but would like any monetary awards to be used for plaintiffs with past due balances." Similarly, NYCHA tenant Sheenadahnara Sierra has requested to "be compensated monetarily." These comments are not relevant in that the Revised Consent Decree does not contemplate monetary awards although it does, as stated above, enable the Ombudsperson to award "other appropriate relief," which may include rent abatements. Revised Consent Decree ¶ 26. True and correct copies of the letters of Tony and Trisha Yancey, and Sheenadahnara Sierra, are available at COMMENTS_02670-71; 02672-73; 02118.

f.    NYCHA tenant Enna Romero suggested that individual tenants who do not do their part to contribute to the wellness of other tenants should be penalized. The Revised Consent Decree does not prevent NYCHA from creating, or enforcing its existing, rules and regulations concerning tenant behavior and safety. A true and correct copy of Enna Romero's letter is available at COMMENTS_02006-07.

g.      NYCHA tenant Addie R. Marrow proposed adding to the Revised Consent Decree a specific provision requiring NYCHA to address the rust and excessive moisture in her bathroom.  The Revised Consent Decree does require NYCHA to effectively remediate excessive moisture without needing to mention Ms. Marrow's apartment specifically, and the Ombudsperson would be a channel through which Ms. Marrow could report this specific issue should NYCHA fail to remediate the excessive moisture effectively and within the applicable time parameters.  A true and correct copy of Addie R. Marrow's letter is available at COMMENTS_01360-62.

h.      NYCHA tenant Valerie White indicated that she supports the Revised Consent Decree because it calls for an Ombudsperson who can order relief for individual tenants and because it sets strict guidelines on how and when repairs should be done, but she requests a special service for scheduling repair appointments that accommodates tenants' work schedules and more advance notice of appointments for repairs.  The Revised Standard Procedure, incorporated by reference into the Revised Consent Decree, provides a detailed process for contacting the resident to schedule appointments and requires that NYCHA make a courtesy call to the tenant while in transit to the tenant's apartment for the appointment.  (Dkt. #184 at 8-10.) A true and correct copy of Valerie White's letter is available at COMMENTS_02514-17.

i.      NYCHA tenant Lynda Hutchinson recommended that NYCHA should use "Purple," a mold-resistant gypsum board/sheetrock.  The Revised Consent Decree does not specify the brand that should be used, but does require NYCHA to "replace contaminated sheetrock with mold-resistant gypsum board and cement board" in accordance with the remediation methods developed in partnership with Microecologies.  Revised Consent Decree

¶ 4(c). A true and correct copy of Lynda Hutchinson's letter is available at
COMMENTS_01102-05.

j.       NYCHA tenants Abraham and Mary Livingston support the Revised Consent
Decree but requested that the new protocols for remediating mold and excessive moisture be
implemented "immediately," as they are currently dealing with an ongoing water leak. Although
NYCHA has asserted that immediate roll-out of the Mold Busters program NYCHA-wide is not
feasible, the Revised Consent Decree commits NYCHA to completing this roll-out by December
31, 2019. *Id.* ¶ 7(f). A true and correct copy of the letter of Abraham and Mary Livingston is
available at COMMENTS_01294-98.

k.       NYCHA tenants Angel Golds and Lynora Ashford commented on the dual case
caption appearing on the Order Regarding Public Comment on the Proposed Settlements that
"This is another civil cases [sic] combine twice together as one now. I wanted separ[at]ed for
more action!" It appears that these tenants want the two actions to remain separate, and may
have mistakenly thought that the U.S. and *Baez* cases had been consolidated based on the dual
case caption. A true and correct copy of the letter of Angel Golds and Lynora Ashford is
available at COMMENTS_00719-31.

l.       NYCHA tenant Jeannette Salcedo recommended that NYCHA must add
"manpower" by "[a]dding jobs" and the "retraining of all staff." The Revised Consent Decree
requires NYCHA to re-train all staff involved in mold and excessive moisture remediation (*Id.*
¶ 7(b)). The Revised Consent Decree does not prevent NYCHA from hiring additional
employees. Rather, it permits the Ombudsperson to issue an order requiring NYCHA to hire an
independent contractor, a remedy that could be used when NYCHA's own employees are not

able to handle the work.  *Id.* ¶ 25.  A true and correct copy of Jeanette Salcedo's letter is available at COMMENTS_02028-29.

