**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARIBEL BAEZ; FELIPA CRUZ; R.D., ON BEHALF OF HER MINOR CHILD, A.S.; on their own behalf and on behalf of all others similarly situated; UPPER MANHATTAN TOGETHER, INC.; and SOUTH BRONX CHURCHES SPONSORING COMMITTEE, INC., <br><br> Plaintiff, <br><br> v. <br><br> NEW YORK HOUSING AUTHORITY, <br><br> Defendant. | No. 13 Civ. 8916 (WHP) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR AN ORDER APPROVING MODIFIED AMENDED STIPULATION AND ORDER OF SETTLEMENT**

# TABLE OF CONTENTS

**Page**

Preliminary Statement.................................................................................................... 1

Statement of Facts........................................................................................................... 4

    A.    The Original Consent Decree............................................................... 4
    B.    The Motion to Enforce........................................................................ 7
    C.    NYCHA's Continuing Breaches........................................................... 9
    D.    The Negotiations............................................................................... 13
    E.    The Revised Consent Decree ............................................................ 17

        1.    *Definitions*............................................................................ 17
        2.    *NYCHA's Performance Requirements* .................................. 17
        3.    *Procedures and Protocols*.................................................... 18
        4.    *Reasonable Accommodations* .............................................. 19
        5.    *Monitoring and Reporting* ................................................... 20
        6.    *Ombudsperson* .................................................................... 21
        7.    *Jurisdiction* ......................................................................... 22
        8.    *Attorneys' Fees* ................................................................... 23

Argument ...................................................................................................................... 24

I.     THE COURT SHOULD APPROVE THE REVISED CONSENT DECREE
      BECAUSE IT IS FAIR, REASONABLE, ADEQUATE, AND IN THE BEST
      INTERESTS OF THE CLASS. ...................................................................... 24

    A.    Substantive Fairness.......................................................................... 25

        1.    *The Complexity, Expense, and Likely Duration of the Litigation*............ 25
        2.    *The Class Has Reacted Favorably to the Revised Consent Decree*......... 27
        3.    *The Revised Consent Decree Represents the Best Result the Class*
            *Could Achieve and There Is No Preferable Alternative Remedy*.............. 27

    B.    Procedural Fairness........................................................................... 31
    C.    The Court's Questions ....................................................................... 33

II.    THE REVISED CONSENT DECREE IS AN ADEQUATE AND NECESSARY
      REMEDY FOR NYCHA'S BREACHES OF THE ORIGINAL CONSENT
      DECREE. ..................................................................................................... 36

Conclusion .................................................................................................................... 39

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Arbitron, Inc. v. Tralyn Broad., Inc.*,
    400 F.3d 130 (2d Cir. 2005).........................................................................18

*Berger v. Heckler*,
    771 F.2d 1556 (2d Cir. 1985)...............................................................37, 38

*Bloor v. Falstaff Brewing Corp.*,
    601 F.2d 609 (2d Cir. 1979).......................................................................18

*Charron v. Wiener*,
    731 F.3d 241 (2d Cir. 2013).......................................................................25

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by Goldberger v.*
    *Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) ..........................24, 25, 27, 31, 35

*City of New York v. Local 28, Sheet Metal Workers' Int'l Ass'n*,
    170 F.3d 279 (2d Cir. 1999).......................................................................30

*Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*,
    74 N.Y.2d 475 (N.Y. 1989) ...............................................................18, 19

*E.E.O.C. v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental*
    *Ironworkers, Joint Apprentice-Journeyman Educ. Fund*,
    925 F.2d 588 (2d Cir. 1991).......................................................................38

*Escalera v. NYCHA*,
    924 F. Supp. 1323 (S.D.N.Y. 1996)............................................................31

*Floyd v. City of New York*,
    959 F. Supp. 2d 668 (S.D.N.Y. 2013)..........................................................31

*Hurley v. Coughlin*,
    158 F.R.D. 22 (S.D.N.Y. 1993) .................................................................38

*Ingles v. Toro*,
    438 F. Supp. 2d 203 (S.D.N.Y. 2006)....................................................25, 35

*Joel A. v. Giuliani*,
    218 F.3d 132 (2d Cir. 2000).......................................................................25

*LaForest v. Former Clean Air Holding Co.*,
    376 F.3d 48 (2d Cir. 2004).........................................................................37

*Malchman v. Davis,*
   706 F.2d 426 (2d Cir. 1983)...................................................................32

*Selby v. Principal Mut. Life Ins. Co.,*
   No. 98 Civ. 5283 (RLC), 2003 U.S. Dist. Lexis 21138
   (S.D.N.Y. Nov. 21, 2003) ....................................................................25

*Sony Corp. SXRD v. Cardenas,*
   448 F. App'x 85 (2d Cir. 2011) ...........................................................34

*U.S. SEC v. Citigroup Glob. Mkts., Inc.,*
   752 F.3d 285 (2d Cir. 2014).................................................................37

*United States v. Alcoa, Inc.,*
   533 F.3d 278 (5th Cir. 2008) ...............................................................38

*United States v. City of Yonkers,*
   856 F.2d 444 (2d Cir. 1988).................................................................31

*United States v. Metro. Opera,*
   11 Civ. 0236 (GBD) (S.D.N.Y. Jan. 12, 2011, ECF No. 2)...................29

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
   396 F.3d 96 (2d Cir. 2005)..............................................................32, 36

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ......................................................................................1, 24

Fed. R. Civ. P. 53(f) ......................................................................14, 15, 20, 34

Plaintiffs, a class of New York City Housing Authority ("NYCHA") residents who have asthma, respectfully submit this memorandum in support of their motion for an order, pursuant to Fed. R. Civ. P. 23(e), approving the Modified Amended Stipulation and Order of Settlement filed with the Court on July 24, 2018 (Dkt. #193-1) (the "Revised Consent Decree").[1]  The Revised Consent Decree contains significantly strengthened safeguards, designed by the parties under the Special Master's auspices, that help ensure more effective and timely remediation of mold and excessive moisture in NYCHA apartments throughout New York City.  The Court should approve the Revised Consent Decree because it is fair, reasonable, adequate, and in the best interests of the class.

### Preliminary Statement

In December 2013, NYCHA agreed to a Stipulation and Order of Settlement (the "Original Consent Decree") (Dkt. #11), promising to effectively remediate mold and excessive moisture in NYCHA apartments and to do so in a timely fashion.  In an order dated February 11, 2014, the Court certified a class in this case under Fed. R. Civ. P. 23(b)(2), defined as "current and future residents of NYCHA who have asthma that substantially limits a major life activity and who have mold and/or excessive moisture in their NYCHA housing." (Dkt. #17.)  In an order dated April 8, 2014, the Court approved the Original Consent Decree.  (Dkt. #21.)

NYCHA breached the Original Consent Decree from the outset.  On April 22, 2015, Plaintiffs brought a motion to enforce (Dkt. #35), and in a Memorandum and Order dated December 15, 2015, the Court found that "NYCHA has been out of compliance with the Consent Decree from the day it was entered by this Court."  (Dkt. #88 at 3.)  On February 1, 2016, the

---

[1]     The Revised Consent Decree modified the Amended Stipulation and Order of Settlement, previously filed with the Court on April 6, 2018 (Dkt. #166-1).

Court appointed Professor Francis McGovern as Special Master to investigate NYCHA's failure to comply and to make recommendations. (Dkt. #96.) Notwithstanding the efforts of Plaintiffs and the Special Master over the last two years to work with NYCHA to develop new procedures and protocols for remediating mold and excessive moisture, NYCHA continues to be in breach; in fact, its performance has gotten worse.

In February 2018, NYCHA informed Plaintiffs that it would not fully implement its new procedures and protocols for remediating mold and excessive moisture until January 2020. Alarmed at this prospect, Plaintiffs presented a proposed order for injunctive relief to NYCHA and stated that they were prepared to ask the Court to adopt that order as a remedy for NYCHA's continuing breaches or to give NYCHA an opportunity to negotiate appropriate relief.[2] NYCHA chose to negotiate, and on April 5, 2018, after months of intense negotiations under the Special Master's supervision, the parties agreed on a Revised Consent Decree, which the Special Master filed with the Court on April 6, 2018. (Dkt. #166.)

By orders dated April 16, 2018 (Dkt. #167) and May 23, 2018 (Dkt. #172), the Court raised certain questions about the Revised Consent Decree. Plaintiffs responded to those questions in a letter dated April 27, 2018 (Dkt. #170) and a joint report dated June 26, 2018 (Dkt. #173). Among other things, the parties stated that they were willing to modify the Revised Consent Decree in response to the issues raised by the Court, which they did. (Dkt. #193.)

On June 11, 2018, the United States government (the "Government") filed an action against NYCHA alleging violations of various federal regulations regarding lead paint, mold, and other issues. *United States v. NYCHA*, 18 Civ. 5213 (WHP) (S.D.N.Y.) (Dkt. #1). The Government

---

[2] The Original Consent Decree was scheduled to expire on April 17, 2018. On April 16, 2018, the Court extended its jurisdiction over the Original Consent Decree pending further order of the Court. (Dkt. #168.)

designated that case as related to *Baez* (Dkt. #3), and it was assigned to this Court. Accompanying the Government's complaint was a consent decree, to which NYCHA agreed, mandating the appointment of a monitor to ensure that NYCHA complied with federal regulations. (Dkt. #5-1.)

