**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

MARIBEL BAEZ; FELIPA CRUZ; R.D., ON
BEHALF OF HER MINOR CHILD, A.S.; on
their own behalf and on behalf of all others
similarly situated; UPPER MANHATTAN
TOGETHER, INC.; and SOUTH BRONX
CHURCHES SPONSORING COMMITTEE,
INC.,

        Plaintiffs,

        v.

NEW YORK CITY HOUSING AUTHORITY,

        Defendant.

No. 13 Civ. 8916 (WHP)

---

**REPORT AND RECOMMENDATION OF THE SPECIAL MASTER**
**SELECTING AN INDEPENDENT DATA ANALYST**
**AND INDEPENDENT MOLD ANALYST**

On November 29, 2018, the Court issued an Opinion and Order (the "Opinion and Order") (ECF No. 219) granting Plaintiffs' motion for approval of a modified version of a proposed amended stipulation and order of settlement (the "Revised Consent Decree") and issued a separate order approving the Revised Consent Decree (ECF No. 220). Pursuant to paragraphs 17 and 19 of the Revised Consent Decree, the Special Master shall consider proposals from the parties and issue a report and recommendation selecting an Independent Data Analyst and Independent Mold Analyst, respectively. These proposals shall be subject to the Court's approval under Rule 53(f) of the Federal Rules of Civil Procedure.

Through this Report and Recommendation, I am proposing for the Court's review and approval the following candidates: Stout Risius Ross, LLC ("Stout") for the role of Independent Data Analyst and Microecologies, Inc. ("Microecologies") for the role of Independent Mold

Analyst.  I also propose that the Court appoint Stout to develop the operating documents, procedures, and database that are prerequisites to launching the Ombudsperson's call center and e-mail operations.  I will propose in a separate report and recommendation a candidate for the role of Ombudsperson.  *See* Revised Consent Decree ¶ 22.

Plaintiffs and New York City Housing Authority ("NYCHA") have jointly proposed these candidates to me, and I met with the parties in person on December 20, 2018, and January 24, 2019, and by telephone conferences on January 11, 2019, February 1, 2019, April 9, 2019, April 15, 2019, and May 15, 2019, to discuss and review these proposals.  In addition, the Court and I interviewed Stout regarding the Independent Data Analyst position and Ombudsperson call center operations on May 13, 2019.  I believe these are the best candidates for the positions for the reasons elaborated below.

On May 6, 2019, NYCHA informed Plaintiffs that it was suspending further provision of the periodic reports that identify, among other things, the mold and excessive moisture repairs made in the previous quarter, the time it took to complete the repairs, and the recurrence rates, because the Independent Data Analyst has not been appointed.  These periodic reports were required by the Original Consent Decree (ECF No. 22, ¶ 10), and that requirement has been carried into the Revised Consent Decree (ECF No. 220, ¶¶ 14-16).  The Revised Consent Decree calls for newly designed reports to be developed by the Independent Data Analyst with input from the parties.  Accordingly, the Independent Data Analyst should be appointed as soon as possible.

**Independent Data Analyst**

The Revised Consent Decree defines "Independent Data Analyst" in paragraph 1(i) as "an individual or advisory firm who is selected by the Special Master with the input of the parties and retained by the Special Master, and is qualified in forensic data analysis."  Paragraph 18 of the

Revised Consent Decree describes the duties of the Independent Data Analyst to include assisting the parties in designing new and improved periodic reports; recommending improvements to those reports as needed thereafter; and reviewing and confirming the accuracy of the reports on an ongoing basis.

As described in Stout's proposal dated January 30, 2019, with updates dated May 17, 2019, attached hereto as Exhibit 1, as well as in the Declaration of Neil Steinkamp (ECF No. 199), Stout is uniquely qualified to serve as the Independent Data Analyst because Stout's team, led by Neil Steinkamp of Stout's Strategic Systems Consulting Practice, has extensive experience in forensic data analysis and is also deeply familiar with NYCHA's past periodic reports and NYCHA's current processes of data collection, analysis, and production.  On a pro bono basis, Stout has dedicated more than 890 professional hours, valued at over $215,000, to understanding and analyzing how NYCHA's periodic reports are generated; what data NYCHA has available; how NYCHA creates, schedules, and completes work orders for mold and excessive moisture repairs; what inaccuracies existed in NYCHA's past periodic reports and how to correct those errors; and how NYCHA's periodic reports could be redesigned to reflect reliable and meaningful measurements of NYCHA's compliance with the Revised Consent Decree.  Throughout this process, Stout has met jointly and individually with the parties and has earned their trust and confidence.

Given Stout's expertise and past experience with NYCHA's data and periodic reports, Stout is best positioned to develop the new periodic reports in an expeditious manner.  The parties are concerned about the time that would be lost and the additional expenses that would be incurred by bringing on board an advisory firm unfamiliar with NYCHA's periodic reports and data processes.  Stout has estimated that it could complete the work required to identify inefficiencies

and inaccuracies, develop data controls and reporting tools, and redesign NYCHA's reporting metrics for an initial cost of approximately $100,000 to $120,000 for the first month.  Thereafter, Stout estimates that ongoing review of the new periodic reports to ensure the accuracy and utility of those reports would cost approximately $5,000 to $10,000 on a monthly basis.  Given these estimates, I expect the cost of the Independent Data Analyst's services for a preliminary six-month contract would be approximately $170,000.  An additional six months would produce a total of approximately $250,000 for the first year.

