# EXHIBIT 1

# Stout's Proposal Regarding Select Consulting Services Associated with, and In Support Of, the Role of Ombudsperson

## NYCHA Mold and Excessive Moisture Work Orders



**CONFIDENTIAL**

January 30, 2019

Neil Steinkamp │ Stout Risius Ross, LLC

CONFIDENTIAL

## Introduction

On October 26, 2018 Stout Risius Ross, LLC ("Stout") — Neil Steinkamp and Stout submitted a proposal to provide consulting services associated with the role of Independent Data Analyst to the Baez Plaintiffs ("Plaintiffs") and the New York City Housing Authority ("NYCHA") as contemplated and described in the Proposed Amended Stipulation and Order of Settlement, which the Court so-ordered on November 29, 2018 (the "Revised Consent Decree"). This proposal has been updated to reflect additional considerations and information received since October 26, 2018. Please refer to **Appendix A** for a revised and updated copy of Stout's Independent Data Analyst proposal.[1]

Stout submits this proposal to Plaintiffs and NYCHA to incorporate select consulting services associated with the role of Ombudsperson related to "Complaint Processing and Investigative Support Services" in conjunction with the Independent Data Analyst role. This proposal contemplates that Neil Steinkamp (as the proposed Independent Data Analyst) and Stout's Forensic Services team working under his guidance and supervision would serve as a consultant to the Ombudsperson contemplated in the Revised Consent Decree.

We believe that it would be in the best interest of the Plaintiffs, NYCHA, NYCHA tenants, the Ombudsperson, the Independent Mold Analyst and the Special Master to utilize Stout for the activities outlined in this proposal for the following reasons:

- **Improved Data Analytics and Recommendations:** Data from call center activity, tenant complaints, and investigative findings/observations can be incorporated into the analysis and recommendations of the Independent Data Analyst to improve quarterly reporting, identify systemic trends, and recommend strategies for reducing mold and excessive moisture recurrence and open work orders.
- **Cost Effective and Efficient:** The data collection, investigative and reporting functions of the call center (including email) can be streamlined into the activities of the Independent Data Analyst reducing redundancies across the appointed parties.
- **Maximize Expertise of Ombudsperson:** By using Stout, including as the Independent Data Analyst, to collect information from tenants via phone call, email, or other mechanisms, conduct standardized triage, perform investigative procedures (when necessary) and provide information to the Ombudsperson, the role of the Ombudsperson can be focused on adjudication, maximizing the expertise and resources of the Ombudsperson.

Given Stout's extensive expertise in data analytics, forensic investigative services, and strategic consulting regarding social and economic considerations in housing matters we are **uniquely qualified to offer comprehensive and cost efficient services** for this additional role. Working together with NYCHA, the Ombudsperson, the Independent Mold Analyst and the Plaintiffs, Stout can consistently, reliably and cost-effectively gather information from tenant complaints, perform initial triage and response (as appropriate) and provide the Ombudsperson with the relevant, reliable, and regular reporting and support to enable prompt and effective adjudication of escalated circumstances.

---

[1] Stout's Proposal Regarding Consulting Services for the Role of Independent Data Analyst dated January 30, 2019 ("Independent Data Analyst Proposal").

CONFIDENTIAL

## Proposed Scope

Stout proposes that, in conjunction with the roles and responsibilities of the Independent Data Analyst, Stout will work collaboratively with NYCHA, the Plaintiffs, the Special Master, the Independent Mold Analyst and the Ombudsperson to provide Tenant Complaint Processing and Investigative Support Services in three phases:

### Phase 1 – Process Development

Recognizing the necessity of collaboration with the appointed parties, Plaintiffs, NYCHA, the Ombudsperson and the Special Master, and the inherent uncertainties regarding the volume and nature of tenants' complaints, we propose an initial phase during which the parties would work together to develop standard processes, protocols, triage guidelines, communication and reporting expectations, and systems for data collection, storage, access and sharing.

We expect that this phase can be completed in 30 days, utilizing several meetings of all of the involved parties to align these processes, roles and responsibilities.

### Phase 2 – Initial Launch and Evaluation

With the understanding that the launch of the tenant complaint hotline (and other tenant complaint mechanisms) will be an immediate full and complete launch, we recommend utilizing a 60-day evaluation period during which tenant call volumes, issues, escalations, etc. can be evaluated in an effort to identify process refinement that could create cost reduction opportunities and other improvements.

During this phase we recommend regular in-person meetings of all involved parties to review and evaluate the effectiveness of the processes developed in Phase 1 and utilized during in the initial evaluation. Due to the uncertainties associated with the initial launch in this phase, we expect the monthly costs in this phase to be greater as resources are used to ensure responsiveness and flexibility as initial launch processes are evaluated. At the end of this phase we expect to identify cost reduction opportunities that will be recognized in Phase 3.

### Phase 3 – Process Refinement and Standardization

After incorporating the process refinements identified in Phase 2, standard processes and best-practices would be incorporated for standard monthly activities. Over time, with the incorporation of NYCHA process improvements to work order completion, and reduction in mold recurrence, we expect that tenant complaint (call and other mechanisms) volume will decline. However, we also expect that tenant complaint volume may fluctuate significantly from week to week and month to month. As such, refined standard processes will be utilized with flexible staffing of trained and capable responders to ensure comprehensive and consistent responses to all tenant complaints and related escalation. Throughout Phase 3, Stout will continue to seek opportunities for cost containment, efficiencies, and ways to eliminate duplicative activities.  Stout will work closely with the involved parties to communicate about costs incurred and opportunities to reduce costs while ensuring the appropriate responsiveness to tenant complaints.

CONFIDENTIAL

## Staffing

Stout's team has extensive experience in assisting organizations of all sizes in conducting forensic investigations and has the appropriate training, experience, and expertise to ensure that all responders to tenant complaints have the interpersonal skills, empathy, and cultural competency to effectively communicate with NYCHA tenants. All staff will be trained on the protocols and processes developed in Phase 1 and will clearly, consistently and reliably document all interaction with NYCHA tenants. Staff will also be trained on the processes for validating information related to tenant complaints, possibly through view-only or read-only access to Maximo, as well as the process for sharing information with the Ombudsperson for review. A supervisor will be used to ensure all processes are being followed consistently and that tenant information is being collected accurately. In addition, the supervisor will ensure that interaction with the Ombudsperson is fluid and prompt, to ensure that information is provided to the Ombudsperson using established systems and protocols and that information received back from the Ombudsperson is acted on promptly and consistently with the direction provided by the Ombudsperson.

Because our professionals are routinely exposed to highly sensitive and confidential information, we have strict policies and procedures in place to ensure that confidential information is not disclosed to, or accessible by, anyone outside of the engagement team. We are keenly aware of the need to protect and maintain confidential data. For each engagement we establish clear policies and procedures regarding client communication and interaction and will do so in this engagement to ensure the safety of NYCHA tenants as well as our staff. In addition, for this engagement, call center staff will be located in closed-door offices (in our New York office) to ensure strict confidentiality of all tenant interaction.

Given the uncertainty outlined in the phases described above, and based on the expectation of up to 1,000 or more tenant complaints per month (30-40 per day) Stout plans to initially utilize two full-time call center respondents during Phase 2 (with at least one bi-lingual or multi-lingual call responder on staff), as well as one part time supervisor, in addition to the oversight of senior staff. Stout will only invoice for professional time actually incurred. All staff, including call center staff, will record time spent responding to or addressing tenant complaints to ensure accurate time entry for time incurred in support of the Ombudsperson. Stout will include time entry details in all invoices submitted to the Special Master.

Our staffing model may change after the Phase 2 evaluation described above, based on the results of the evaluation and our discussions with all involved parties. If during Phase 2 we are unable to respond to all tenant complaints within 24 hours, and if we are not able to provide a live call center respondent for at least 70% of tenant complaints received by phone, we will immediately inform the Ombudsperson, NYCHA, Plaintiffs and the Special Master with a recommendation regarding the staffing change necessary to ensure this level of responsiveness. Stout will be prepared to accommodate any immediate staffing additions, if necessary, and will utilize the staff training protocols developed with the involved parties in Phase 1.

**Call Center Respondent Attributes and Cost Considerations**

- Call Center Respondents will have an associate or bachelor level degree and have prior job experience.

CONFIDENTIAL

- Clear and effective communication skills including bi-lingual capabilities such as Spanish and Mandarin Chinese
- Interpersonal skills with training regarding empathy, cultural competency, and trauma awareness
- Technical capabilities to operate phone systems, online portal/live chat, and complex data platform for data input and tracking
- Adaptability and critical thinking and the ability to ask appropriate follow-up questions while fielding live calls
- Ability to consistently follow documented protocols and procedures
- Ability to issue-spot tenant complaints for potential concerns, non-mold issues, data inconsistencies, potential need for escalation, etc.
- Attention to detail and ability to multi-task
- Cost of operations for phone system, email, online portal and data platform
- Dedicated confidential closed door space to ensure strict confidentially of all tenant interaction
- Ability to scale based on the demands of call center volume

**Investigator Attributes and Cost Considerations**

- Forensic professionals are certified, credentialed, and trained to conduct various types of investigations and may hold designations such as Certified Fraud Examiners (CFE)
- Sophistication and experience to identify, document and quantify errors and irregularities
- Ability to record detailed observations and notes in investigative settings
- Specialize in sensitive, complex, and high-stakes investigations where all aspects of the investigation may be subject to review and critique by external parties or the courts
- Extensive interpersonal skills and capabilities to conduct interviews and on-site client visits
- Skilled with data analysis and database applications including Access, SQL, and Tableau, as well as many other types of applications
- Focused on data integrity and quality assurance throughout the course of the project
- Ability to identify at-risk situations during tenant visits to ensure their safety and that of tenants
- Ability to work remotely and effectively utilize remote data entry systems

## Complaint Processing and Validation

Provided below is an overview of initial considerations associated with Stout's proposed role in complaint processing and validation. Please refer to **Appendix B** for a detailed workplan and estimate of hours and cost by task. Note that Appendix B pertains to estimated hours and professional fees for 10,000 tenant complaints per year. The actual number experienced may be higher or lower than this amount, and may fluctuate significantly. Stout will work diligently to minimize professional fees while ensuring appropriate responsiveness to tenant complaints and the requests of other involved parties.

    a. We understand that multi-lingual communication will be developed informing NYCHA tenants about the role of the Ombudsperson as well as a phone number and email address that can be used for certain tenant complaints. If possible, we recommend that such

CONFIDENTIAL

communication indicate to tenants the times during which live call center respondents will be available and how promptly they can expect a reply. We expect such communication can be developed during Phase 1 described above.

b.  Our proposal is that Stout will serve as the inbound call-center for NYCHA tenant complaints and will manage the email inbox for emailed tenant complaints, and complaints submitted through other mechanisms (such as apps, live chat, web-based forms or other tools developed to assist tenants in communicating complaints).

c.  During Phase 1, described above, Stout will work with the involved parties to outline the roles, responsibilities, training, processes and systems used by call center staff, including but not limited to consideration of:
    i.    Read-only / view-only remote access to mold and excessive moisture work order data in NYCHA's Maximo system;
    ii.   Language translation services and related response processes;
    iii.  Cultural competency and empathetic response training;
    iv.   Days of the week and hours of the day in which live call center respondents will be available;
    v.    Call  recording and transcription policies;
    vi.   Automated call prompts for emergencies, non-mold complaints, language preferences, etc.;
    vii.  Text communication policies;
    viii. Email response processes and auto-reply language;
    ix.   Tenant complaint data elements and conversion of verbal comments to data elements;
    x.    Quality control and data review policies;
    xi.   Data sharing policies with all involved parties;
    xii.  Escalation communication and file sharing structures with the Ombudsperson; and
    xiii. Regular periodic reporting formats.

d.  It is the combination of these activities that will serve as the basis for time incurred by call center respondents and supervisors.  That is, call center respondents will not simply be answering calls from tenants. Rather, call center respondents will be trained to gather information, conduct follow-ups, address language barriers, record information, prepare reports, and identify needs for escalation or investigation.
    i.    When possible, Stout will seek opportunities for tenant interaction to use standardized processes and data entry. This could be accomplished through the use of web-forms or apps that tenants can access for follow up inquiries or to submit additional information. While call center respondents will be available for tenant follow up, the use of standard forms for certain activities can create opportunities for streamlined data processes and cost savings.

e.  Stout will gather and input the tenant complaint information to a data platform, create a ticket for the tenant for tracking, and will utilize standard processes to validate the tenant's work order status.

