# THE LAW FIRM OF

# CÉSAR DE CASTRO, P.C.

ATTORNEY AT LAW

7 World Trade Center, 34th Floor
New York, New York 10007

646.200.6166 Direct
646.839.2682 Fax
cdecastro@cdecastrolaw.com
www.cdecastrolaw.com

October 27, 2020

*Via* ECF and E-Mail

The Honorable William H. Pauley
United States District Judge
U.S. District Court for the Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

     Re: *Baez, et al. v. New York City Housing Authority (NYCHA)*,
       13 Cv. 8916 (WHP)
       **Ombudsperson Quarterly Report (Q3), 5/1/2020 — 7/31/2020**[1]

Dear Judge Pauley,

In its third quarter of operation, the Ombudsperson Call Center ("OCC") continued to be successful in resolving NYCHA resident complaints regarding mold and leak issues. The OCC continued to receive nearly universal positive feedback from tenants, NYCHA, plaintiffs and plaintiffs' counsel. The OCC was only operational throughout the full NYCHA portfolio in the last month of quarter 3. As of the close of the quarter, in total the OCC had assisted over 2,000 NYCHA households (up from 600 at the end of last quarter), fully resolved 525 complaints, and participated in over 7,000 calls with NYCHA residents. In quarter 3, the OCC averaged 118 new mold and leak complaints per week. Many of the complaints involved reports of severe conditions or a lack of proper repair work. However, even with an exponential increase in call and complaint volume, the OCC successfully worked towards the resolution of the complaints it received. While as Ombudsperson I was not asked to adjudicate a resident mold or leak dispute in quarter 3, I was actively involved in developing OCC procedures, monitoring progress on matters that may potentially reach me, and coordinating with NYCHA on a myriad of issues. Based on my review and conversations with the parties, it appears that by the end of quarter 4, several matters will be escalated to me for action.

---

[1] As in previous quarters, also being filed today is the separate quarterly report of Stout Risius Ross, LLC ("Stout") regarding its operation of the OCC that contains a comprehensive analysis of the complaints received, resolved, and those still outstanding.

Due in part to operational limitations in place as a result of the COVID-19 pandemic since March 2020, open mold and leak work order backlogs at NYCHA (44,866 parent work orders as of August 2, 2020) steadily rose during quarter 3. As we forecasted in our quarter 2 report, with the OCC's expansion to Brooklyn, appropriate Mold Response Unit ("MRU") staffing, primarily the addition of the appropriate number of Resident Coordinators ("RCs") is crucial to NYCHA's compliance with the consent decree and best efforts.[2] NYCHA needed to immediately begin hiring the necessary staff to respond to resident complaints with consistent and effective resident communication. Unfortunately, the process of appropriately staffing MRU stalled during quarter 3 despite the necessary funding in place, in part due to hiring freezes in place as a result of COVID-19.

In quarter 3, NYCHA struggled to effectively respond to resident complaints and OCC requests. I believe that these struggles were a direct result of its MRU staff shortages. By the close of quarter 3, NYCHA was strained to keep up with the increased volume and requests from the OCC. As a result, while NYCHA is actively attempting to alleviate its staff shortages in quarter 4 (I have been informed that NYCHA has filled 29/30 RC positions), it is likely that I will be increasingly called upon to ensure that resident complaints are acted upon in a timely and appropriate way in coming quarters. This may require adjudication of more simple or basic resident complaints, such as scheduling complaints, in addition to complex cases.

1. <u>Ombudsperson Adjudicatory Actions</u>

As noted above, in quarter 3, I was not called upon to adjudicate any disputes regarding individual resident complaints received by the OCC. However, I have been actively involved in monitoring the operations of the OCC and coordinating with NYCHA regarding relevant policies and procedures. In addition, there have been several resident complaints that I have had to monitor at the request of both the OCC and NYCHA. Based on my conversations with the parties, it appears that at I may be called upon to resolve at least two matters in the coming quarter, one of which may be escalated to me by NYCHA itself.

