UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARIBEL BAEZ, *et al.*,

          Plaintiffs,

-against-

NEW YORK CITY HOUSING AUTHORITY,

          Defendant.

13 Civ. 8916 (WHP)

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO EXTEND THE APPOINTMENTS OF THE INDEPENDENT MOLD ANALYST, INDEPENDENT DATA ANALYST, OMBUDSPERSON, AND OMBUDSPERSON CALL CENTER**

---

New York City Housing Authority ("NYCHA") residents deserve to live in apartments free of mold and excessive moisture. The provision of such apartments to Plaintiffs—a class that suffers from underlying respiratory ailments like asthma, which are exacerbated by mold and excessive moisture—is all the more important during the COVID-19 pandemic.

Over the past year and a half, the Independent Mold Analyst ("IMA") and Independent Data Analyst ("IDA") have worked with NYCHA to lay some of the groundwork necessary to bring NYCHA into compliance with its obligations under the terms of the Revised Consent Decree and make good on its obligations to its residents. Consistent with the Revised Consent Decree, the IMA and IDA have worked to determine the root causes of mold and excessive moisture in NYCHA apartments, created a standard "Mold Busters" protocol for the effective remediation of mold in all NYCHA apartments, trained NYCHA staff on how to follow the Mold Busters protocol, advised NYCHA on optimal next steps to meet the performance parameters set forth in the Revised Consent Decree, provided oversight, and made suggestions and recommendations that have *collectively saved NYCHA over $100 million.* Since November 2019, the Ombudsperson and Ombudsperson Call Center ("OCC") (together with the IDA and

IMA, the "Independents") have provided independent assistance to thousands of NYCHA residents whose requests for repairs were not timely or effectively handled by NYCHA.

Nonetheless, significant work remains. NYCHA remains well out of compliance with its obligations under the Revised Consent Decree[1] and lacks the standardized operational response necessary to come into compliance quickly and efficiently. While the Independents have made great progress in laying the groundwork for NYCHA to come into compliance, important foundational work remains to be completed, including the finalization of an Excessive Moisture Standard Procedure (the counterpart to the Mold Busters protocol for excessive moisture problems); the implementation of an automated scheduling program; and the replacement of roof fans and cleaning of interior ducts across NYCHA's portfolio.

This case is at an inflection point. Due to the excellent work of the Independents (as detailed further below), NYCHA now has more tools, insights, and information about mold and excessive moisture occurrence, remediation, and recurrence than it has ever had. However, it has not developed a comprehensive strategy to apply these tools to improve conditions for its residents, nor has it followed many of the Independents' recent recommendations that would enable it to do so. To finish the groundwork necessary to efficiently combat mold and excessive moisture across NYCHA developments, and to move toward sustained progress residents can see, it is imperative that the Independents' terms be extended. Plaintiffs thus respectfully request

---

[1] As just one example, NYCHA has never come close to meeting the Revised Consent Decree's time performance parameters for complex mold repairs, and its performance metrics have gotten worse over time. In Quarter 22 (which covered the August 1-October 31, 2019 reporting period), 67% of all closed, complex Mold Busters work orders were completed outside of the required 15-day time frame, in an average of 50.99 days. Those numbers rose to 84% completed outside the required 15-day time frame in Quarter 23, with an average completion time of 58.4 days; and rose still further in subsequent quarters such that by Quarter 26 (the quarter that just ended), 91% of all complex mold work orders closed in the quarter were completed outside the 15-day time frame, with an average completion time of 118 days.

that the Independents be reappointed through December 31, 2021 to enable greater efficiencies and benefits for NYCHA residents, as discussed below.

