**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------

MARIBEL BAEZ, *et al.*,

                 Plaintiffs,

       -against-

NEW YORK CITY HOUSING
AUTHORITY,

             Defendant.

-------------------------------------------------------

Case No. 13 Civ. 8916 (WHP)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE**
**THE REVISED CONSENT DECREE**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ...................................................................................................... 3

    I.        NYCHA Fails to Abate Mold and Excessive Moisture in NYCHA
            Housing, Prompting this Litigation.............................................................................. 3

    II.      NYCHA Chooses to Forego Litigation and Consent to this Court's
            Oversight over its Settlement with a Class of Current and Future
            NYCHA Residents................................................................................................... 3

    III.    NYCHA Fails to Comply with the Original Consent Decree from the
            Outset, Prompting Plaintiffs' Motion to Enforce and the Creation of a
            Revised Consent Decree Designed to Bring NYCHA into Compliance
            with its Obligations to NYCHA Residents. ............................................................. 4

    IV.    Months After the Revised Consent Decree Is Submitted to the Court,
            NYCHA Announces its Plan to Transition One-Third of All NYCHA
            Units to RAD Management, and Later Informs Plaintiffs that it Will Not
            Abide by its Obligations Under the Revised Consent Decree in Such
            Buildings. ................................................................................................................. 7

    V.      Consistent with its Position, NYCHA Fails to Comply with the Revised
            Consent Decree in RAD- and PACT-Managed Buildings to the
            Detriment of NYCHA Residents. ........................................................................... 9

LEGAL STANDARD................................................................................................................ 11

ARGUMENT ............................................................................................................................ 12

    I.        The Purpose of Both the Original and Revised Consent Decrees Is To
            Ensure that NYCHA Effectively Remediates Mold and Excessive
            Moisture Conditions in *All* NYCHA Apartments................................................. 12

    II.      NYCHA May Not Circumvent its Obligations Under the Revised
            Consent Decree By Changing the Funding or Day-to-Day Management
            of NYCHA Housing ............................................................................................... 13

    III.    NYCHA's Position That It Is Only Required to Comply with the Revised
            Consent Decree in NYCHA Developments that Receive Section 9
            Funding is Illogical and Inconsistent with Well-Settled Principles of
            Construction. .......................................................................................................... 15

    IV.    Given the Purpose and Intent of the Revised Consent Decree, NYCHA
            Should Be Required To Comply With All Provisions of the Revised
            Consent Decree in All NYCHA Housing. ............................................................. 19

CONCLUSION......................................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Baez v. New York City Hous. Auth.*,
    No. 13CV8916, 2018 WL 6242224 (S.D.N.Y. Nov. 29, 2018) ...............................................22

*Berger v. Heckler*,
    771 F.2d 1556 (2d Cir. 1985)........................................................................................12, 18

*Butler Wooten & Peak LLP v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
    943 F.3d 125 (2d Cir. 2019)...................................................................................................16

*Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*,
    869 F.2d 34 (2d Cir. 1989).....................................................................................................18

*Cheng v. Modansky Leasing Co.*,
    73 N.Y.2d 454 (1989) ............................................................................................................19

*EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers*,
    No. 71 Civ. 2877 (RLC), 1988 WL 131293 (S.D.N.Y. Dec. 1, 1988), *aff'd*,
    925 F.2d 588 (2d Cir. 1991).........................................................................11, 12, 20, 22

*Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*,
    252 F.3d 608 (2d Cir. 2001)...................................................................................................18

*Juan F. ex rel. Lynch v. Weicker*,
    37 F.3d 874 (2d Cir. 1994)....................................................................................................11

*King v. Allied Vision, Ltd.*,
    65 F.3d 1051 (2d Cir. 1995)...................................................................................................18

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*,
    424 F.3d 195 (2d Cir.2005)....................................................................................................16

*Patterson v. Newspaper & Mail Deliverers' Union*,
    791 F. Supp. 1015 (S.D.N.Y. 1992).......................................................................................14

*Rufo v. Inmates of Suffolk Cnty. Jail*,
    502 U.S. 367 (1992)...............................................................................................................22

*Schering Corp. v. Ill. Antibiotics Co.*,
    62 F.3d 903 (7th Cir. 1995) .............................................................................................14, 21

*SPCP Grp., LLC v. Eagle Rock Field Servs., LP*,
    No. 12 Civ. 3610 (PAC), 2013 WL 359650 (S.D.N.Y. Jan. 30, 2013) ...................................21

*United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester*
    *Cnty.*, No. 06 Civ. 2860 (DLC), 2016 WL 3004662 (S.D.N.Y. May 24, 2016),
    *aff'd*, 689 F. App'x 71 (2d Cir. 2017) ..................................................................................12

*United States v. Am. Cyanamid Co.*,
    719 F.2d 558 (2d Cir. 1983) ..............................................................................................18

*United States v. Boston Sci. Corp.*,
    253 F. Supp. 2d 85 (D. Mass. 2003) ..................................................................................14

*United States v. N.Y.C. Dist. Council*,
    229 F. App'x 14 (2d Cir. 2007) ..........................................................................................14

## PRELIMINARY STATEMENT

In 2013, a class of New York City Housing Authority ("NYCHA") residents brought a case against NYCHA because NYCHA's failure to abate mold and excessive moisture in their homes was threatening their health.  In lieu of going to trial, NYCHA agreed to submit to this Court's jurisdiction and enter into a consent decree obligating it to effectively remediate mold and excessive moisture in NYCHA apartments and to do so within certain performance parameters (the "Original Consent Decree").  NYCHA's persistent failure to comply with its obligations under the Original Consent Decree led to Court enforcement and the creation and adoption of a revised consent decree (the "Revised Consent Decree").  The Revised Consent Decree maintained NYCHA's core obligations from the Original Consent Decree—the effective remediation of mold and excessive moisture in set time parameters—and added additional obligations and protections for tenants in furtherance of bringing NYCHA into compliance with its obligations under the Original Consent Decree.

