**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MARIBEL BAEZ, *et al.*,

                Plaintiffs,

    -against-

NEW YORK CITY HOUSING
AUTHORITY,

              Defendant.

Case No. 13 Civ. 8916 (WHP)

---

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFFS' MOTION TO ENFORCE THE REVISED CONSENT DECREE**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ....................................................................................................... 3

    I.        NYCHA'S AGING HOUSING STOCK .................................................................. 3

    II.      SECTION 8, SECTION 9, AND THE RAD PROGRAM ..................................... 3

    III.    NYCHA BEGAN IMPLEMENTING PACT WELL BEFORE THE PARTIES AGREED TO THE RCD ......................................................................... 4

    IV.    THE TERMS OF THE RCD LIMIT ITS APPLICABILITY TO NYCHA-OPERATED SECTION 9 PUBLIC HOUSING DEVELOPMENTS ..................... 6

    V.      THE PACT PROGRAM ENSURES THAT MOLD IS REMEDIATED ............. 8

ARGUMENT ............................................................................................................................. 11

    I.        THE RCD UNAMBIGUOUSLY APPLIES ONLY TO NYCHA-OPERATED SECTION 9 PUBLIC HOUSING DEVELOPMENTS ................... 11

    II.      PLAINTIFFS ARE NOT ENTITLED TO REINTERPRET THE RCD ............. 16

    III.    PACT CONVERSIONS ARE CONSISTENT WITH THE "MANIFEST INTENT" OF THE RCD ........................................................................................ 22

    IV.    PLAINTIFFS IMPROPERLY SEEK A MODIFICATION OF THE RCD ......... 24

CONCLUSION .......................................................................................................................... 25

i

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Am. Com. Lines, LLC* v. *Water Quality Ins. Syndicate,*
    403 F. Supp. 3d 312 (S.D.N.Y. 2018)......................................................................14

*In re Avon Securities Litigation,*
    2004 WL 3761563 (S.D.N.Y. Mar. 29, 2004) ...............................................13, 15

*Baez* v. *New York City Hous. Auth.,*
    2018 WL 6242224 (S.D.N.Y. Nov. 29, 2018)..........................................................25

*Banco Espirito Santo, S.A.* v. *Concessionaria Do Rodoanel Oeste S.A.,*
    100 A.D.3d 100 (1st Dep't 2012) ...........................................................................17

*Barcia* v. *Sitkin,*
    1996 WL 251848 (S.D.N.Y. May 10, 1996) ...........................................................24

*Brill* v. *Wing,*
    937 F. Supp. 170 (N.D.N.Y. 1996).........................................................................13

*Clayman* v. *Goodman Properties, Inc.,*
    518 F.2d 1026 (D.C. Cir. 1973)..............................................................................17

*Crumpton* v. *Bridgeport Educ. Ass'n,*
    993 F.2d 1023 (2d. Cir. 1993).................................................................................24

*Flannigan* v. *Vulcan Cap. Mgmt. Inc.,*
    2008 WL 11517448 (S.D.N.Y. 2008)......................................................................18

*Johnson* v. *New York State Dep't of Corrections,*
    2019 WL 6176072 (S.D.N.Y. Oct. 24, 2019) ...................................................11, 12

*S.E.C.* v. *Levine,*
    881 F.2d 1165 (2d Cir. 1989)..................................................................................12

*Lilly* v. *City of New York,*
    934 F.3d 222 (2d Cir. 2019)....................................................................................18

*United States* v. *Local*
    *1804-1, Int'l Longshoremen's Ass'n,* 44 F.3d 1091, (2d Cir. 1995)........................12

*P.J. by & through W.J.* v. *Connecticut State Bd. of Educ.,*
    931 F.3d 156 (2d Cir. 2019)....................................................................................11

*Perez* v. *Danbury Hosp.,*
    347 F.3d 419 (2d Cir. 2003)....................................................................................11

*New York* v. *PVS Chemicals, Inc.*,
    776 F. App'x 728 (2d Cir. 2019) ......................................................................13

*Rentways, Inc.* v. *O'Neill Milk & Cream Co.*,
    308 N.Y. 342 (1955) ......................................................................................19

*Rothenberg* v. *Lincoln Farm Camp, Inc.*,
    755 F.2d 1017 (2d Cir. 1985)..........................................................................19

*Rufo* v. *Inmates of Suffolk, County Jail*,
    502 U.S. 367 (1992)........................................................................................25

*Schering Corp.* v. *Ill. Antibiotics Co.*,
    62 F.3d 903, (7th Cir. 1995) ...........................................................................24

*Spandex House, Inc.* v. *Hartford Fire Ins. Co.*,
    816 Fed. App'x. 611 (2d Cir. 2020)................................................................17

**STATUTES**

Housing Act of 1937....................................................................................................3

Housing and Community Development Act of 1974 ....................................................3

## PRELIMINARY STATEMENT

The Revised Consent Decree ("RCD") is clear and unambiguous that its detailed procedures for remediating mold and excessive moisture apply only to the scores of aging ***Section 9*** public housing developments that the New York City Housing Authority ("NYCHA") ***operates***, and not to the developments that NYCHA does ***not operate***.  The RCD should be enforced as written.

Plaintiffs' self-styled motion to "enforce" the RCD is really an attempt to rewrite and expand the RCD by extending it to housing developments that NYCHA does *not* operate—developments that private developers have spent hundreds of millions of dollars renovating to remove the root causes of mold and excessive moisture, along with other capital improvements.

Those housing developments have been renovated under an Obama administration initiative called the Rental Assistance Demonstration program ("RAD"), which NYCHA has implemented under the name Permanent Affordability Commitment Together ("PACT").  The program is a public-private partnership in which former NYCHA-operated developments are leased to private developers, who in turn invest hundreds of millions of dollars to renovate the developments and operate them more efficiently.

This highly publicized and widely praised program was well underway during the negotiations between the parties that gave rise to the RCD in 2018, and the parties expressly *excluded* these developments from the decree, focusing instead on Section 9 public housing developments that NYCHA itself operates.  Clearly illustrating this limitation, the centerpiece of the RCD—the heavily negotiated revised Standard Procedure document that is incorporated into the RCD and that establishes the protocols for addressing NYCHA's mold and excessive moisture issues—states unequivocally that it "applies to staff responsible for the operation and maintenance of public housing developments that receive Section 9 subsidies from the U.S. Department of

Housing and Urban Development ("HUD")," and that it "*does not apply to privately managed developments including Permanent Affordability Commitment Together (PACT) developments*."