40.    My colleagues and I also identified several letters that were not written by *Baez* class members or other NYCHA tenants but that recommend additional remedies relating to NYCHA:

a.    A letter from Jessie Fields, M.D., a doctor whose patients include NYCHA tenants with asthma, argues that NYCHA violated the terms of the Original Consent Decree and expresses support for the Revised Consent Decree because it calls for "strict long term monitoring of the conditions in the developments."  Dr. Fields urges that the U.S. and *Baez* settlements "require the active participation of the residents of public housing in their design and implementation."  As stated before, tenants will have a role in implementing and enforcing the Revised Consent Decree through reports to the Ombudsperson.  In addition, Plaintiffs' counsel, with the assistance of Manhattan Together and South Bronx Churches, has received substantial input and guidance from NYCHA tenants throughout the process of drafting and negotiating the Revised Consent Decree and the Revised Standard Procedure.  A true and correct copy of Jessie Field's letter is available at COMMENTS_00598-01.

b.    A letter from an organization called Turning the Tide does not comment specifically about the Revised Consent Decree but provides a list of recommendations to promote healthy housing, much of which is beyond the scope of a civil action obligating NYCHA to remediate mold and excessive moisture (e.g., requests for rent freezes, jail time for NYCHA staff, workshops on climate change, etc.).  To the extent it calls for use of equipment such as borescopes and training on how to perform inspections, the Revised Standard Procedure

covers these topics. (Dkt. #184.) A true and correct copy of Turning the Tide's letter is available at COMMENTS_02416-18.

      c.     A letter from Equal Justice Works Fellow Chris Helwig, an attorney who represents individual NYCHA tenants in housing repair actions, supports the Revised Consent Decree and recommends that NYCHA's training program include training not only on the Revised Standard Procedure but also on the terms of the Revised Consent Decree itself. Mr. Helwig also recommends that the Independent Mold Analyst be involved in these training programs. Although the Independent Mold Analyst has not yet been appointed, it is my understanding that the Special Master expects that Microecologies, his current mold remediation expert, will be involved in designing the training programs in collaboration with the outside training vendor hired by NYCHA. A true and correct copy of Chris Helwig's letter is available COMMENTS_00904-08.

      d.     A letter from Milagros de Hoz, the Environmental Health Programs Manager at WE ACT for Environmental Justice, "welcomes the prospect of the consent decrees" given NYCHA's failure to comply with the Court's prior orders, but raises a number of concerns about transparency, accountability, and tenant participation. In particular, she claims that there is no timetable for NYCHA to address the issues on which the complaints were based, no mechanism for transparently tracking the finances of the repairs and other requirements laid out in the decree, and no independent accountability to ensure that NYCHA complies with the decree. These claims are unsupported, as the Revised Consent Decree provides specific deadlines for each component of the Mold Busters roll-out (*Id.* ¶ 7), requires periodic reports tracking the status of NYCHA's repairs (*Id.* ¶¶ 14-15), and appoints an Independent Data Analyst to confirm the accuracy of those reports (*Id.* ¶¶ 17-18) and an independent Ombudsperson to ensure

27

accountability (*Id.* ¶¶ 22-27).  Ms. Hoz also asserts that the U.S. and *Baez* decrees lack oversight

into the procurement of supplies and fail to restore the $35 billion in federal funding cut from

NYCHA's annual budget.  It is beyond the scope of the *Baez* litigation to oversee NYCHA's

procurement, and the parties to the *Baez* case do not have the authority to require the federal

government to provide additional funding to NYCHA.  Lastly, Ms. Hoz states that the proposed

decrees do not provide a transparent tenant reporting system or a mechanism for tenants to have

a say in prioritizing repairs and other issues to be addressed and that the decrees do not overhaul

the tenant association system or make mention of NYCHA's obligations to hire local NYCHA

residents.  To the contrary, the Revised Consent Decree envisions that tenants will report to the

Ombudsperson when NYCHA has failed to repair mold or excessive moisture in accordance

with the Revised Consent Decree.  However, overhauling the tenant association system and

enforcing NYCHA's Section 3 hiring requirements is beyond the scope of the *Baez* litigation,

which is focused on NYCHA's obligations to remediate mold and excessive moisture.  A true

and correct copy of Milagros de Hoz's letter is available at COMMENTS_00452-54.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief.

New York, New York
August 31, 2018

/s/ Erin M. Meyer
Erin M. Meyer