On June 28, 2018, the Court issued an order inviting the parties to submit letter memoranda addressing the ramifications of the Government's proposed consent decree for this action. (Dkt. #174.) On July 9, 2018, the parties submitted letter memoranda in this action (Dkt. ##182, 183), and the Government, NYCHA, and the City submitted letter memoranda in the Government action (Dkt. ##21, 25, 27). All of the parties to both actions agreed that the two decrees could operate in parallel with each other. On July 10, 2018, the Court held a joint hearing on this case and the Government's case (Dkt. #187), which led to an order scheduling a hearing on both the Revised Consent Decree and the Government's decree on September 26, 2018. (Dkt. #190.)

After the hearing on July 10, 2018, Plaintiffs filed a Revised Standard Procedure manual (Dkt. #184) that NYCHA had agreed to adopt in accordance with the schedule set forth in the Revised Consent Decree. On July 18, 2018, the Court issued a memo endorsement approving the form of notice (Dkt. #189), which NYCHA sent to residents and posted at various locations on or about July 24, 2018. On July 24, 2018, the Special Master filed a modified version of Revised Consent Decree, which addressed the Court's earlier comments. (Dkt. #193.)

Plaintiffs urge the Court to approve the Revised Consent Decree, as modified on July 24, 2018. The Revised Consent Decree is a substantial step forward in Plaintiffs' efforts to rid NYCHA apartments of the mold and excessive moisture that has plagued them for years, if not decades. The Revised Consent Decree calls for (i) the elimination of reoccurrences; (ii) the tightening of performance requirements, including the addition of a best efforts obligation for simple repairs that exceed seven days and more complex repairs that exceed fifteen days; (iii) strict

deadlines for implementing new procedures and protocols; (iv) the development of new periodic reports, which must be certified under penalty of perjury; and (v) the appointment of an Independent Ombudsperson who can address individual resident complaints and direct NYCHA to provide prompt relief. For the first time, residents will have a mold abatement remedy that does not require them to retain a lawyer and go to court.

The Revised Consent Decree is substantively fair because (i) it enables the parties to resolve complex issues of enforcement without the need to resort to further proceedings before the Court; (ii) the Special Master has approved it, and the members of the class have clearly expressed support for its terms; and (iii) it is as favorable to the class as any relief the Court could have unilaterally ordered, and no alternative remedy has been suggested. The Revised Consent Decree is procedurally fair because it was negotiated at arm's length by experienced counsel. As a result of the Revised Consent Decree, the class will be significantly better off than it would be under the Original Consent Decree, which was approved by the Court. Furthermore, the Revised Consent Decree provides adequate and necessary injunctive relief that directly addresses NYCHA's breaches of the Original Consent Decree.

## **Statement of Facts**

### A. The Original Consent Decree

According to NYCHA's website, NYCHA has 176,066 public housing apartments in 2,462 buildings, housing 174,282 families and 396,581 authorized residents. Declaration of Steven M. Edwards dated August 31, 2018 ("Edwards Decl."), ¶ 2, Ex. 1. NYCHA's periodic reports indicate that at least one-sixth of those apartments have been affected by mold in the last two years. Declaration of Neil Steinkamp, dated August 31, 2018 ("Steinkamp Decl."), ¶¶ 4, 11. Mold causes or exacerbates asthma, a condition that afflicts many low-income people who live in substandard conditions. Edwards Decl. ¶ 2, Exs. 2, 3. According to NYCHA itself, 150,000 NYCHA

residents, including 35,000 children under the age of fifteen, live in developments located in "asthma hotspots" that generate the highest rates of asthma-related emergency room visits in New York City. *Id.* Ex. 3.

For many years, community organizers and church leaders have been trying to get relief from the mold and excessive moisture problems that permeate NYCHA housing. Two of those groups, Upper Manhattan Together, Inc. ("Manhattan Together") and the South Bronx Churches Sponsoring Committee, Inc. ("South Bronx Churches"), have been particularly active in this area. Declaration of Michael Stanley dated August 31, 2018 ("Stanley Decl."), ¶¶ 7-8.[3] In 2011, they reached out to the Natural Resources Defense Council ("NRDC"), which in turn contacted the National Center for Law and Economic Justice ("NCLEJ"), for help with this problem. On December 17, 2013, Plaintiffs filed a complaint against NYCHA (Dkt. #1), and on December 20, 2013, they filed the Original Consent Decree (Dkt. #11), which Plaintiffs had negotiated with NYCHA. Stanley Decl. ¶ 2.

The Original Consent Decree contained performance standards that required NYCHA to effectively remediate mold and excessive moisture and to do so within specified time periods: seven days on average for simple repairs that can be done by a maintenance worker in a single visit to the apartment and fifteen days on average for more complex repairs that need skilled trades and other specialized staff and that require multiple visits to the apartment. Original Consent Decree ¶¶ 1(d)-(e), 4. The Original Consent Decree further provided that NYCHA would be deemed in compliance if it satisfied the timing requirements at least 95% of the time. *Id.* ¶ 5.

---

[3]     Manhattan Together and South Bronx Churches include approximately thirty not-for-profit organizations and churches whose members include approximately 13,000 NYCHA residents. Manhattan Together and South Bronx Churches are part of Metro IAF, a nationwide organization with more than twenty-one local affiliates representing hundreds of congregations and other not-for-profit organizations. Stanley Decl. ¶ 1.

The Original Consent Decree also provided that within 60 days after completing a Level II or Level III repair,[4] NYCHA must make a good faith attempt to contact the resident to determine, *inter alia*, if the mold and excessive moisture problems and their underlying causes had been effectively addressed. *Id.* ¶ 6. At the close of each quarter, NYCHA was required to provide Plaintiffs' counsel with a report on the number of residents contacted and the percentage of reoccurrences. NYCHA was also required to provide periodic reports on a number of matters, including the average time to complete repairs. *Id.* ¶ 10.

In addition, the Original Consent Decree required NYCHA to utilize the procedures and protocols contained in a policy document entitled "Operations & Maintenance Policy for Mold & Moisture Control in Residential Buildings," which was attached to and incorporated by reference in the Original Consent Decree as Exhibit A. That document, which NYCHA calls its "Standard Procedure," outlined the steps that NYCHA workers were required to take to comply with the Original Consent Decree. *Id.* ¶ 7. Among other things, it provided that where mold and excessive moisture problems were detected, "NYCHA staff shall promptly and methodically assess the situation and apply remediation techniques designed to eliminate or control problems at their source . . . ." *Id.* Ex. A at 6.

The Original Consent Decree provided that the Court would retain jurisdiction over the decree for 30 months, or 36 months if a motion for modification and enforcement were made. *Id.* ¶ 13(a). It also provided that Plaintiffs could move for enforcement if Plaintiffs believed NYCHA was not complying. *Id.* ¶ 17. The Court approved the Original Consent Decree on April 17, 2014

---

[4] A Level I repair is a repair that involves 10 square feet or less of mold; a Level II repair is a repair that involves 10 square feet to 100 square feet of mold; a Level III repair is a repair that involves 100 square feet or more of mold.

(Dkt. #22), and it was scheduled to expire on November 17, 2016, unless Plaintiffs moved to enforce, in which case it would expire on April 17, 2017.

B.     The Motion to Enforce

From the outset, NYCHA failed to comply with the Original Consent Decree.  NYCHA took the position that the performance standards related to each individual work order, not to repairs, and that it could take far longer than seven or fifteen days to complete a repair if the repair required multiple work orders.  Using information in NYCHA's periodic reports to link "parent" and subsequent "child" work orders, Plaintiffs discovered that simple repairs were in fact taking longer than seven days on average, even though NYCHA's reports purported to show that NYCHA was in compliance.  (Dkt. #36, ¶¶ 10-11.)[5]

On April 22, 2015, Plaintiffs moved to enforce the Original Consent Decree, seeking the appointment of a special master and a finding of contempt.  (Dkt. ##35, 44.)  Plaintiffs contended that NYCHA's interpretation of the Original Consent Decree was incorrect – that the performance requirements related to completion of repairs, not individual work orders.  Plaintiffs demonstrated that if parent and child work orders were linked together, NYCHA's average time to complete seven-day repairs was 8.7 days in the first quarter (not the 6.8 days that NYCHA had represented) and 9.5 days in the third quarter (not the 6.3 days that NYCHA had represented).  (Dkt. #36, ¶ 11; Dkt. #36-1 at 4; Dkt. #36-6 at 4.)[6]  Perhaps most striking, NYCHA's own reports showed that

---

[5]     NYCHA responded to this discovery by eliminating from its reports the information that enabled Plaintiffs to link parent and child work orders.  (Dkt. #69, ¶ 4.)
[6]     According to NYCHA's periodic reports, less than 2% of the repairs were complex fifteen-day repairs, and NYCHA appeared to be complying with that requirement.  (Dkt. #36, ¶¶ 7, 11; Dkt. #36-1 at 4; Dkt. #36-2 at 4; Dkt. #36-6 at 4.)

mold and excessive moisture reoccurrence rates averaged 34% across the first three quarters.  (Dkt. #36, ¶ 19.)[7]

To illustrate the impact on NYCHA residents of NYCHA's failure to comply with the Original Consent Decree, Plaintiffs submitted a spreadsheet prepared by Manhattan Together and South Bronx Churches identifying 128 individual cases in which NYCHA had failed to remediate mold or excessive moisture in accordance with the Original Consent Decree.  (Dkt. ##39, 40.)  At first, NYCHA claimed that it had never seen the spreadsheet before, even though Manhattan Together and South Bronx Churches had sent it to NYCHA in the regular course of business.  Hearing Tr. at 31:23-32:6.[8]  NYCHA then demanded the right to re-inspect all of the apartments identified in the spreadsheets.  (Dkt. #73.)  After the inspections were completed, NYCHA misrepresented the results (Dkt. #83), but ultimately did not dispute that the apartments in fact had mold.  (Dkt. ##84-86.)