I believe these costs are reasonable, particularly because Stout's analysis promises not only to improve the accuracy of NYCHA's periodic reports, but also to use NYCHA's data to develop actionable insights that will improve NYCHA's effectiveness and efficiency and maximize NYCHA's resources with the ultimate aim of decreasing work order completion time and mold recurrence rates.  As Mr. Steinkamp has explained, his goal in serving as the Independent Data Analyst would be to enable NYCHA to use data analysis and data visualization as a method of understanding patterns in mold and excessive moisture remediation, identifying where and why remediation practices are succeeding or failing, and devising new strategies to remove barriers to improvement and to expand successful practices.

**Ombudsperson Call Center and E-mail Operations**

I am also recommending that Stout develop the operating documents, procedures, and database that will enable the launch of the Ombudsperson's call center and e-mail operations in advance of the Court's approving a candidate for the Ombudsperson role.  The Ombudsperson will ultimately need to employ the services of a call center to handle the initial intake of complaints, given that the volume of calls could be thousands per month.  After discussing this at length, NYCHA and Plaintiffs proposed that Stout develop and operate that call center.  Given its work

as the Independent Data Analyst, Stout will have familiarity with NYCHA's operations and information systems.  Stout also has experience with intake interviews, data collection, and fact investigation.  I believe that substantial synergies can be achieved by consolidating those functions in Stout.  Because Stout will already have access to view data contained in NYCHA's Maximo system in its capacity as the Independent Data Analyst, Stout will be able to efficiently search for and verify the work order numbers and other information provided by tenants who contact the Ombudsperson.  In addition, incorporating the call center data into the periodic report data that Stout would already be analyzing as the Independent Data Analyst will enhance Stout's ability to identify systemic trends and develop data-driven recommendations for reducing mold recurrence.

As Stout's proposals dated January 30, 2019, and May 17, 2019, describe in detail, Stout has envisioned three phases for developing and launching the Ombudsperson's call center and e-mail operations.  At this time, however, I propose only that Stout complete the first phase, which calls for the pre-launch development of the call center structure and operations.  Once I have recommended, and the Court has approved, a candidate for the role of Ombudsperson, Stout and the Ombudsperson will collaborate to open the call center to tenant calls and will review and improve its structure and procedures on an ongoing basis.

To develop the call center, Stout and the parties will work together to establish its structure and draft procedures for documenting and resolving tenant complaints.  Stout and the parties will, *inter alia*, draft (i) an intake questionnaire; (ii) a decision-tree determining how to record and respond to tenant complaints, including guidance on which complaints warrant investigation and/or escalation to the Ombudsperson; and (iii) instructions for call center analysts regarding coordinating with NYCHA to obtain work order history and other data relevant to the tenant's complaint.

Stout has estimated that it would cost approximately $37,000 to complete the pre-launch development phase of the Ombudsperson's call center and e-mail operations.

**Independent Mold Analyst**

The Revised Consent Decree defines "Independent Mold Analyst" in paragraph 1(j) as "an individual who is selected by the Special Master with the input of the parties and retained by the Special Master, and has a Mold Assessors License from the New York State Department of Labor and is either (1) certified as an industrial hygienist by the American Industrial Hygiene Association; or (2) certified by the American Council for Accredited Certification (ACAC) as an Indoor Environmental Consultant, an Indoor Environmentalist, a Microbial Consultant, a Microbial Investigator, a Moisture Control Consultant, or a Moisture Control Investigator." Paragraph 20 of the Revised Consent Decree describes the duties of the Independent Mold Analyst, which include conducting mold and excessive moisture inspections, issuing reports describing the results of those inspections, and making recommendations for improved compliance with the revised Standard Procedure.

I am nominating Microecologies for the Independent Mold Analyst position because Microecologies has a proven track record as my mold expert in this case since July 2016, and has extensive expertise relating to identifying and abating the root causes of mold and excessive moisture issues in NYCHA housing generally, and the mechanics and objectives of the Mold Busters program specifically. The parties and I interviewed Bill Sothern and Chris Mikrut of Microecologies on December 20, 2018, and again on January 24, 2019, to discuss their proposal pertaining to the Independent Mold Analyst position. On January 24, 2019, the parties and I also interviewed representatives from a second industrial hygiene consulting firm that had been proposed by NYCHA. However, after conducting this interview and reviewing the second firm's

proposal, the parties and I jointly determined that Microecologies is the more experienced and cost-effective option.

As described in Microecologies' proposals dated November 16, 2018, and February 1, 2019, attached hereto as Exhibit 2, Microecologies is uniquely qualified to serve as the Independent Mold Analyst because Microecologies has been investigating excessive moisture and mold problems in NYCHA housing since 1997, and has conducted more than 150 mold inspections in NYCHA housing as my mold expert over the past two-and-a-half years for the purpose of analyzing the root causes of mold in NYCHA housing and developing effective remediation strategies targeted to each type of root cause.  The Microecologies team is led by Bill Sothern, a Certified Industrial Hygienist ("CIH") and nationally recognized expert on indoor environmental health with more than twenty-five years of experience in environmental health-based inspections.