CONFIDENTIAL

    i.  For inbound live calls, this will involve gathering information from the tenant and recording the information in a centralized database. For emailed complaints, protocols will be used for tenant follow up based on a human review of the email.  If apps or web-based forms are used to also enable tenant complaints, structured data responses will assist with automated triage and follow up of these tenant complaints.

    ii.  It may be possible to use brief call prompts for live in-bound calls to screen complaints unrelated to mold. Data will be collected on tenant prompt responses in order to monitor the volume of calls directed to non-mold prompts.

f.  Stout will screen each tenant complaint to confirm the accuracy of various elements of information provided on the call or indicated in an email. Review activities will be determined in collaboration with the Ombudsperson, and other involved parties, and may include, but would not be limited to:

    i.  Confirmation of time work orders have been outstanding

    ii.  Review for potential duplicative or related work orders

    iii.  Information on prior attempts to schedule or complete work with the tenant

g.  Stout will triage the complaints for investigation based on agreed upon procedures and time tables discussed during Phase 1.

    i.  There will be an escalation process to notify the Ombudsperson - including requests for photos or other documentation to further validate tenant claims.

    ii.  A response protocol will also be enabled so that the Ombudsperson can easily and clearly communicate that he/she has completed review of each tenant complaint file and has made a final determination as to close the current complaint or for Stout to take additional steps.

        1.  Each tenant interaction, contact attempt, or follow up activity will be recorded by Stout.

h.  When possible, and as appropriate, Stout will encourage NYCHA tenants to communicate complaints via email, text, online live chat, through apps or web-based forms.

    i.  Stout can also develop an online portal for NYCHA tenants to review their complaints, track the status of the complaints (using unique log-in information or tracking numbers), upload relevant documentation (pictures, work orders, etc.), provide additional feedback or comments, or request a follow-up call to discuss further.

    ii.  The cost to develop this portal will depend on the functionality that NYCHA, the Plaintiffs, Ombudsperson and the Special Master request for this portal. Stout's expectation is that the cost of developing this portal will be at least $20,000, and may be significantly more depending on the functionality requested by the parties. These development costs may be partially offset by the cost savings and efficiencies resulting from decreases to the tenant call follow up process.

        1.  Because of the expectation of development costs being offset by efficiencies, and due to the uncertainties associated with requested portal features, the costs of portal development in Appendix B are preliminarily estimated to be $20,000. The actual costs of the development of this portal

CONFIDENTIAL

could vary significantly from this estimate depending on the functionality requested by the parties.

2. During Phase 1, Stout will work with NYCHA, Plaintiffs, the Special Master, the Ombudsperson and the Independent Mold Analyst to identify the functionality that all parties are interested in developing, the associated development and maintenance costs, and the data collected and stored from this platform. Functionality could include:
   a. Complaint submission form with email and / or text confirmation;
   b. Live chat capability;
   c. Complaint tracking and status available to tenants;
   d. Post-complaint tenant surveys;
   e. Automated email and / or text follow-up communication regarding complaint status;
   f. Tenant documentation upload; and
   g. Mobile-enabled functionality.

3. It may also be possible to utilize functionality that currently exists in the MyNYCHA app for this purpose. This may reduce development costs and create synergies associated with improved tenant engagement with the app. If so, a data sharing protocol will be developed to facilitate Stout receiving tenant complaint information submitted through the MyNYCHA app.

As mentioned above, **Appendix B** includes detailed tasks and activities, with estimated hours and professional fees for each phase, recognizing that these may be revised based on discussions with the involved parties.

## Investigative Support

Provided below is an overview of initial considerations associated with Stout's proposed role in investigative support. Please refer to **Appendix B** for a detailed workplan and estimated of hours and professional fees by task.

   a. Stout will work closely with the Ombudsperson to identify effective procedures for determining cost-efficient forms of investigation. Based on Stout's triage of tenant complaints, as determined in Phase 1, Stout will provide the Ombudsperson with Stout's assessment of each complaint and recommended next steps for Ombudsperson approval. Stout will then take action based on the Ombudsperson's recommendation.
      i. Investigative measures may include review and analysis of work order and tenant interaction information in NYCHA's Maximo system, discussions with various stakeholders (such as NYCHA staff and / or planning department, maintenance workers, contractors, Independent Mold Analyst, Plaintiffs or NYCHA tenants), and review of pictures or other documentation submitted by tenants.

CONFIDENTIAL

b. Stout will make in-person visits to NYCHA apartments when there is reason to investigate certain complaints further.

    i. Stout will utilize procedures develop in Phase 1 for contacting tenants about why an in-person visit is being scheduled, timing for when such visits can happen, information that will be collected at the visit, photographic evidence gathered, coordination with the Ombudsperson and Independent Data Analyst, coordination with NYCHA staff at the tenant's development, and protocols for discussion and follow-up with the tenant after the visit.

    ii. Call center staff will not be used for on-site inspections or investigations. Stout will use staff trained in investigative techniques to perform on-site inspections.

        1. Senior Stout staff will also periodically accompany the Stout investigators to ensure all investigation procedures are being followed.

            a. Senior Stout staff is expected to be more significant in Phase 2 as all staff implement and evaluate the procedures and protocols defined in Phase 1.

        2. Senior Stout staff will also be available to accompany Stout investigators in the event of particularly contentious or complex inspections.

c. Stout will promptly report findings to the Ombudsperson with issues identified during each on-site visit.

CONFIDENTIAL

## Estimated Professional Fees

The hourly rates of Stout professionals are based on experience, training, and level of professional expertise with hourly rates for this engagement ranging from $100 to $425.  The professional rates contemplate the necessary experience and expertise of all staff to ensure all activities can be performed with professional competence, as described above. Hourly professional rates for the primary engagement roles will be:

- Call Center Respondents: $100 to $125
- Investigators: $185 to $220
- Call Center Supervisors and Platform Developers: $275 to $350
- Senior Oversight and Ombudsperson Relations: $425

This proposal contemplates full integration and collaboration with the Independent Data Analyst, identified as Neil Steinkamp, in all development, implementation and evaluation described herein. The professional fees necessary for the Independent Data Analyst's contributions to the activities described herein are contemplated in the proposal for the Independent Data Analyst. As such, based on the staffing model described herein, while the Independent Data Analyst will be intimately involved in the Ombudsperson support activities, Stout does not anticipate additional incremental professional fees by the Independent Data Analyst himself, for purposes of the development and implementation of the activities described in this proposal.

All professional time will be billed at actual, individual hourly rates, and only for the actual time incurred on the matter. We will use an appropriate combination of staff with experience and expertise suitable for the work being performed by each individual in each phase, to ensure that professional fees incurred are minimized, but also that competent persons are performing the required tasks and activities. Professional fees will be reviewed on an annual basis. Any changes to professional fees for any individual will be communicated to, and approved by, the Special Master before being applied.

Below is a preliminary estimate of professional fees for each of the three phases detailed above. Due to the engagement uncertainties that exist at this times, a not-to-exceed estimate of professional fees is not possible. However, at the conclusion of Phase 2, Stout can develop a revised estimate of standard monthly professional fees that considers options such as flat fees or hourly rates with caps based on agreed upon thresholds. Such considerations would be based on the evaluation of Phase 2 and the related contemplated process refinements in coordination with the Ombudsperson, and other involved parties.

Please refer to Appendix B for detailed estimated hours and professional fees for each phase and task outlined in this proposal. The actual professional fees incurred in each phase will depend on the professional services required or requested, the availability of and access to necessary information or persons, the cooperation of NYCHA throughout the engagement, and efficiencies that can be identified throughout Phase 1 and 2. Additional consulting services beyond the scope of our Initial Consulting and System Development fees will be billed hourly on an as needed or requested basis. Throughout all phases of the engagement Stout will remain committed to seeking cost saving opportunities while ensuring the appropriate responsiveness to tenant complaints.

CONFIDENTIAL

The table below provides estimated professional fees based on potential _monthly_ tenant complaint volume of 800 monthly complaints (approx. 10,000 annually). For Phase 1, the estimated fees may vary based on the level of involvement of the parties and possible utilization of functionality of tools and templates that NYCHA has previously developed. For Phase 2 and 3, the estimated fees may vary based on the methods of which complaints are submitted (e.g. through apps, live chat, web-based forms, or other tools developed) and possible use of automated tools (such as brief call prompts prior to live operator interaction). For purposes of this proposal, we estimate that each tenant complaint will, on average, require approximately 5 minutes of agent time to interact with the tenant and record the necessary information.  Call timing and duration will be tracked throughout Phase 2 and Phase 3 in order to refine expectations of call duration and related staffing and costs. We then consider the additional time required for a proportion of complaints requiring follow up and investigation, and the necessary supervisorial review. **At the conclusion of Phase 2, Stout can provide the Special Master with analysis and review of call center activities and costs, including, average cost estimates per tenant call, email and other interaction type, in order to estimate on-going cost.** The analyses of call center activity can also include time spent interacting with the tenant, investigating the complaint, reviewing NYCHA data, interacting with the Ombudsperson, and resolving the tenant complaint. Such analyses will enable all involved parties the ability to consider potential revisions to the Phase 3 professional fee estimate, including consideration of a monthly flat fee.

As detailed in Appendix B, Phase 1 will require more senior involvement of Stout professionals, resulting in higher estimated cost per hour in that phase. The involvement of senior Stout professionals in Phase 1 will ensure that opportunities to streamline procedures are identified and to ensure that all processes and protocols are informed by this experience and expertise. In Phase 2 we begin call center operations, but also utilize more supervisor and senior staff involvement to ensure that initial uncertainties are appropriately managed and communicated. This staffing model will result in slightly higher costs in Phase 2, but is necessary due to the uncertainty in expected call volume. When possible, we will seek to reduce professional fees in Phase 2. In Phase 3 we expect to have a stabilized call center operation. Most of the hours incurred in this phase are by call center staff with an hourly billing rate of $100 and investigator staff with hourly billing rates ranging from $185 to $220 depending on the complexity of the complaint. The hourly call center staff rate reflects a staff person that is competent for the required activities, available during the required call times, and trained to perform all necessary tasks. Supervisor and senior staff will used as necessary during Phase 3 to ensure all processes and procedures are being performed correctly.