2. <u>Expansion of the OCC to the Full NYCHA Portfolio</u>

With the addition of Brooklyn on July 1, 2020, the OCC became available to all NYCHA residents. The addition of Brooklyn was very significant given the volume and percentage of mold and leak complaints originating from that borough. At the time of the OCC's expansion to Brooklyn, approximately 55% of open mold and leak work orders were in Brooklyn. As a result, OCC call volume increased exponentially, however, building upon the experiences and lessons of our incremental rollout suggested and ordered by the Court, the OCC was able to efficiently answer and respond to residents and work towards resolving those cases.

On the other hand, NYCHA struggled with the OCC's expansion this quarter, particularly in July after the Brooklyn launch. Unlike the other expansions, Brooklyn management struggled to

---

[2] I have been informed by NYCHA that the title of the RCs has been changed to Resident Communication Associates ("RCAs").

timely respond to requests from the OCC and from the MRU.  Throughout the quarter, NYCHA's MRU department, despite serious staffing shortages, continued to demonstrate its willingness and efforts to be responsive to all OCC requests and demands.  However, given its staff shortages and the general lack of responsiveness from some developments, its level of responsiveness to OCC requests diminished significantly.  NYCHA has pledged to fill the appropriate positions within MRU in order to expeditiously respond to the OCC's needs.  It should be noted that despite it serving a different function within NYCHA, the OCC has developed a strong working relationship with NYCHA's Compliance Department and it has helped coordinate responses to many OCC complaints.  The Compliance Department has proven an effective and professional partner in helping the OCC with complex OCC cases.  Unfortunately, by the end of quarter 3, it was clear that it too suffers from staff shortages.  By the end of the quarter, it began referring to the OCC all mold and leak cases referred to it by the federal monitor.

      3.     <u>Continued Resident Outreach Difficulties</u>

As reported in last quarter, resident outreach regarding the OCC has been problematic.  Nothing in the consent decree mandates NYCHA to notify or otherwise advertise the existence of the OCC to its tenants.  However, since its inception, NYCHA has appropriately recognized that it must embrace the OCC and the Ombudsperson and provide all of the support it can to ensure its success.  From my conversations with NYCHA, it is evident that it embraces the role of the OCC in not only efficiently and effectively assisting NYCHA residents but also its potential role in helping restore trust between it and its tenants.  Accordingly, NYCHA accepted the responsibility of tenant outreach regarding the existence of the OCC and how it is a helpful and effective resource for residents with leak and mold complaints.

In quarter 3, outreach to NYCHA residents about the existence of the OCC continued to be problematic.  As in early outreach efforts, the independence of the OCC and Ombudsperson was not always emphasized in some tenant communications, communications were sent that failed to include necessary supporting materials, and some communications were sent with a hashtag which has more than 400,000 posts unrelated and not associated with the OCC.  In this quarter, I started to receive some metrics regarding data outreach, however, I still await (as I have since quarter 1) detailed feedback and data confirming that e-mail communications had reached residents and what portion had been returned as undeliverable.  Concerns remain that many residents are completely unaware of the OCC's existence, are confused regarding its connection to NYCHA, and/or are suspicious whether the OCC could effectively help them.  Communication efforts improved throughout the quarter because of the efforts of the Compliance Department that acted as a liaison between the OCC and the NYCHA Department of Communications.  In quarter 4, communication efforts have substantially improved, and the OCC and the Compliance Department have agreed on language and a schedule of releases.  In addition, the OCC has explored and continues to explore potential independent outreach efforts in order to spread the word regarding the availability of the OCC to all NYCHA residents.