**I.      The IMA Has Played an Instrumental Role in NYCHA's Progress to Date and Its Expertise and Oversight Remain Critical to NYCHA's Ability to Achieve Compliance with the Terms of the Revised Consent Decree**

Led by Dr. Bill Sothern and his team at Microecologies (New York City's leading indoor health experts), the IMA has been instrumental in: (1) the creation of NYCHA's Mold Busters protocol, which improved NYCHA's standard procedure for identifying the root causes of mold and remediating mold such that it is less likely to recur; (2) training NYCHA staff on how to properly inspect units and implement the Mold Busters protocol; (3) conducting randomized inspections to determine the quality of NYCHA's repair work; (4) identifying patterns in NYCHA's failed inspections and developing re-training protocols to assist NYCHA with better implementing the Mold Busters protocol; (5) determining that condensation-related excessive moisture is the root cause of approximately 70% of the mold problems in NYCHA buildings and that inadequate exhaust ventilation in bathrooms is the primary cause of the condensation; and (6) the consequent launch of NYCHA's roof fan and exhaust ventilation project,[2] which the IMA's research suggests will be a critical component in reducing mold occurrence in NYCHA buildings.  As explained in further detail in Section IV, the IMA has also used its significant expertise and research capabilities to recommend efficient and cost-effective steps that NYCHA can undertake to facilitate coming into compliance with the Revised Consent Decree.  One of these recommendations alone saved NYCHA approximately $100 million.

---

[2] This project calls for NYCHA to replace roof fans on NYCHA buildings portfolio-wide and to clean interior ducts in NYCHA buildings and apartments (many of which are blocked due to paint and/or decades of accumulated dust and debris) to allow for the increased air flow from functioning roof fans to reach the apartments, thus hopefully addressing the primary root cause of mold in NYCHA bathrooms.

While the IMA has helped lay the necessary groundwork for NYCHA to come into compliance with the Revised Consent Decree, NYCHA has yet to even come close to doing so, and the IMA's continued work and oversight are integral to moving NYCHA forward toward compliance.  As an initial matter, the IMA's (1) random inspections of apartments inspected and repaired by NYCHA staff and (2) follow-up training for NYCHA staff who failed to properly follow the Mold Busters protocol both remain necessary forms of oversight, particularly given that between June 12 and October 23, 2020, nearly half of the IMA's random inspections failed or "failed with comments" (30 of 68), and nearly half of the inspections that did pass (15 of 38) only "passed with comments."

Likewise, significant work remains to be done in moving the roof fan and exhaust ventilation project forward to a satisfactory conclusion.  Despite the IMA (1) assisting NYCHA with developing and implementing a roof fan pilot project that provided proof of concept for roof fan replacements; (2) developing specifications for the project; (3) assisting NYCHA in identifying contractors who could perform the work in a satisfactory manner; and (4) developing a Critical Path Timeline project management tool for the expeditious replacement of roof fans and cleaning of interior vents as early as February 2020, roof fan replacement under the project has only recently begun in earnest (with only 175 fans installed as of November 18, 2020),[3] and NYCHA has yet to commit to a plan for completing the interior duct work portion of the project despite knowing this portion is critical given many vents are painted over or clogged with debris.  The IMA will be essential in moving this project to completion, including making necessary

---

[3] On October 13, 2020, NYCHA informed Plaintiffs that it had replaced 1,661 roof fans since 2018 as a result of its roof fan inspection program.  If that number is accurate, NYCHA still must replace approximately 8,400 fans in connection with the roof fan installation and exhaust ventilation project.

contacts with contractors; providing input during NYCHA's evaluation of contractors' capabilities; ensuring that the fans are installed properly and in a reasonable time frame; and troubleshooting problems.[4]

The IMA is also an important part of the creation of an Excessive Moisture Standard Procedure—the counterpart to the Mold Busters protocol developed by the IMA. Currently, NYCHA has no standard procedure that NYCHA staff must follow when a resident reports a leak or other problem with excessive moisture in their apartment. Without a standard procedure, workers in the field cannot be held accountable for poor repairs, robust inspection data is not collected, and remediation efforts cannot be evaluated. Further, due to the multi-unit characteristics of most leak work orders and the lack of a data protocol, recurrence rates—an important metric in determining the success of the repair—cannot be measured for leak work orders. After being pushed to implement such a standard procedure for the better part of two years, NYCHA is currently piloting a draft Excessive Moisture Standard Procedure. Thus far, the IMA has provided detailed comments on the draft Excessive Moisture Standard Procedure. Once the results of the pilot are available, the IMA will play a key role in evaluating the pilot and improving the procedure, which—if done well—will form the backbone of NYCHA's ability to respond to excessive moisture complaints quickly and successfully. A successful Excessive Moisture Standard Procedure is particularly important given that approximately 80% of all *Baez* work orders are excessive moisture work orders.