After years of systemic non-compliance with both the Original and Revised Consent Decrees, NYCHA now argues that it need not comply with its longstanding obligations to NYCHA tenants who happen to live in NYCHA apartments that are managed through the Department of Housing and Urban Development's Rental Assistance Demonstration ("RAD") and Permanent Affordability Commitment Together ("PACT") programs.

According to NYCHA, because those NYCHA developments now receive their funding through Section 8 of the Housing Act of 1937, and the Revised Consent Decree defines the term "NYCHA public housing developments" to refer to apartments that receive Section 9 funding, RAD- and PACT-managed buildings are eliminated from the scope of the Revised Consent Decree.  Never mind that the defined term appears in only one paragraph in the entire decree, and does not appear in any paragraph detailing NYCHA's core obligations under the Revised

Consent Decree.  Never mind that the certified class comprises "[c]urrent *and future* residents of NYCHA" who have asthma and certain conditions "*in their NYCHA housing*"—a different term entirely.  And never mind that the manifest intent of the Revised Consent Decree was providing additional protections to NYCHA tenants in light of NYCHA's persistent compliance failures.

Consistent with its tortured interpretation of the applicability of the Revised Consent Decree, NYCHA has abandoned its obligations under the Revised Consent Decree in RAD- and PACT-managed NYCHA developments.  In doing so, NYCHA is depriving its residents of benefits to which they are entitled, including effective and timely mold and excessive moisture remediation and access to the Ombudsperson and the Ombudsperson Call Center ("OCC").  NYCHA is also artificially bettering the compliance metrics it is required to meet under the Revised Consent Decree by administratively closing hundreds of open work orders whenever a RAD or PACT transition occurs.

Perhaps most concerning in light of NYCHA's continued compliance issues, NYCHA's stated interpretation—that all NYCHA units funded through Section 8 fall outside the scope of the Revised Consent Decree—would eviscerate the decree.  Several months after Plaintiffs and NYCHA (collectively, the "Parties") submitted the Revised Consent Decree to the Court for approval, NYCHA announced that it was transitioning one-third of its housing stock (62,000 units) to RAD and PACT management.  This year, NYCHA announced its proposed "Blueprint for Change"—a project that would see an additional 110,000 NYCHA apartments funded through Section 8 instead of Section 9.  Practically speaking, if NYCHA's interpretation is countenanced, NYCHA could transition every single NYCHA apartment to Section 8 funding and declare itself free and clear of this Court's jurisdiction, all without ever meeting its obligations under the Revised Consent Decree.  Neither the law nor equity permits NYCHA to

circumvent both the letter and spirit of the Court's Revised Consent Decree.

As explained in detail below, NYCHA may not evade its obligations merely by changing the way in which certain NYCHA apartments are funded and/or managed.  This Court should therefore order NYCHA to comply with its obligations under the Revised Consent Decree in all NYCHA buildings, regardless of how they are funded.

## FACTUAL BACKGROUND

I. **NYCHA Fails to Abate Mold and Excessive Moisture in NYCHA Housing, Prompting the Above-Captioned Litigation.**

On December 17, 2013, residents of NYCHA housing who suffer from asthma sued NYCHA under the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, and the Fair Housing Amendments Act of 1988 for failure to effectively abate mold and excessive moisture in their apartments following requests for reasonable accommodation. *See* ECF No. 1 ¶ 1.  Plaintiffs sued on behalf of themselves and all others similarly situated, and sought injunctive relief to (1) compel NYCHA to modify its procedures to effectively address the root causes of mold and excessive moisture, and (2) to require NYCHA to remediate mold and excessive moisture work orders within certain time parameters, consistent with those newly-implemented procedures, among other things.  *See id.* at Requested Relief Clause, ¶¶ 3-4.

II. **NYCHA Chooses to Forego Litigation and Consent to this Court's Oversight over its Settlement with a Class of Current and Future NYCHA Residents.**

Rather than contest Plaintiffs' claims, NYCHA chose to forego litigation and "settle the action only months after it was filed."  *See* ECF No. 219 at 1.  On December 20, 2013, the Parties filed a proposed Stipulation of Settlement—the Original Consent Decree—with the Court.  *See* ECF. No. 11.  Pursuant to the Original Consent Decree, NYCHA agreed to (1) significantly modify its procedures for abating mold and excessive moisture, (2) repair and abate simple mold and excessive moisture work orders within seven days, (3) repair and abate complex

mold and excessive moisture work orders within 15 days, and (4) address the root cause of the mold and excessive moisture, among other obligations.  *See* ECF No. 22 ¶¶ 5–6.  The Original Consent Decree in no way limited NYCHA's obligations to specific subsets of its housing portfolio, a fact that NYCHA acknowledged at the pre-motion conference on December 9, 2020.  *See* Meyer Aff., Ex. A at 9:19-22 (admitting Original Consent Decree covered NYCHA housing funded through Section 8).[1]

On February 11, 2014, the Court certified a class of Plaintiffs, agreed to by NYCHA, which included "[c]urrent and future residents of NYCHA who have asthma that substantially limits a major life activity and who have mold and/or excessive moisture in their NYCHA housing."  ECF No. 17 at 3.  On March 27, 2014, the Court held a class settlement fairness hearing during which approximately 31 NYCHA residents spoke and "described personal health conditions . . . and the prevalence of mold and excessive moisture in their apartments."  *See* ECF No. 16 at 1–2; ECF No. 21 at 3.  Plaintiffs' counsel and the Court received an additional 114 comments from class members, a great majority of whom expressed support for the provisions of the proposed settlement.  *See* ECF No. 21.  The Court approved the class settlement on April 8, 2014 and "so ordered" the Original Consent Decree on April 17, 2014.  *See* ECF Nos. 21, 22.