The rest of the RCD reflects this same explicit limitation.  It defines "NYCHA public housing developments" as "public housing developments that *receive Section 9 subsidies and are operated by NYCHA*," and provides that NYCHA shall fully implement the revised Standard Procedure and *all* other provisions of the decree "across all of NYCHA's public housing developments by December 31, 2019."  Multiple other provisions use terms that are applicable specifically to NYCHA-operated developments, as opposed to PACT Section 8 developments that NYCHA does not operate.

Plaintiffs' argument that the RCD's limitation to NYCHA-operated developments somehow "eviscerates" the RCD's protections is mistaken.  To the contrary, the PACT program has enabled the leveraging of hundreds of millions of dollars in private investment capital to renovate thousands of housing units and replace the leaky roofs, facades, windows, and pipes that have plagued these units for years and that are the root causes of mold and excessive moisture that the RCD intended to alleviate.  The private developers who manage these developments recognize the obligation to promptly remediate any mold and excessive moisture, and also have the resources to do so far more quickly and more effectively than NYCHA.  The PACT program is thus entirely consistent with the goals of the RCD and indeed, achieves what the RCD alone cannot.

In short, Plaintiffs are not seeking to "enforce" the RCD, but to change it dramatically by requiring NYCHA to implement the decree's procedures in PACT Section 8 developments where private developers and property managers are making renovations to fix the root causes of mold and excessive moisture, which NYCHA does not have the funds to do itself, and where the private developers can respond more quickly and effectively than NYCHA.

2

Contrary to what Plaintiffs imply in their brief, NYCHA fully shares in Plaintiffs' objectives with respect to the remediation of mold and excessive moisture, and remains open to continued dialogue with Plaintiffs about how mold and excessive moisture remediation are being addressed in PACT Section 8 developments, even though such developments fall outside the scope of the RCD.

## FACTUAL BACKGROUND

### I.     NYCHA'S AGING HOUSING STOCK

NYCHA was created in 1934, during the Great Depression.  Today, it is by far the largest public housing authority ("PHA") in the nation.  Declaration of Gregory Russ (hereinafter "Russ Decl.") ¶ 3.

NYCHA is a victim of its age, and of chronic underfunding, particularly in the area of capital investment for facility renovations.  Some 175 of NYCHA's 302 developments are 50 or more years old, and 93 are at least 60 years old, and they have not been adequately maintained through the years.  *Id*. at ¶ 4.  As a result, windows, roofs, facades, pipes, and ventilation systems—all of the parts of the buildings that are necessary to keep them water tight and combat excessive moisture—continue to deteriorate.  As explained below, NYCHA has few available options to fund its current $40 billion in capital needs to address these serious structural issues.

### II.    SECTION 8, SECTION 9, AND THE RAD PROGRAM

HUD administers two major low-income housing programs that fund NYCHA, commonly referred to as Section 8 and Section 9.  Section 9, part of the original Housing Act of 1937, provides federal funding for publicly owned and operated housing units—the type of housing that is commonly referred to as "public housing."  Russ Decl. ¶ 6.  Section 8, created by the Housing and Community Development Act of 1974, offers a different model.  Under Section 8, a housing authority provides vouchers to low-income families to subsidize their rent in privately owned and

operated homes.  *Id.* at ¶ 7.

In 2012, the Obama administration launched RAD, which uses Section 8 to spur private investment in chronically underfunded, publicly owned housing developments like NYCHA's.  In broad strokes, under RAD, a housing authority can lease its developments to private developers under a long-term lease.  HUD continues to subsidize tenants' rent payments, with the housing authority administering a project-based Section 8 subsidy to the development.  The developers, in turn, invest hundreds of millions of dollars to renovate the properties, and retain private property management companies to operate the developments, which are now funded as Section 8 developments.  *See* Russ Decl. ¶ 18; *see generally* Declaration of Gregory Laufer (hereinafter "Laufer Decl."), Ex. B.

In the nine years since its inception, RAD has been enormously successful in renovating low-income housing units across the country and in providing effective property management.  It has spurred more than $10 billion in new investment in low-income housing, achieving in just a few years what would have taken PHAs, at historic and current capital program funding levels, nearly 34 years to achieve on their own.  Laufer Decl., Ex. A.

## III.   NYCHA BEGAN IMPLEMENTING PACT WELL BEFORE THE PARTIES AGREED TO THE RCD

Plaintiffs and NYCHA agreed to an initial consent decree in this litigation in April 2014 (the "Original Consent Decree" or "OCD"), which established a protocol for mold and excessive moisture remediation known as the "Standard Procedure."  Thereafter, between December 2015 and April 2018, the Court and the parties, with the assistance of the Special Master, took a number of steps to improve NYCHA's mold remediation efforts.  On July 24, 2018, the parties agreed to and filed with the Court an Amended Stipulation and Order of Settlement—the RCD—(ECF No. 193-1), which the Court entered on November 29, 2018.  ECF No. 220.  Among other things, the

RCD included robust new procedures for mold remediation, involving a highly detailed revised Standard Procedure implemented through what is also known as "Mold Busters." *See* Declaration of Elena Tenchikova (hereinafter "Tenchikova Decl.") ¶ 22.

Although Plaintiffs assert that NYCHA announced PACT conversions to one third of its housing stock "[s]everal months after [the parties] submitted the RCD to the Court for approval" (Pl. Mem. at 2), NYCHA had been participating in the program long before the parties agreed to the RCD, and did so openly and with widespread publicity. Indeed, NYCHA issued at least a dozen news releases and held countless public meetings with NYCHA residents concerning the PACT program before the parties agreed to the RCD and submitted it to the Court for approval. *See* Russ Decl. ¶ 27.

NYCHA began considering the RAD/PACT program shortly after it was launched. *Id.* NYCHA announced its first PACT project in May 2015, which involved conversion of the Ocean Bay Apartments in Far Rockaway, Queens—a 24-building complex with 1,395 apartments housing nearly 4,000 residents—from a NYCHA-operated Section 9 development to a PACT Section 8 development. *Id.* at ¶ 28. Starting in the spring of 2015, NYCHA held more than a dozen meetings with tenants about the program, including town hall-style meetings in all five boroughs. *Id.* at ¶ 29.