On December 15, 2015, the Court issued its Order on the motion to enforce.  (Dkt. #88.)  The Court agreed with Plaintiffs' interpretation of the Original Consent Decree and found that "NYCHA has been out of compliance with the Consent Decree from the day it was entered by this Court."  (Dkt. #88 at 3.)  The Court added that "NYCHA's justifications for its failure to comply are inadequate, and the attitude of NYCHA officials appears to be one of indifference."  *Id.*  In addition, the Court found:

> Plaintiffs' statistics are unrebutted and compelling.  After repairs have been completed, mold and excessive moisture reoccurrence rates for the five quarters through July 2015 remain high: 34% reoccurrence in the first quarter, 41% reoccurrence in the second quarter, 27% reoccurrence in the third quarter, 22% reoccurrence in the fourth quarter, and 27% reoccurrence in the fifth quarter.

---

[7]    In addition, Plaintiffs demonstrated that thousands of repairs took more than fifteen days and some took more than 90 days.  (Dkt. #36, ¶ 18.)

[8]    The implication was that NYCHA had simply thrown the spreadsheets away.  Edwards Decl. ¶ 4.

> (Second Supp. Edwards Decl. ¶ 16.) And a close analysis reveals that the number of reported reoccurrences has increased substantially from quarter to quarter. (Second Supp. Edwards Decl. ¶ 16.) While the Consent Decree does not establish a maximum acceptable level of reoccurrence, the reoccurrences reported by NYCHA suggest that tenants' asthma and respiratory problems are being exacerbated by the continued presence of mold and excessive moisture in New York City public housing.

*Id.* at 6 (emphasis in original). The Court also stated: "The failure to remediate mold and excessive moisture jeopardizes the health and public welfare of hundreds of thousands of New Yorkers." *Id.*

Based on these findings, the Court ordered NYCHA to comply with the December 15, 2015, Order and determined that it would appoint a special master. *Id.* at 5-6. On February 1, 2016, the Court appointed Professor Francis McGovern as Special Master to investigate NYCHA's failure to comply with the Original Consent Decree and to make recommendations to the Court concerning corrective action. (Dkt. #96.) The Special Master's original term was four months. *Id.* On May 31, 2016, the Special Master requested that his term be extended another four months. (Dkt. #113.) On March 30, 2017, in accordance with a stipulation executed by the parties, the Court extended the Special Master's term to April 17, 2018. (Dkt. #144.) The parties also stipulated to an extension of the Original Consent Decree for another year, to April 17, 2018, "without prejudice to the right of plaintiffs to move for further extensions if the facts justify such relief." (Dkt. #143.)

C.    NYCHA's Continuing Breaches

During the nearly two-and-a-half years that the Special Master has been serving, the parties have met with him more than twenty times to discuss NYCHA's ongoing breaches of the Original Consent Decree and steps that NYCHA could take to cure those breaches. Declaration of Erin M. Meyer, dated August 31, 2018 ("Meyer Decl."), ¶ 4. At Plaintiffs' suggestion, the Special Master retained Microecologies, Inc. ("Microecologies"), mold remediation specialists, as a consultant to

9

assist NYCHA in developing new procedures and protocols for remediating mold and excessive moisture. (Dkt. #145.) NYCHA also retained its own consultant, Steven Winter Associates, to advise it on the mold problem. Edwards Decl. ¶ 8.

In the summer of 2016, the parties began to work with Microecologies to develop new procedures and protocols for the remediation of mold and excessive moisture. This effort resulted in a "pilot project," launched in May 2017, to test the new procedures and protocols. Meyer Decl. ¶ 7. NYCHA retained Matthew Perzanowski, an Associate Professor of Environmental Health Sciences at Columbia University's Mailman School of Public Health, to analyze the effectiveness of these new procedures and protocols as implemented in the pilot project developments. *Id.*

Over the course of many meetings with NYCHA and the Special Master, it became apparent to Plaintiffs that, prior to the hiring of Microecologies, NYCHA had done little, if anything, to improve its performance since agreeing to the Original Consent Decree in December 2013. NYCHA was simply waiting for the Original Consent Decree to expire in April 2017. Edwards Decl. ¶ 18.

NYCHA's lack of serious effort continued after the Special Master was appointed in February 2016. On September 27, 2017, the Special Master issued a draft Interim Report in which he identified the following "fundamental problems" in NYCHA's efforts to eradicate mold, including:

- "the absence of systematic methodologies for mold eradication";

- "a lack of systematic training for maintenance workers and skilled trades for mold eradication";

- "inadequate accountability to ensure that systematic mold eradication methodologies are performed"; and

- "less than optimal analysis of available data concerning class members, mold problems, and remediation techniques."

Edwards Decl. ¶ 14, Ex. 4.

NYCHA agreed that its performance had significant problems that it called "pain points." It admitted that when a resident calls with a complaint, there was "[n]o system requirement for [a] scheduled date" and that a "[l]ack of training impacts coverage." It further admitted that (i) the inspection "[p]rocess [was] not standardized" and was "cumbersome"; (ii) the "[t]raining [was] not standardized"; (iii) in inspecting the ventilation, the "[m]easurement parameters may be incorrect" and in inspecting the roof fans, the "[p]rocess [was] not standardized"; and (iv) "the [p]rocedure [was] not practical for staff to follow." Edwards Decl. ¶ 15, Ex. 5.

Roof fans provide a telling example of NYCHA's inability to get things done. In 2016, NYCHA's own consultant, Steven Winter Associates, inspected twelve buildings and found only one operational fan. Edwards Decl. ¶ 8. Microecologies found similar problems as early as August 2016, and had recommended that the fans be repaired and operated 24/7. Meyer Decl. ¶¶ 11, 12. Professor Perzanowski also concurred with the recommendation after finding that buildings in the pilot project that lacked adequate ventilation experienced statistically significant higher mold reoccurrence rates than buildings with roof fans operating 7 days a week, 24 hours a day. Edwards Decl. ¶ 13; Meyer Decl. ¶ 13. Notwithstanding this advice, NYCHA did nothing for months until the Special Master threatened to get a Court order. Edwards Decl. ¶ 13; Meyer Decl. ¶ 14. It was not until April 2018 that NYCHA reluctantly agreed to modify its policy to require that roof fans operate 24/7 beginning on June 1, 2018. Meyer Decl. ¶ 14, Ex. 8.

In February of this year, NYCHA delivered troubling news: Its new "Mold Busters" program would not become fully operational until 2020, and its new Standard Procedure for remediating mold and excessive moisture would not be ready for Plaintiffs' review until May 17, 2018. Revised computer programs, including a new application for handheld devices, would not

be ready until August 30, 2018. The periodic reports would not be revised and enhanced until December 31, 2018, and new training would not be complete until December 23, 2019. Meyer Decl. ¶ 15, Ex. 9. In short, as of February 2018 – more than four years since the Original Consent Decree had been so-ordered – NYCHA had actually implemented absolutely nothing.

In the meantime, the breaches continued. Plaintiffs suspected that NYCHA was not remediating mold within the required time parameters even though NYCHA's periodic reports represented that its average completion times were in compliance. When Plaintiffs asked NYCHA for access to its Maximo database to search the underlying work order data and assess the accuracy of NYCHA's calculations, NYCHA refused. *Id.* ¶ 16.

With the help of forensic data analysts at Stout Risius Ross, LLC ("Stout"), who agreed to assist Plaintiffs on a pro bono basis, Plaintiffs discovered in March of this year that NYCHA's periodic reports are "inaccurate" – to put it mildly. According to Stout's analysis, NYCHA's average time to complete fifteen-day repairs was as high as 35.5 days during the period of May 2017 through July 2017. Steinkamp Decl. ¶ 15.[9] This is nearly triple the number that NYCHA reported and is a clear breach.[10]

The reoccurrence rates also continued to be very high. Between February 2018 and April 2018, the reoccurrence rate averaged 48%, and in the month of September 2017, the reoccurrence rate was 55%. *Id.* ¶ 7, Ex. 2. This compares to an average reoccurrence rate in the first five

---

[9]     The average completion time for simple, seven-day repairs was slightly below seven days in the twelfth, thirteenth, fourteenth, and sixteenth quarters, compared to the average of approximately five days that NYCHA had reported during those quarters. NYCHA averaged slightly above seven days on simple repairs in the fifteenth quarter. Steinkamp Decl. ¶ 15.
[10]    NYCHA would not provide Stout with updated datasets for time periods prior to the twelfth quarter, and therefore Stout's re-calculation of NYCHA's average completion times was limited to the period of February 2017 through April 2018. Steinkamp Decl. ¶¶ 3, 14.

quarters of 30.2%, which the Court found unacceptably high in its December 15, 2015, Order. (Dkt. #88 at 6.)