In addition, Microecologies collaborated with the parties to review and improve the *NYCHA Standard Procedure Manual – Mold/Mildew Control in NYCHA Residential Buildings* and, in particular, to develop the initial inspection protocol that NYCHA's property maintenance supervisors utilize as part of the Mold Busters program to diagnose the root cause(s) of mold and excessive moisture and identify the proper remediation techniques.  Through these experiences, Microecologies has developed a distinctive and unparalleled understanding of NYCHA's building systems and mold problems.  This level of expertise is essential because the Independent Mold Analyst must be recognized by NYCHA's staff as an authority who is qualified to critique their work and help them improve their inspection and remediation processes.

The parties have agreed that the Independent Mold Analyst should conduct a minimum of 250 Quality Assurance ("QA") inspections of randomly selected apartments per year (i.e., approximately 62 inspections per quarter).  The QA inspections will consist of three types: initial

QA inspections, midstream QA inspections, and post-completion QA inspections.  The initial QA inspections will determine the accuracy of the property maintenance supervisor's preliminary inspection findings, and confirm that the supervisor has internalized the Mold Busters training program and is prepared to successfully determine the root cause of the mold or excessive moisture problem before beginning more invasive and costly work.  Midstream QA inspections will be conducted when NYCHA's repairs require a wall break, to ensure that the underlying moisture source in the wall has been properly identified and rectified.  Finally, post-completion QA inspections will determine whether the remediation work was performed correctly to prevent the recurrence of mold and to hold NYCHA staff accountable for effective repairs.

Microecologies' standard hourly rates are $375 for a CIH and $275 for a Senior Investigator, but for this project they are willing to provide a discounted rate of $187.50 and $137.50, respectively.  To reduce costs, the large majority of QA inspections and report preparation will be handled by the Senior Investigator at the lower hourly rate, with this work product to be reviewed and approved by the CIH.  In particularly complex situations, the CIH may also be involved in the field inspections.  The parties expect Microecologies will perform a total of 150 initial QA inspections, 50 midstream QA inspections, and 50 post-completion QA inspections in the first year.  Assuming that Microecologies can complete half of these inspections in the first six months, Microecologies estimates costs of approximately $53,500 for 75 initial QA inspections, $18,000 per year for 25 midstream QA inspections, and $18,000 per year for 25 post-completion QA inspections, with approximately $23,000 allocated to unusual or complex inspections necessitating additional CIH oversight.  This produces a total estimated cost of $112,500 for the first six months, or $225,000 for the first year.  I believe these costs are reasonable, particularly because Microecologies' proposal is centered on ensuring that the sources

of mold and excessive moisture are effectively identified and eradicated, ultimately saving NYCHA's resources over time by minimizing mold recurrences.

**Conclusion**

For the foregoing reasons, I recommend (i) Stout and Microecologies as the most qualified candidates for the positions of Independent Data Analyst and Independent Mold Analyst, respectively; and (ii) Stout as the most qualified entity to develop and operate a call center in collaboration with the Ombudsperson. Based on the hourly and monthly cost estimates provided by Stout and Microecologies for the Independent Data Analyst and Independent Mold Analyst positions, I estimate the total cost of these candidates' services to be approximately $282,500 for the first six months. The first three months will involve higher start-up costs associated with the initial design of the new periodic reports, but the monthly costs thereafter are projected to be less, such that the overall cost for the Independent Data Analyst and Independent Mold Analyst services is at this time expected to be less than $475,000 for the first year. I propose that the candidates would be hired on a six-month contract basis, with careful monitoring of the costs each month and the development of an accurate budget at the time the contract would be up for renewal based on increased knowledge of the number of inspections required and other relevant information. The attached exhibits detailing the candidates' proposals assume a one-year contract, but both of the candidates have indicated their willingness to begin the work on the basis of a six-month contract. The pre-launch development phase of the Ombudsperson call center operation to be performed by Stout is estimated to cost an additional $37,000.

When the Ombudsperson has been appointed and the call center has been launched, the initial one-year estimate will be higher than the estimate of $500,000 set forth in the Opinion and Order, which was based on Plaintiffs' estimate at the July 10, 2018, hearing. However, I am

convinced that we need to spend the additional money to do the job right.  After discussing the matter with the parties and the candidates in detail, I do not believe there is any way of reducing the amount further.  The Revised Consent Decree creates an independent mechanism for dealing with the issues of transparency, quality assurance, and resident complaints in a way that will help to restore NYCHA's credibility with residents and ensure the continued effectiveness of the effort. I believe it is money well spent.

Dated: May 30, 2019                                                Respectfully submitted,

Francis E. McGovern
210 Science Drive
Durham, North Carolina 27708
Tel. (919) 613-7095
Fax (919) 613-7165
mcgovern@law.duke.edu

*Court-Appointed Special Master*