CONFIDENTIAL

| Estimate of Professional Fees Based on Estimated Annual Tenant Complaint Volume of 10,000 | |
|---|---|
| **Phase** | **Estimated Professional Fees*** |
| ***Initial Consulting and System Development*** | |
| Phase 1: Pre-Launch Development | $27,019 |
| Phase 2: Initial Launch and Evaluation | |
| Initial Launch (Estimated Cost per Month of 2 Month Phase) | $22,472   (Monthly) |
| *Implied Cost per Tenant Complaint* | *$26.97* |
| Evaluation and Process Refinement | $11,525 |
| Phase 2: Initial Launch and Evaluation | $56,469 |
| ***Ongoing Review & Sustainable Processes for Continuous Improvement*** | |
| Phase 3: Standardized Call Center and Investigative Services | $19,155   (Monthly)** |
| *Implied Cost per Tenant Complaint* | *$22.99* |
| ***Total Estimated Year 1 Cost*** | **$255,883** |
| ***Total Estimated Year 2 Cost*** | **$229,860** |

*\*Estimated Professional Fees are based on Estimated Annual Tenant Complaint Volume of 10,000.*

*\*\*Stout can develop a revised estimate of standard monthly professional fees at the conclusion of Phase 2.*

The estimates outlined in the proposal anticipates certain efficiencies, synergies or cost savings to be identified in Phase 1 and 2.  If the actual number of tenant complaints is greater than estimated, the complexity of complaints are more significant than anticipated, the investigations and on-site visits are more frequent than expected, or other variations to the estimated hours incorporated in this proposal and Appendix B the actual professional fees incurred may be greater than what is indicated in the table above. As necessary, Stout can refine our estimate of professional fees as we gain a more complete understanding of NYCHA, the Plaintiffs' and the Special Master's priorities and needs.



# Appendix A

# Stout's Proposal Regarding Consulting Services for the Role of Independent Data Analyst

## NYCHA Mold and Excessive Moisture Work Orders



**CONFIDENTIAL**

January 30, 2019

Neil Steinkamp │ Stout Risius Ross, LLC

CONFIDENTIAL

## Introduction and Qualifications

Stout Risius Ross, LLC ("Stout") — Neil Steinkamp and Stout's Strategic Systems Consulting Practice — submit this proposal to the Baez Plaintiffs ("Plaintiffs") and the New York City Housing Authority ("NYCHA") to provide consulting services associated with the role of Independent Data Analyst as contemplated and described in the Proposed Amended Stipulation and Order of Settlement which the Court so-ordered on November 29, 2018 (the "Revised Consent Decree"). The Proposed Order defines the Independent Data Analyst as "an individual or advisory firm who is selected by the Special Master with the input of the parties and retained by the Special Master and is qualified in forensic data analysis." The Proposed Order also indicates that:

> "The Independent Data Analyst shall assist parties and the Special Master in designing new periodic reports and shall review and confirm the accuracy of the Periodic Reports and recommend improvements to those reports as needed thereafter.  For purposes of designing, reviewing, and confirming the accuracy of the Period[ic] Reports, the Independent Data Analyst shall be given access to all data relating to mold and excessive moisture in NYCHA's computer system, in meetings scheduled with NYCHA's IT Department, for such periods of time and under such terms and conditions that the Special Master deems appropriate."

**Stout is uniquely qualified to serve as Independent Data Analyst for NYCHA** due to our extensive expertise in providing consulting and strategic solutions regarding social and economic considerations in housing matters joined with our expansive data platform and data visualization capabilities. Working together with NYCHA and the Plaintiffs, Stout can deliver comprehensive consulting services that will offer impactful findings, strategies and solutions developed through collaboration with NYCHA, the analysis and integration of internal and external data sets, and iterative processes to enhance NYCHA's understanding of mold and excessive moisture work orders and reoccurrence for sustainable and continuous improvement.

Stout is a premier global advisory firm specializing in Investment Banking, Valuation & Financial Opinions, and Dispute Consulting. Our clients and their advisors rely on our premier expertise, deep industry knowledge, and unparalleled responsiveness on complex financial, economic and social matters. In addition to these services, Stout's professionals have significant expertise in strategy consulting involving a variety of socio-economic issues, including issues of or related to access to justice and the needs of low-income individuals and at-risk communities. Stout has direct experience and expertise with analysis related to housing issues, such as cost/benefit analyses for expanded legal representation in eviction cases, analyses of the sufficiency of housing subsidies, and analyses of eviction outcomes and trends.

Please refer to **Appendix A** for the Curriculum Vitae of Neil Steinkamp.

**Contact Information**:
Neil Steinkamp
Direct +1.646.807.4229 | Mobile +1.646.455.9430
nsteinkamp@stout.com

## Practice Overview and Housing Related Expertise

Under the direction of Neil Steinkamp, who leads Stout's Strategic Systems Consulting Practice as well as Stout's Pro Bono Practice, Stout has become a recognized leader in the civil legal aid and non-profit community because of our work with low-income populations, including the following services:

- Economic impact assessments and policy research for civil legal aid initiatives;
- Strategy consulting and action plan development for issues relating to access to justice;
- Non-profit budget development, review, and recommendations;
- Dashboards and internal tools for program evaluation and strategy;
- Cost-benefit and impact analyses for non-profit initiatives and activities; and
- Dispute consulting, forensic data analysis, and economic damages analyses for low-income individuals.

### Select Client Organizations

- The Legal Aid Society of New York City
- New York State Permanent Commission on Access to Justice
- The U.S. Department of Justice
- Empire Justice Center
- Urban Justice Center
- Legal Services NYC
- New York Legal Assistance Group
- Right to Counsel NYC Coalition
- City Bar Justice Center
- The Vera Institute of Justice
- Georgetown Center for Poverty and Inequality
- Mobilization for Justice
- Neighborhood Legal Services
- Ohio State Legal Services Association
- LawHelp Interactive
- The Philadelphia Bar Association
- Oakland County Bar Association
- Chicago Bar Foundation

- Maryland Volunteer Lawyer Service
- Pro Bono Partnership
- Legal Assistance Foundation
- Massachusetts Committee for Public Counsel Services
- The Union Settlement Association
- The Osborne Association
- Every Child Fed
- Too Young to Wed
- The Human Trafficking Pro Bono Legal Center
- Immigration Equality
- Domestic Violence Legal Clinic
- Her Justice
- D.C. Legal Services
- Legal Services of New Jersey
- inMotion, Inc.
- Start Small Think Big / Sunshine Bronx Business Incubator

### Select Client Communities

- Low-income tenants facing eviction
- Low-income home owners facing foreclosure
- People experiencing homelessness and rent-burden
- Low-income pro se litigants
- Low-income workers

- Victims of domestic violence
- Low-income veterans
- Victims of human trafficking
- LGBTQ+ community
- Immigrants
- Children from low-income families

CONFIDENTIAL

## Data Visualization Capabilities

Stout's team includes Data Scientists and Data Analysts who manage and maintain data visualization software platforms used for Stout's strategic planning and evaluation engagements. The data visualization platform enables clients to easily review information, analysis, trends, and maps based on the data they provide Stout as well as additional research and data collected by Stout.

Stout has created hundreds of maps, charts, graphs, histograms, and other data visualization mechanisms to aid in complex analyses and evaluations that assist in stakeholder engagement, strategy development and program refinement. Stout currently manages, maintains and analyzes approximately two terabytes (2,000 gigabytes) of data for ongoing clients who regularly use the platform to evaluate their progress toward milestone goals and refine their improvement strategies.

The following figures are four examples of Stout's many data visualization capabilities. Analyzing data and presenting it in a dynamic tool such as Stout's not only leads to better insights and evaluation as well as enhanced internal and external stakeholder engagement.

### Examples of Stout's Data Visualization Tools

   

*Figure A*                                     *Figure B*

**Figure A** is an example of a zip code-level heat map. These maps are useful in assessing densities of data and how those densities compare to nearby areas. Stout has also created bi-variate heat maps which combine two variables on one map. For example, a bi-variate heat map could show the mold reoccurrence rates by housing type for each zip code in New York City.

**Figure B** is an example of a zip code-level community asset map. These maps, usually of a county or zip code, show pins for where community assets such as hospitals, schools, train stations, grocery stores, libraries, courts, and legal aid providers are located. Complementing these asset maps with external data sets (such as crime, housing type, demographic information, social services demands, healthcare needs, and other data) with internal data collected by NYCHA can highlight systemic challenges and opportunities for enhancement to NYCHA's efforts. For example, by mapping work orders experiencing longer scheduling

CONFIDENTIAL

delays and public transportation routes, it may be observed that tenants who live farthest from public transportation have a more difficult time scheduling appointments.

**Figure C** (below) is an example of a scatterplot. Scatterplots are similar to simple line graphs in that data is situated along horizontal and vertical axes. However, scatterplots also show correlations between variables which provide relational insights about the data in the scatterplot and quickly identify outliers for further analysis. Plotting work order data could show the relationship between trade contractors and effective remediation.

**Figure D** (below) is an example of a quadrant chart and a corresponding zip code heat map. The data in the heat map is assigned a quadrant based on the combination of two factors and then plotted on the quadrant chart. For example, the red dots and red zip codes in Figure D could represent instances where there are high levels of reoccurrence and high concentrations of units without ventilation. The orange dots and orange zip codes could represent instances where there are high levels of recurrence and low concentrations of units with ventilation. These charts are helpful for grouping data based on two measures and observing the distribution of the data.



*Figure C*



*Figure D*

CONFIDENTIAL

## Proposed Consulting Services as Independent Data Analyst

As Independent Data Analyst, Stout will work collaboratively with the Plaintiffs, NYCHA and the Special Master to analyze data collected by NYCHA relating to mold and excessive moisture, as well as the Ombudsperson and Independent Mold Analyst to review and incorporate data regarding tenant complaints. Before beginning the analyses, Stout will seek to further our understanding of NYCHA and the work order process. The contemplated analyses would be informed by continuing our meetings with NYCHA, its staff and contractors, and NYCHA tenants. Information from these stakeholders will contextualize the data being analyzed. Through these analyses, it is possible that we discover opportunities for process or procedural refinements that would enhance NYCHA's data collection, periodic reporting, scheduling, and reoccurrence reduction and expedient work order completion strategies including additional automated data processes, integrated data controls for quality assurance, and enriched data visualization platforms.

Stout would then continue in our capacity as Independent Data Analyst with ongoing monthly review of the redesigned periodic reports, confirming the accuracy of such reports, collaborating with NYCHA, the Ombudsperson and Independent Mold Analyst on data interpretation and strategy refinement, and recommending improvements to the reports as needed thereafter. **Figure E** illustrates Stout's proposed procedural framework as Independent Data Analyst.