      4.     <u>NYCHA Staffing</u>

As noted above, NYCHA staffing was the largest challenge for NYCHA in quarter 3.  NYCHA continued to struggle with the need for maintenance workers, plumbers, painters, carpenters, and

there remained vacancies at important management levels within developments.  Furthermore, MRU staffing shortages, namely vacant RC positions left NYCHA struggling to keep up with increased OCC complaints.  Prior to the addition of Brooklyn to the OCC's jurisdiction, MRU was beginning to have difficulties responding to the OCC's requests in a timely manner, however, requests would never go unanswered.  Unfortunately, with the predicted increase in complaints and, thus, increased requests from the OCC, MRU was unable to timely respond to all the OCC requests as it had in the past.  It appears that its difficulties were a factor of NYCHA's failure to increase MRU staff and a lack of responsiveness (and MRU's inability to stay on top of) NYCHA employees at some developments.  Instead of being able to keep up with new OCC requests, MRU was forced to follow up time and time again with development staff that were not being responsive to requests related to open OCC matters.  The current RCs became overburdened and, in some cases, residents began having difficulties reaching RCs, reporting that some voicemail boxes were full.

The RC position was born from the collaborative work of the OCC and NYCHA staff at the first development in which we launched, the Jefferson Houses.  It was an experimental temporary position that in practice proved extraordinarily effective to ensure meaningful communication between residents and NYCHA and appropriately limited the costs of the OCC staff communicating with residents.  With each of the OCC expansions, the RCs have proven to be a necessary and instrumental position in moving the OCC cases to successful completion.  However, the position is still advertised by NYCHA as a temporary one.  We hope that NYCHA will make the RCs a permanent part of its staff and commitment to improve resident communication regarding mold and leak work being conducted in resident apartments.  Going forward, appropriate RC and MRU staffing will limit the costs of the OCC operations and most importantly, help NYCHA in its goals to improve its relationships with its tenants and effectively remediate leak and mold conditions.

I certainly appreciate and understand the tremendous fiscal difficulties NYCHA faces, especially in the current economic climate, however, at a minimum, appropriately staffing MRU in the short term can have a tremendous impact on the effectiveness of the OCC.[3]

    5.    <u>Leak Standard Procedure</u>

Since October 2019, NYCHA has been working on developing a desperately needed leak standard procedure.  Unlike its response to mold complaints, NYCHA's response to leaks, which if not handled appropriately will likely lead to countless mold complaints, is not standardized across the portfolio.  Leaks make up a large portion of complaints to the OCC.  In quarter 3, 55% of complaints to the OCC were leak related.  All parties and stakeholders appear to agree that a standard operating procedure detailing the appropriate steps to investigate and resolve a leak is necessary and overdue.  An appropriately implemented standard operating procedure with built

---

[3] NYCHA should continue to explore the use of technology to free up much-needed resources.  The OCC continues to successfully utilize its virtual inspection technology and successfully solicit photographs and videos from residents and NYCHA in order to help move matters towards a resolution.  The OCC has not had to conduct a single site visit.  Scheduling backlogs remain a problem for NYCHA given the complexities of scheduling in-house staff and outside vendors to perform work on resident apartments.  NYCHA has reported that it is piloting automated scheduling technologies in the coming months in parts of its portfolio.

in oversight and accountability provisions should limit the number of complaints received by the OCC. Unfortunately, NYCHA has been working on the draft leak standard operating procedure for approximately one year. NYCHA is currently testing its draft leak standard operating procedure in a pilot that is set to conclude on or about November 9, 2020. I hope to see an approved plan in the short term.

      6.    <u>Conclusion</u>

In this quarter, the OCC successfully completed its NYCHA portfolio-wide rollout and is available to all residents who may be experiencing mold and leak problems within their apartments. The OCC has been able to handle the increased volume of complaints due to the incremental rollout that was suggested by the Court. As in the previous quarters, the Ombudsperson and the OCC continue to benefit from a strong working relationship with NYCHA, in particular the MRU and Compliance Department. As a result, in this quarter, the OCC was able to help more than 1,000 additional NYCHA residents. While NYCHA remains committed to responding to and working with the OCC, it faced a number of difficulties in this quarter, all of which the undersigned, the Special Master, and the plaintiffs have been diligently working to remedy.

Respectfully submitted,

    /s/

César de Castro

cc:    All Parties (*via* ECF)