---

[4] The project is expected to have work at various stages of completion in approximately 40 developments concurrently over the next 8-12 months. Given the difficulties in getting the project off the ground, the IMA's continued assistance in moving the project forward as it becomes more complex is particularly important.

The IMA is also in the process of piloting a standard procedure for wall breaks, which, if done in an appropriately significant quantity, will provide the IMA and NYCHA with a statistically-valid understanding of the extent to which plumbing and insulation problems are contributing to mold and excessive moisture problems in NYCHA bathrooms.  The completion of the pilot will enable the IMA to provide additional recommendations to NYCHA on how to address the root causes of mold and excessive moisture, finalize a wall-break procedure, and assist with training workers on the new procedure.  The data obtained in the second phase of this project will also serve to inform the need for, and scope of, the proposed $8+ billion plumbing replacement work outlined in the NYCHA Stabilization Plan.

In short, the continued expertise, assistance, and oversight of the IMA is essential to NYCHA's ability to make the systemic changes necessary to come into compliance with its obligations under the Revised Consent Decree.

**II.    The IDA Has Played an Instrumental Role in NYCHA's Progress to Date and Its Expertise and Oversight Remain Critical to NYCHA's Ability to Achieve Compliance with the Terms of the Revised Consent Decree**

Led by Neil Steinkamp and his team at Stout, the IDA has proven invaluable in both improving the quality of NYCHA's data and interpreting that data to provide NYCHA with a roadmap for actions that would most efficiently bring it toward compliance with the Revised Consent Decree.  Among numerous other key actions, the IDA has (1) developed enhanced and transparent quarterly reporting with dynamic visualizations to evaluate compliance for a wide variety of sub-categories and work order segments and locations; (2) conducted regular and ongoing data quality reviews to ensure the integrity of the data and ensure that all of the relevant work orders are included in the data received; (3) identified and corrected inaccuracies in NYCHA's Quarterly Reports, including that NYCHA's data understated NYCHA's average time to complete repairs; (4) developed recurrence metrics for Mold Busters work orders to more

6

accurately measure mold recurrence rates (and therefore enable NYCHA to take targeted steps toward lowering mold recurrence, including developing both operational responses to instances of recurrence and further refining the recurrence calculations, both of which NYCHA has thus far failed to do); (5) worked with NYCHA to identify deficiencies with NYCHA's roof fan data;[5] (6) analyzed NYCHA's compliance data to identify causes of non-compliance related to complex mold and excessive moisture conditions (thus giving NYCHA the ability to focus on a process to minimize delays and ensure appropriate remediation, which, as discussed below, it has thus far not done); (7) developed numerous platforms and tools to assist NYCHA in complying with the obligations of the Revised Consent Decree; and (8) recommended updates to the Mold Busters remediation procedure (in conjunction with the IMA) to improve NYCHA's ability to identify primary root causes and additional potential causes of mold growth.

At NYCHA's request, the IDA also (1) built models to enable NYCHA to estimate staffing and resource needs based on mold and excessive moisture data; (2) developed a segmentation analysis of all open work orders to better understand the complexity and level of work required for then-open work orders; (3) developed an analysis for NYCHA to identify those building lines with the most complex mold and excessive moisture work orders in order to enable NYCHA to develop strategies to prioritize investigation and repair work for those lines; (4) built numerous analyses intended to allow NYCHA the ability to monitor individual accountability and compliance, including resident satisfaction survey responses, child work

---

[5] Given the important role that adequate ventilation plays in reducing mold and excessive moisture problems in NYCHA buildings (as identified and confirmed by the IMA), the Revised Consent Decree requires that NYCHA roof fans be run twenty-four hours per day where possible; and that NYCHA inspect the roof fans in all NYCHA public housing developments at least once per month and repair or replace any malfunctioning roof fans within twenty-one days of the inspection. *See* ECF No. 220 ¶ 11.

orders closed with no work done, brief inspections, and repeated unfounded work orders; and (5) facilitated the use of field insights in creating the draft Excessive Moisture Standard Procedure, among other things.