### III.   NYCHA Fails to Comply with the Original Consent Decree from the Outset, Prompting a Motion to Enforce and the Creation of a Revised Consent Decree Designed to Bring NYCHA into Compliance with its Obligations to NYCHA Residents.

"From the moment this Court approved the [Original Consent Decree], NYCHA defaulted on its obligations."  ECF No. 167 at 1.  Plaintiffs moved to enforce the Original Consent Decree approximately one year after it was entered, which the Court granted in

---

[1] Documents attached to the Declaration of Erin M. Meyer in support of Plaintiffs' Motion to Enforce the Revised Consent Decree are hereinafter referred to as "Meyer Aff., Ex. __."

December 2015.[2]  *See* ECF Nos. 35, 88.  The Court appointed a Special Master to assist in the creation of new procedures and protocols for remediating mold and excessive moisture to reduce mold recurrence rates, and to enforce NYCHA's compliance with the Original Consent Decree. *See* ECF No. 88 at 5-7.  The Parties worked with the Special Master for approximately two years to develop such revised policies and procedures.  *See* ECF No. 204 at 2.

However, in February 2018, NYCHA informed Plaintiffs that it could not fully implement its new procedures and protocols for remediating mold and excessive moisture until January 1, 2020—long after the Original Consent Decree's scheduled expiration in April 2018. Ultimately confronted with "NYCHA's continuing breaches and the prospect that NYCHA would simply wait until the Consent Decree expired without taking remedial action," Plaintiffs notified NYCHA in February 2018 of their intent to seek injunctive relief unless NYCHA agreed to a revised consent decree.  *See* ECF No. 219 at 2.

The parties submitted a proposed revised consent decree to the Court on April 6, 2018. After reviewing the proposal, the Court requested modifications to strengthen the consent decree, as "the amended consent decree smack[ed] of a slapdash effort to present this Court with a temporary truce that allows Plaintiffs to claim a victory in name and NYCHA to maintain a façade of action without any definite obligations apart from the status quo."  ECF No. 167 at 3. The parties made the requested modifications and submitted the updated revised consent decree—the Revised Consent Decree—for approval on July 24, 2018.  Following a hearing during which the Court heard argument from counsel and statements from NYCHA residents, the Court "so ordered" the Revised Consent Decree on November 29, 2018.  *See* ECF Nos. 215, 219.

---

[2] Plaintiffs also moved for sanctions, which the Court denied.  *See* ECF No. 88 at 7**.**

The Revised Consent Decree carries forward the same core requirements as the Original Consent Decree:  it requires NYCHA to "effectively remediate mold and excessive moisture," and to do so in accordance with set time parameters as in the Original Consent Decree.  *See* ECF No. 220 ¶¶ 2-3.  However, "[t]o better serve the purposes of the Consent Decree," the Revised Consent Decree also includes certain modifications meant to ensure that NYCHA actually meets those core obligations.  *See* ECF No. 219 at 9.  For example, the Revised Consent Decree explicitly provides that NYCHA must prevent mold recurrence and remediate the *root cause* of mold and excessive moisture.  *See, e.g.*, ECF No. 220 ¶¶ 2–4.  It further provides for the oversight of an Independent Data Analyst ("IDA"), an Independent Mold Analyst ("IMA"), and an independent Ombudsperson to assist NYCHA in meeting its core obligations.  *See, e.g., id.* ¶¶ 14–27.  Likewise, to address the root causes of mold and excessive moisture (and thus meet the core obligations to effectively remediate them), the Revised Consent Decree requires the adoption of a new mold standard procedure based on the Parties' work with the Special Master and further requires NYCHA to ensure adequate ventilation through the inspection, repair, replacement, and continuous operation of roof fans.  *See id.* ¶¶ 7, 11.  And to remove one of the concerns that led to the negotiation of the Revised Consent Decree in the first place, the Court approved the removal of a "sunsetting" provision from the Original Consent Decree, reasoning that its removal "disincentivizes NYCHA from stalling until the Consent Decree expires."  *See* ECF No. 219 at 10.  By its terms, the Revised Consent Decree "shall remain in effect until such time as it is vacated by the Court."  ECF No. 220 ¶ 28.

While the Parties were exchanging drafts of what would become the Revised Consent Decree, NYCHA added the term "NYCHA public housing developments" into the Definitions Section of the Revised Consent Decree.  *See* Meyer Aff. ¶ 5.  That term is defined as "public

housing developments that receive Section 9 subsidies and are operated by NYCHA." ECF No. 220 ¶ 1(o). In conjunction with the addition of this term into the Definitions Section, NYCHA added the term into one paragraph of the Revised Consent Decree outlining NYCHA's obligations with respect to roof fans. *See* Meyer Aff. ¶ 5. Paragraph 11(a) requires NYCHA to "inspect the roof fans in all NYCHA public housing developments within forty-five (45) days of the Effective Date" of the Revised Consent Decree and use best efforts to repair or replace malfunctioning fans identified during the inspection; and Paragraph 11(b) requires NYCHA to "inspect the roof fans in all NYCHA public housing developments at least once per month thereafter" and repair or replace malfunctioning fans within 21 days of the inspection. *See* ECF No. 220 ¶¶ 11(a)–(b).