In January 2017, NYCHA announced that the Obama administration had approved the conversion of 1,700 additional units in NYCHA housing developments in Brooklyn and the Bronx through the PACT program, which would raise an additional $300 million for capital and other improvements, including roof replacements. *Id.* at ¶ 32. NYCHA's press release at the time made clear that NYCHA would "shift the funding source supporting these buildings from Section 9 (public housing) to project-based Section 8." *Id.* at Ex. F.

In June 2017, NYCHA announced that Ocean Bay would receive a $560 million

investment through PACT to make much-needed capital improvements, including roof repairs and new boilers. *Id*. at Ex. G. In January 2018, it announced that three developers had been selected for the PACT conversions in Brooklyn and the Bronx that would provide over $300 million in capital needs. *Id.* at ¶ 34. The release also noted that NYCHA's Community Development team had held two dozen resident engagement meetings to discuss the conversion process. *Id*.

In June 2018, Mayor de Blasio announced an agreement to convert an additional 2,400 units in 21 NYCHA-operated public housing developments in Brooklyn and Manhattan to PACT Section 8 developments, which would enable $400 million in upgrades to the buildings, including the replacement of windows, boilers, and roofs. *Id.* at ¶ 35. PACT conversions have continued after 2018; for instance, the conversion of the Manhattan Bundle—which includes 40 buildings in various properties in Manhattan—closed in November 2020. *See* Laufer Decl., Ex. B at 16; Russ Decl. ¶ 40.

## IV.  THE TERMS OF THE RCD LIMIT ITS APPLICABILITY TO NYCHA-OPERATED SECTION 9 PUBLIC HOUSING DEVELOPMENTS

Against this background of widespread publicity about the PACT program, the parties entered into a negotiated agreement that expressly states that it applies only to NYCHA-operated Section 9 public housing developments, and excludes PACT Section 8 developments. To illustrate, the revised Standard Procedure, which all parties approved and which the RCD incorporates by reference (RCD ¶ 5), expressly states on page 1:

> This Standard Procedure applies to staff responsible for the operation and maintenance of public housing developments that receive Section 9 subsidies from the U.S. Department of Housing and Urban Development (HUD) and are operated by NYCHA. ***This procedure does not apply to privately managed developments including Permanent Affordability Commitment Together (PACT) developments***.

ECF No. 184 at 1 (emphases added); ECF No. 222 at 1 (emphases added).

The RCD also defines "NYCHA public housing developments" as "public housing

developments that receive Section 9 subsidies and are operated by NYCHA." RCD § 1(o). This definition, by its terms, *excludes* PACT Section 8 developments, which receive Section 8 subsidies and are operated by private developers, not NYCHA. The RCD then provides that "NYCHA shall fully implement the revised Standard Procedure and *all other* provisions of this Order across all of NYCHA's public housing developments by December 31, 2019" (RCD § 7(f)) (emphasis added), thus tying all of the decree's provisions to that definition that is limited to NYCHA-operated Section 9 public housing developments.

Consistent with the RCD's express limitations to NYCHA-operated Section 9 public housing developments, the language of the RCD and the systems that NYCHA has created in response to its obligations under the RCD are focused on mold and excessive moisture remediation in NYCHA-operated developments and not privately operated developments. For one, a central term in the RCD—"Work Order"—is defined as "the process by which *NYCHA* schedules and carries out work to be performed to address a condition in an apartment requiring remediation." RCD § 1(q) (emphasis added).

Furthermore, the RCD is inextricably linked to the Maximo software that NYCHA has developed for its own use in tracking Work Orders and effectuating mold remediation. *See* Tenchikova Decl. ¶¶ 8–19. Section 7(a) expressly states that "NYCHA shall complete the revised design of its Maximo system and its handheld devices to create and track Mold Work Orders by August 30, 2018." RCD § 7(a); Tenchikova Decl. ¶ 9. In addition, the two types of work orders set forth in the RCD—"Excessive Moisture Work Order" and "Mold Work Order"—as well as subcategories "Parent" and "Child" worker orders are all terms that are unique to Maximo, and are used to categorize work orders based on NYCHA's processes. Tenchikova Decl. at ¶ 13. The RCD also specifies a series of "Failure Codes" associated with Excessive Moisture Work Orders

that are specific to Maximo and specific to NYCHA's operational processes. *Id.* at ¶ 14. Finally, the key RCD performance parameter—whether a Work Order must be completed in the familiar seven or 15 days—is determined based on the type of civil service worker employed by NYCHA— *i.e.*, public, not private employees—necessary for the job. *Id.* at ¶¶ 15–17. These terms taken together further confirm that the RCD contemplates *NYCHA* being the one to effectuate mold and excessive moisture remediation governed by the RCD, not private developers.

## V.  THE PACT PROGRAM ENSURES THAT MOLD IS REMEDIATED

The PACT program has enabled NYCHA to obtain hundreds of millions of dollars of investments in capital improvements, at a time when virtually no money is available for capital investments in traditional NYCHA-operated Section 9 public housing developments. As a result, the deteriorating roofs, facades, windows, and pipes that are the root causes of the mold and excessive moisture conditions in PACT Section 8 developments are finally being replaced. Russ Decl. ¶ 37.

Mold remediation is a priority for PACT Section 8 conversions. In December 2019, NYCHA issued the "Mold and Moisture Control Procedures for NYCHA's PACT Projects Memorandum"—commonly called the "Mold Memo"—which sets forth guidelines for mold remediation in PACT developments. *Id.* at Ex. K. Among other things, it will require that PACT developers adopt Operation and Management Plans ("O&M Plans") that outline "the essential tasks that will be routinely executed to eliminate sources of moisture," and the Mold Memo provides a "suggested guideline" to be "consistent with the . . . Baez Consent Decree." *Id.* at Ex. K at 5.

The Mold Memo also explains that NYCHA will transfer responsibility for work orders to PACT developers through an orderly process that ensures the transfer of the information regarding work orders in NYCHA's system. *Id.* at ¶ 39. It also sets forth expectations for PACT developers

8

to provide reports to NYCHA on "capital repairs, remediation work completed in Apartments and resident communication and responses to complaints and mold issues." *Id.* at Ex. K at 3. Following issuance of the Mold Memo, NYCHA has ensured that PACT developers follow its guidelines, even going so far as to include the document in the Control Agreement with its most recent PACT developer, and including in developers' leases a requirement that their O&M Plans be "consistent with Baez v. NYCHA, No. 13 Civ. 8916, as same may be amended." *Id.* at ¶ 40.