In addition, Stout's analysis showed that thousands of repairs were taking more than fifteen days to complete, although approximately 50% of complex repairs were timely. Steinkamp Decl. ¶ 52. In some cases, the repairs took more than a year. *Id.* Manhattan Together and South Bronx Churches have continued to document some of these cases in their spreadsheets, described above. Stanley Decl. ¶ 7.

> D.    The Negotiations

Faced with continuous breaches for more than four years, a consent decree slated to expire on April 17, 2018, and no assurances from NYCHA other than a plan to roll out its "Mold Busters" program by 2020, Plaintiffs decided to move for relief. On February 2, 2018, Plaintiffs sent NYCHA and the Special Master a document entitled "Proposed Order for Permanent Relief," which in subsequent drafts was called "Proposed Order for Injunctive Relief." Plaintiffs invited NYCHA, under the Special Master's supervision, to negotiate a new consent decree in an attempt to avoid motion practice. Meyer Decl. ¶ 18, Ex. 11.

Plaintiffs' Proposed Order for Injunctive Relief attempted to accomplish several things. First, it sought to provide some relief for individual NYCHA residents suffering from NYCHA's breaches by setting a limit on the time to complete repairs and providing for the appointment of an independent Ombudsperson to whom residents could go if NYCHA was not complying with the decree. Second, it set forth seven pages of specific procedures and protocols for the inspection and remediation of mold and excessive moisture that Plaintiffs believed NYCHA had already agreed to in literally dozens of meetings with Microecologies. Third, it included a detailed description of new periodic reports that would provide more accurate information on NYCHA's

compliance, and it required certification of those reports' accuracy under penalty of perjury. Fourth, it called for the appointment of an Independent Data Analyst, such as Stout, who could audit the reports' accuracy, and an Independent Mold Analyst, such as Microecologies, who could monitor NYCHA's compliance with the procedures and protocols. Fifth, it provided that NYCHA could terminate the decree only if it showed that it was complying with the decree and that the decree was no longer needed. This provision was intended to remedy the way that NYCHA approached the Original Consent Decree, which was to simply wait out the clock. *Id.* ¶ 19.

To effectuate its provisions, including the appointment of the Ombudsperson, the proposed order provided that the Special Master would issue reports and recommendations, to which NYCHA could object pursuant to Fed. R. Civ. P. 53(f). This would enable the Court to maintain control over the process, including modifying the process if necessary, while protecting NYCHA's due process rights. In sum, the Proposed Order for Injunctive Relief was designed to remedy NYCHA's breaches by accomplishing the Original Consent Decree's objectives – to effectively remediate mold and excessive moisture in a timely fashion. *Id.* ¶ 20.

Plaintiffs did not receive a written response to their proposal until March 13, 2018. *Id.* ¶ 22, Ex. 13. In its written response, NYCHA rejected Plaintiffs' proposed performance standards; rejected Plaintiffs' very specific procedures and protocols and instead proposed the process for developing new procedures and protocols that appears in the Revised Consent Decree; rejected Plaintiffs' very specific requirements for periodic reports and instead proposed the process for developing new periodic reports that appears in the Revised Consent Decree; agreed to the concept of an Independent Data Analyst and an Independent Mold Analyst, but insisted that they be selected by NYCHA as opposed to the Special Master; and agreed to the appointment of an Ombudsperson, but insisted that the Ombudsperson be a NYCHA employee that NYCHA

selects. NYCHA also took the position that the Revised Consent Decree should expire in December 2020 irrespective of whether there were continuing breaches. *Id.* ¶ 22.

Plaintiffs' initial reaction was to reject NYCHA's position and seek relief from the Court, but at the Special Master's urging, Plaintiffs agreed to defer the filing of a letter seeking a pre-motion conference and negotiate further with NYCHA. *Id.* ¶ 23. There followed extensive negotiations and exchanges of drafts in which Plaintiffs agreed to revert to the performance requirements in the Original Consent Decree, provided NYCHA use best efforts to complete repairs as quickly as possible where the time to repair exceeded seven or fifteen days; agreed to NYCHA's proposed process for developing new procedures and protocols, provided it meet certain minimum requirements and address the roof fans issue; agreed to NYCHA's proposed process for developing new periodic reports; and took the position that, after receiving input from the parties, the Special Master should issue reports and recommendations pursuant to Rule 53(f) appointing the Independent Data Analyst, Independent Mold Analyst, and Ombudsperson, subject to the Court's approval. *Id.* ¶ 23. To remove the temptation to simply wait out the clock, Plaintiffs also insisted that the Court's jurisdiction should continue until NYCHA could demonstrate that it had complied with the Revised Consent Decree and that the decree is no longer needed. *Id.* ¶ 23.

During the negotiations, the Special Master also weighed in with his own positions. The Special Master insisted that the procedures and protocols section include a timeline for NYCHA to complete the various steps of its "Mold Busters" program and certify the completion of each step. The Special Master also urged, and the parties agreed, that he have the authority to appoint the Independent Data Analyst, Independent Mold Analyst, and Ombudsperson, without seeking the Court's prior approval. *Id.* ¶ 24. Throughout this two-month period of intensive negotiations,

Plaintiffs' counsel believed that the Special Master was updating the Court on the parties' progress. Edwards Decl. ¶ 22.

The parties reached agreement on the Revised Consent Decree on April 4, 2018, subject to the need for Manhattan Together and South Bronx Churches to get approval from their constituencies, which they did on April 5, 2018. Meyer Decl. ¶ 25. NYCHA later confirmed that it too had received all necessary approvals, including approval from the new interim head of NYCHA and City Hall. Edwards Decl. ¶ 26. Because the agreement had been circulated to many people at this point, the parties and the Special Master agreed that it would be unrealistic to try to keep it confidential, so the Special Master filed it with the Court on April 6, 2018 (Dkt. #166-1.) Edwards Decl. ¶ 26.

On April 11, 2018, the Special Master reported that he had discussed the Revised Consent Decree with the Court, and that the Court expressed concern about certain aspects of it. Edwards Decl. ¶ 22. On April 12, 2018, the parties discussed with the Special Master and agreed to modify the Revised Consent Decree in certain respects to obviate the Court's concerns. *Id.* The Court then issued a Memorandum and Order on April 16, 2018, reiterating its concerns. (Dkt. #167.)

On April 27, 2018, Plaintiffs' counsel wrote the Court seeking a pre-motion conference to discuss the status of the case and a motion for approval of the Revised Consent Decree, or in the alternative, a motion for injunctive relief in the form of the Revised Consent Decree. (Dkt. #170.) Plaintiffs' counsel also described the modifications to the Revised Consent Decree to which the parties had agreed. On May 4, 2018, NYCHA responded to Plaintiffs' letter and expressed its support for the Revised Consent Decree, stating that "NYCHA appreciates that Plaintiffs are frustrated with the implementation timeline, but believes a methodical implementation of the Mold Busters program will benefit residents in the longer term." (Dkt. #171.)

On May 23, 2018, the Court issued an order setting a conference for July 10, 2018, and asked the parties to file a joint status report before the conference. (Dkt. #172.) The parties filed their joint status report on June 26, 2018. (Dkt. #173.)

E.      The Revised Consent Decree

The Revised Consent Decree was the subject of lengthy negotiation and many compromises by both sides. It also reflects substantial input from the Special Master. What follows is a description of the key provisions and an explanation of how they work together.

1.      *Definitions*

With a few minor additions, the definitions are carried over from the Original Consent Decree. Among other things, "Independent Data Analyst," "Independent Mold Analyst," and "Ombudsperson" are defined, and "[e]ffectively remediate mold and excessive moisture" is defined to mean "the completion of repairs necessary to remove mold and abate excessive moisture, prevent their reoccurrence, and eliminate the causes of mold and excessive moisture at their source." This makes explicit a definition that was implicit in various provisions of the Original Consent Decree and the Court's December 15, 2015, Order.

2.      *NYCHA's Performance Requirements*

This section carries over the Original Consent Decree's performance requirements with two additions. First, paragraph 2 makes clear that NYCHA is obligated to effectively remediate mold and excessive moisture. Second, paragraphs 3(b) and (c) provide that where NYCHA has failed to complete a repair within seven or fifteen days – without regard to any averages – it must use its "best efforts" to complete the repair as quickly as possible. This paragraph is designed to provide some relief for residents forced to wait more than seven or fifteen days for a repair to be completed, and it sets a standard that the Ombudsperson can apply if there are complaints in those situations.

17

Best efforts is a well-established legal concept.  *See, e.g.*, *Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609 (2d Cir. 1979).  It is especially applicable where one party is completely dependent on another, as is the case here.  It eliminates NYCHA's ability to excuse its non-performance in particular cases by contending that a resident fell within the outer bounds of the average or the worst 5%.

3.  *Procedures and Protocols*

As noted above, the Original Consent Decree included as Exhibit A a document entitled "Operations & Maintenance Policy for Mold & Moisture Control to Residential Buildings," which NYCHA called the "Standard Procedure."  The Revised Consent Decree calls for NYCHA to update its Standard Procedure to include the new procedures and protocols that the parties, the Special Master, and Microecologies have been working on for the last two years.  Paragraph 4 sets forth certain minimum requirements based on these discussions.