*Figure E*

## Proposed Workplan

**Phase 1: Further Understand NYCHA, Mold Work Orders, and Data Processes**
During Phase 1 of the engagement Stout's goal is to gather more information about NYCHA, mold work orders, and NYCHA's data processes. We have previously met with NYCHA and had preliminary discussions regarding mold work orders and data processes. However, to analyze NYCHA's data comprehensively and to provide valuable recommendations, it is critical that Stout develop a fulsome understanding of these fundamental elements.

- **1.1 - Meetings with NYCHA:** Stout will work with the Plaintiffs and NYCHA to schedule meetings with NYCHA leadership. The goal of these meetings will be to further our understanding of NYCHA's operations broadly and specifically to mold remediation. Stout will also seek to develop an understanding of NYCHA's data processes, practices, and procedures through meetings with NYCHA's Information Technology (IT) Department.

CONFIDENTIAL

- **1.2 - Meetings with NYCHA Staff and Contractors:** Stout will meet with NYCHA staff and contractors to thoroughly understand the role of each in the data collection and mold remediation processes. Through the course of these meetings we would discuss in detail the process by which a mold case is opened, existence of mold and/or excess moisture is determined, work orders are generated, and the mold (or excess moisture) case is closed. To the extent possible, it may be helpful for Stout to observe this process in person.
  - **1.2.1 - Mold Busters:** Stout would also seek to meet with the NYCHA team implementing the Mold Busters program. This tenant outreach program will be important to understand in order to appropriately consider and interpret mold work order data and trends.
- **1.3 - Meetings with NYCHA Tenants:** In addition to meeting with NYCHA leadership, staff, and contractors, Stout would be interested in meeting with NYCHA tenants. As would be expected, tenants are directly impacted by NYCHA's data collection and mold remediation processes. Tenant experiences can be informative and important to consider during initial data analyses and when contemplating enhancements.

### Phase 2: Analyze and Visualize Mold Work Order Data

During Phase 2 of the engagement Stout will work with NYCHA and the Plaintiffs to analyze and visualize mold work orders in order to develop a comprehensive understanding of trends and factors impacting work order completion and mold and excessive moisture reoccurrence. These analyses and visualizations will assist in creating revised periodic reports, data systems to ensure accurate and appropriate data collection, and will inform strategies that will expedite work order completion and reduce rates of reoccurrence.

- **2.1 - Data Process Documentation:** Stout will develop document requests to assist in our understanding of the data that will be analyzed. These document requests may include requests for documentation regarding data processes, practices, training, and procedures.
- **2.2 - Data Analysis:** Stout will work with NYCHA to build analyses using mold and excess moisture work order data elements. These analyses will consider a wide range of potential relationships and contributory factors such as prevalence of mold and/or excessive moisture by building, length of time to remediation, trade contractor and scheduling trends, quality assurance test results, unit location, unit ventilation, unit orientation, inspection observations, tenant scheduling challenges, and reoccurrence rates. Stout will also consider whether there are other data sets at NYCHA for other work orders or tenant / building activities that may inform or influence observed trends. Additionally, Stout will consider gathering external data sets for New York City. These data sets could highlight trends and patterns for specific populations and for specific geographic areas that may also provide insights or correlations that would inform effective strategies for mold work order completion. Integrating these data sets into NYCHA's current data platform and data visualization tool could allow for continuous monitoring of current trends and patterns and the identification of emerging trends and patterns. As Stout collects data, we will consider its use and application in evaluating opportunities for data process, practice, and procedure enhancements and will review and discuss each with NYCHA prior to any integration or analysis.
- **2.3 - Data Visualizations:** Stout will work with NYCHA to integrate all identified data sets and assist with the creation of visualization tools such as maps, charts, scatterplots, trend lines,

CONFIDENTIAL

histograms, or other relevant visualizations to identify relationships, patterns, and emerging trends that are not easily gleaned from a static tool. For example, NYCHA could use this platform to geospatially map data related to its Mold Busters outreach program to better understand where that message has been or has not effective. Using data visualizations to comprehensively understand the many aspects of the mold remediation process can also highlight opportunities for refinement.

### Phase 3: Evaluate Opportunities for Data and Process Enhancements

During Phase 3 of the engagement Stout will use the findings from our analyses in Phase 2 to explore opportunities for data and process enhancements.

- **3.1 - Identify Inefficiencies and Provide Streamlined Solutions:** Throughout Phases 1 and 2, Stout and NYCHA may identify inefficiencies in scheduling processes and systems, shortages of skilled workers, cumbersome data tracking and reporting systems, tenant scheduling challenges, workforce training, and other potential causes for delays in work order completion. To the extent these inefficiencies are identified, Stout will work collaboratively with NYCHA to propose processes to remediate these issues and data controls to observe whether new processes are effective.
- **3.2 - Creation of Reporting Tools:** Stout will assist with the development of reporting metrics, analyses and reports. This effort will focus on developing a robust framework to track and assess mold work orders, work order completion, and reoccurrence rates, and other measurements or trends that NYCHA or the Special Master find informative. These reporting tools will be integrated into the data platform and visualization with automated data controls that will create real-time reliable and consistent data for internal review and external reporting.
    - **3.2.1 - Creation of Tenant Surveys and Feedback Forms:** Stout can work with NYCHA to create tenant satisfaction surveys and feedback forms that will allow NYCHA to solicit information from tenants at various stages of the mold remediation process (e.g. initial reporting, work order completion, follow-up visits, etc.). Such forms may include websites, text messages, in-person questionnaires, etc. Data from these could be integrated into the data platform to further inform strategy development.
    - **3.2.2 - Data Quality Control Reviews:** Throughout this iterative process, Stout will conduct frequent data quality control reviews and provide feedback to NYCHA regarding errors or anomalies identified in the data.

### Phase 4: Ongoing Review & Sustainable Processes for Continuous Improvement

During Phase 4 of the engagement, Stout will work with NYCHA to implement enhancements and refinements for its current data processes as well as the database and reporting tools created in Phase 3.

- **4.1 - Ongoing Review and Recommendations:** Stout will review periodic reports from NYCHA and review NYCHA's data processes. These reviews could result in additional refinements to the periodic reports and/or NYCHA's data collection processes. Stout will meet with NYCHA and the Special Master to discuss metrics and observations, successful implementation efforts to date, best practices, future considerations and solutions to create a long-term sustainable process that provides the high-quality mold remediation for NYCHA tenants.

CONFIDENTIAL

- **4.2 - Sustainability Planning Process:** Stout will work with NYCHA to ensure that the processes being instituted are sustainable and automation is incorporated where advisable. This may also include: (1) documenting implementation challenges; (2) creating and sharing best practices; and (3) using tenant surveys and feedback forms to support continuous improvement.
  - **4.2.1 - Documenting Implementation Challenges and Best Practices:** Through collaboration with NYCHA, Stout will identify and document the challenges faced and best practices developed during implementation.
  - **4.2.2 - Continuous Improvement –** Stout will work with NYCHA to develop strategies for continuous improvement through the use of data reviews and analysis, internal meeting and stakeholder engagement, tenant feedback, and periodic independent review and assessment.

## Estimate of Professional Fees

The hourly rates of Stout professionals are based on experience, training, and level of professional expertise. All professional time will be billed at actual, individual hourly rates, and only for the actual time incurred on the matter. We will use an appropriate combination of staff with experience and expertise suitable for the work being performed by each individual in each phase, to ensure that professional fees incurred are minimized, but also that competent persons are performing the required tasks and activities.

We expect that our blended hourly rate, considering the various experience levels utilized for this project, will be between $350 and $400. Below is a preliminary estimate of professional fees for each of the four project phases detailed above. Our estimated range of professional fees for Initial Consulting and System Development is $100,000 to $120,000. Our estimated range of monthly professional fees related to the Ongoing Review & Sustainable Processes for Continuous Improvement is $5,000 to $10,000. The actual professional fees incurred in each phase will depend on the professional services required or requested, the availability of and access to necessary information or persons, and the cooperation of NYCHA throughout the engagement. Additional consulting services beyond the scope of our Initial Consulting and System Development fees will be billed hourly on an as needed or requested basis.

| Estimate of Professional Fees | |
| --- | --- |
| **Phase** | **Estimated Professional Fees** |
| *Initial Consulting and System Development* | |
| Phase 1: Further Understand NYCHA, Mold Work Orders, and Data Processes | $22,000 - $27,000 |
| Phase 2: Collect and Analyze Current Data | $45,000 - $55,000 |
| Phase 3: Evaluate Opportunities for Data and Process Enhancements | $33,000 - $38,000 |
| **Initial Consulting and System Development - Estimated Professional Fees** | **$100,000 - $120,000** |
| *Ongoing Review & Sustainable Processes for Continuous Improvement* | |
| **Phase 4: Ongoing Review & Sustainable Processes for Continuous Improvement** | **$5,000 - $10,000**   (Monthly) |

CONFIDENTIAL

As necessary, Stout can refine our estimate of professional fees as we gain a more complete understanding of NYCHA, the Plaintiffs' and the Special Master's priorities and needs.



# Appendix B

# Proposed Workplan - Phase 1 - Pre-Launch Development

Estimated Hours by Task - 10,000 Annual Calls Scenario



| Task / Subtask | Estimated Hours | Estimated Blended Rate [1] | Estimated Fees |
|---|---|---|---|
| **Onboarding & Initial Consulting** | | | |
| **1. Engagement Planning Meetings** | | | |
| -1.1: Meetings with the Special Master, Plaintiff counsel, NYCHA, Ombudsperson, and the Independent Mold Analyst | 3 | $425 | **$1,275** |
| -- Understand the roles and responsibilities of the parties, reporting processes and establish a timeline for the Pre-Launch Development Phase | | | |
| -1.2: Collaborate with the Ombudsperson to determine and define the support role activities | 2 | $425 | **$850** |
| | | | |
| **2. Further Understand NYCHA, Mold Work Orders, and Data Processes** | | *See Note [2]* | |
| -2.1: Meetings with NYCHA leadership | | | |
| -2.2: Meetings with NYCHA staff and contractors | | | |
| -- Mold Busters and Mold Work Orders | | | |
| -- Data Processes and available data sets | | | |
| | | | |
| **3. Collect and Analyze Current Data** | | *See Note [2]* | |
| *Subtotal* | | | *$2,125* |
| | | | |
| **Development of the Call Center** | | | |
| **4. Call Center Process Development** | | | |
| -4.1: Understand NYCHA call center process, procedures, creation of work orders and training materials | 4 | $350 | **$1,400** |
| -4.2: Collaborate with NYCHA, the Ombudsperson and the Special Master to develop the call center framework | 10 | $425 | **$4,250** |
| -- Determine the method and hours of operation - live person, automated services | | | |
| -- Determine the location of the call center - Stout office, NYCHA office, Ombudsperson office | | | |
| -- Determine the integration with the NYCHA computer data system | | | |
| -- Determine the features and functionality required - language capabilities, translation services, recording of calls, number of phone-lines, call roll-over procedures | | | |
| -- Determine the integration of email communication or online portal for NYCHA tenants to access for communication | | | |