At the request of NYCHA Chairman Gregory Russ, the IDA also (1) created a forecasting tool to anticipate NYCHA's future needs as the conditions surrounding the ongoing COVID-19 pandemic change; (2) developed tools for NYCHA to assess incremental repairs during COVID-19; (3) built work order projections so that NYCHA could proactively plan for the expected increased level of work order volumes; and (4) developed and piloted tools to be able to conduct virtual inspections for residents.  These virtual inspection tools assist not only with operations during the pandemic, but also have wider applications in saving time and money. By enabling the first inspection to be done virtually, NYCHA has the chance to lower the incidence of missed appointments, and the initial virtual inspection would also enable a more targeted and productive first physical visit to the resident's home.  As discussed below, despite a successful pilot, to date NYCHA has taken no further action on virtual inspections.

As with the IMA, while the hard work of the IDA has laid the groundwork for NYCHA to come into compliance with the Revised Consent Decree, the insights, oversight, and recommendations of the IDA remain critical to NYCHA's ability to actually do so.  The IDA's ongoing review of NYCHA data provides oversight and quality control, which remains necessary for identifying errors in NYCHA's data, ensuring that NYCHA's interpretation and presentation of the data in its quarterly reports is accurate and complete, and providing Plaintiffs and NYCHA with a multi-faceted and data-driven understanding of the current state of NYCHA's compliance with the Revised Consent Decree, as well as areas for NYCHA to focus its efforts, among other reasons.  As just a few examples:

- The IDA previously identified and corrected a number of inaccuracies in NYCHA's quarterly reports that understated NYCHA's average time to complete repairs, and thus overstated NYCHA's compliance with the time parameters in the Revised Consent Decree.  *See* ECF No. 246 at 3-4.  More recently, the IDA has flagged significant concerns over the integrity of the roof fan data that NYCHA is collecting.

- Likewise, the IDA plays a critical role in reviewing the quarterly reports and making sure that the way NYCHA presents data is accurate and placed in the proper context, rather than focusing only on the positive.  On information and belief, the early drafts of NYCHA's Quarter 26 Report (prior to review by the IDA) mischaracterized the effect of COVID-19 on NYCHA's non-compliance with the terms of the Revised Consent Decree, and the IDA had to work with NYCHA to make sure the data was presented in a more accurate manner.  When NYCHA implied in the final Quarter 26 Report that COVID-19 was the reason for its non-compliance with its obligations under the Revised Consent Decree, Plaintiffs were able to ask the IDA to explain the impact of COVID-19 based on the data, and learned that while COVID-19 did exacerbate NYCHA's inability to comply with the Revised Consent Decree, it is not the reason for NYCHA's non-compliance.

- The IDA has also identified that NYCHA's mold remediation compliance has not improved over the last eighteen months and identified specific reasons for the lack of improvement.

The IDA's ongoing work is also critical to creating and identifying efficient ways for NYCHA to come into compliance with its obligations under the Revised Consent Decree, as well as overseeing their implementation.  The tools, insights, and information developed by the IDA thus far have put the IDA in a position to (1) develop a comprehensive, data-driven strategy NYCHA can use to reduce the number of days it takes to finish work orders; (2) develop priority operational responses for NYCHA based on the concentration of priority issues across the NYCHA portfolio; (3) develop an operational response for NYCHA to address NYCHA developments with long time frames for scheduling and completing Mold Busters inspections, given inspections are a necessary first step in remediating mold; and (4) develop an action plan to correct failed Quality Assurance Checks.  NYCHA has undertaken none of these actions on its own, but each of them is an important means of efficiently and effectively coming into

compliance with the terms of the Revised Consent Decree.