IV.   **Months After the Revised Consent Decree Is Submitted to the Court, NYCHA Announces its Plan To Transition One-Third of All NYCHA Units to RAD Management, and Later Informs Plaintiffs that it Will Not Abide by its Obligations Under the Revised Consent Decree in Such Buildings.**

On November 18, 2018—nearly four months after the Revised Consent Decree was submitted to the Court and over seven months after the initial version of the Revised Consent Decree was agreed to by the Parties—NYCHA publicly announced its intention to transition one-third of its housing stock (62,000 units) to RAD management. *See* Meyer Aff., Ex. B. Under the RAD and PACT programs, NYCHA remains the owner of its housing stock but leases its buildings to private developers, who handle day-to-day operations. HUD funding for RAD and PACT-managed buildings is provided through Section 8 of the Housing Act of 1937 rather than Section 9 of that Act. *See* Meyer Aff., Ex. C.

In or around September 2019, NYCHA informed Plaintiffs that the Revised Consent Decree would not apply to NYCHA developments funded and managed through the RAD and PACT programs. *See* Meyer Aff., Ex. D. Over the next year, Plaintiffs repeatedly asked

NYCHA to provide them with documents and information relating to RAD and PACT, including (1) which developments were slated for transition and on what timeframe, (2) whether the leases that NYCHA was negotiating informed the developers of NYCHA's continuing obligations under the Revised Consent Decree, and (3) the status of mold and excessive moisture remediation in those buildings after they were transitioned to RAD management.  *See* Meyer Aff. ¶ 9.  These requests were met with significant pushback and delay or no response at all and, to date, NYCHA still has not provided Plaintiffs with most of the documents and information they requested.  *See id.* ¶ 10.

In or around early May 2020, Plaintiffs asked NYCHA to provide them with the lease agreements for developments scheduled to transition to RAD management.  *See id.* ¶ 11.  In a June 19, 2020 email, NYCHA's counsel provided Plaintiffs with two pages of the lease agreement for the "Brooklyn Bundle," which had already transitioned.  In her email, NYCHA's counsel stated both that (1) the lease "requires compliance with *Baez*" and (2) she "expect[ed] the same language to be included in the lease agreement for the [planned] Manhattan Bundle." *See id.*

On October 13, 2020, NYCHA's counsel reversed course, sending a letter to Plaintiffs' counsel that stated NYCHA's position that "the Consent Decree applies only to NYCHA-operated housing developments receiving Section 9 subsidies," and "[b]ecause RAD buildings receive Section 8 subsidies exclusively, these properties fall outside the scope of the Consent Decree."  *See id.* ¶ 12.

On November 23, 2020, Plaintiffs learned that a bundle of NYCHA developments in Manhattan were slated to transition to RAD and/or PACT management on November 30, 2020. *See id.* ¶ 13.  NYCHA had not informed Plaintiffs of this impending transition, but confirmed the

8

plans on November 25, 2020 after an inquiry from Plaintiffs. *See id.* Plaintiffs filed their pre-

motion letter on November 27, 2020. *See* ECF No. 277.

**V.     Consistent with its Position, NYCHA Fails to Comply with the Revised Consent Decree in RAD- and PACT-Managed Buildings to the Detriment of NYCHA Residents.**

Once NYCHA developments are transitioned to RAD- or PACT-management, NYCHA

administratively closes all open mold and excessive moisture work orders in those buildings,

regardless of whether any actual repairs were completed. On December 8, 2020, the IDA

provided the Parties and Special Master with a letter report summarizing data from the

Manhattan Bundle's RAD transition. *See* Meyer Aff., Ex. E. The IDA's report revealed that

25% of the 1,645 apartments in the Manhattan Bundle had open mold and excessive moisture

work orders at the time of transition; as of November 25, 2020, there were 737 open parent and

child mold and excessive moisture work orders in those units; and that on the day of transition,

NYCHA cancelled 746 open parent and child work orders with the administrative code "RAD."

*See id.* at 5.

Of the 737 work orders that were open on November 25 (the last date for which the IDA

has work order details), 41% had been open for 200 days or more, and many of the open work

orders were for severe conditions. *See id.* at 3, 4 n.6. Among other such conditions, 46 units had

work orders classified as an emergency; 269 units had work orders classified as Priority Level 6

(high priority); 109 units had a work code indicating that there could be an open wall cavity in

the unit; and 17 units had leaks from above, including flooding, constant leaking, and constant

dripping. *See id.* at 3, 4. Still other units had inspection results indicating over 20 square feet of

mold in the apartment that had not been fully remediated at the time that NYCHA

administratively closed the work orders. *See id.* at 4 (stating that of the 81 open parent mold

work orders with completed inspections, 40% had inspection results indicating over 20 square

feet of mold, with 2 work orders indicating over 200 square feet of mold).

On information and belief, once a work order is administratively closed, NYCHA ceases to track it. Thus, on information and belief, NYCHA is currently unaware of the status of any of the outstanding 746 parent and child mold and excessive moisture work orders that awaited remediation at the time that the Manhattan Bundle was transitioned to RAD management. Nor is NYCHA following up with the developers to whom NYCHA leased the day-to-day management of its buildings to ensure that (1) the developers are fixing mold and excessive moisture work orders within the time parameters required by the Revised Consent Decree, (2) the developers are effectively remediating such conditions by addressing the root causes of the issues, as required by the Revised Consent Decree, and (3) the mold and excessive moisture remediation data from such buildings are included in NYCHA's quarterly compliance reports, as required by the Revised Consent Decree, among other compliance obligations. Plaintiffs have received conflicting reports from NYCHA staff as to whether NYCHA is providing RAD developers with a list of the open mold and excessive moisture work orders that NYCHA administratively closes on the date of transition, such that the developers are aware of those open work orders when they take over day-to-day management of the buildings. *See* Meyer Aff. ¶ 16.