PACT developers take mold remediation seriously. Each developer performs a due diligence inspection prior to closing, during which they determine the extent of the buildings' renovation needs, including in relation to mold. *See generally* Laufer Decl., Ex. B. The developers then make substantial capital improvements to remediate the root causes of mold. For example, in one PACT development in the Bronx known as the Baychester and Murphy Houses, the developer—a joint venture of L+M Development Partners, Camber Property Group, and MBD Community Housing Corporation—made numerous improvements that included: replacing the existing roofs; installing new windows with new caulking and aluminum sills; installing an Exterior Insulation Finishing system that acts as a waterproofing barrier; replacing all roof fans; cleaning ventilation ducts; and addressing leaks in plumbing risers. *Id.* at 5.

PACT Section 8 developers then address new mold complaints as they arise, and residents benefit from the resources of private developers. For example, at the Hope Gardens and Bushwick Gardens developments in Brooklyn, the developers—each a joint venture of Pennrose LLC and Acacia Network—have employed a system that allows residents to make complaints through an electronic database that they can access from their mobile devices. *Id.* at 8. Those mold work orders are treated as high priorities, and they are not closed until the resident confirms the work has been completed. *Id.* at 8–9. PACT property managers have also worked toward better

9

educating residents on the causes of mold in order to decrease household causes of excessive moisture.  At the Baychester and Murphy Houses, property managers have provided tip sheets to residents outlining how to prevent mold and excessive moisture in their apartments, and management asks residents to proactively communicate when there is evidence of excessive moisture in apartments or common areas.  *Id*.  At the Ocean Bay and Betances properties, the developers—two joint ventures by MDG Development, Wavecrest Management, and Catholic Charities—inspect all common areas on a quarterly basis to ensure no damage or leaks that could result in mold are present, and each unit receives an inspection on an annual basis.  *Id.* at 10–13. PACT developers also provide NYCHA with regular updates on the properties, including with respect to their efforts to remediate mold.  *See generally id*.

Furthermore, residents of PACT Section 8 housing retain numerous protections with respect to mold and excessive moisture issues.  They are able to file complaints to obtain remediation of mold issues and they have access to many enforcement tools.  For example, residents in PACT Section 8 developments can report mold issues to the NYCHA Customer Contact Center, which triggers the scheduling of special inspections and enforcement by NYCHA's Leased Housing Department, which is the department that administers the Section 8 program.  Such inspections are performed pursuant to HUD's Housing Quality Standards ("HQS"), which are the minimum criteria a unit must meet to qualify for the Section 8 program, and any violation must be cured and confirmed with either a tenant signature or photos.  Russ Decl. ¶ 43.

Also, residents of PACT Section 8 developments are protected by New York City Local Law 55, which obligates landlords to keep units mold free, conduct annual mold inspections in each unit, and to remediate mold conditions found during inspections.  Residents can also call 311

and file a mold complaint directly with the New York City's Department of Housing Preservation & Development ("HPD"), the agency responsible for enforcing State and City housing quality and safety laws and codes.  In addition, prior to conversion, NYCHA provides information to residents of PACT Section 8 developments concerning these rights, such as by circulating brochures that prominently feature numbers to call for repairs.  *See id.* at ¶ 48.

## ARGUMENT

## I.  THE RCD UNAMBIGUOUSLY APPLIES ONLY TO NYCHA-OPERATED SECTION 9 PUBLIC HOUSING DEVELOPMENTS

The crux of Plaintiffs' motion is that the RCD applies not just to NYCHA-operated Section 9 public housing developments, but to PACT Section 8 developments as well.  Plaintiffs are mistaken.

### A.  The Plain Language of the RCD Limits Its Application to NYCHA-Operated Section 9 Public Housing Developments

Consent decrees, though enforced by a court, are construed as contracts, as they are agreements between parties.  *P.J. by & through W.J.* v. *Connecticut State Bd. of Educ.*, 931 F.3d 156, 164 (2d Cir. 2019).  Thus, when interpreting a consent decree, "deference is paid to the plain meaning of the decree's language."  *Id.*; *see also Johnson* v. *New York State Dep't of Corrections*, 2019 WL 6176072, at *8 (S.D.N.Y. Oct. 24, 2019) (noting that a settlement agreement that is clear and unambiguous on its face must be enforced according to its terms).  In doing so, courts must apply a "narrow construction" to consent decrees and "abide by the express terms of a consent decree and may not impose supplementary obligations on the parties . . . ."  *Perez* v. *Danbury Hosp.*, 347 F.3d 419, 424 (2d Cir. 2003).   Here, the plain language of the RCD makes clear that it applies only to NYCHA-operated Section 9 public housing developments.  As such, the Court cannot look outside its "four corners" in interpreting it.  *Id*.

To begin with, the revised Standard Procedure—which sets forth the protocols for

remediating mold and excessive moisture that are the central focus of the RCD, and which the RCD incorporates by reference—expressly states, "This procedure does not apply to privately managed developments including Permanent Affordability Commitment Together (PACT) developments." *See supra* Part IV; ECF No. 184 at 1; *see also S.E.C.* v. *Levine*, 881 F.2d 1165, 1178–79 (2d Cir. 1989) ("A consent decree should be construed like a contract according to traditional contract principles, including the principle that documents incorporated by reference . . . become an intrinsic part of the contract.").

In addition, the RCD itself defines "NYCHA public housing developments" to mean "public housing developments that receive Section 9 subsidies and are operated by NYCHA" (RCD § 1(o)), and then uses that definition to establish the deadline for NYCHA to implement the revised Standard Procedure "and all other provisions of this Order." § 7(f); *see supra* Part IV. Therefore, the RCD requires implementation of its provisions only in NYCHA-operated Section 9 public housing.