At NYCHA's request, paragraph 5 provides a process and a schedule for revising the Standard Procedure.  As noted above, the parties have now agreed on a Revised Standard Procedure (Dkt. #184) as reflected in the Revised Consent Decree.  Court approval of the Revised Consent Decree will require NYCHA to implement it.

Paragraph 6 of the Revised Consent Decree provides that the parties may ask the Special Master to modify the Performance Standards if appropriate.  This is not an agreement to agree.  It is an agreement that the Special Master shall determine whether there should be any modifications after receiving input from the parties.  *See, e.g.*, *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483-84 (N.Y. 1989) (price determined by neutral third party is not an agreement to agree); *see also Arbitron, Inc. v. Tralyn Broad., Inc.*, 400 F.3d 130, 135-36 (2d Cir. 2005) (citing *Cobble Hill* and explaining that a contract is not an agreement to agree where it provides "a mechanism for objectively determining material terms in the future").  To ensure that

18

any modification can be enforced, the Revised Consent Decree, as modified, provides that the Special Master's determination shall have the force and effect of an order issued by an arbitrator.

Paragraph 7 sets forth the timeline for the roll out of NYCHA's new "Mold Busters" program, as the Special Master requested, and paragraph 8 provides for the certification of compliance with those timelines.

Paragraph 9 provides that the Standard Procedure may be updated over time. Plaintiffs recognize that it is important for NYCHA to have the ability to improve upon the Standard Procedure as necessary. If there is a dispute about whether an update is appropriate, the Special Master will resolve the dispute. Paragraph 9 also enables the parties to ask the Court to incorporate any updates into the Standard Procedure but does not require them to do so – hence the permissive language, "the parties *may* present any such change to the Court . . . ." (emphasis added). This recognizes that some updates may not be important enough to warrant inclusion in the Standard Procedure.

Paragraph 10 simply requires NYCHA to modify its other written policies, standard operating procedures, forms, and informational materials for residents and staff (including maintenance staff, development staff, and maintenance supervisors), as necessary to effect the Revised Standard Procedure. This language is taken verbatim from the Original Consent Decree.

Paragraph 11 deals with the roof fan issue. It requires NYCHA to fix the fans and operate them 24/7 in accordance with the recommendations of the experts and provides a timetable for NYCHA to do so.

4. *Reasonable Accommodations*

This section carries over the requirements from the Original Consent Decree.

5.        *Monitoring and Reporting*

This section deals with periodic reports and efforts to monitor NYCHA's compliance, issues the Special Master deems very important. As with the Standard Procedure, in accordance with NYCHA's request, paragraph 14 sets forth a process and a schedule for establishing new periodic reports. It is not an agreement to agree. It is an agreement that the Special Master shall determine the revised periodic reports in a report and recommendation after receiving input from the parties. The Court may then approve, modify, or reject the report and recommendation in accordance with Rule 53(f). If the Court adopts the Special Master's report and recommendation, it will become part of the Revised Consent Decree. Paragraph 15 provides that until a new approach to the periodic reports is developed, NYCHA will continue to provide the periodic reports required by the Original Consent Decree.

Paragraph 16 provides that the reports shall be deemed submitted to the Court and certified as true, accurate, and compete under penalty of perjury. This is designed to remedy the problem Plaintiffs have twice experienced where NYCHA's reports are not accurate and yet NYCHA suffered no consequences for the inaccuracy. This paragraph creates a much-needed incentive to make the reports accurate and gives the reports' creators a reason to resist if someone suggests that they should create an inaccurate report.

Paragraphs 17 and 18 provide for the appointment of an Independent Data Analyst. Plaintiffs' counsel and the Special Master do not have the expertise to design meaningful and accurate reports. These paragraphs provide the means to do so. They also provide that the Independent Data Analyst can "view" NYCHA's database to ascertain the data that is available for reporting purposes.

Paragraphs 19 through 21 provide for the appointment of the Independent Mold Analyst. As stated above, the Special Master has expressed that monitoring and accountability are very

important, and Plaintiffs agree.  Reports are a useful tool, but there is no way to determine what actually is happening unless there are expert inspections.

6.      *Ombudsperson*

As noted above, the concept of the Ombudsperson – to which NYCHA's general counsel agreed to more than a year ago – is very important to Plaintiffs; indeed, it is the most important part of the Revised Consent Decree.  Edwards Decl. ¶ 24.  Unlike NYCHA's "Mold Busters" program, which may or may not be successful, the Ombudsperson provides real relief to real people who need NYCHA to effectively remediate the mold and excessive moisture in their apartments.  It also encompasses the process that Manhattan Together and South Bronx Churches have been engaging in for more than four years on a voluntary and ad hoc basis.

Paragraphs 22 and 23 provide for the Ombudsperson's appointment and compensation. Most importantly, the Ombudsperson will be independent and unaffiliated with any party.  This is critical because, for the concept to work, the Ombudsperson must be perceived by NYCHA residents to be independent; otherwise the Ombudsperson will be viewed as yet another meaningless band-aid.

Paragraph 24 provides a mechanism to inform the residents of the Ombudsperson's existence.  In connection with every mold and excessive moisture repair, the resident will be told whether the repair is a seven-day or fifteen-day repair and will be given the Ombudsperson's contact information, which will also be published on NYCHA's website.

Paragraph 25 provides that if a resident complains, the Ombudsperson shall investigate the complaint by hearing from both NYCHA and the resident.  It is likely that, in most cases, the Ombudsperson will try to work out a resolution in the first instance.  If a satisfactory resolution cannot be reached, the Ombudsperson will have the authority to issue an order requiring that the

repair be completed using various approaches, including by hiring an outside contractor, a remedy that NYCHA suggested.

Paragraph 26 provides that if, and only if, the Ombudsperson finds that NYCHA has acted in bad faith or has failed to use its best efforts, the Ombudsperson may order other appropriate relief, such as a rent abatement in cases where such relief does not affect the resident's eligibility for housing assistance. It further provides that if, and only if, the Ombudsperson finds that NYCHA has acted in bad faith or has failed to use its best efforts *and* has done so on a systematic basis, the Ombudsperson may issue an order imposing a fine payable to the Court.

Paragraph 27 provides that relief under paragraph 25 is not appealable, while orders pursuant to paragraph 26 would have the same effect as a report and recommendation and would be appealable. The parties believe that appeals of orders issued pursuant to paragraph 26 would be extremely rare. Edwards Decl. ¶ 23. Among other things, such orders require a finding of breach *and* bad faith or a failure to use best efforts, and, in the case of monetary penalties, the breaches must be systematic. Furthermore, if NYCHA does not appeal, the Court will not have to do anything unless NYCHA refuses to comply with the Ombudsperson's order – in which case the Court may treat the order as an order of an arbitrator. If NYCHA does appeal, the Court can either decline to enforce the Ombudsperson's order, affirm that order, or issue an Order of its own.

7.    *Jurisdiction*

Paragraph 13(a) of the Original Consent Decree mandated that its terms would simply "cease to have any effect" and the Court would no longer retain jurisdiction, after 36 months had lapsed. The Original Consent Decree did not provide any standards for termination. Rather, it placed the burden on Plaintiffs to seek extensions, which they were forced to do on several occasions. This created uncertainty and provided no incentive for NYCHA to comply. In contrast, the Revised Consent Decree provides, in paragraph 28, that it will remain in effect until vacated

by the Court, placing the burden on NYCHA to demonstrate compliance and show that the decree is no longer needed. Plaintiffs insisted on this structure to avoid the problem with the Original Consent Decree, where NYCHA seemed intent on running out the clock.

The parties debated whether the level of compliance should be "substantial compliance" or something lower or higher. As a compromise, the parties agreed that the Court should "consider" whether NYCHA has effectively remediated mold and complied with the Performance Parameters. This leaves it squarely for the Court to decide, based on all the facts and circumstances, whether NYCHA's compliance is sufficient to justify vacating the decree. Edwards Decl. ¶ 25.

8.    *Attorneys' Fees*

Paragraph 33, the attorneys' fees provision, differs from the fees provision contained in the Original Consent Decree in that it permits Plaintiffs to move for attorneys' fees in connection with monitoring activities, as well as enforcement. Plaintiffs' counsel have spent hundreds of hours meeting with NYCHA and the Special Master to develop new procedures and protocols, as well as reviewing and analyzing the periodic reports. Plaintiffs believe they should be able to seek fees and costs for that effort, and NYCHA – of course – is entitled to oppose.

The Revised Consent Decree also provides that Plaintiffs may move for fees if an enforcement motion results in an informal resolution or a settlement. The Original Consent Decree limited attorneys' fees to time spent in connection with a successful motion to enforce, which created a disincentive to settle. The Revised Consent Decree eliminates that disincentive and gives the Court discretion to consider an application for attorneys' fees based on all the facts and circumstances.

*                    *                    *

The provisions of the Revised Consent Decree work together to provide effective and enhanced relief for the Plaintiff class. The Performance Requirements require NYCHA to

eliminate reoccurrences and complete simple repairs in seven days and more complex repairs in fifteen days – without regard to any averages, which only affect Plaintiffs' rights on a motion to enforce. They further require NYCHA to use best efforts to complete any repair that exceeds the applicable time period. If NYCHA fails to use best efforts, the resident can seek relief from the Ombudsperson, who can order NYCHA to take immediate action. In this way, the revised Consent Decree – for the first time – provides real relief for the residents of NYCHA housing who are suffering from the consequences of mold and excessive moisture.