CONFIDENTIAL DISCUSSION MATERIALS

## Proposed Workplan - Phase 1 - Pre-Launch Development
Estimated Hours by Task - 10,000 Annual Calls Scenario



| Task / Subtask | Estimated Hours | Estimated Blended Rate [1] | Estimated Fees |
|---|---|---|---|
| -4.3:  Collaborate with NYCHA, the Ombudsperson and the Special Master to develop the standard processes regarding the call center | 10 | $425 | **$4,250** |
| -- Establish roles and responsibilities of call representative(s) and supervisor(s) | | | |
| -- Determine data collection requirements and systems for storage | | | |
| -- Determine the tools, forms and reports required | | | |
| -- Determine  the communication and reporting expectations between NYCHA tenant and Stout | | | |
| -- Determine the communication and reporting expectations between the Ombudsperson and Stout | | | |
| -- Develop a Triage protocol and procedure guideline for escalation, validation and investigation | | | |
| -- Develop policies and procedures regarding Tenant communication | | | |
| -- Call script(s) and procedure guidelines with Tenants - initial call, follow-up communication, resolution | | | |
| -- Call script(s) with Independent Mold Analyst - initial call, follow-up communication, resolution | | | |
| -- Quality Control procedures and templates | | | |
| -- Procedures and protocol for complaints with a proper work order | | | |
| | | | |
| **5. Call Center Infrastructure Development** | | | |
| | | | |
| -5.1:  Collaborate with NYCHA, the Ombudsperson and the Special Master to develop the call center infrastructure | 20 | $350 | **$7,000** |
| -- Creation of database and call representative user portal | | | |
| -- Catalogue of the data fields available for population | | | |
| -- Forms and templates for the call center representative to enter and log relevant information | | | |
| -- Various reports for monitoring and servicing of complaints | | | |
| -- Data integrity checks | | | |
| -5.2:  Creation of a dedicated toll-free phone number(s) | 4 | $250 | **$1,000** |
| -5.3:  Creation of features and functionality as agreed upon by the parties | TBD | TBD | |
| -- Tenant complaint portal (preliminary estimate) | TBD | TBD | **$0** |
| -5.4:  Creation of a dedicated email address for complaint communication | 2 | $250 | **$500** |
| *Subtotal* | | | *$18,400* |

**Development of the Complaint Validation Process and Investigatory Services**

# Proposed Workplan - Phase 1 - Pre-Launch Development
Estimated Hours by Task - 10,000 Annual Calls Scenario



| Task / Subtask | Estimated Hours | Estimated Blended Rate [1] | Estimated Fees |
|---|---|---|---|
| **6. Complaint Validation Process Development** | | | |
| -6.1:  Collaborate with NYCHA, the Ombudsperson and the Special Master to develop the call center validation processes regarding NYCHA tenant complaints | 6 | $425 | **$2,550** |
| -- Screen tenant complaints to confirm the accuracy of various elements of information provided | | | |
| -- Work order data validation process | | | |
| -- Maximo computer system customer review | | | |
| -- Triage protocol and metrics procedure guideline | | | |
| -- Escalation process to notify the Ombudsperson - including requests for photos or other documentation to further validate tenant claims. | | | |
| | | | |
| **7. Investigatory/Site Visit Process Development** | | | |
| -7.1:  Understand NYCHA site visit process, procedures, and training materials | 4 | $425 | **$1,700** |
| -7.2:  Collaborate with NYCHA, the Ombudsperson and the Special Master to develop a site visit process | 4 | $425 | **$1,700** |
| -- Establish roles and responsibilities of the investigator | | | |
| -- Process timeline and expectations of communication | | | |
| -- Safety guidelines and procedures for staff and tenants | | | |
| -- Data collection requirements | | | |
| -- Triage protocol and metrics procedure guideline | | | |
| -- Policies and procedures regarding Tenant communication | | | |
| -- Meeting script(s) with Tenants | | | |
| *Subtotal* | | | *$5,950* |
| | | | |
| **Training** | | | |
| **8. Development of Training Materials** | | | |
| -8.1:  Develop training materials | 20 | $350 | **$400** |
| -- Know-your-customer (NYCHA Tenants) | | | |
| -- Mold and moisture issues | | | |
| -- Call center database, process, tools and functionality | | | |
| -- Data entry and quality control | | | |

## Proposed Workplan - Phase 1 - Pre-Launch Development
Estimated Hours by Task - 10,000 Annual Calls Scenario



| Task / Subtask | Estimated Hours | Estimated Blended Rate [1] | Estimated Fees |
|---|---|---|---|
| -- Triage and escalation process | | | |
| -- Communication guidelines | | | |
| -- Processes for validating information related to tenant complaints | | | |
| | | | |
| **9. Training Activities** | | | |
| -9.1:  Conduct training | 12 | $350 | **$144** |
| -- Call center training | | | |
| -- Validation training | | | |
| -- Investigation training | | | |
| *Subtotal* | | | *$544* |
| | | | |
| **Phase 1: Pre-Launch Development** | **101** | | **$27,019** |

Footnotes:

[1] Proposed rates are based on hourly rates by level ($150 - $425). Estimated Blended Rate is a weighted rate based on the estimated % of time by level needed to service the task.

[2] Cost estimate included in Stout's Independent Data Analyst Proposal.

CONFIDENTIAL DISCUSSION MATERIALS

# Proposed Workplan - Phase 2 - Initial Launch and Evaluation
Estimated Hours by Task - 10,000 Annual Calls Scenario



| Task / Subtask | Estimated Hours | Estimated Blended Rate [1] | Estimated Fees |
|---|---|---|---|
| **Initial Launch - 2 Months** | | | |
| **10. Call Center Launch** | *Annual Tenant Complaint Volume 10,000* | | |
| Call Center representative - bi-lingual | 60 | $125 | **$7,500** |
| Call Center validation and investigation | 34 | $220 | **$7,392** |
| Project management, quality control, and communication with various parties | 17 | $350 | **$5,880** |
| Reporting and discussions to Ombudsperson | 4 | $425 | **$1,700** |
| **Estimated Cost per Month** | | | **$22,472** |
| | | | |
| **Estimated Cost for 2 Months** | | | **$44,944** |
| | | | |
| **Evaluation & Process Refinement** | | | |
| **11. Analysis of Initial Launch** | | | |
| -11.1:  Analysis of call center data | 15 | $250 | **$3,750** |
| -- Volume of calls | | | |
| -- Length of time per call | | | |
| -- Number of follow-ups with NYCHA tenants | | | |
| -- Languages | | | |
| -11.2: Analysis of validation and investigation data | 8 | $250 | **$2,000** |
| -- Number of validations | | | |
| -- Length of time of validations | | | |
| -- Number of investigations | | | |
| -- Identification of commonalities | | | |
| -11.3: Identification of process refinements | 8 | $350 | **$2,800** |
| | | | |
| **12. Process Refinement** | | | |
| -12.1:  Regular meetings with the Special Master, NYCHA, Ombudsperson, and the Independent Mold Analyst to refine Phase 1 (Pre-Launch Development) processes | 4 | $425 | **$1,700** |

CONFIDENTIAL DISCUSSION MATERIALS

## Proposed Workplan - Phase 2 - Initial Launch and Evaluation
Estimated Hours by Task - 10,000 Annual Calls Scenario



| Task / Subtask | Estimated Hours | Estimated Blended Rate [1] | Estimated Fees |
|---|---|---|---|
| -12.2: Collaborate with the Ombudsperson to implement identified refinements to processes, data systems, tools, procedures, forms, training, staffing  etc. (as needed) to reduce costs in Phase 3 | 3 | $425 | $1,275 |
| *Subtotal* | | | *$11,525* |
| | | | |
| **Phase 2: Initial Launch and Evaluation** | **267** | | **$56,469** |

Footnotes:

[1] Proposed rates are based on hourly rates by level ($150 - $425). Estimated Blended Rate is a weighted rate based on the estimated % of time by level needed to service the task.

[2] Call Center representative assumed live coverage for 8 hours a day and an email and/or voice mailbox service for after hours.

CONFIDENTIAL DISCUSSION MATERIALS

## Proposed Workplan - Phase 3 - Process Refinement and Standardization
Estimated Hours by Task - 10,000 Annual Calls Scenario



| Task / Subtask | Estimated Hours | Estimated Rate | Estimated Fees |
|---|---|---|---|
| **Standardized Call Center** | | | |
| | **Annual Tenant Complaint Volume** | | |
| | **10,000** | | |
| **13. Call Center Standardization Fees** | | | |
| Call Center representative - bi-lingual | 50 | $100 | **$5,000** |
| Call Center validation and investigation | 28 | $185 | **$5,180** |
| Project management, quality control, and communication with various parties | 28 | $275 | **$7,700** |
| Reporting and discussions to Ombudsperson | 3 | $425 | **$1,275** |
| **Estimated Monthly Cost** | | | **$19,155** |
| | | | |
| **Phase 3 - Process Refinement and Standardization** | **109** | | **$19,155** |

Footnotes:
[1] Call Center representative assumed live coverage for 8 hours a day and an email and/or voice mailbox service for after hours.

CONFIDENTIAL DISCUSSION MATERIALS

# Stout's Proposal Regarding Select Consulting Services Associated with, and In Support Of, the Role of Ombudsperson

## NYCHA Mold and Excessive Moisture Work Orders



**CONFIDENTIAL**

May 17, 2019

Neil Steinkamp │ Stout Risius Ross, LLC

CONFIDENTIAL

## Introduction

On January 30, 2019 Stout submitted a proposal to Plaintiffs and NYCHA to incorporate select consulting services associated with the role of Ombudsperson related to "Complaint Processing and Investigative Support Services" in conjunction with the Independent Data Analyst role. This proposal has been updated to reflect additional considerations and information received since January 30, 2019 as it relates to the scope of Phase 1 – Pre-Launch Development. Please refer to Appendix B for a revised and updated copy of the proposed workplan. This proposal contemplates that Neil Steinkamp (as the proposed Independent Data Analyst) and Stout's Forensic Services team working under his guidance and supervision would serve as a consultant to the Ombudsperson contemplated in the Revised Consent Decree.

We believe that it would be in the best interest of the Plaintiffs, NYCHA, NYCHA tenants, the Ombudsperson, the Independent Mold Analyst and the Special Master to utilize Stout for the activities outlined in this proposal for the following reasons:

- **Improved Data Analytics and Recommendations:** Data from call center activity, tenant complaints, and investigative findings/observations can be incorporated into the analysis and recommendations of the Independent Data Analyst to improve quarterly reporting, identify systemic trends, and recommend strategies for reducing mold and excessive moisture recurrence and open work orders.
- **Cost Effective and Efficient:** The data collection, investigative and reporting functions of the call center (including email) can be streamlined into the activities of the Independent Data Analyst reducing redundancies across the appointed parties.
- **Maximize Expertise of Ombudsperson:** By using Stout, including as the Independent Data Analyst, to collect information from tenants via phone call, email, or other mechanisms, conduct standardized triage, perform investigative procedures (when necessary) and provide information to the Ombudsperson, the role of the Ombudsperson can be focused on adjudication, maximizing the expertise and resources of the Ombudsperson.

Given Stout's extensive expertise in data analytics, forensic investigative services, and strategic consulting regarding social and economic considerations in housing matters we are uniquely qualified to offer comprehensive and cost efficient services for this additional role. Working together with NYCHA, the Ombudsperson, the Independent Mold Analyst and the Plaintiffs, Stout can consistently, reliably and cost-effectively gather information from tenant complaints, perform initial triage and response (as appropriate) and provide the Ombudsperson with the relevant, reliable, and regular reporting and support to enable prompt and effective adjudication of escalated circumstances.