The IDA is also essential to the successful implementation of NYCHA's Excessive Moisture Standard Procedure. Among other things, the IDA will (1) evaluate the results of the pilot once completed; (2) assist with implementing the procedure portfolio-wide; and (3) analyze the resulting data to develop reliable calculations related to excessive moisture recurrence rates—something that the IDA has done for the Mold Busters protocol but has been unable to do for excessive moisture complaints thus far due to a lack of standard procedure. The IDA's analysis of recurrence rates will provide invaluable information as to the effectiveness of the Excessive Moisture Standard Procedure and the best steps to take to reduce excessive moisture in NYCHA apartments.

Moreover, the IDA will be a critical component in the transition of the virtual inspection pilot to a portfolio-wide project if and when NYCHA decides to act on the results of the pilot. The virtual inspection pilot was very successful, receiving positive feedback from residents and having the potential to both transform how NYCHA communicates with residents and to make more efficient use of NYCHA's resources. However, months after the pilot's completion and the IDA's provision of a detailed document with pilot findings, NYCHA has yet to implement virtual inspections beyond the pilot.

In short, the continued expertise, assistance, and oversight of the IDA is critical to NYCHA's ability to come into compliance with its obligations under the Revised Consent Decree.

**III. The Ombudsperson and OCC Have Played an Instrumental Role in Assisting NYCHA Residents and Remain Critical to NYCHA's Ability to Achieve Compliance with the Terms of the Revised Consent Decree**

The independent Ombudsperson, Cesar de Castro, and the OCC have been critical components in achieving real results for residents with mold and excessive moisture problems in

their apartments. Since the OCC launched in November 2019, the OCC has assisted over 4,400 NYCHA residences. In OCC Quarter 4 alone (the quarter that just ended), the OCC fielded over 7,500 resident calls. Although many of the complaints received by the OCC involved reports of severe conditions or consistent failures by NYCHA to make repairs, the OCC successfully worked toward resolving those complaints and was able to fully resolve 1,169 resident complaints by the close of the quarter. Residents have universally expressed satisfaction with the OCC, in large part because they trust Mr. Steinkamp's team; value the OCC's independence; and are grateful for the OCC's consistent and effective communication, as well as the results the OCC is able to achieve for NYCHA residents, which have been a significant improvement over other avenues by which tenants previously raised issues to NYCHA. The OCC has now launched portfolio-wide, bringing the benefits of the OCC to many more NYCHA residents.

The Ombudsperson has been instrumental to the success of the OCC. Although he was not called upon to adjudicate any resident disputes in OCC Quarter 3 (which covered the May 1-July 31, 2020 reporting period), he was actively involved in developing OCC procedures, monitoring progress on escalating matters, coordinating with NYCHA on a myriad of issues (including NYCHA's continued shortcomings with respect to resident outreach efforts and steps NYCHA could take to improve them), and holding NYCHA accountable. *See* ECF No. 273.

Despite the OCC's successes to date, it has become increasingly clear that the OCC and the Ombudsperson remain necessary to the successful implementation of the Revised Consent Decree. As an initial matter, increased tenant access to the OCC has highlighted the problems facing NYCHA residents and NYCHA's difficulties in resolving them. The NYCHA Mold Remediation Unit has had severe staffing shortages, with the IDA calculating in November 2019 that NYCHA needed to hire over 300 staff to properly remediate mold and excessive moisture

conditions.  Nonetheless, NYCHA has not yet hired those staffers and stalled its hiring efforts in the past quarter.  As a result of this and other problems, NYCHA struggled to effectively respond to resident complaints and OCC requests this past quarter.  This past quarter, the OCC called upon the Ombudsperson to monitor over 400 resident complaints, all of which required NYCHA's immediate attention.  Plaintiffs understand that even with the Ombudsperson's close oversight and supervision, it took NYCHA over six weeks to effectively communicate with residents, schedule appointments, and develop remediation plans for those complaints.  Not surprisingly, many calls to the OCC have been from repeat callers, seeking assistance after NYCHA failed to respond to their problems in a satisfactory manner in the first instance.

Moreover, due in part to operational limits in place as a result of the COVID-19 pandemic since March 2020, open mold and excessive moisture work order backlogs at NYCHA steadily rose in the last quarter.  Coupled with the OCC's portfolio-wide expansion in July 2020, this backlog has resulted in a significant increase in call volume.  Because the OCC will be endeavoring to resolve an overwhelming number of complaints that have been lodged, it is likely that the Ombudsperson will be called upon to adjudicate both simple and complex resident complaints in the near future.  As acknowledged by the Revised Consent Decree, the independence of the Ombudsperson in reviewing and adjudicating these complaints is necessary to achieve lasting results for NYCHA residents.