Additionally, consistent with its unilateral determination that the Revised Consent Decree does not apply in RAD- or PACT-managed buildings, NYCHA is not providing any information about its compliance with the Revised Consent Decree in such buildings to the IDA, which is necessary for the IDA to confirm the accuracy of the quarterly compliance reports. On information and belief, NYCHA is likewise not including NYCHA apartments managed through RAD or PACT in the "randomly selected apartments" that the IMA is obligated to inspect for quality assurance. *See* ECF No. 220 ¶ 20. Thus, when the IMA reviews the quality of repairs

and undertakes any necessary training or retraining of maintenance staff to ensure more effective remediation in the future, the IMA is not undertaking such reviews, analysis, or training in any RAD- or PACT-managed NYCHA buildings.

NYCHA is also failing to provide tenants in RAD- and PACT-managed buildings with access to the Ombudsperson and to the OCC, an independent call center run by the independent Ombudsperson to address residents' concerns about mold and excessive moisture repairs and to facilitate the effective and timely remediation of such problems.  While the OCC has been integral in achieving results for tenants, the impact of NYCHA's position on the applicability of the Revised Consent Decree is that NYCHA residents in buildings transitioned to Section 8 no longer have access to the OCC or to the Ombudsperson, who himself plays a critical compliance role given his ability to order appropriate relief in the event that he determines that NYCHA has failed to use best efforts to resolve complaints under the Ombudsperson's investigation.  *See, e.g.*, ECF No. 220 ¶ 26.

## LEGAL STANDARD

Consent decrees are hybrids between contracts and judicial orders and, as such, "are construed largely as contracts, but are enforced as orders."  *EEOC v. Local 580, Int'l Ass'n of Bridge Ironworkers*, No. 71 Civ. 2877 (RLC), 1988 WL 131293, at *1 (S.D.N.Y. Dec. 1, 1988) (internal citations omitted), *aff'd*, 925 F.2d 588 (2d Cir. 1991).  Thus, "in implementing the purposes of a decree, a court is not rigidly confined only to the terms contained within the four corners of the parties' agreement."  *Juan F. ex rel. Lynch v. Weicker*, 37 F.3d 874, 878 (2d Cir. 1994).  Rather, "the court has inherent power to enforce consent judgments, beyond the remedial 'contractual' terms agreed upon by the parties."  *Local 580*, 925 F.2d 588, 593 (2d Cir. 1991).  As such, courts may consider the relevant provisions of a consent decree "in the light of the obligation as a whole and the intention of the parties manifested thereby."  *United States ex rel.*

*Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty.*, No. 06 Civ. 2860 (DLC), 2016 WL 3004662, at *12 (S.D.N.Y. May 24, 2016), *aff'd*, 689 F. App'x 71 (2d Cir. 2017).

Because "[c]onsent decrees are subject to continuing supervision and enforcement by the court," the "court has an affirmative duty to protect the integrity of its decree." *Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir. 1985) (internal citations omitted). To ensure compliance with its decree, "a court may use its broad discretionary power to fashion equitable remedies," *Anti-Discrimination Ctr.*, 2016 WL 3004662, at *13, and "may take such [remedial] steps as are appropriate given the resistance of the non-compliant party." *Local 580*, 925 F.2d at 592 (quoting *Berger*, 771 F.2d at 1569).

## ARGUMENT

I.  **The Purpose of Both the Original and Revised Consent Decrees Is To Ensure that NYCHA Effectively Remediates Mold and Excessive Moisture Conditions in *All* NYCHA Apartments.**

When NYCHA agreed to settle the above-captioned lawsuit, it agreed to effectively remediate mold and excessive moisture conditions in *all* NYCHA apartments. In furtherance of those obligations, the Original Consent Decree: (1) certified a class of "current and future" NYCHA residents with asthma who have mold or excessive moisture in their "NYCHA housing" and (2) required NYCHA to abate mold and excessive moisture in their apartments within set time parameters. *See* ECF Nos. 21–22. Nothing about the Original Consent Decree limited NYCHA's obligations to Section 9 housing, either expressly or impliedly. Indeed, the certified class comprises all current *and future* NYCHA residents who met the other class conditions, with no distinction made as to whether their NYCHA housing is funded under Section 8 or Section 9 of the Housing Act.

The Revised Consent Decree did not change these obligations. The certified class remains the same, and NYCHA's core obligations to class members—to effectively remediate

mold and excessive moisture in their apartments within Court-ordered time parameters—remain the same. *See* ECF No. 220 at 2; *id.* ¶¶ 2–3. The primary difference between the two decrees is that the Revised Consent Decree provides *greater protections* for class members through mechanisms designed to ensure that NYCHA actually meets its core obligations.

The history of the Revised Consent Decree provides further evidence that the manifest intent of the Parties in drafting it was to strengthen the Original Consent Decree, not to gut it. The Revised Consent Decree was drafted after Plaintiffs moved to enforce the Original Consent Decree due to NYCHA's systemic failures to meet its core requirements, and after Plaintiffs had to threaten to move to enforce the Original Consent Decree yet again when NYCHA would not commit to rolling out its new standard procedures prior to the expiration of the Original Consent Decree. *See generally* Factual Background Section III, *supra*. It was further modified in response to this Court's admonishment that the draft revised decree was not strong enough. *See* ECF No. 167 at 3.

In no way, shape, or form should the modification of the Original Consent Decree to provide *greater protections* to class members be construed in such a manner so as to *remove protections* for some—and potentially all—class members who happen to live in NYCHA housing funded through Section 8. Yet NYCHA's interpretation of the Revised Consent Decree leads to exactly that result, and in acting on that interpretation, NYCHA has removed numerous protections from those class members who currently live in such NYCHA housing. *See generally* Factual Background Section V, *supra*.