This limited application of the RCD is consistent with the fact that numerous words and phrases used throughout the RCD—including "Maximo," "Work Order," and the titles of distinct civil service workers performing remediation work—are specific to the NYCHA systems and procedures that it uses to handle work orders in developments that it operates. *See supra* Part IV. These terms contradict any argument that the RCD applies to PACT Section 8 developments, which are privately managed. *See United States* v. *Local 1804-1, Int'l Longshoremen's Ass'n*, 44 F.3d 1091, 1097 (2d Cir. 1995) ("We are required, in interpreting a particular provision of a consent decree, to read that provision in light of the decree as a whole"); *Johnson*, 2019 WL 6176072, at *9 ("[I]nterpretations which render the contract valid or its performance possible are preferred to those which render it invalid or its performance impossible.").

**B.     To the Extent It Needs to Be Considered, Extrinsic Evidence Confirms What the RCD's Plain Language Shows**

When, as here, a consent decree is unambiguous and clear on its face, extrinsic evidence must not be considered.  *Brill* v. *Wing*, 937 F. Supp. 170, 175 (N.D.N.Y. 1996) (holding that when a consent decree is "'plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature.'") (quoting *Goodheart Clothing Co., Inc.* v. *Laura Goodman Enterprises, Inc.*, 962 F.2d 268, 272 (2d Cir. 1992)).  Therefore, the Court need not look beyond the plain language of the RCD.  If, however, the Court were to consider extrinsic evidence in interpreting the RCD, such evidence only confirms what the plain language shows.

*__Drafting History.__*  The drafting history of Section 7(f) confirms that the parties agreed to limit the application of the RCD to NYCHA-operated Section 9 public housing developments.  *See New York* v. *PVS Chemicals, Inc*., 776 F. App'x 728, 729 (2d Cir. 2019) (considering the drafting history of a consent decree); *see also In re Avon Securities Litigation*, 2004 WL 3761563 at *5 (S.D.N.Y. Mar. 29, 2004) ("[t]he courts have developed subsidiary rules to assist in interpreting ambiguous contracts,   a   number   of   which   have   been   invoked here . . . [D]rafting history and chronology may be relevant") (internal citations omitted).

Plaintiffs provided NYCHA with a draft of the RCD on March 20, 2018, stating that "NYCHA shall fully comply with the Standard Procedure and all other provisions of this Order across *all of NYCHA's developments* by December 31, 2019."  ECF No. 203-14 at 10 (emphases added).  Plaintiffs' draft also required that "NYCHA shall inspect the roof fans in *all* NYCHA developments . . . ."  *Id.* at 11 (emphasis added).

NYCHA rejected that language.  Its response included the definition (discussed above) of the term "NYCHA public housing developments" as meaning "public housing developments *that*

*receive Section 9 subsidies and are operated by NYCHA*," and then narrowed the scope of both

Sections 7(f) and 11 by using that defined term to limit their scope.  ECF No. 203-15 at 8 (emphases

added).  Plaintiffs then responded with another draft on March 27, 2018, changing certain other

sections but not these critical provisions that limit the scope of the agreement to "public housing

developments that receive Section 9 subsidies and are operated by NYCHA."  ECF No. 203-16 at

2.  The narrowing language that NYCHA proposed then remained part of the final, operative RCD

that the Court entered on November 29, 2018.  *See* ECF No. 220 at 5, 9–11.

      The parties also extensively negotiated the revised Standard Procedure, which is expressly

limited to "public housing developments that receive Section 9 subsidies . . . and are operated by

NYCHA" and which expressly excludes PACT Section 8 developments.  *Supra* Part IV.  On May

17, 2018, NYCHA provided Plaintiffs with a draft of that document dated May 16, 2018 that

included this language.  Laufer Decl., Ex. C at 7.  On June 18, 2018 counsel for Plaintiffs sent a

redline reflecting their proposed edits to the May 16, 2018 draft.  Laufer Decl., Ex. C at 12–75.

Plaintiffs did not object or provide any edits to that language in their response.  *Id.* at 16.  The

version that the Court approved on November 29, 2018 contained the same limitation, except it

added that the Section 9 subsidies for NYCHA-operated developments were "from the U.S.

Department of Housing and Urban Development (HUD)".  ECF No. 184 at 2.  In addition,

subsequent iterations of the revised Standard Procedure that the parties have agreed to after entry

of the RCD have continued to exclude privately managed PACT Section 8 developments from its

scope.  *See e.g.*, ECF No. 222.

      ***The Parties' Course of Conduct.***  The parties' course of conduct over the last seven

years—including the five years that preceded the RCD—also shows that the RCD applies only to

NYCHA-operated Section 9 public housing developments.  *See Am. Com. Lines, LLC* v. *Water*

*Quality Ins. Syndicate*, 403 F. Supp. 3d 312, 325–26 (S.D.N.Y. 2018) ("The parties post-execution course of conduct constitutes relevant, probative evidence."); *In re Avon Sec. Litig.*, 2004 WL 3761563 at *5 ("[t]he parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties.") (internal citations omitted). From the day that the parties agreed to the OCD, NYCHA has implemented the required mold remediation measures only in NYCHA-operated Section 9 public housing developments, and not in developments that it does not operate.

Similarly, all of the RCD's policies and procedures have been applied only in NYCHA-operated Section 9 public housing developments. *See* Tenchikova Decl. ¶¶ 6, 9–10, 22–24. For example, the Mold Busters program and the Ombudsperson Call Center ("OCC") were piloted and designed specifically for NYCHA-operated Section 9 public housing developments. *See id.* at ¶¶ 23, 37. They established new procedures, training, data points, and changes to Maximo that were specific to the unique way that NYCHA operates its Section 9 public housing developments. *See id.* at ¶¶ 22, 25–26, 34.

Furthermore, the structures put in place to measure NYCHA's compliance with the RCD use systems and data that are specific to NYCHA-operated Section 9 public housing developments. *First*, under the RCD, NYCHA is obligated to produce quarterly reports ("Periodic Reports") to Plaintiffs that measure NYCHA's compliance with various requirements, such as timely addressing work order requests. From the beginning, these Periodic Reports have been based on data related only to work orders generated from NYCHA-operated Section 9 public housing developments tracked in Maximo. *See id.* at ¶ 28. Indeed, Maximo feeds directly and automatically into the Periodic Reports themselves. *Id.* at ¶ 31.