<u>Argument</u>

I.  **THE COURT SHOULD APPROVE THE REVISED CONSENT DECREE BECAUSE IT IS FAIR, REASONABLE, ADEQUATE, AND IN THE BEST INTERESTS OF THE CLASS.**

The Court may approve a proposed settlement of the claims, issues, or defenses of a certified class "after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The standards for determining the substantive fairness and reasonableness of a class action settlement generally are set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000), as follows: "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation (citations omitted)." In addition, "[t]he court must review the negotiating process leading up to the settlement for procedural fairness, to ensure

that the settlement resulted from an arm's-length, good faith negotiation between experienced and skilled litigators." *Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013).

A number of courts have considered the applicability of the *Grinnell* factors to Rule 23(b)(2) classes and eliminated or modified some of them. In *Joel A. v. Giuliani*, 218 F.3d 132, 138 (2d Cir. 2000), for example, the district court eliminated factors (5), (7), (8), and (9) and interpreted factor (4) to be whether the agreement is more favorable than any the court could have unilaterally ordered after a trial and whether any preferable alternative remedy has been suggested. 218 F.3d at 138. *Accord, Selby v. Principal Mut. Life Ins. Co.*, No. 98 Civ. 5283 (RLC), 2003 U.S. Dist. Lexis 21138, at *8-9 (S.D.N.Y. Nov. 21, 2003); *Ingles v. Toro*, 438 F. Supp. 2d 203, 211 (S.D.N.Y. 2006) (Chin, D.J.). Because NYCHA decided not to litigate the case and there has been no discovery, factors (3) and (6) are not relevant here either. The relevant substantive fairness factors are: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; and (3) whether any preferable alternative remedy has been suggested. In addition, Plaintiffs must satisfy the requirement for procedural fairness. *Charron,* 731 F.3d at 247. The Revised Consent Decree fully meets each of the applicable factors.

A.   <u>Substantive Fairness</u>

1.   <u>*The Complexity, Expense, and Likely Duration of the Litigation*</u>

From its commencement, this litigation has presented complex federal claims regarding the availability of reasonable accommodations to persons recognized as having disabilities under the Americans with Disabilities Act, in the context of requesting amelioration of mold and excessive moisture conditions in their apartments. The post-settlement enforcement process has continually presented challenging problems of relief and conflict resolution, in the context of fashioning a system of systemic mold abatement throughout thousands of NYCHA apartments.

25

The parties and the Special Master deliberated for more than two years over a range of complex issues, including (i) the effectiveness of various mold and moisture eradication techniques; (ii) the differences in occurrence and continuing prevalence of these conditions in various NYCHA developments and the conditions characterizing these differences; (iii) technological improvements in detecting and documenting mold and excessive moisture during apartment inspections, including the use of moisture meters and handheld devices; and (iv) implementation of improved procedures for reporting complaints of mold and moisture and creating consequent work orders designed to timely and effectively eradicate these conditions in the apartments of thousands of affected class members.

If the Court rejects the revised Consent Decree, the parties will be forced to litigate the case unless the Court keeps the Original Consent Decree in place. Litigation of this case will involve extensive discovery covering a period of many years, and there will be numerous logistical difficulties since many of the key witnesses are no longer employed by NYCHA. Both sides will have to retain experts who will be required to conduct extensive analyses. There will undoubtedly be motion practice, and a trial will be lengthy. At the end of the trial, which would likely take place years from now, the Court will have to consider relief, which is unlikely to be materially different from what the parties have already agreed to.

If the Original Consent Decree is continued, the Court will have to determine what to do about NYCHA's breaches. Plaintiffs will undoubtedly make a motion to enforce, and they will seek discovery regarding NYCHA's breaches, including whether the provision of inaccurate data in periodic reports was intentional or inadvertent. The Court will have to consider appropriate relief, including potential sanctions for contempt. Other than contempt, it is doubtful that the relief would be materially different from what NYCHA has already agreed to do.

Either scenario would be complex, expensive and protracted. The time and expense spent on litigating the complaint or an enforcement motion would be better spent on effectively remediating mold and excessive moisture and providing immediate relief. For these reasons, the first *Grinnell* factor supports approval.

### 2. *The Class Has Reacted Favorably to the Revised Consent Decree*

There can be no doubt that the class members' reaction to the Revised Consent Decree is favorable. The Court has received more than 150 letters of support from NYCHA tenants who suffer from asthma, or have household members who do, and who have experienced mold and excessive moisture problems in their apartments. The Court has also received approximately 350 additional letters from other NYCHA tenants and members of the community who have expressed concerns about mold and excessive moisture problems and/or have voiced their support for the Revised Consent Decree.[11] Meyer Decl. ¶ 26. In these letters, members of the class and the institutional Plaintiffs have repeatedly emphasized the necessity of the Revised Consent Decree to ensure that NYCHA will be held accountable for remediating mold and excessive moisture at its root causes in a timely manner. There has been only one letter submitted in opposition to the settlement. *Id.*

### 3. *The Revised Consent Decree Represents the Best Result the Class Could Achieve and There Is No Preferable Alternative Remedy*

The Revised Consent Decree is the best result the class could achieve under the circumstances, and no preferable alternative remedy has been suggested. Negotiations over the Revised Consent Decree began with Plaintiffs' counsel threatening to move for injunctive relief as a result of NYCHA's failure to comply with the Original Consent Decree. Edwards Decl. ¶ 20.

---

[11] The Original and Revised Consent Decrees, by their terms, are applicable to all NYCHA residents.

The initial draft of the Revised Consent Decree encompassed everything Plaintiffs thought they could get if they litigated the motion. Meyers Decl. ¶ 18, Ex. 11. Any compromises were based on Plaintiffs' counsel's judgment as to what, as a practical matter, NYCHA was capable of doing, as discussed below.

The Revised Consent Decree is designed to plug certain gaps in the Original Consent Decree, which NYCHA did not hesitate to exploit. First, NYCHA sought to excuse its performance by claiming there was no reoccurrence standard in the Original Consent Decree. (Dkt. #56 at 14.) The Revised Consent Decree addresses that issue by requiring NYCHA "to remove mold and abate excessive moisture, prevent their reoccurrence, and eliminate the causes of mold and excessive moisture at their source." Revised Consent Decree ¶¶ 1(f), 2.

Second, by taking advantage of a provision in the Original Consent Decree which provided that NYCHA would be in compliance if it completed 95% of work orders within the applicable time periods on average, NYCHA was able to excuse its failure to complete repairs within the applicable time periods in thousands of cases. Steinkamp Decl. ¶ 52. While the Revised Consent Decree retains, for purposes of demonstrating systemic compliance, the language regarding 95% of repairs being completed within the applicable time periods on average, the critical distinction is that it mandates that each resident has the right to expect repairs to be completed within the applicable time periods in all cases. This is accomplished by the provision that "NYCHA shall use its best efforts to complete the repair as quickly as possible" if it fails to comply with the applicable standard. Furthermore, the resident has the right to seek relief from the Ombudsperson if the resident has any concern about effectiveness or timeliness of the repair or about failure to use best efforts. Revised Consent Decree ¶¶ 3(b), (c).

Third, the Revised Consent Decree provides strict deadlines for creating and implementing new procedures and protocols, referred to as the Revised Standard Procedure. *Id.* ¶¶ 4-8. As noted above, Plaintiffs originally proposed a detailed document containing revised procedures and protocols developed in meetings with the Special Master and Microecologies over the last two years, but NYCHA asked for more time to complete its process, which was already underway. Meyer Decl. ¶ 22. Plaintiffs thought NYCHA's request was reasonable, so they agreed to minimum standards plus the deadlines. *Id.* ¶ 23. NYCHA has now met the deadline for developing the Revised Standard Procedure, and the parties have agreed to incorporate it by reference into the Revised Consent Decree (¶ 5). The remaining steps, the completion of which must be certified to the Special Master, are well underway. The Revised Consent Decree also requires NYCHA to run roof fans 24 hours per day. Revised Consent Decree ¶ 11.

Fourth, the Revised Consent Decree directs a process for developing a new approach for monitoring and reporting. *Id.* ¶¶ 14-16. Again, as noted above, the early drafts of the Revised Consent Decree included a detailed description of new periodic reports that Plaintiffs proposed based on Stout's recommendations. Meyer Decl. ¶ 19. NYCHA asked for more time to consider Plaintiffs' proposals but agreed to a process whereby the Special Master would determine, with the Independent Data Analyst's assistance, the form and content of new periodic reports, subject to the Court's approval. Revised Consent Decree ¶ 14. The Revised Consent Decree also provides that the new periodic reports, as well as the existing periodic reports, will be certified under penalty of perjury, *id.* ¶ 16, which should provide safeguards against the inaccurate reports that NYCHA has provided in the past. *See, e.g.*, *United States v. Metro. Opera*, 11 Civ. 0236 (GBD) (S.D.N.Y. Jan. 12, 2011, ECF No. 2) (requiring certification of compliance under penalty of perjury).