## Proposed Scope

Stout proposes that, in conjunction with the roles and responsibilities of the Independent Data Analyst, Stout will work collaboratively with NYCHA, the Plaintiffs, the Special Master, the Independent Mold Analyst and the Ombudsperson to provide Tenant Complaint Processing and Investigative Support Services in three phases:

CONFIDENTIAL

## Phase 1 – Process Development

Recognizing the necessity of collaboration with the appointed parties, Plaintiffs, NYCHA, the Ombudsperson and the Special Master, and the inherent uncertainties regarding the volume and nature of tenants' complaints, we propose an initial phase during which the parties would work together to develop standard processes, protocols, triage guidelines, communication and reporting expectations, decision trees and systems for data collection, storage, access and sharing. Additionally, we recommend conducting data analysis to estimate call volumes, thereby indicating how many calls (of the initially expected 10,000 - 20,000) that can reasonably be expected to require Ombudsperson interaction or involvement, of various forms.

We expect that this phase can be completed in 30 – 60 days, utilizing several meetings of all of the involved parties to align these processes, roles and responsibilities. The availability of the parties and the data necessary to complete this phase will impact the amount of time required to complete this phase.

## Phase 2 – Initial Launch and Evaluation

With the understanding that the launch of the tenant complaint hotline (and other tenant complaint mechanisms) will be an immediate full and complete launch, we recommend utilizing a 60-day evaluation period during which tenant call volumes, issues, escalations, etc. can be evaluated in an effort to identify process refinement that could create cost reduction opportunities and other improvements.

During this phase we recommend regular in-person meetings of all involved parties to review and evaluate the effectiveness of the processes developed in Phase 1 and utilized during in the initial evaluation. Due to the uncertainties associated with the initial launch in this phase, we expect the monthly costs in this phase to be greater as resources are used to ensure responsiveness and flexibility as initial launch processes are evaluated. At the end of this phase we expect to identify cost reduction opportunities that will be recognized in Phase 3.

## Phase 3 – Process Refinement and Standardization

After incorporating the process refinements identified in Phase 2, standard processes and best-practices would be incorporated for standard monthly activities. Over time, with the incorporation of NYCHA process improvements to work order completion, and reduction in mold recurrence, we expect that tenant complaint (call and other mechanisms) volume will decline. However, we also expect that tenant complaint volume may fluctuate significantly from week to week and month to month. As such, refined standard processes will be utilized with flexible staffing of trained and capable responders to ensure comprehensive and consistent responses to all tenant complaints and related escalation. Throughout Phase 3, Stout will continue to seek opportunities for cost containment, efficiencies, and ways to eliminate duplicative activities. Stout will work closely with the involved parties to communicate about costs incurred and opportunities to reduce costs while ensuring the appropriate responsiveness to tenant complaints.

## Staffing

Stout's team has extensive experience in assisting organizations of all sizes in conducting forensic investigations and has the appropriate training, experience, and expertise to ensure that all responders to tenant complaints have the interpersonal skills, empathy, and cultural competency to effectively communicate

CONFIDENTIAL

with NYCHA tenants. All staff will be trained on the protocols and processes developed in Phase 1 and will clearly, consistently and reliably document all interaction with NYCHA tenants. Staff will also be trained on the processes for validating information related to tenant complaints, possibly through view-only or read-only access to Maximo, as well as the process for sharing information with the Ombudsperson for review. A supervisor will be used to ensure all processes are being followed consistently and that tenant information is being collected accurately. In addition, the supervisor will ensure that interaction with the Ombudsperson is fluid and prompt, to ensure that information is provided to the Ombudsperson using established systems and protocols and that information received back from the Ombudsperson is acted on promptly and consistently with the direction provided by the Ombudsperson.

Because our professionals are routinely exposed to highly sensitive and confidential information, we have strict policies and procedures in place to ensure that confidential information is not disclosed to, or accessible by, anyone outside of the engagement team. We are keenly aware of the need to protect and maintain confidential data. For each engagement we establish clear policies and procedures regarding client communication and interaction and will do so in this engagement to ensure the safety of NYCHA tenants as well as our staff. In addition, for this engagement, call center staff will be located in closed-door offices (in our New York office) to ensure strict confidentiality of all tenant interaction.

Given the uncertainty outlined in the phases described above, and based on the expectation of up to 1,000 or more tenant complaints per month (30-40 per day) Stout plans to initially utilize two full-time call center respondents during Phase 2 (with at least one bi-lingual or multi-lingual call responder on staff), as well as one part time supervisor, in addition to the oversight of senior staff. Stout will only invoice for professional time actually incurred. All staff, including call center staff, will record time spent responding to or addressing tenant complaints to ensure accurate time entry for time incurred in support of the Ombudsperson. Stout will include time entry details in all invoices submitted to the Special Master.

Our staffing model may change after the Phase 2 evaluation described above, based on the results of the evaluation and our discussions with all involved parties. If during Phase 2 we are unable to respond to all tenant complaints within 24 hours, and if we are not able to provide a live call center respondent for at least 70% of tenant complaints received by phone, we will immediately inform the Ombudsperson, NYCHA, Plaintiffs and the Special Master with a recommendation regarding the staffing change necessary to ensure this level of responsiveness. Stout will be prepared to accommodate any immediate staffing additions, if necessary, and will utilize the staff training protocols developed with the involved parties in Phase 1.

**Call Center Respondent Attributes and Cost Considerations**

- Call Center Respondents will have an associate or bachelor level degree and have prior job experience.
- Clear and effective communication skills including bi-lingual capabilities such as Spanish and Mandarin Chinese
- Interpersonal skills with training regarding empathy, cultural competency, and trauma awareness
- Technical capabilities to operate phone systems, online portal/live chat, and complex data platform for data input and tracking

CONFIDENTIAL

- Adaptability and critical thinking and the ability to ask appropriate follow-up questions while fielding live calls
- Ability to consistently follow documented protocols and procedures
- Ability to issue-spot tenant complaints for potential concerns, non-mold issues, data inconsistencies, potential need for escalation, etc.
- Attention to detail and ability to multi-task
- Cost of operations for phone system, email, online portal and data platform
- Dedicated confidential closed door space to ensure strict confidentially of all tenant interaction
- Ability to scale based on the demands of call center volume

**Investigator Attributes and Cost Considerations**

- Forensic professionals are certified, credentialed, and trained to conduct various types of investigations and may hold designations such as Certified Fraud Examiners (CFE)
- Sophistication and experience to identify, document and quantify errors and irregularities
- Ability to record detailed observations and notes in investigative settings
- Specialize in sensitive, complex, and high-stakes investigations where all aspects of the investigation may be subject to review and critique by external parties or the courts
- Extensive interpersonal skills and capabilities to conduct interviews and on-site client visits
- Skilled with data analysis and database applications including Access, SQL, and Tableau, as well as many other types of applications
- Focused on data integrity and quality assurance throughout the course of the project
- Ability to identify at-risk situations during tenant visits to ensure their safety and that of tenants
- Ability to work remotely and effectively utilize remote data entry systems

## Complaint Processing and Validation

Provided below is an overview of initial considerations associated with Stout's proposed role in complaint processing and validation. Please refer to **Appendix B** for a detailed workplan and estimate of hours and cost by task. Note that Appendix B pertains to estimated hours and professional fees for 10,000 tenant complaints per year. The actual number experienced may be higher or lower than this amount, and may fluctuate significantly. Stout will work diligently to minimize professional fees while ensuring appropriate responsiveness to tenant complaints and the requests of other involved parties.

     a. We understand that multi-lingual communication will be developed informing NYCHA tenants about the role of the Ombudsperson as well as a phone number and email address that can be used for certain tenant complaints. If possible, we recommend that such communication indicate to tenants the times during which live call center respondents will be available and how promptly they can expect a reply. We expect such communication can be developed during Phase 1 described above.

CONFIDENTIAL

b.  Our proposal is that Stout will serve as the inbound call-center for NYCHA tenant complaints and will manage the email inbox for emailed tenant complaints, and complaints submitted through other mechanisms (such as apps, live chat, web-based forms or other tools developed to assist tenants in communicating complaints).

c.  During Phase 1, described above, Stout will work with the involved parties to outline the roles, responsibilities, training, processes and systems used by call center staff, including but not limited to consideration of:

  i.  Read-only / view-only remote access to mold and excessive moisture work order data in NYCHA's Maximo system;
  ii.  Language translation services and related response processes;
  iii.  Cultural competency and empathetic response training;
  iv.  Days of the week and hours of the day in which live call center respondents will be available;
  v.  Call recording and transcription policies;
  vi.  Automated call prompts for emergencies, non-mold complaints, language preferences, etc.;
  vii.  Text communication policies;
  viii.  Email response processes and auto-reply language;
  ix.  Tenant complaint data elements and conversion of verbal comments to data elements;
  x.  Quality control and data review policies;
  xi.  Data sharing policies with all involved parties;
  xii.  Escalation communication and file sharing structures with the Ombudsperson; and
  xiii.  Regular periodic reporting formats.

d.  It is the combination of these activities that will serve as the basis for time incurred by call center respondents and supervisors.  That is, call center respondents will not simply be answering calls from tenants. Rather, call center respondents will be trained to gather information, conduct follow-ups, address language barriers, record information, prepare reports, and identify needs for escalation or investigation.

  i.  When possible, Stout will seek opportunities for tenant interaction to use standardized processes and data entry. This could be accomplished through the use of web-forms or apps that tenants can access for follow up inquiries or to submit additional information. While call center respondents will be available for tenant follow up, the use of standard forms for certain activities can create opportunities for streamlined data processes and cost savings.

e.  Stout will gather and input the tenant complaint information to a data platform, create a ticket for the tenant for tracking, and will utilize standard processes to validate the tenant's work order status.

  i.  For inbound live calls, this will involve gathering information from the tenant and recording the information in a centralized database. For emailed complaints, protocols will be used for tenant follow up based on a human review of the email.  If

       apps or web-based forms are used to also enable tenant complaints, structured data responses will assist with automated triage and follow up of these tenant complaints.

    ii.   It may be possible to use brief call prompts for live in-bound calls to screen complaints unrelated to mold. Data will be collected on tenant prompt responses in order to monitor the volume of calls directed to non-mold prompts.

f.   Stout will screen each tenant complaint to confirm the accuracy of various elements of information provided on the call or indicated in an email. Review activities will be determined in collaboration with the Ombudsperson, and other involved parties, and may include, but would not be limited to:

    i.   Confirmation of time work orders have been outstanding

    ii.   Review for potential duplicative or related work orders

    iii.   Information on prior attempts to schedule or complete work with the tenant

g.   Stout will triage the complaints for investigation based on agreed upon procedures and time tables discussed during Phase 1.

    i.   There will be an escalation process to notify the Ombudsperson - including requests for photos or other documentation to further validate tenant claims.

    ii.   A response protocol will also be enabled so that the Ombudsperson can easily and clearly communicate that he/she has completed review of each tenant complaint file and has made a final determination as to close the current complaint or for Stout to take additional steps.