In short, the continued excellent work of the OCC and the oversight of the independent Ombudsperson are essential to NYCHA's ability to effectively respond to resident complaints and remediate mold and excessive moisture in compliance with its obligations under the Revised Consent Decree.

**IV.    The Appointments of the IMA, IDA, Ombudsperson, and OCC Should be Extended Through December 31, 2021**

Plaintiffs respectfully move the Court to extend the appointments of the IMA, IDA, Ombudsperson, and OCC through December 31, 2021.  The parties have met and conferred, and Plaintiffs understand that NYCHA will be filing a separate motion to extend the Independents' appointments for a period of six months.  Given NYCHA's continued non-compliance with the Revised Consent Decree, the significant work that remains for NYCHA to come into compliance, and the benefits that the certainty of year-long appointments will bring (in terms of the types of projects the Independents can undertake and the cost savings resulting from longer-term planning), a one-year extension is appropriate.

Indeed, a one-year extension will allow the Independents to embark on longer-term projects and to focus on those projects that will best contribute to NYCHA's compliance with the Revised Consent Decree rather than on projects that might be more easily completed within a six-month time frame but that might be less effective or less efficient overall.

Moreover, it is indisputable that the great work of the Independents makes NYCHA more efficient and saves money over the long term.  As detailed above, the insights and oversight of the Independents have led to knowledge and proposals that, if adopted, will enable NYCHA to more efficiently and effectively serve tenants and come into compliance with its obligations under the Revised Consent Decree.  The Independents' advice and counsel have already helped NYCHA to implement various cost-effective measures and save millions of dollars as a result.  For example, the IMA's research saved NYCHA approximately $100 million by showing that NYCHA's planned project to clean and seal exhaust risers/shafts portfolio wide was both unnecessary and potentially toxic to NYCHA residents.  The IMA has also recently proposed a

solution to NYCHA to get the interior vent portion of the roof fan installation and exhaust ventilation project completed quickly and for only $25 per vent.

In addition, given the significant work that remains for NYCHA to come into compliance with its obligations under the Revised Consent Decree, it is inconceivable that NYCHA will not need the oversight and advice of the Independents in six months.  Extending the terms of the Independents for one year will enable the parties to focus on the compliance issues at hand rather than on motion practice, and will also conserve Court resources as a result.

As such, Plaintiffs request that the appointments of the IMA, IDA, Ombudsperson, and OCC be extended through December 31, 2021.

## **CONCLUSION**

The Independents' work has been critical to the progress NYCHA has made thus far and their continued involvement is integral to NYCHA's ability to meet its obligations under the Revised Consent Decree.  Accordingly, Plaintiffs respectfully request that the Court enter an order extending the appointments of the IMA, IDA, Ombudsperson, and OCC through December 31, 2021 and providing that the parties may file any motions in support of their further reappointment by November 30, 2021.

Dated: November 30, 2020                                              Respectfully submitted,

By: */s/ David A. Picon*

David A. Picon
Erin M. Meyer
Jennifer E. Tarr
Dominique Kilmartin
**PROSKAUER ROSE LLP**
11 Times Square
New York, NY 10036
Tel. 212-969-3000
dpicon@proskauer.com

emeyer@proskauer.com
jtarr@proskauer.com
dkilmartin@proskauer.com

By: */s/ Gregory Bass*

Gregory Bass
**NATIONAL CENTER FOR LAW AND ECONOMIC JUSTICE**
275 Seventh Avenue, Ste. 1506
New York, NY 10001
Tel. 212-633-6967
bass@nclej.org

By: */s/ Nancy S. Marks*

Nancy S. Marks
**NATURAL RESOURCES DEFENSE COUNCIL**
40 West 20th Street
New York, NY 10011
Tel. 212-727-2700
nmarks@nrdc.org

*Attorneys for Plaintiffs*