## II. NYCHA May Not Circumvent its Obligations Under the Revised Consent Decree By Changing the Funding or Day-to-Day Management of NYCHA Housing.

It is well settled that a party may not circumvent its obligations under a consent decree, by contract or otherwise. *See, e.g.*, *United States v. N.Y.C. Dist. Council*, 229 F. App'x 14, 18

(2d Cir. 2007) (party's execution of collective bargaining agreements did not permit party "to circumvent the Consent Decree through a CBA"); *Patterson v. Newspaper & Mail Deliverers' Union*, 791 F. Supp. 1015, 1021 (S.D.N.Y. 1992) (consent decree empowered Administrator "to see to it that the obligations of the Consent Decree are not skirted via a phony sale of assets to a company that was neither a party defendant . . . nor a signatory to the Decree"); *see also Schering Corp. v. Ill. Antibiotics Co.*, 62 F.3d 903, 906 (7th Cir. 1995) (although defendants' actions did not violate the specific terms of the consent decree, their actions were nonetheless improper because they "engaged in a massive, deliberate, illegal, and unscrupulous effort to circumvent the consent decree"); *United States v. Boston Sci. Corp.*, 253 F. Supp. 2d 85, 101 (D. Mass. 2003) (defendant violated consent decree that required it to provide product to licensee when defendant developed new product that it argued fell outside scope of consent decree and failed to provide it to licensee, as evidence indicated that defendant created the new product "in bad faith primarily to circumvent the consent decree").

As such, NYCHA may not circumvent its obligations under the Revised Consent Decree by changing the way NYCHA buildings are funded or managed. Yet NYCHA's interpretation of the Revised Consent Decree creates a loophole that would eviscerate the entire decree. If NYCHA were correct, NYCHA could fund the entirety of its housing stock through Section 8 and declare itself free and clear of its obligations under the Revised Consent Decree, depriving hundreds of thousands of NYCHA residents of protections to which they are entitled along the way. NYCHA already appears to be planning to do so. NYCHA currently plans to transition one-third of its housing stock to RAD and PACT-management, *see* Meyer Aff., Ex. B, and NYCHA's Blueprint for Change proposal shows that NYCHA also plans to transition the remainder of its housing stock to Section 8 funding. *See id.*, Ex. F. In essence, NYCHA

14

proposes to eliminate its obligations under the Revised Consent Decree—and this Court's jurisdiction over it—by contract rather than by compliance.

That is not something NYCHA is permitted to do. The Revised Consent Decree permits only one means by which it may be vacated—through Court Order, and only after NYCHA makes a successful showing that it "has complied with the Order as determined by the Court and the Order is no longer needed." ECF No. 220 ¶ 28. In fact, the Court approved of the removal of the "sunsetting" provision from the Original Consent Decree for this exact reason—to ensure NYCHA cannot escape its obligations unless and until it achieves compliance. Neither the law nor the Revised Consent Decree countenance NYCHA's attempts to skirt its obligations in Section 8 units.

III.    **NYCHA's Position That It Is Only Required to Comply with the Revised Consent Decree in NYCHA Developments that Receive Section 9 Funding is Illogical and Inconsistent with Well-Settled Principles of Construction.**

The crux of NYCHA's argument is that the Revised Consent Decree does not apply to NYCHA developments that receive Section 8 funding because the Revised Consent Decree defines the term "NYCHA public housing developments" to refer to "public housing developments that receive Section 9 subsidies and are operated by NYCHA." ECF No. 220 ¶ 1(o). NYCHA's reading of the Revised Consent Decree is incorrect. Nothing about the Revised Consent Decree limits it to Section 9 housing. The defined term "NYCHA public housing developments" appears in only one paragraph in the entire Revised Consent Decree, in a paragraph that imposes obligations on NYCHA with respect to roof fan inspection, repair, replacement, and operation. *See id.* ¶¶ 11(a)–(b).

Notably, the defined term on which NYCHA hangs its hat is not incorporated into any of the sections of the Revised Consent Decree dealing with NYCHA's core remediation obligations. *See id.* ¶¶ 2–3 (setting forth requirements to effectively remediate mold and

15

excessive moisture within set performance parameters).  Nor is it used in the provisions requiring NYCHA to include mold and excessive moisture remediation data in its periodic compliance reports, the provision requiring the IMA to "perform quality assurance inspections of randomly selected apartments," or the provisions obliging NYCHA to provide its residents with access to the Court-appointed Ombudsperson and the OCC, among others.  *See, e.g.*, *id.* ¶¶ 14–16, 18, 20, 22–27.

There is simply no reason to assume that the limited use of a defined term should supersede those parts of the Revised Consent Decree where the term is not used.  A finding to the contrary would render the defined term meaningless, thereby violating the basic principle that a contract "should be construed so as to give full meaning and effect to *all of its provisions*." *Butler Wooten & Peak LLP v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 943 F.3d 125, 131 (2d Cir. 2019) (emphasis added); *see LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir.2005) (court's interpretation of contract should not render its provisions "meaningless").

Furthermore, interpreting the term "NYCHA public housing developments" to limit the applicability of the entirety of the Revised Consent Decree to Section 9 housing runs afoul of the class certified in this case, which includes "[c]urrent and *future residents* of NYCHA" who have certain conditions "in their *NYCHA housing*,"—a more general term than the defined term at issue.  *See* ECF No. 220 at 2 (emphases added).  If the class the Revised Consent Decree is supposed to protect is not limited to residents of NYCHA housing funded through Section 9— and there is no reason to read this limitation into the Revised Consent Decree where there is no indication of any intent to do so—then it cannot be that the Revised Consent Decree itself can be read to eliminate protections for class members who live in NYCHA housing funded through

16

Section 8.