*Second,* the independent monitors put in place by the RCD measure NYCHA's compliance

*only* with respect to NYCHA-operated Section 9 public housing developments.  The Independent Data Analyst ("IDA") relies on data in Maximo; he does not have access to data from privately managed housing.  *See id.* at ¶ 31.  Neil Steinkamp, the current IDA, even acknowledged in his recent letter to the Special Master that developments "operated by private management (rather than NYCHA) [were] not considered within Baez."  ECF Doc. 295-1, Ex. E at 1, n. 2.  Similarly, the Independent Mold Analyst ("IMA") performs random inspections on a quarterly basis of NYCHA-operated Section 9 public housing developments to measure NYCHA's compliance with the Standard Procedure.  RCD ¶ 20; *see* Tenchikova Decl. ¶ 32.  The IMA inspects only units in NYCHA-operated Section 9 public housing developments.  *Id.* at ¶¶ 32–33.  And finally, the Ombudsperson and the OCC, which were operational starting in July 2020 (well after the first PACT conversion), are available only for residents in NYCHA-operated public housing.  The Ombudsperson and OCC use the NYCHA-specific Maximo system to review the history of escalated work orders in order to conduct investigations and recommend remediation plans.  *See id.* at ¶ 35.  Therefore, the Ombudsperson's report as well as the OCC report pertain only to residents in developments that NYCHA itself operates.  *Id.* at ¶¶ 36, 38.

The scope of all of these reports is readily apparent from the reports themselves.  So Plaintiffs have plainly been aware that, consistent with the terms of the RCD, they relate only to NYCHA-operated Section 9 public housing developments.  *Id.* at ¶¶ 39–40.

## II.    PLAINTIFFS ARE NOT ENTITLED TO REINTERPRET THE RCD

Plaintiffs advance a series of arguments in an attempt to avoid the RCD's plain meaning and to impose new obligations on NYCHA to remediate mold in PACT Section 8 developments—

obligations that the parties never contemplated.  Their arguments fail.

> **A.     The Apostrophe in "NYCHA's Public Housing" Does Not Render the Term Ambiguous**

Plaintiffs' entire argument hangs principally on one apostrophe.  Plaintiffs argue that the RCD is ambiguous and therefore should be interpreted as covering Section 8 PACT developments—despite all of the evidence to the contrary—because Section 7(f) refers to "all of NYCHA**'s** public housing developments" while the defined term in Section 1(o) is "NYCHA public housing developments," with no apostrophe.  Pl. Mem. at 17.  This argument fails.

"[P]unctuation is a most fallible guide by which to interpret a writing, and it never prevails over a meaning which emerges plainly from a consideration of the entire document."  *Clayman* v. *Goodman Properties, Inc.*, 518 F.2d 1026, 1031 n.24 (D.C. Cir. 1973) (internal citations omitted); *see also Spandex House, Inc.* v. *Hartford Fire Ins. Co.*, 816 Fed. App'x. 611, 614 (2d. Cir. 2020) (in which the court rejected plaintiffs' attempts to "distort" the plain text of a contract "in the name of a hyper-technical, punctuation-driven interpretation"); *Banco Espirito Santo, S.A.* v. *Concessionaria Do Rodoanel Oeste S.A.*, 100 A.D.3d 100, 109 (1st Dep't 2012) ("It is a cardinal principle of contract interpretation that mistakes in grammar, spelling or punctuation should not be permitted to alter, contravene or vitiate manifest intention of the parties as gathered from the language employed.").  Here, the insertion of a single apostrophe in what is clearly intended to be, based on the plain language of the text and history discussed above, a defined term does not suggest that the words "NYCHA**'s** public housing" in Section 7(f) mean anything other than "NYCHA public housing."

Even if the term were ambiguous (which it is not), the extrinsic evidence demonstrates that the additional apostrophe should not be interpreted as expanding the scope of the RCD to cover PACT Section 8 developments, especially since the RCD and the revised Standard Procedure

explicitly apply only to NYCHA-operated Section 9 public housing developments. Relatedly, Plaintiffs' argument that the Court should interpret the phrase "NYCHA's public housing developments" against NYCHA under the *contra proferentum* doctrine (Pl. Mem. at 18) is also meritless. The "rule does not apply when both parties participate in the negotiation and drafting process." *Flannigan* v. *Vulcan Cap. Mgmt. Inc.*, 2008 WL 11517448 at *5 (S.D.N.Y. 2008). The RCD was extensively negotiated by able and sophisticated counsel. Moreover, there is no reason to resort to this rule because the phrase is not ambiguous in the first place. *See Lilly* v. *City of New York*, 934 F.3d 222, 236–37 (2d Cir. 2019) ("the offer is not ambiguous. [Plaintiff] cannot read ambiguity into the clear terms of the contract in order to invoke the doctrine of *contra proferentem*.").

**B.      The Limitation to NYCHA-Operated Section 9 Public Housing Developments Applies to the Entire RCD**

Plaintiffs also assert that the RCD is not limited to NYCHA-operated Section 9 public housing developments because some provisions in the RCD do not expressly contain that limitation. Pl. Memo. at 15–17. This argument fails, too. Section 7(f) expressly provides that "the revised Standard Procedure *and all other provisions of this Order*" shall be implemented by December 31, 2019, "across all of NYCHA's public housing developments" (emphases added)— that is, NYCHA-operated Section 9 public housing developments. This broad statement of applicability eliminates any need to insert that limitation in every section of the RCD.

Indeed, as Plaintiffs themselves acknowledge, it is a "basic principle that a contract 'should be construed so as to give full meaning and effect to all of its provisions.'" Pl. Mem. at 16 (citation omitted). By failing to acknowledge that Section 7(f) limits the applicability of "all provisions of this Order" to NYCHA-operated Section 9 public housing developments, Plaintiffs fail to give "full meaning and effect" to Section 7(f).

18

Plaintiffs also ignore the fact that the revised Standard Procedure states that it applies only to NYCHA-operated Section 9 public housing developments and *not* to privately managed developments, such as PACT Section 8 developments.  Therefore, there is no way to interpret the RCD as applying to PACT Section 8 developments because the mold remediation procedures in the revised Standard Procedure—which are the heart of the RCD—explicitly do not apply to those developments.  Such an interpretation would contravene the rule that contracts should be interpreted to make sense in light of the whole agreement.  *See Rentways, Inc.* v. *O'Neill Milk & Cream Co.*, 308 N.Y. 342, 347 (1955) (noting that the court must choose an interpretation "which best accords with the sense of the remainder of the contract").