Fifth, the Revised Consent Decree calls for the appointment of an Independent Data Analyst and an Independent Mold Analyst to assist in developing periodic reports, monitoring the effectiveness of NYCHA's revised procedures and protocols, and suggesting improvements, if any are needed. Revised Consent Decree ¶¶ 17-21. Neither Plaintiffs nor the Special Master have the necessary expertise to do these things. Meyer Decl. ¶ 19. The Court has the authority to require the parties to retain experts and consultants to guarantee the implementation of a consent decree. *See, e.g.*, *City of New York v. Local 28, Sheet Metal Workers' Int'l Ass'n*, 170 F.3d 279, 285 (2d Cir. 1999) (statistical expert). These experts will perform limited tasks.

Sixth, the Revised Consent Decree provides for the appointment of an Independent Ombudsperson, described above. Revised Consent Decree ¶ 22. In connection with every mold or excessive moisture repair, NYCHA will give the resident a written statement indicating whether the repair will be completed in seven or fifteen days. The statement will also tell the resident that the resident can contact the Ombudsperson if the resident has any concerns about the repair. *Id.* ¶ 24. The Ombudsperson can issue an order providing relief, including (i) requiring NYCHA to complete the repair in a specified number of days; (ii) transferring the resident to another apartment; (iii) ordering an independent contractor to complete the repair; and (iv) requesting the Independent Mold Analyst to inspect the apartment and provide a remediation plan. *Id.* ¶ 25.[12] As noted above, this provision, which Plaintiffs view as the most important achievement of the Revised Consent Decree, provides – for the first time – concrete and specific relief for NYCHA residents.

---

[12] The Ombudsperson also has the authority to order additional relief if NYCHA has acted in bad faith or has failed to use its best efforts, and the Ombudsperson may impose a fine if NYCHA has "systematically" failed to comply with the decree. Revised Consent Decree ¶ 26.

Seventh, the Revised Consent Decree will stay in effect unless and until it is vacated by the Court. *Id.* ¶ 28. This is a vast improvement over the Original Consent Decree, which had a limited duration, thus encouraging NYCHA to do nothing in the hope that the decree would expire. Meyer Decl. ¶ 19. The Court has the power to enter a decree of unlimited duration. *See, e.g.*, *Floyd v. City of New York*, 959 F. Supp. 2d 668, 678 (S.D.N.Y. 2013) ("when the City has achieved compliance"); *Escalera v. NYCHA*, 924 F. Supp. 1323 (S.D.N.Y. 1996) (eviction procedures).[13]

The Court found that the Original Consent Decree satisfied the *Grinnell* standards and was fair, adequate, and reasonable. (Dkt. #21 at 4.) The seven reasons discussed above demonstrate why the Revised Consent Decree is a substantial improvement over the Original Consent Decree. For these reasons, the Revised Consent Decree should be approved as well.

B.    Procedural Fairness

The Revised Consent Decree was negotiated at arm's length by experienced counsel, including counsel from two private law firms, Proskauer and Quinn Emanuel, and two public interest law groups, NCLEJ and NRDC. Those negotiations were overseen by the Special Master, who was present for many of the discussions and made a number of suggestions. Meyer Decl. ¶ 24. Several of these lawyers have worked on the case since its inception, and many of them have been involved for the past two years in intense, and often adversarial, discussions under the auspices of the Special Master.

---

[13]    The Revised Consent Decree also provides that Plaintiffs may move for enforcement if NYCHA is in systematic noncompliance with the decree, but NYCHA would have a good faith and best efforts defense unless the Court concludes that NYCHA's failure to comply is due to lack of funding, in which case the Court can issue appropriate relief to incentivize funders to supply the funds. *See, e.g.*, *United States v. City of Yonkers,* 856 F.2d 444, 458 (2d Cir. 1988) (in response to defense that it did not have funding, city was told to get the funding or face contempt).

31

Further, there is no evidence, or even an appearance, of collusion between the parties. Neither counsel nor any member of the class will receive any benefit outside of the terms of the Revised Consent Decree itself. The negotiation of the Revised Consent Decree was driven by Plaintiffs' threat to pursue an enforcement motion for injunctive relief based on evidence of NYCHA's noncompliance derived from NYCHA's own periodic reports. *See Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983) (the court must evaluate the negotiating process in light of "the experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves") (citations omitted).

In its Memorandum and Order of April 16, 2018 (Dkt. #167), the Court expressed a concern that the Revised Consent Decree had been "reached in haste" and "smacks of a slapdash effort to present this Court with a temporary truce that allows Plaintiffs to claim a victory in name and NYCHA to maintain a façade of action without any definite obligations apart from the status quo." (Dkt. #167 at 2-3.) The Revised Consent Decree was the subject of intensive negotiations for more than two months under the Special Master's supervision, after the parties had already devoted two years to debating and developing improved protocols for mold remediation and methods for holding NYCHA accountable. Meyer Decl. ¶ 23. The timing was dictated by the expiration date of the Original Consent Decree, which was April 17, 2018. *Id.* ¶ 18. Far from being a temporary truce or a façade, the Revised Consent Decree imposes significant additional obligations on NYCHA, described above, that are beneficial to the class. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (a "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arms-length negotiations between experienced, capable counsel . . . .") (quoting *Manual for Complex Litig., Third*, § 30.42 (1995)).

C.    The Court's Questions

As noted above, in its Orders of April 16 and May 23, 2018, the Court raised a number of questions about the Revised Consent Decree.  In its order of April 16, the Court expressed concern that the Ombudsperson, Independent Mold Analyst, and Independent Data Analyst would be appointed solely at the Special Master's discretion, without any judicial approval.  (Dkt. #167 at 2.)  As discussed above, the Special Master suggested this approach (Meyer Decl. ¶ 24), and Plaintiffs believed that the Special Master's views reflected the views of the Court.  Edwards Decl. ¶ 22.  The parties have now modified the decree to provide that the Special Master will issue reports and recommendations on these appointments, which will be subject to the Court's review and approval.  Revised Consent Decree ¶¶ 17, 19, 22.

In addition, the Court expressed concern about a proliferation of appeals from actions of the Ombudsperson.  (Dkt. #167 at 2-3.)  In response, the parties agreed to modify the Revised Consent Decree to eliminate appeals to the Court for revised performance parameters (¶ 6), revisions to the Standard Procedure (¶ 9) and orders of the Ombudsperson pursuant to paragraph 25.[14]  In each case, the Revised Consent Decree states that the decision shall be deemed to have "the force and effect of an order issued by an arbitrator."  This language was added to give Plaintiffs the ability to seek a court order in the event that NYCHA refuses to comply with an order of the Special Master or the Ombudsperson.  The Revised Consent Decree also provides that the Court will have jurisdiction over any motion to enforce or vacate such an order.  Revised Consent Decree ¶ 29.

---

[14]    NYCHA will have the ability to appeal the imposition of fines, Revised Consent Decree ¶ 27, which may be imposed if NYCHA has acted in bad faith or failed to use best efforts, but it is anticipated that such appeals will be rare, if they ever occur at all.  Edwards Decl. ¶ 23.

In an Order dated May 23, 2018, the Court asked the parties to explain the rationale for using the same time parameters that the parties agreed to in the Original Consent Decree, even though NYCHA has consistently failed to meet them. (Dkt. #172.) As stated in the Parties Joint Report dated June 26, 2018 (Dkt. #173), the time parameters in the Revised Decree were the product of a compromise. (*Id.* at 6.) NYCHA is able to comply with the seven-day requirement for simple repairs (*Id.* at 13), so there is no reason to change that requirement. For more complex repairs, NYCHA has only been able to comply with the fifteen-day requirement approximately half the time (*Id.*), but if the parties were to relax the time parameter for fifteen-day repairs, then thousands of people as to whom NYCHA is in compliance would be hurt, and NYCHA would benefit from its breach. Accordingly, the parties agreed that NYCHA will continue to perform complex repairs in fifteen days where it can; and where it cannot, the Revised Consent Decree provides that "NYCHA shall use its best efforts to complete the repair as quickly as possible," and the resident may seek relief from the Ombudsperson. Revised Consent Decree ¶¶ 3(b), 3(c), 26, 27. While Plaintiffs believe that NYCHA's performance will improve in the future if it properly implements the Revised Standard Procedure,[15] continuation of the current time parameters is the best available solution at the present time.[16] It will require NYCHA to complete repairs in the shortest possible time, which is critical to people who have asthma. Plaintiffs respectfully request that the Court provide some deference to the parties' solution. *See Sony Corp. SXRD v. Cardenas*, 448 F. App'x 85, 88 (2d Cir. 2011) ("Consequently, when evaluating a settlement agreement, the

---

[15]     Because NYCHA's quarterly reports purported to show that NYCHA was complying with the time parameters (even though it was not), the focus of the revised procedures and protocols has been the prevention of reoccurrences. Edwards Decl. ¶¶ 16, 17.

[16]     The Revised Consent Decree also provides that either party can ask the Special Master to modify the time parameters, and that decision will not be appealable under Rule 53(f). Revised Consent Decree ¶ 6.

court is not to substitute its judgment for that of the parties . . . ."); *Grinnell,* 495 F.2d at 462 ("The court is . . . called upon to consider . . . the exercise of business judgment in determining whether the settlement is reasonable" (citation omitted)) (quoting *Young v. Katz,* 447 F.2d 431 (5th Cir. 1971)); *Ingles*, 438 F. Supp. 2d at 211 ("the court is not to substitute its judgment for that of the parties").