        1.   Each tenant interaction, contact attempt, or follow up activity will be recorded by Stout.

h.   When possible, and as appropriate, Stout will encourage NYCHA tenants to communicate complaints via email, text, online live chat, through apps or web-based forms.

    i.   Stout can also develop an online portal for NYCHA tenants to review their complaints, track the status of the complaints (using unique log-in information or tracking numbers), upload relevant documentation (pictures, work orders, etc.), provide additional feedback or comments, or request a follow-up call to discuss further.

    ii.   The cost to develop this portal will depend on the functionality that NYCHA, the Plaintiffs, Ombudsperson and the Special Master request for this portal. Stout's expectation is that the cost of developing this portal will be at least $20,000, and may be significantly more depending on the functionality requested by the parties. These development costs may be partially offset by the cost savings and efficiencies resulting from decreases to the tenant call follow up process.

        1.   Because of the expectation of development costs being offset by efficiencies, and due to the uncertainties associated with requested portal features, the costs of portal development in Appendix B are preliminarily estimated to be $20,000. The actual costs of the development of this portal could vary significantly from this estimate depending on the functionality requested by the parties.

CONFIDENTIAL

2.  During Phase 1, Stout will work with NYCHA, Plaintiffs, the Special Master, the Ombudsperson and the Independent Mold Analyst to identify the functionality that all parties are interested in developing, the associated development and maintenance costs, and the data collected and stored from this platform. Functionality could include:
    a.  Complaint submission form with email and / or text confirmation;
    b.  Live chat capability;
    c.  Complaint tracking and status available to tenants;
    d.  Post-complaint tenant surveys;
    e.  Automated email and / or text follow-up communication regarding complaint status;
    f.  Tenant documentation upload; and
    g.  Mobile-enabled functionality.
3.  It may also be possible to utilize functionality that currently exists in the MyNYCHA app for this purpose. This may reduce development costs and create synergies associated with improved tenant engagement with the app. If so, a data sharing protocol will be developed to facilitate Stout receiving tenant complaint information submitted through the MyNYCHA app.

As mentioned above, Appendix B includes detailed tasks and activities, with estimated hours and professional fees for each phase, recognizing that these may be revised based on discussions with the involved parties.

## Investigative Support

Provided below is an overview of initial considerations associated with Stout's proposed role in investigative support. Please refer to Appendix B for a detailed workplan and estimated of hours and professional fees by task.

a.  Stout will work closely with the Ombudsperson to identify effective procedures for determining cost-efficient forms of investigation. Based on Stout's triage of tenant complaints, as determined in Phase 1, Stout will provide the Ombudsperson with Stout's assessment of each complaint and recommended next steps for Ombudsperson approval. Stout will then take action based on the Ombudsperson's recommendation.
    i.  Investigative measures may include review and analysis of work order and tenant interaction information in NYCHA's Maximo system, discussions with various stakeholders (such as NYCHA staff and / or planning department, maintenance workers, contractors, Independent Mold Analyst, Plaintiffs or NYCHA tenants), and review of pictures or other documentation submitted by tenants.

b.  Stout will make in-person visits to NYCHA apartments when there is reason to investigate certain complaints further.

CONFIDENTIAL

  i. Stout will utilize procedures develop in Phase 1 for contacting tenants about why an in-person visit is being scheduled, timing for when such visits can happen, information that will be collected at the visit, photographic evidence gathered, coordination with the Ombudsperson and Independent Data Analyst, coordination with NYCHA staff at the tenant's development, and protocols for discussion and follow-up with the tenant after the visit.

  ii. Call center staff will not be used for on-site inspections or investigations. Stout will use staff trained in investigative techniques to perform on-site inspections.

    1. Senior Stout staff will also periodically accompany the Stout investigators to ensure all investigation procedures are being followed.

      a. Senior Stout staff is expected to be more significant in Phase 2 as all staff implement and evaluate the procedures and protocols defined in Phase 1.

    2. Senior Stout staff will also be available to accompany Stout investigators in the event of particularly contentious or complex inspections.

c. Stout will promptly report findings to the Ombudsperson with issues identified during each on-site visit.

CONFIDENTIAL

## Estimated Professional Fees

The hourly rates of Stout professionals are based on experience, training, and level of professional expertise with hourly rates for this engagement ranging from $100 to $425.  The professional rates contemplate the necessary experience and expertise of all staff to ensure all activities can be performed with professional competence, as described above. Hourly professional rates for the primary engagement roles will be:

- Call Center Respondents: $100 to $125
- Investigators: $185 to $220
- Call Center Supervisors and Platform Developers: $275 to $350
- Senior Oversight and Ombudsperson Relations: $425

This proposal contemplates full integration and collaboration with the Independent Data Analyst, identified as Neil Steinkamp, in all development, implementation and evaluation described herein. The professional fees necessary for the Independent Data Analyst's contributions to the activities described herein are contemplated in the proposal for the Independent Data Analyst. As such, based on the staffing model described herein, while the Independent Data Analyst will be intimately involved in the Ombudsperson support activities, Stout does not anticipate additional incremental professional fees by the Independent Data Analyst himself, for purposes of the development and implementation of the activities described in this proposal.

All professional time will be billed at actual, individual hourly rates, and only for the actual time incurred on the matter. We will use an appropriate combination of staff with experience and expertise suitable for the work being performed by each individual in each phase, to ensure that professional fees incurred are minimized, but also that competent persons are performing the required tasks and activities. Professional fees will be reviewed on an annual basis. Any changes to professional fees for any individual will be communicated to, and approved by, the Special Master before being applied.

Below is a preliminary estimate of professional fees for each of the three phases detailed above. Due to the engagement uncertainties that exist at this times, a not-to-exceed estimate of professional fees is not possible. **However, at the conclusion of Phase 2, Stout can develop a revised estimate of standard monthly professional fees that considers options such as flat fees or hourly rates with caps based on agreed upon thresholds.** Such considerations would be based on the evaluation of Phase 2 and the related contemplated process refinements in coordination with the Ombudsperson, and other involved parties.

Please refer to Appendix B for detailed estimated hours and professional fees for each phase and task outlined in this proposal. The actual professional fees incurred in each phase will depend on the professional services required or requested, the availability of and access to necessary information or persons, the cooperation of NYCHA throughout the engagement, and efficiencies that can be identified throughout Phase 1 and 2. Additional consulting services beyond the scope of our Initial Consulting and System Development fees will be billed hourly on an as needed or requested basis. Throughout all phases of the engagement Stout will remain committed to seeking cost saving opportunities while ensuring the appropriate responsiveness to tenant complaints.

CONFIDENTIAL

The table below provides estimated professional fees based on potential _monthly_ tenant complaint volume of 800 monthly complaints (approx. 10,000 annually). For Phase 1, the estimated fees may vary based on the level of involvement of the parties and possible utilization of functionality of tools and templates that NYCHA has previously developed. For Phase 2 and 3, the estimated fees may vary based on the methods of which complaints are submitted (e.g. through apps, live chat, web-based forms, or other tools developed) and possible use of automated tools (such as brief call prompts prior to live operator interaction). For purposes of this proposal, we estimate that each tenant complaint will, on average, require approximately 5 minutes of agent time to interact with the tenant and record the necessary information.  Call timing and duration will be tracked throughout Phase 2 and Phase 3 in order to refine expectations of call duration and related staffing and costs. We then consider the additional time required for a proportion of complaints requiring follow up and investigation, and the necessary supervisorial review. **At the conclusion of Phase 2, Stout can provide the Special Master with analysis and review of call center activities and costs, including, average cost estimates per tenant call, email and other interaction type, in order to estimate on-going cost.** The analyses of call center activity can also include time spent interacting with the tenant, investigating the complaint, reviewing NYCHA data, interacting with the Ombudsperson, and resolving the tenant complaint. Such analyses will enable all involved parties the ability to consider potential revisions to the Phase 3 professional fee estimate, including consideration of a monthly flat fee.

As detailed in Appendix B, Phase 1 will require more senior involvement of Stout professionals, resulting in higher estimated cost per hour in that phase. The involvement of senior Stout professionals in Phase 1 will ensure that opportunities to streamline procedures are identified and to ensure that all processes and protocols are informed by this experience and expertise. In Phase 2 we begin call center operations, but also utilize more supervisor and senior staff involvement to ensure that initial uncertainties are appropriately managed and communicated. This staffing model will result in slightly higher costs in Phase 2, but is necessary due to the uncertainty in expected call volume. When possible, we will seek to reduce professional fees in Phase 2. In Phase 3 we expect to have a stabilized call center operation. Most of the hours incurred in this phase are by call center staff with an hourly billing rate of $100 and investigator staff with hourly billing rates ranging from $185 to $220 depending on the complexity of the complaint. The hourly call center staff rate reflects a staff person that is competent for the required activities, available during the required call times, and trained to perform all necessary tasks. Supervisor and senior staff will used as necessary during Phase 3 to ensure all processes and procedures are being performed correctly.

CONFIDENTIAL

| Phase | Estimated Professional Fees* |
|---|---|
| **Estimate of Professional Fees** | |
| **Based on Estimated Annual Tenant Complaint Volume of 10,000** | |

*Initial Consulting and System Development*

| Phase | Estimated Professional Fees* |
|---|---|
| Phase 1: Pre-Launch Development | $37,269 |
| Phase 2: Initial Launch and Evaluation | |
| Initial Launch (Estimated Cost per Month of 2 Month Phase) | $22,472 (Monthly) |
| *Implied Cost per Tenant Complaint* | *$26.97* |
| Evaluation and Process Refinement | $11,525 |
| Phase 2: Initial Launch and Evaluation | $56,469 |

*Ongoing Review & Sustainable Processes for Continuous Improvement*

| | |
|---|---|
| Phase 3: Standardized Call Center and Investigative Services | $19,155 (Monthly)** |
| *Implied Cost per Tenant Complaint* | *$22.99* |
| **Total Estimated Year 1 Cost** | **$266,133** |
| **Total Estimated Year 2 Cost** | **$229,860** |

*\*Estimated Professional Fees are based on Estimated Annual Tenant Complaint Volume of 10,000.*

*\*\*Stout can develop a revised estimate of standard monthly professional fees at the conclusion of Phase 2.*

The estimates outlined in the proposal anticipates certain efficiencies, synergies or cost savings to be identified in Phase 1 and 2.  If the actual number of tenant complaints is greater than estimated, the complexity of complaints are more significant than anticipated, the investigations and on-site visits are more frequent than expected, or other variations to the estimated hours incorporated in this proposal and Appendix B the actual professional fees incurred may be greater than what is indicated in the table above. As necessary, Stout can refine our estimate of professional fees as we gain a more complete understanding of NYCHA, the Plaintiffs' and the Special Master's priorities and needs.