In its letter opposing Plaintiffs' request for a pre-motion conference, NYCHA argued that the presence of a different but similar term in Paragraph 7(f) to the Revised Consent Decree— "NYCHA's public housing developments"—somehow means that the Revised Consent Decree applies only to NYCHA buildings funded under Section 9.  *See* ECF No. 282 at 1–2.  This argument similarly fails.  As an initial matter, NYCHA's argument would at best mean that NYCHA had no obligations to follow the requirements of Paragraphs 7 and 11 in NYCHA buildings funded through Section 8.  It would have no impact on NYCHA's core obligations under the Revised Consent Decree to effectively and timely remedy mold and excessive moisture conditions in NYCHA apartments, which, as discussed above, are not contained in either Paragraph 7 or 11.

More importantly, however, the terms are not the same.  The defined term "NYCHA public housing developments" is different than the undefined term "NYCHA's public housing developments."  Had NYCHA intended to use the defined term, it should have done so.  Just as reading the defined term into the rest of the Revised Consent Decree would render the defined term meaningless, so too would it here.  The Court should thus find that NYCHA must comply with the requirements of Paragraph 7 in all NYCHA housing.

In the alternative, the Court should determine that the term undefined term "NYCHA's public housing developments" is ambiguous.  *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617 (2d Cir. 2001) ("[A]n ambiguous word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person[.]").  Where, as here, the Court is interpreting a consent decree and a term is ambiguous, the Court can and should "consider extrinsic evidence to ascertain the parties' intent, including the circumstances

surrounding the formation of the decree," and should construe the ambiguous term to effectuate

that intent. *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1059 (2d Cir. 1995); *see Canterbury Belts*

*Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 38 (2d Cir. 1989) (appropriate for district court

"to consider the history of the decree's negotiation" in interpreting ambiguous provision of a

consent decree); *United States v. Am. Cyanamid Co.*, 719 F.2d 558, 564 (2d Cir. 1983) ("[W]hen

the language of a consent decree provision is not clear on its face, a court of equity may, in

construing the provision, consider the purpose of the provision in the overall context of the

judgment at the time the judgment was entered.").

Here, the manifest intent of the parties was to ensure that NYCHA residents live in

apartments free of mold and excessive moisture. *See* ECF No. 215 at 5:14-17 (noting that

submissions relating to approval of Revised Consent Decree and proposed federal settlement

"lay b[are] the decades-long failure at all levels of government . . . to provide safe, sanitary, and

decent housing" to NYCHA residents). Any ambiguous provisions, including the term in

Paragraph 7, should be read with an eye to effectuating this goal, meaning that Paragraph 7

should be interpreted to apply to all NYCHA housing regardless of how it is funded. *See Berger*,

771 F.2d at 1568 ("[A] court has an affirmative duty to protect the integrity of its decree . . .

where the performance of one party threatens to frustrate the purpose of the decree.").

To the extent the term "NYCHA's public housing developments" is ambiguous, that

ambiguity should also be construed against NYCHA because it drafted the term at issue. *See*

*Cheng v. Modansky Leasing Co.*, 73 N.Y.2d 454, 460 (1989) ("If the [agreement] was

ambiguous because it did not state [a term] explicitly, then its terms must be strictly construed

against the drafter.").

Nor is it a defense that the revised mold standard procedure—a document drafted by

NYCHA—currently states that it applies only to NYCHA buildings funded through Section 9. *See* ECF No. 282 at 2.  NYCHA's core obligations under the Original and Revised Consent Decrees—to effectively and timely remediate mold and excessive moisture—do not stem from the revised mold standard procedure.  Rather, the revised mold standard procedure stems from NYCHA's core obligations.

Moreover, the Revised Consent Decree contemplates the revision of the revised mold standard procedure as necessary to ensure Plaintiffs are able to obtain needed accommodations. The Revised Consent Decree expressly incorporates Paragraphs 8, 9, and 11 of the Original Consent Decree.  *See* ECF No. 220 ¶ 12.  In turn, Paragraph 9 of the Original Consent Decree provides that "[n]othing herein precludes plaintiffs from seeking to compel changes in procedures . . . submitted to plaintiffs after the effective date of this [Original Consent Decree] in the event that, after defendant has considered plaintiffs' comments, plaintiffs belief in good faith that defendant's . . . actual issuances do not conform to the Policies annexed hereto as Exhibits A and/or B."  ECF No. 22 ¶ 9.  Exhibit A is the original mold standard procedure, and does not contain any language limiting its applicability to Section 9 housing.  *See id.* Ex. A.

To further the manifest intent of both the Original and Revised Consent Decrees, the Court should order that the revised mold standard procedure be revised to apply to all NYCHA housing, regardless of how it is funded.

**IV.    Given the Purpose and Intent of the Revised Consent Decree, NYCHA Should Be Required To Comply With All Provisions of the Revised Consent Decree in All NYCHA Housing.**

As explained above, the only paragraph of the entire Revised Consent Decree that can even possibly be read to limit any of NYCHA's obligations to class members is Paragraph 11. Even assuming Paragraph 11 applies only to Section 9 housing, the Court can and should still

require compliance with this provision in all NYCHA housing, regardless of funding source.[3]

It is undisputed that the purpose of both the Original and Revised Consent Decrees is "to eliminate mold and/or excessive moisture problems at their source."  ECF No. 220 at 2; *see also* ECF No. 22 at 2 (noting that it is NYCHA's "policy . . . to eliminate or control mold and/or excessive moisture problems at their source").  The Parties agree that repairing or replacing roof fans is a key step to achieving this goal.  *See* ECF No. 246 at 11 ("Because excessive condensation resulting from inadequate ventilation has been shown repeatedly to be a primary cause of mold in NYCHA developments, the parties believe that the roof fan and ventilation repairs will – if done correctly – lead to a reduction in the rates of mold and excessive moisture.").  It is for this reason that fixing roof fans was included as an enumerated requirement of the Revised Consent Decree (itself a targeted judicial intervention prompted by years of NYCHA's noncompliance).