Plaintiffs acknowledge that Section 11 of the RCD, which concerns fixing roof fans—and which they concede is a "key step" in achieving mold remediation—*is* explicitly limited to NYCHA-operated Section 9 public housing developments, and therefore does not apply to PACT Section 8 developments.  Pl. Memo. at 20.  It would be illogical for the RCD to exclude PACT Section 8 developments from this "key" requirement if the rest of the RCD applied to those developments.  The only sensible explanation is that every provision of the RCD—including NYCHA's obligation to fix roof fans—applies only to NYCHA-operated Section 9 public housing developments. *See Rothenberg* v. *Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985) ("an interpretation that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect") (internal citations omitted).

### C.    The Exhibits to the OCD Do Not Allow the Court to Expand the RCD

Plaintiffs also argue that the RCD permits Plaintiffs to seek revisions to NYCHA's mold remediation procedures that do not conform to the policies attached to the OCD as Exhibit A and B, and that the Court should therefore revise the Standard Procedure to apply to PACT Section 8

developments.  Pl. Mem. at 19.  This argument is meritless.  Not only do Plaintiffs ignore that the paragraphs of the OCD incorporated into the RCD regarding these exhibits apply only with regard to reasonable accommodations (not mold remediation), but they also overlook that the distinction between NYCHA-operated Section 9 public housing developments and privately managed PACT Section 8 developments is fundamental to the remediation procedures and the entire RCD. Therefore, the Court should reject this argument.

> **D.  The Class Definition and the Original Consent Decree Do Not Extend the RCD's Application to "Section 8 units"**

Plaintiffs also contend that the RCD should apply to all residents of, in their words, "Section 8 units" because that is purportedly consistent with the class definition and the OCD.  Pl. Memo. at 15–17.  But the class has never included such residents.  It has always been defined as "current and future residents of NYCHA who have asthma . . . and who have mold and/or excessive moisture in their NYCHA housing."  *Compare* ECF No. 22 at ¶ 2 to ECF No. 220 at 2.  Until Plaintiffs' current motion, the parties have always treated this dual reference to "residents of NYCHA" and "NYCHA housing" and the relief in the OCD and RCD as not including residents of "Section 8 units."  This is because many residents of "Section 8 units" reside in housing that private landlords own and operate, with rent-subsidy vouchers administered by NYCHA.  Such Section 8 voucher recipients cannot be within the scope of the relief granted by the OCD or RCD because NYCHA does not manage the day-to-day operations of these units.

Indeed, at the time the class was certified, the class did not include such residents of Section 8 units.  This is illustrated by the Order requiring distribution of class notice, which states that "Defendants shall cause the Notice . . . to be (a) posted in the lobby of housing units that [NYCHA] owns and/or operates . . . [and] (b) mailed to all NYCHA residents with the February 2014 rent bills." ECF No. 16 at 2. On its face, none of these methods provided notice to residents of Section

8 units in privately-operated buildings.  That is because such Section 8 residents are not class members.

Plaintiffs nonetheless argue that NYCHA supposedly acknowledged at the December 9, 2020 pre-motion conference that the "Original Consent Decree in no way limited NYCHA's obligations to specific subsets of its housing portfolio."  Pl. Mem. at 4.  Plaintiffs have mischaracterized NYCHA's counsel's statements.  NYCHA's counsel noted that "when the original consent decree was entered into," a "part of that consent decree was the reasonable accommodation provisions, which do in fact apply to Section 8 housing."  Dec. 9 Tr. 11:2-4.  This is a reference to Section 8 voucher holders being included in NYCHA's preexisting "Reasonable Accommodations" policy, an amended version of which was attached as Exhibit B to the OCD.

This policy was created in 2012, *not* in connection with the OCD, and was broader than the scope of the OCD in that it explicitly extended to three distinct groups of housing residents: "applicants, Section 8 voucher holders, and NYCHA residents."  Laufer Decl., Ex. D.  This policy was updated as part of the OCD, ostensibly to address the group "NYCHA residents."  The inclusion of Section 8 voucher holders in the policy does not expand the *Baez* class to include Section 8 voucher holders.  Indeed, the reasonable accommodations section of the Periodic Reports issued under the RCD addresses accommodations only in NYCHA-operated Section 9 public housing developments, thus demonstrating that the class does not include Section 8 voucher holders.  *See* Tenchikova Decl. ¶ 29.

Nor does the fact that the class definition includes "future" NYCHA residents help Plaintiffs.  Pl. Memo. at 16–17.  These are "future" residents of the housing covered by the class definition and the remedial decrees, meaning the NYCHA-operated Section 9 public housing developments that are covered by the RCD.  This reference to "future" does not—and cannot by

21

virtue of common sense—refer to housing that falls outside the scope of these decrees, such as privately managed PACT Section 8 developments.

## III.   PACT CONVERSIONS ARE CONSISTENT WITH THE "MANIFEST INTENT" OF THE RCD

Plaintiffs' arguments also miss the forest for the trees:  PACT conversions are the only available vehicle for NYCHA to ensure that the root causes of mold and excessive moisture in its aging developments are addressed in a comprehensive manner in a short timeframe—thereby achieving the key purpose of the RCD.  Therefore, NYCHA is *not* circumventing any of its obligations under the RCD through PACT conversions nor contradicting the intent of the decree. Pl. Mem. at 14.  To the contrary, PACT capital investments address the root causes of mold in a way NYCHA was never able to, even while operating under the RCD, and private developers and property managers can remediate mold more effectively than NYCHA can.  *See supra* Part V; *see generally* Laufer Decl., Ex. B.

Plaintiffs' argument that NYCHA is laying the groundwork to further limit the application of the RCD as part of the proposed "Blueprint for Change" program, which will also use Section 8 funding (Pl. Mem. at 14), is unfounded.  As an initial matter, that program has not yet been authorized.  *See* Russ Decl. ¶ 44.  And, in any event, NYCHA expects that the RCD would apply to developments that are part of that program because, as the program is currently contemplated, NYCHA itself would operate those developments.  *Id.*

Plaintiffs are also incorrect in their speculation that NYCHA's practice of administratively closing open mold and leak work orders after conversion indicates that NYCHA is abdicating its responsibilities.  When NYCHA-operated developments are converted to PACT, a small team of staff at NYCHA administratively closes all open mold and excessive moisture work orders on those buildings in Maximo.  *See* Pl. Mem. at 9; Tenchikova Decl. ¶ 21.  However, these

administrative closures do *not* mean the repair work associated with such work orders is canceled. Up until the time of conversion, all work orders are tracked and maintained in Maximo and NYCHA continues to conduct inspections and work on the properties.  *Id.* at ¶ 20.  That is why such work orders are included in Periodic Reports concerning compliance with the RCD, which is confirmed by the facts and figures quoted by the IDA in his December 8, 2020 letter to the Special Master.  ECF No. 295-1, Ex. E; *See* Tenchikova Decl. ¶ 20.