In the May 23 Order, the Court also expressed concern about "the appointment of an ombudsperson with sweeping powers and a bureaucracy to administer the proposed decree . . . ." (Dkt. #172 at 1.) The Revised Consent Decree provides that the Special Master will determine the terms and conditions of the Ombudsperson's jurisdiction, as well as a budget for the Ombudsperson's fees and whether the Ombudsperson can hire additional staff. Revised Consent Decree ¶¶ 22-23.[17] It is anticipated that once the Ombudsperson is in place, the Ombudsperson will develop detailed procedures for his or her work, in consultation with the parties, subject to the Special Master's approval. Edwards Decl. ¶ 24.[18]

Finally, in an Order dated June 28, 2018 (Dkt. #174), the Court asked the parties to address the ramifications of the Government's consent decree, which is not a factor in determining whether the settlement is in the best interests of the class. In their responses, the parties here and the Government parties unanimously expressed the view that there is no inherent conflict between the two decrees. (Dkt. ##182, 193 in this case, and Dkt. ##25-27 in the Government's case.) Paragraph 39 of the proposed consent decree in the Government action directs the Monitor to

---

[17]     The Revised Consent Decree provides for similar control by the Special Master over the Independent Data Analyst and the Independent Mold Analyst. Revised Consent Decree ¶¶ 17, 19.
[18]     In the May 23 Order, the Court also expressed concern about the development of workable remediation protocols. The Revised Standard Procedure has now been agreed-upon by the parties.

coordinate with the Special Master in *Baez*. *United States v. NYCHA*, 18 Civ. 5213 (S.D.N.Y. June 11, 2018) (Dkt. #5-1). While NYCHA would not agree to the language the Government sought in the Revised Consent Decree to resolve conflicts, the Revised Consent Decree as modified provides in paragraph 31 that nothing in its terms precludes NYCHA from complying with its obligations in the Government action. The effort in this case, which is well underway, focuses primarily on operational issues, while the Government's monitor, who will not be in place for months, will have greater power to effect institutional change by ordering capital repairs. (Dkt. #183). Furthermore, because of their representation and close contact with the class, Plaintiffs are in a unique position to protect their interests.

There is a "'strong judicial policy in favor of settlements, particularly in the class action context.'" *Wal-Mart*, 396 F.3d at 116 (quoting *In re Painewebber Ltd. P'ships Litig.*, 147 F.3d 132, 138 (2d Cir. 1998)). This settlement will make the class far better off than they are today. For all of these reasons, the Court should approve the Revised Consent Decree.

## II. THE REVISED CONSENT DECREE IS AN ADEQUATE AND NECESSARY REMEDY FOR NYCHA'S BREACHES OF THE ORIGINAL CONSENT DECREE.

This is not an ordinary motion for approval of a consent decree. There already is a consent decree that NYCHA has continually violated. As noted above, the reoccurrence rate has gotten worse – increasing from a low of 22% in 2015 to a high of 48% in the most recent quarter. Steinkamp Decl. ¶ 7. And while NYCHA repeatedly represented that it was in compliance with the seven- and fifteen-day time parameters, it has now admitted that the representations it made in its periodic reports were inaccurate (Meyer Decl. ¶ 17, Ex. 10), and the time to complete fifteen-day repairs has averaged as high as 35.5 days in a recent quarter. (Dkt. #173 at 13.)

As the Court found in its December 15, 2015, Order (Dkt. #88), NYCHA has been in breach of the Original Consent Decree since the day it was entered, and that breach continues to this day.

There must be a remedy for that breach.  *See, e.g.*, *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985) (the "court has an affirmative duty to protect the integrity of its decree") (internal quotation marks omitted).  Otherwise, parties will have little incentive to comply with court orders.

If NYCHA had not agreed to the Revised Consent Decree, Plaintiffs would have moved for injunctive relief.[19]  A plaintiff seeking injunctive relief must show four things:  "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for the injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *U.S. SEC v. Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 296 (2d Cir. 2014) (quoting *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  Each of these requirements is easily satisfied here.

NYCHA's own documents admit that mold is "associated with increased risks for respiratory symptoms, asthma, hypersensitivity pneumonitis, rhinosinusitis, bronchitis, and respiratory infections."  (Dkt. #184 at 3.)  "Potential health effects and symptoms associated with exposures to mold and excessive moisture include allergic reactions, asthma, and other respiratory complaints."  *Id.* at 3.  It follows that failure to effectively remediate mold and excessive moisture causes irreparable harm.  *See, e.g.*, *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 55 (2d Cir. 2004) ("substantial risk to plaintiffs' health").

Monetary damages are never fully adequate to compensate for harm to a person's health.  *Id.* at 56 ("much more than monetary harm").  That is particularly true where, as here, NYCHA residents do not have the resources to seek relief in court.  That is yet another reason why the Ombudsperson's role in the Revised Consent Decree is particularly important.

---

[19]   The instant motion could be considered, in the alternative, a motion for injunctive relief.

Furthermore, the balance of hardships clearly tips in favor of the class. At the hearing on July 10, 2018, the Court noted that reform of living conditions in NYCHA housing is "urgently needed," that living conditions in NYCHA housing are "deplorable," and that "mold problems jeopardize the health and well-being of 400,000 tenants." Hearing Tr. at 4:9-17 (Jul. 10, 2018). While NYCHA's financial hardships are well-known, the Revised Consent Decree is designed to improve living conditions within NYCHA's financial constraints.

Finally, there has been no allegation that the public interest would be disserved by the Revised Consent Decree. Indeed, it is clear that the public interest will be promoted by the decree. There can be no doubt that NYCHA residents will be better off with the Revised Consent Decree than without it.

If likelihood of success on the merits were required here, there can be no doubt that NYCHA is in breach – NYCHA admits it. (Dkt. #173 at 9-14.) Once noncompliance is established, the Court has the power to take any action "appropriate given the resistance of the noncompliant party." *Berger*, 771 F.2d at 1569. "Until parties to [a consent decree] have fulfilled their express obligations, the court has continuing authority and discretion—pursuant to its independent, juridical interests—to ensure compliance." *E.E.O.C. v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice-Journeyman Educ. Fund*, 925 F.2d 588, 593 (2d Cir. 1991). "Consent decrees are judgments . . . and district courts may fashion remedies to enforce prior judgments. These remedies need not match those . . . originally provided by the court's earlier judgment." *United States v. Alcoa, Inc.*, 533 F.3d 278, 288 (5th Cir. 2008) (internal quotation marks omitted). "[T]he reasonable imposition of equitable remedies outside the confines of the decree is permitted to secure compliance by the parties." *Hurley v. Coughlin*, 158 F.R.D. 22, 30 (S.D.N.Y. 1993).

The intent of the Original Consent Decree, as reflected in its "whereas" clauses, was to "combat the problems of mold growth and excessive moisture in apartments and other areas by taking proactive measures" and by "removing visible mold, identifying the excessive moisture sources that support mold growth and eliminating them" to advance the "best interests of the class." Unfortunately, in the four years that it has operated under the Original Consent Decree, NYCHA has failed to achieve that objective – notwithstanding the assistance of the Special Master. As described above, the Revised Consent Decree provides much-needed relief by (i) making NYCHA's obligation to eliminate reoccurrences clear; (ii) tightening the seven- and fifteen-day requirements and adding a best efforts obligation when the repair exceeds seven or fifteen days; (iii) providing strict deadlines for developing and implementing new procedures and protocols; (iv) creating a process for developing new periodic reports and monitoring results; and (v) providing for the appointment of an Ombudsperson to whom residents can go for immediate relief.

The fact that Plaintiffs would have been entitled to the relief in the Revised Consent Decree even if NYCHA had not agreed to it is an additional reason to approve the decree. That NYCHA has agreed to the Revised Consent Decree makes it all the more appropriate. That the parties and the Special Master – who have been working on this issue for many years and understand it better than perhaps anyone else – agree that the Revised Consent Decree provides a sound and workable approach, is yet another reason to approve the Revised Consent Decree.

## Conclusion

For the foregoing reasons, the Court should grant the parties' motion to approve the Revised Consent Decree.

Dated: New York, New York
            August 31, 2018

Respectfully submitted,

**Quinn Emanuel Urquhart & Sullivan, LLP**

/s/ Steven M. Edwards
_____
Steven M. Edwards
51 Madison Ave, 22nd Floor
New York, New York 10010
Tel:   (212) 849-7000
Fax:   (212) 849-7100
stevenedwards@quinnemanuel.com

**Proskauer Rose LLP**

/s/ Erin M. Meyer
_____
Erin M. Meyer
Zachary W. Chalett
Eleven Times Square
New York, New York 10036
Tel:   (212) 969-3000
Fax:  (212) 969-2900
emeyer@proskauer.com
zchalett@proskauer.com

**Natural Resources Defense Council, Inc.**

/s/ Nancy S. Marks
_____
Nancy S. Marks
40 West 20th Street
New York, New York 10011
Tel:   (212) 727-2700
Fax:  (415) 795-4799
nmarks@nrdc.org

**National Center for Law & Economic Justice, Inc**.

/s/ Marc Cohan
_____
Marc Cohan
Greg Bass
275 Seventh Avenue, Suite 1506
New York, New York 10001
Tel:   (212) 633-6967
Fax:  (212) 633-6371
cohan@nclej.org
bass@nclej.org

_Attorneys for Plaintiffs_