# Appendix B Revised

# Proposed Workplan - Phase 1 - Pre-Launch Development
Estimated Hours by Task - 10,000 Annual Calls Scenario



| Task / Subtask | Estimated Hours | Estimated Blended Rate [1] | Estimated Fees |
|---|---|---|---|
| **Onboarding & Initial Consulting** | | | |
| **1. Engagement Planning Meetings** | | | |
| -1.1:  Meetings with the Special Master, Plaintiff counsel, NYCHA, Ombudsperson, and the Independent Mold Analyst | 3 | $425 | **$1,275** |
| -- Understand the roles and responsibilities of the parties, reporting processes and establish a timeline for the Pre-Launch Development Phase | | | |
| -1.2:  Collaborate with the Ombudsperson to determine and define the support role activities | 2 | $425 | **$850** |
| | | | |
| **2. Further Understand NYCHA, Mold Work Orders, and Data Processes** | | *See Note [2]* | |
| -2.1:  Meetings with NYCHA leadership | | | |
| -2.2:  Meetings with NYCHA staff and contractors | | | |
| -- Mold Busters and Mold Work Orders | | | |
| -- Data Processes and available data sets | | | |
| | | | |
| **3. Collect and Analyze Current Data** | | *See Note [2]* | |
| *Subtotal* | | | *$2,125* |
| | | | |
| **Development of the Call Center** | | | |
| **4. Call Center Process Development** | | | |
| -4.1:  Understand NYCHA call center process, procedures, creation of work orders and training materials | 4 | $350 | **$1,400** |
| -4.2:  Collaborate with NYCHA, the Ombudsperson and the Special Master to develop the call center framework | 20 | $425 | **$8,500** |
| -- Determine the method and hours of operation - live person, automated services | | | |
| -- Determine the location of the call center - Stout office, NYCHA office, Ombudsperson office | | | |
| -- Determine the integration with the NYCHA computer data system | | | |
| -- Determine the features and functionality required - language capabilities, translation services, recording of calls, number of phone-lines, call roll-over procedures | | | |
| -- Determine the integration of email communication or online portal for NYCHA tenants to access for communication | | | |
| -- Analysis of call center data - Volume of calls, length of time per call, Number of follow-ups with NYCHA tenants, languages, etc. | | | |

CONFIDENTIAL DISCUSSION MATERIALS

# Proposed Workplan - Phase 1 - Pre-Launch Development

Estimated Hours by Task - 10,000 Annual Calls Scenario



| Task / Subtask | Estimated Hours | Estimated Blended Rate [1] | Estimated Fees |
|---|---|---|---|
| -4.3:  Collaborate with NYCHA, the Ombudsperson and the Special Master to develop the standard processes regarding the call center | 20 | $425 | **$8,500** |
| -- Establish roles and responsibilities of call representative(s) and supervisor(s) | | | |
| -- Determine data collection requirements and systems for storage | | | |
| -- Determine the tools, forms and reports required | | | |
| -- Determine  the communication and reporting expectations between NYCHA tenant and Stout | | | |
| -- Determine the communication and reporting expectations between the Ombudsperson and Stout | | | |
| -- Develop a Triage protocol and procedure guideline for escalation, validation and investigation | | | |
| -- Develop policies and procedures regarding Tenant communication | | | |
| -- Call script(s) and procedure guidelines with Tenants - initial call, follow-up communication, resolution | | | |
| -- Call script(s) with Independent Mold Analyst - initial call, follow-up communication, resolution | | | |
| -- Quality Control procedures and templates | | | |
| -- Procedures and protocol for complaints with a proper work order | | | |
| -- Develop Decision trees and estimate call volumes that can reasonably be expected to require Ombudsperson interaction or involvement, of various forms | | | |
| **5. Call Center Infrastructure Development** | | | |
| -5.1:  Collaborate with NYCHA, the Ombudsperson and the Special Master to develop the call center infrastructure | 25 | $350 | **$8,750** |
| -- Creation of database and call representative user portal | | | |
| -- Catalogue of the data fields available for population | | | |
| -- Forms and templates for the call center representative to enter and log relevant information | | | |
| -- Various reports for monitoring and servicing of complaints | | | |
| -- Data integrity checks | | | |
| -- Ombudsperson portal | | | |
| -5.2:  Creation of a dedicated toll-free phone number(s) | 4 | $250 | **$1,000** |
| -5.3:  Creation of features and functionality as agreed upon by the parties | TBD | TBD | |
| -- Tenant complaint portal (preliminary estimate) | TBD | TBD | **$0** |
| -5.4:  Creation of a dedicated email address for complaint communication | 2 | $250 | **$500** |
| *Subtotal* | | | *$28,650* |

| Development of the Complaint Validation Process and Investigatory Services | | | |
|---|---|---|---|
| **6. Complaint Validation Process Development** | | | |
| -6.1:  Collaborate with NYCHA, the Ombudsperson and the Special Master to develop the call center validation processes regarding NYCHA tenant complaints | 6 | $425 | **$2,550** |
| -- Screen tenant complaints to confirm the accuracy of various elements of information provided | | | |
| -- Work order data validation process | | | |

CONFIDENTIAL DISCUSSION MATERIALS

## Proposed Workplan - Phase 1 - Pre-Launch Development
Estimated Hours by Task - 10,000 Annual Calls Scenario



| Task / Subtask | Estimated Hours | Estimated Blended Rate [1] | Estimated Fees |
|---|---|---|---|
| -- Maximo computer system customer review | | | |
| -- Triage protocol and metrics procedure guideline | | | |
| -- Escalation process to notify the Ombudsperson - including requests for photos or other documentation to further validate tenant claims. | | | |
| | | | |
| **7. Investigatory/Site Visit Process Development** | | | |
| -7.1:  Understand NYCHA site visit process, procedures, and training materials | 4 | $425 | **$1,700** |
| -7.2:  Collaborate with NYCHA, the Ombudsperson and the Special Master to develop a site visit process | 4 | $425 | **$1,700** |
| -- Establish roles and responsibilities of the investigator | | | |
| -- Process timeline and expectations of communication | | | |
| -- Safety guidelines and procedures for staff and tenants | | | |
| -- Data collection requirements | | | |
| -- Triage protocol and metrics procedure guideline | | | |
| -- Policies and procedures regarding Tenant communication | | | |
| -- Meeting script(s) with Tenants | | | |
| *Subtotal* | | | *$5,950* |

| Training | | | |
|---|---|---|---|
| **8. Development of Training Materials** | | | |
| -8.1:  Develop training materials | 20 | $350 | **$400** |
| -- Know-your-customer (NYCHA Tenants) | | | |
| -- Mold and moisture issues | | | |
| -- Call center database, process, tools and functionality | | | |
| -- Data entry and quality control | | | |
| -- Triage and escalation process | | | |
| -- Communication guidelines | | | |
| -- Processes for validating information related to tenant complaints | | | |
| | | | |

CONFIDENTIAL DISCUSSION MATERIALS

# Proposed Workplan - Phase 1 - Pre-Launch Development
Estimated Hours by Task - 10,000 Annual Calls Scenario



| Task / Subtask | Estimated Hours | Estimated Blended Rate [1] | Estimated Fees |
|---|---|---|---|
| **9. Training Activities** | | | |
| -9.1:  Conduct training | 12 | $350 | **$144** |
| -- Call center training | | | |
| -- Validation training | | | |
| -- Investigation training | | | |
| *Subtotal* | | | *$544* |
| | | | |
| **Phase 1: Pre-Launch Development** | **126** | | **$37,269** |

Footnotes:
[1] Proposed rates are based on hourly rates by level ($150 - $425). Estimated Blended Rate is a weighted rate based on the estimated % of time by level needed to service the task.
[2] Cost estimate included in Stout's Independent Data Analyst Proposal.

# Proposed Workplan - Phase 2 - Initial Launch and Evaluation
Estimated Hours by Task - 10,000 Annual Calls Scenario



| Task / Subtask | Estimated Hours | Estimated Blended Rate [1] | Estimated Fees |
|---|---|---|---|
| **Initial Launch - 2 Months** | | | |
| | *Annual Tenant Complaint Volume* | | |
| | *10,000* | | |
| **10. Call Center Launch** | | | |
| Call Center representative - bi-lingual | 60 | $125 | **$7,500** |
| Call Center validation and investigation | 34 | $220 | **$7,392** |
| Project management, quality control, and communication with various parties | 17 | $350 | **$5,880** |
| Reporting and discussions to Ombudsperson | 4 | $425 | **$1,700** |
| **Estimated Cost per Month** | | | **$22,472** |
| | | | |
| **Estimated Cost for 2 Months** | | | **$44,944** |
| | | | |
| **Evaluation & Process Refinement** | | | |
| **11. Analysis of Initial Launch** | | | |
| -11.1:  Analysis of call center data | 15 | $250 | **$3,750** |
| -- Volume of calls | | | |
| -- Length of time per call | | | |
| -- Number of follow-ups with NYCHA tenants | | | |
| -- Languages | | | |
| -11.2: Analysis of validation and investigation data | 8 | $250 | **$2,000** |
| -- Number of validations | | | |
| -- Length of time of validations | | | |
| -- Number of investigations | | | |
| -- Identification of commonalities | | | |
| -11.3: Identification of process refinements | 8 | $350 | **$2,800** |
| | | | |
| **12. Process Refinement** | | | |
| -12.1:  Regular meetings with the Special Master, NYCHA, Ombudsperson, and the Independent Mold Analyst to refine Phase 1 (Pre-Launch Development) processes | 4 | $425 | **$1,700** |

CONFIDENTIAL DISCUSSION MATERIALS

# Proposed Workplan - Phase 2 - Initial Launch and Evaluation
Estimated Hours by Task - 10,000 Annual Calls Scenario



| Task / Subtask | Estimated Hours | Estimated Blended Rate [1] | Estimated Fees |
|---|---|---|---|
| -12.2: Collaborate with the Ombudsperson to implement identified refinements to processes, data systems, tools, procedures, forms, training, staffing  etc. (as needed) to reduce costs in Phase 3 | 3 | $425 | **$1,275** |
| *Subtotal* | | | *$11,525* |
| | | | |
| **Phase 2: Initial Launch and Evaluation** | **267** | | **$56,469** |

Footnotes:
[1] Proposed rates are based on hourly rates by level ($150 - $425). Estimated Blended Rate is a weighted rate based on the estimated % of time by level needed to service the task.
[2] Call Center representative assumed live coverage for 8 hours a day and an email and/or voice mailbox service for after hours.

CONFIDENTIAL DISCUSSION MATERIALS

# Proposed Workplan - Phase 3 - Process Refinement and Standardization
Estimated Hours by Task - 10,000 Annual Calls Scenario



| Task / Subtask | Estimated Hours | Estimated Rate | Estimated Fees |
|---|---|---|---|
| **Standardized Call Center** | | | |
| **13. Call Center Standardization Fees** | *Annual Tenant Complaint Volume* | | |
| | *10,000* | | |
| Call Center representative - bi-lingual | 50 | $100 | **$5,000** |
| Call Center validation and investigation | 28 | $185 | **$5,180** |
| Project management, quality control, and communication with various parties | 28 | $275 | **$7,700** |
| Reporting and discussions to Ombudsperson | 3 | $425 | **$1,275** |
| **Estimated Monthly Cost** | | | **$19,155** |
| | | | |
| **Phase 3 - Process Refinement and Standardization** | **109** | | **$19,155** |

Footnotes:
[1] Call Center representative assumed live coverage for 8 hours a day and an email and/or voice mailbox service for after hours.

CONFIDENTIAL DISCUSSION MATERIALS