Because "a consent judgment contemplates judicial interests apart from those of the litigants," a "court has inherent power to enforce consent judgments, beyond the remedial 'contractual' terms agreed upon by the parties…until parties to such an instrument have fulfilled their express obligations."  *Local 580*, 925 F.2d at 593.  Requiring NYCHA to only address roof fans in Section 9 housing would provide NYCHA with exactly what the Revised Consent Decree was meant to prevent: a reduced compliance burden as a reward for years of inaction.

The Seventh Circuit's decision in *Schering Corp.* is instructive.  There, the parties entered into a consent decree permanently enjoining the defendants from selling a "solution" (i.e., a drug in a liquid form) "for therapeutic use," unless such solution is expressly approved by

---

[3] To the extent necessary, the Court should also interpret the applicability of the revised mold standard procedure and the upcoming excessive moisture standard procedure to apply to all NYCHA housing for the same reasons articulated below.

the FDA.  62 F.3d at 905.  The defendants continued to sell the solution for therapeutic use but, "in an effort to get around the injunction," they sold it in powdered rather than liquid form.  *Id.* The district court found that defendants "were deliberately seeking to circumvent the injunction," and that the evidence demonstrated that defendants "engaged in a massive, deliberate, illegal, and unscrupulous effort to circumvent the consent decree," but nonetheless held that the decree "could not be read broadly enough to reach the powdered form."  *Id.* at 905, 906.

The Seventh Circuit reversed.  *Id.*  Although the Seventh Circuit recognized that "injunctions should be construed narrowly," it found that "[i]f narrow literalism is the rule of interpretation, injunctions will spring loopholes."  *Id.* at 906.  The Seventh Circuit thus held that the decree was "properly interpreted to reach the powdered equivalent," noting that "it is inconceivable that [plaintiff] would have agreed to end its suit" if it knew that defendants could still sell the drug in an alternative form.  *Id.* at 907.

As in *Schering*, it is inconceivable that Plaintiffs would have agreed to a Revised Consent Decree with a loophole that threatens to swallow the decree.  This Court should interpret the Revised Consent Decree to avoid such an outcome.  *See SPCP Grp., LLC v. Eagle Rock Field Servs., LP*, No. 12 CIV. 3610 (PAC), 2013 WL 359650, at *6 (S.D.N.Y. Jan. 30, 2013) (court "must avoid interpreting a contract in a manner that would be absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties") (internal citation omitted).

NYCHA's argument that such a reading would modify the Revised Consent Decree, *see* ECF No. 282 at 3, does not help it here.  As an initial matter, such a reading is not a modification but rather an interpretation that falls within the Court's equitable powers.  *See, e.g.*, *Local 580*, 925 F.2d at 593.  Either way, however, modifying the Revised Consent Decree is well within this

21

Court's powers. *See Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992) (court may modify consent decree where (1) the party seeking modification establishes a significant change in circumstances warranting revision; and (2) the proposed modification is suitably tailored to the changed circumstances).

NYCHA continues to breach its obligations under the Revised Consent Decree by failing to address the root causes of mold and excessive moisture in NYCHA housing. *See Baez v. NYCHA*, No. 13 Civ. 8916, 2018 WL 6242224, at \*4 (S.D.N.Y. Nov. 29, 2018) ("continued failure to perform pursuant to a consent decree such that the objectives of the consent decree would not be achieved may constitute changed factual conditions under *Rufo*") (internal citation omitted). In light of these continued failures, there could be no more suitably tailored modification than for NYCHA to be obligated to conduct the roof fan maintenance it admits would lead to the abatement of mold and excess moisture required by this Court's orders.

## CONCLUSION

NYCHA residents are entitled to the benefits of the Revised Consent Decree no matter how their NYCHA housing is managed or funded. Yet NYCHA is currently shirking its obligations to NYCHA residents who live in NYCHA housing funded through the RAD and PACT programs, and doing so based on an interpretation of the Revised Consent Decree that would eviscerate the decree. Plaintiffs respectfully request that the Court enforce the Revised Consent Decree and issue an order requiring NYCHA to comply with its obligations under the Revised Consent Decree in all NYCHA housing—including in developments that are, or will be, funded through Section 8 of the Housing Act. In the alternative, Plaintiffs respectfully request that the Court modify the Revised Consent Decree as necessary to effect its manifest intent. Plaintiffs further respectfully request that the Court impose any additional relief that the Court deems just and proper.

Dated: December 21, 2020

Respectfully submitted,

By: */s/ David A. Picon*

David A. Picon
Jennifer E. Tarr
Erin M. Meyer
Dominique Kilmartin
**PROSKAUER ROSE LLP**
11 Times Square
New York, NY 10036
Tel. 212-969-3000
dpicon@proskauer.com
jtarr@proskauer.com
emeyer@proskauer.com
dkilmartin@proskauer.com

By: */s/ Gregory Bass*

Gregory Bass
**NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE**
275 Seventh Avenue, Ste. 1506
New York, NY 10001
Tel. 212-633-6967
bass@nclej.org

By: */s/ Nancy S. Marks*

Nancy S. Marks
**NATURAL RESOURCES DEFENSE
COUNCIL**
40 West 20th Street
New York, NY 10011
Tel. 212-727-2700
nmarks@nrdc.org

*Attorneys for Plaintiffs*