Once the conversions occur, NYCHA provides records of all of those open work orders to the new developers and their property managers as they take over responsibility for operating the converted developments and making the required repairs.  *Id.* at ¶ 20; *See* Laufer Decl., Ex. B. The developers also perform their own inspections to assess the condition of the properties, including the extent of their mold issues.  *See generally* Laufer Decl., Ex. B.  The results of these inspections are used to create a capital plan that addresses not only the properties' immediate remedial needs, but also the developments' root causes of mold.  *Id.*  Plaintiffs' contention that NYCHA is trying to "artificially better[]" its compliance metrics (Pl. Mem. at 9) is also without merit.  PACT property managers are better able to address the work orders than NYCHA.  And, in any event, the number of work orders that were administratively closed upon conversion, as detailed in the letter Plaintiffs cite (ECF No. 295, Ex. E), constitute just 0.59% of the total work orders considered in the last Periodic Report.  *See* Tenchikova Decl. ¶ 21.  This practice does not permit NYCHA to demonstrate any improvement in its overall compliance statistics.

Plaintiffs also ignore the fact that, in addition to improved property management, residents of PACT Section 8 developments have several protections in place to ensure their mold complaints are addressed, as described *supra* Part V.  They can report mold issues to the NYCHA Customer Contact Center; they are entitled to inspections pursuant to HUD's HQS; they are protected by

HPD's enforcement of Local Law 55; and they are also entitled to inspection and enforcement through NYCHA's Leased Housing Department.  Moreover, they are protected via the legal obligations to conduct mold remediation that private developers assume in the transaction documents.  *Id.*; *see* Russ Decl. ¶¶ 39–42.

Accordingly, the cases that Plaintiffs cite (Pl. Mem. at 13–14) for the proposition that a party may not circumvent its obligations under a consent decree are inapposite.  For example, in *Schering Corp.* v. *Ill. Antibiotics Co.*, two business competitors entered a consent decree enjoining defendant from selling an antibiotic liquid, and defendant attempted to circumvent the decree by manufacturing and selling the antibiotic in powdered form.  62 F.3d 903, 905 (7th Cir. 1995).  By contrast, NYCHA is seeking to effectuate the purpose of the RCD by using PACT conversions to provide necessary capital improvements to remediate the root causes of mold and a new set of protections—not circumvent the RCD through an "illegal[] and unscrupulous effort[.]"  *Id.* at 906.

## IV.    PLAINTIFFS IMPROPERLY SEEK A MODIFICATION OF THE RCD

Finally, Plaintiffs' motion should be denied on the ground that it is procedurally improper.  Because the RCD unambiguously applies only to NYCHA-operated Section 9 public housing developments, Plaintiffs—by their efforts to apply the RCD to privately managed PACT Section 8 developments—are actually seeking a modification, rather than enforcement, of the RCD.  *See Barcia* v. *Sitkin*, 1996 WL 251848, *4 (S.D.N.Y. May 10, 1996) (finding that because "plaintiffs seek to alter the language of the decree to include a requirement that was not included in the original negotiation process," the motion must be analyzed as one for modification rather than mere enforcement); *see also Crumpton* v. *Bridgeport Educ. Ass'n,* 993 F.2d 1023, 1029 (2d. Cir. 1993) ("the district court's 'clarification' was in reality a modification of the consent decree").  Plaintiffs recognize as much, arguing throughout their motion that the Court should broadly interpret the RCD and modify it as necessary to comport with Plaintiffs' post-facto attempt to

24

expand its scope.  *E.g.* Pl. Mem. at 11–12, 21.

Plaintiffs have not met their burden to modify the consent decree.  "[A] party seeking modification of a consent decree bears the burden of establishing that a *significant* change in circumstances warrants revision of the decree.  If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance."  *Rufo* v. *Inmates of Suffolk, County Jail*, 502 U.S. 367, 383 (1992) (emphasis added).

Here, there has been no change at all, let alone a "significant change" in the relevant circumstances since the November 2018 decision approving the RCD.  *Baez* v. *New York City Hous. Auth.*, 2018 WL 6242224 (S.D.N.Y. Nov. 29, 2018).  The conversion of NYCHA-operated Section 9 public housing developments to PACT Section 8 developments is not a changed circumstance justifying modification.  Rather, PACT is an initiative Plaintiffs have been (or should have been) aware of for years, and certainly prior to this Court's November 29, 2018 entry of the RCD.  *See supra* Facts Part III.  Indeed, the revised Standard Procedure incorporated into the RCD expressly states that it does not apply to PACT developments.  *See supra* Part IV.

NYCHA recognizes that this Court previously held that "continued failure to perform pursuant to a consent decree such that the objectives of the consent decree would not be achieved may constitute changed factual conditions under *Rufo*."  *Baez*, 2018 WL 6242224, at *4 (internal citations omitted).  But Plaintiffs have made no such showing.

## CONCLUSION

Plaintiffs' motion should be denied.

Dated: January 11, 2020

Respectfully submitted,

By: */s/ Gregory F. Laufer*

Gregory F. Laufer
Robert N. Kravitz
**PAUL, WEISS, RIFKIND,**
  **WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019-6064
Tel. 212-373-3000
glaufer@paulweiss.com
rkravitz@paulweiss.com


Melissa F. Zappala
**PAUL, WEISS, RIFKIND,**
  **WHARTON & GARRISON LLP**
2001 K Street NW
Washington, DC 20006
Tel. 202-223-7300
mzappala@paulweiss.com


Wendy L. Prince
Miriam Skolnik
**HERZFELD & RUBIN P.C.**
125 Broad Street
New York, NY 10004
Tel. 212-471-8500
wprince@herzfeld-rubin.com
mskolnik@herzfeld-rubin.com