UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARIBEL BAEZ, *et al.*,

                  Plaintiffs,

       -against-

NEW YORK CITY HOUSING
AUTHORITY,

                 Defendant.

13 Civ. 8916 (WHP)

---

## JOINT PROPOSAL

The parties respectfully submit this Joint Proposal to inform the Court of opportunities to reduce the costs of the Ombudsperson Call Center ("OCC") being operated by Stout Risius Ross, LLC ("Stout").

## BACKGROUND

On November 29, 2018, the Court approved a Modified Amended Stipulation and Order of Settlement ("Revised Consent Decree").  *See* Dkt. No. 220.  Among other things, the Revised Consent Decree provided for the appointment of an Independent Data Analyst ("IDA"), an Independent Mold Analyst ("IMA"), and an Ombudsperson to investigate and adjudicate complaints from residents concerning any failure by New York City Housing Authority ("NYCHA")  to effectively remediate mold and excessive moisture in accordance with the standards set forth in the Revised Consent Decree.  *See id.* ¶¶ 14-27.

By Order dated June 22, 2019, the Court appointed Stout as the IDA.  *See* Dkt. No. 228. By Order dated September 20, 2019, the Court appointed César de Castro as the Ombudsperson

and also appointed Stout to operate the call center to assist the Ombudsperson in handling complaints through December 31, 2020.  *See* Dkt. No. 237.

By Order dated December 23, 2020, the Court re-appointed César de Castro as the Ombudsperson and Stout as the IDA through December 31, 2021 and asked the parties to submit a joint proposal to reduce the costs of the OCC.  *See* Dkt. No. 296.

The parties are pleased to report that they have identified steps to be taken by the stakeholders including Stout (operating the call center), the Ombudsperson (overseeing NYCHA's progress), and NYCHA through its Mold Response Unit ("MRU") a division of the Office of Mold Assessment and Remediation ("OMAR") (responding to resident complaints to OCC), to aid in the reduction of costs for the OCC.  The parties have identified immediate cost savings opportunities that are expected to reduce the costs of providing the essential operations of the OCC to approximately $771,576 annually[1], a 32% immediate reduction relative to costs incurred in 2020.  The parties have also identified further opportunities for cost savings that could be realized with significant effort by NYCHA and may take some time to fully materialize, as discussed below.

### DISCUSSION

**A.  Stout**

While the parties cannot precisely predict the exact volume of resident reported

---

[1] All cost estimates discussed herein are exclusive to operating the OCC. Any requests NYCHA or the parties may ask of Stout related to the call center operations will be itemized separately for invoicing purposes and cost estimates can be provided to NYCHA and the requesting party before the work is started (including but not limited to costs related to OCC Quarterly Reporting, requests for data analysis or visualizations, revisions to OCC standard procedures, supplemental meetings or conferences, or other requests beyond the requirements of the daily operations of the OCC).

complaints to the OCC or the number of follow-up calls required to resolve a resident reported complaint to the OCC, the cost saving opportunities identified herein will immediately reduce the cost of the OCC, including:

- Reduction of OCC Call Center Respondent hourly professional fee by 44% to $45 per hour; and

- Reduction of Annual Call Center Technology costs up to $65,160 based on a 1-year contract renewal.[2] NYCHA has reviewed and approved the 1-year contract renewal.

    With these adjustments alone, we estimate that the cost to operate the OCC will be $777,756 annually (or $64,298 monthly), a 32% (or $357,576 annually) reduction compared to current operations (based on current call volumes).  This cost estimate includes 4 full-time Call Center Respondents (estimated 672 hours per month at $45 per hour) and 1.25 full-time Call Center Supervisors (estimated 210 hours per month at a blended rate of $136 per hour).[3]  The parties believe this estimate is a reasonable expectation based on current call volume, and adjusting only for the items described above.  While NYCHA has requested a cap on monthly fees, Stout is not able to offer a not-to-exceed fee arrangement at this time due to the uncertainty associated with the number of monthly resident reported complaints, particularly as awareness about the OCC increases.  Stout will provide a detailed, itemized monthly invoice to the Court,

---

[2] Estimated Call Center Technology costs only include hosting the ZenDesk platform based on the current number of agents required. Any additional requested technology costs will be itemized separately for invoicing purposes.

[3] The staffing levels discussed are required to service monthly call volumes of 2,226 calls (32% standard operations and 68% follow-up calls), oversight of 2,504 open tickets, 217 resolved tickets, and 420 tickets created in the month.  Any changes to the OCC call volumes will change the estimated costs.

approved by the Special Master.  The itemized billing should help identify areas of future

potential cost savings.

Based on Stout's significant experience managing the OCC, Stout and the parties believe

that the $45 per hour Call Center Respondent rate is fair and reasonable for the level of service

required to successfully operate the OCC at this time.  OCC Call Center Respondents do not

simply answer calls from tenants and follow a specific script.  Rather, Call Center Respondents

are trained to gather information, address language barriers, analyze data, record information,

prepare reports, and identify needs for escalation or investigation.  The Call Center Respondents

have received advanced training to have adaptability and critical thinking to ask appropriate

follow-up questions while fielding live calls and engaging in follow-up interactions.  They have

expertise in interpersonal skills, empathy, cultural competency, and trauma awareness to

effectively communicate with NYCHA tenants and develop trust.  They also have the technical

capabilities to operate phone systems and complex data platforms for data input, tracking and

review to ensure the workflow is efficient and effective.

Stout is able to offer this reduced Call Center Respondent rate to NYCHA based on the

experience and expertise gained during the initial appointment term including investments in

training and technology, creation and on-going refinements of processes and procedures to

streamline operations, and the extensive experience and knowledge that Call Center Respondents

have gained by assisting thousands of NYCHA residents.

Stout and the parties likewise believe the blended $136 per hour Call Center Supervisor

rate is fair and reasonable for the level of service required to successfully operate the OCC at this

time.  The supervisor is used to ensure all processes are being followed consistently and that

tenant information is being collected accurately.  Among other things, the supervisor works

closely with MRU to ensure that NYCHA is following the proper processes and procedures.  In addition, the supervisor ensures that interactions with the Ombudsperson are fluid and prompt, and ensures that information received back from the Ombudsperson is acted on promptly and consistently with the direction provided by the Ombudsperson.

As NYCHA's MRU continues to build the appropriate operational processes and procedures to oversee all resident reported complaints to the OCC, the objective, consistent with the original proposal to the Court, is that Stout's main role will be to process new complaints and confirm resident satisfaction once the complaint is resolved. The OCC's expected standard operations should be related to only 2–3 calls per resident reported complaint to the OCC. In November 2020, 32% of calls were within the expected standard operations (e.g., processing new complaints or confirming resident satisfaction) and 68% of calls were follow-up calls.

Resident follow-up calls and interactions to the OCC may include questions regarding a scheduled date, results of an inspection or the remediation plan, a missed appointment or unannounced appointment, frustration with an interaction with a worker or a delayed scheduling date, complaint about the recent work performed (or lack thereof), or seeking an update from MRU.  The OCC has been working with MRU on strategies to reduce the follow-up calls to the OCC by directing the resident to the MRU.  Such strategies include but are not limited to data tracking to ensure that NYCHA's Resident Community Associates ("RCA") within MRU are establishing effective communication with the resident within 2 business days after the reported complaint has been processed.  Additionally, the OCC can work with NYCHA to determine if there are other strategies to reduce the number of follow-up calls such as including a prompt in the interactive voice response ("IVR") of the OCC phone line to direct a resident to NYCHA if

they wish to speak to an RCA.[4]  A cost estimate considering the reduction of follow-up calls is discussed below.

### B.  Ombudsperson

Among other things, the Revised Consent Decree allows the Ombudsperson to issue an order requiring NYCHA to take one or more of the following actions if NYCHA does not resolve the resident's reported complaint and follow the Ombudsperson's recommendations:

- Requiring NYCHA to complete the repair within a specified number of days;

- Requiring NYCHA to approve and assign the highest priority to a transfer of the tenant's household to another apartment in accordance with TSAP;

- Ordering an independent contractor hired through the Special Master to complete the repairs promptly at NYCHA's expense; and

- Requesting the Independent Mold Analyst to inspect the apartment and prepare a remediation plan at NYCHA's expense.

To date, the Ombudsperson has not issued any orders to NYCHA.  Instead, the Ombudsperson has worked with NYCHA to ensure that NYCHA developed and staffed the appropriate response team (MRU) to adequately address resident reported complaints to the OCC.  During this time, the OCC closely monitored the resident reported complaints, following up or escalating those that were not progressing as needed.  By the end of 2020, NYCHA communicated that it had hired all of its 30 MRU positions and established supervisors to

---

[4] The latest Ombudsperson Call Center Report, covering Q4 (August 1, 2020 – October 31, 2020), explains additional potential reductions in repeat call volume based on the significant time and resources spent to create processes, procedures, tools and templates to create efficiencies and prioritization plans for its internal workflow to best serve residents and the training of new RCAs on these processes and procedures.

oversee the MRU operations.  As a result, in 2021, the Ombudsperson can take a more active role in offering recommendations and issuing orders (and requests) to NYCHA when progress is not being made within the agreed upon timeframes.

This process can include a collaborative approach to develop automated reports to identify resident reported complaints that exceed the agreed upon timeframes (to be determined by the parties), offering NYCHA the ability to take action.  These automated reports will first be accessible by NYCHA.  If action is not taken within a reasonable amount of time thereafter, the Ombudsperson can issue a recommendation or an order.  In circumstances where a delay is being experienced and NYCHA is unable to promptly overcome it, the active participation of the Ombudsperson could reduce the number of follow-up calls received by the OCC as well as the follow-up the OCC would make of MRU.  This would further the objective of achieving 2–3 calls to the OCC per resident reported complaint.  Additionally, the automated report would be able to provide transparency and progress for areas where NYCHA is continuously making progress and taking action within the agreed up timeframes.  These automated reports could create the opportunity to identify the types of complaints that could be referred directly to NYCHA in the future (as discussed below).

### C. NYCHA

Further cost saving opportunities exist if NYCHA is able to (1) assume a greater level of oversight and reporting to the OCC and Ombudsperson and (2) reduce the number of calls to the OCC through the reduction of new resident reported complaints and the reduction of the number of follow-up interactions required per resident reported complaint to the OCC.

*Greater Level of Oversight and Reporting by NYCHA*

Over the next six months, the NYCHA Compliance Department will work with the

Ombudsperson, OCC, OMAR and other stakeholders to evaluate the feasibility of having certain elements of OCC activities or calls referred directly to NYCHA in the first instance. NYCHA anticipates that by employing its own personnel including some of its own residents, the costs associated with the OCC may decrease while providing employment opportunities in our communities. Stout has also made a commitment to hire NYCHA residents if there is attrition of current Call Center Respondents, contingent upon the identification and availability of suitable candidates for the position. NYCHA's goal is to explore bringing the OCC in house under the supervision of the NYCHA Compliance Department, while maintaining the OCC's independence. Plaintiffs believe that one of the key reasons the Ombudsperson and OCC have been so successful are their independence from, and oversight over, NYCHA. Plaintiffs thus object to a proposal that would bring the OCC under NYCHA's control.

In addition to the immediate cost savings identified in Section A above, if NYCHA is able to successfully perform these responsibilities, currently held by OCC supervisors, Stout estimates the cost to operate the OCC could be reduced further to $600,216 annually (or $50,018 monthly), a 47% (or $528,936 annually) reduction compared to current operations. This cost estimate assumes that call volume will remain consistent, but includes a 50% reduction in the Call Center Supervisor hours and no reduction to the Call Center Respondent hours.[5]

Within the last month NYCHA has already taken steps towards assuming some of the responsibilities of oversight and reporting, including the facilitation of a recurring weekly meeting to discuss the status of select resident reported complaints to the OCC. NYCHA has

---

[5] This cost estimate includes 4 full-time Call Center Respondents (estimated 672 total hours per month at $45 per hour) and less than 1 full-time Call Center Supervisor (estimated 105 total hours per month at a blended rate of $136 per hour).

expressed the commitment and desire to take a greater role in the oversight and reporting for open OCC tickets.  However, it will take time to fully realize the benefits of NYCHA's process improvements.  Any requests NYCHA or the parties may ask of Stout related to the creation or development of the oversight and reporting functionalities necessary to oversee the call center operations will be itemized separately for invoicing purposes.

<u>*Reduction in the Number of Calls and Follow-up Interactions Required*</u>

The number of calls the OCC receives is largely attributable to the number of mold and excessive moisture problems in NYCHA apartments that are not effectively remediated and to the number of follow-up interactions.[6]

NYCHA will work with Stout to improve processes that may reduce the number of calls and follow-up interactions required by the OCC, and thereby reduce its cost through effective management activities including, but not limited to:

- NYCHA's MRU continuing to increase the oversight of all resident reported complaints to the OCC to ensure appropriate actions are taken (e.g., timely scheduling of work and re-scheduling), ensuring that communication to the OCC during the remediation process is accurate, prompt and comprehensive, and that there is active and effective communication with the resident. This should reduce the number of follow-up calls the OCC receives from residents and reduce the number of follow-up requests and questions the OCC requires from MRU;

---

[6] As mold and excessive moisture problems are addressed, the number of OCC complaints should decline over time, which will reduce the OCC cost. The IMA has made additional suggestions to reduce the root causes of mold and excessive moisture in NYCHA buildings, including as relates to roof fan replacement and interior vent work.

- Improved communication around scheduling.  If NYCHA reduces missed appointments and proactively reschedules appointments when needed with the resident, fewer residents may contact the OCC with a complaint about missed appointments;

- NYCHA's Compliance department referring resident reported complaints it receives (from the Federal Monitor and directly from NYCHA residents) to NYCHA's OMAR unit rather than to the OCC (which totaled 191 resident reported complaints in the last quarterly reporting period - August 1, 2020 to October 31, 2020). This will reduce the number of resident reported complaints to the OCC;

  o Based on NYCHA's adherence to resolving resident reported complaints within the agreed upon timeframes, and when the number of required follow-up calls and interactions has been sufficiently minimized, the Ombudsperson may consider having the OCC refer certain types of complaints directly to NYCHA to process (e.g., missed appointment complaints or scheduling complaints). This would reduce the number of active resident reported complaints to the OCC that have to be managed.

- Creation of automated OCC messages and OCC script language directing residents to the appropriate MRU staff for scheduling matters rather than calling back the OCC; and

- As of January 15, 2021, NYCHA's MRU is preparing a weekly status report via email to inform the Ombudsperson and OCC of notable ticket activity associated with resident reported complaints to the OCC and areas of concerns (e.g., staffing

10

constraints, lack of responsiveness from developments, internal escalations and actions taken, complex situations, etc.) preventing NYCHA from making progress on the necessary repair work within the apartment. This will provide an efficient way for the Ombudsperson and the OCC to ensure the resident reported complaint to the OCC is being appropriately and effectively resolved.

If these and other proposed measures reduce the number of calls and follow-up interactions required, in addition to the other cost saving opportunities discussed above, Stout estimates that the cost to operate the OCC could be reduced to approximately $418,776 annually (or $34,898 monthly), a 63% (or $710,376 annually) reduction compared to current operations. This cost estimate includes a 50% reduction in the Call Center Supervisor hours and a 50% reduction in Call Center Respondent hours.[7] This 50% reduction would be consistent with average call volumes of 1,000-1,200 per month and ongoing oversight of fewer than 1,250 active OCC tickets.[8]

Stout and NYCHA believe this cost estimate may be achievable based on NYCHA's commitment to implementation of such measures, but increased responsiveness of the developments will also be critical for NYCHA to be able to achieve the estimated reductions. Although the MRU has only been fully staffed since December 2020 and will take some time to be fully up and running, it has already implemented a training program, is working to update Maximo with an OCC flag, and will be providing a remediation plan to the OCC for each complaint to reduce follow up calls.

---

[8] This cost estimate includes 2 full-time Call Center Respondents (estimated 336 total hours per month at $45 per hour) and less than 1 full-time Call Center Supervisor (estimated 105 total hours per month at a blended rate of $136 per hour).

11

As NYCHA remains focused on meeting its obligations in the Revised Consent Decree, the number of resident reported complaints to the OCC should decline, but may increase at times, as NYCHA does some additional outreach to residents.  NYCHA's improved operational response, including scheduling and follow up enhancements, will reduce the number of resident reported complaints to the OCC (and therefore decrease cost).

NYCHA can also effectively and appropriately reduce the number of resident reported complaints to the OCC by serving residents through effective resident communication, prompt response to resident reported conditions, individual accountability and commitment to conduct the proper repair work (including effective and appropriate use of vendors to overcome staffing limitations or complex repairs) and a commitment to operational oversight via data strategy and operational processes. Each of these factors is discussed in the OCC's latest quarterly report.

If NYCHA is able to successfully reduce the number of new resident reported complaints to the OCC and complete the necessary work within the RCD performance requirements, in addition to the other cost saving opportunities discussed above, we estimate that the cost to operate the OCC could be reduced to $248,641 annually (or $20,720 monthly), a 78% (or $880,511 annually) reduction compared to current operations.  This cost estimate includes the estimated Call Center Respondent hours needed to address only standard operations (e.g., 2–3 calls per complaint) at a 68% decline from current operations and a further reduction to the Call Center Supervisor, assuming that this role will be increasingly necessary to address complex situations (since many simple complaints could be referred to NYCHA).[9]

---

[9] This cost estimate includes less than 1 full-time Call Center Respondent (estimated 109 total hours per month at $45 per hour) and less than 1 full-time Call Center Supervisor (estimated 94 total hours per month at a blended rate of $110 per hour).

12

The parties believe cost reductions can be achieved if Stout and NYCHA are able to implement a variety of initiatives highlighted in this proposal and OCC's latest quarterly report.

### D.  Plaintiffs' Additional Proposal Regarding Reduction of OCC Costs Through Actions by NYCHA

Plaintiffs note that the number of calls the OCC receives is attributable both to the number of mold and excessive moisture problems in NYCHA apartments that are not effectively remediated (which in turn leads to complaints to the OCC) and to the number of follow-up interactions.  Over the long term, the largest reduction in the cost of the OCC will come from NYCHA's effective remediation of mold and excessive moisture problems.  The IDA and IMA have proposed actions for NYCHA to take that they expect would assist in the elimination of such problems at their source and the prevention of their recurrence.

Stout has estimated that NYCHA's improved performance in the following key areas will reduce the number of resident reported complaints to the OCC, thereby decreasing the cost: (i) compliance with the 7- and 15-day remediation parameters in the Revised Consent Decree; (ii) prompt responsiveness to resident reported complaints to NYCHA's Customer Contact Center of missed appointments and resident dissatisfaction with repairs; and (iii) implementation of the Leak Standard Procedure across NYCHA's portfolio.

NYCHA can also effectively and appropriately reduce the number of resident reported complaints to the OCC by serving residents through effective resident communication, prompt response to resident reported conditions, individual accountability and commitment to conduct the proper repair work (including effective and appropriate use of vendors to overcome staffing limitations or complex repairs) and a commitment to operational oversight via data strategy and operational processes. Each of these factors is discussed in the OCC's latest quarterly report.

13

In addition to the above cost-saving measures proposed by Stout, Plaintiffs propose that NYCHA take additional actions that have already been recommended by both the IDA and IMA, which will result in the reduction of OCC costs.  Such actions include, but are not limited to, the following:

- Utilize analyses built by the IDA that would enable NYCHA to identify building lines with the most complex mold and excessive moisture work orders, and prioritize investigation and repair for those lines;

- Adopt the virtual inspection tool already developed and piloted by Stout, which would enable NYCHA to conduct initial inspections virtually and lower the incidence of missed appointments;

- Develop an operational response to address developments with long inspection time frames, and identify best practices for those developments with short inspection timeframes;

- Implement operational strategies to track and reduce missed appointments, and leverage those strategies that are already available to—but are being underutilized by—NYCHA; and

- Implement the solution recently proposed by the IMA, which would allow NYCHA to complete the interior vent portion of the roof fan installation and exhaust ventilation project quickly and for only $25 per vent.

NYCHA notes that section D above includes many ideas the parties have discussed to address the issues of mold and excessive moisture, the core issues underlying this litigation, however NYCHA's focus in the joint portion of this proposal is on short  term steps to reduce the cost of the OCC.

14

## CONCLUSION

The parties respectfully offer this proposal for cost saving opportunities identified to aid in the reduction of the costs incurred by the OCC without impacting the level of service and responsiveness residents receive.  NYCHA and Stout have identified immediate cost savings opportunities that are expected to reduce the costs of providing the essential operations of the OCC to approximately $771,576 annually, a 32% immediate reduction relative to costs incurred in 2020.

Dated: January 20, 2021

By: /s/ César de Castro

 THE LAW FIRM OF CESAR DE CASTRO, P.C.
César de Castro
7 World Trade Center, 34th Floor
New York, NY 10007
Tel.  646-200-6166
*Ombudsperson*

By: /s/ Neil Steinkamp

STOUT RISIUS ROSS LLC
Neil Steinkamp
120 West 45th Street, Suite 2900
New York, NY 10036
Tel.  646-807-4229

*Ombudsperson Call Center Operator and Independent Data Analyst*

By: _s/ David A. Picon_

David A. Picon
Erin M. Meyer
Jennifer E. Tarr
Dominique Kilmartin
**PROSKAUER ROSE LLP**
11 Times Square
New York, NY 10036
Tel.  212-969-3000
dpicon@proskauer.com
emeyer@proskauer.com
jtarr@proskauer.com
dkilmartin@proskauer.com


By: _s/ Gregory Bass_

Gregory Bass
**NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE**
275 Seventh Avenue, Ste. 1506
New York, NY 10001
Tel.  212-633-6967
bass@nclej.org


By: _s/ Nancy S. Marks_
Nancy S. Marks
**NATURAL RESOURCES DEFENSE
COUNCIL**
40 West 20th Street
New York, NY 10011
Tel.  212-727-2700
nmarks@nrdc.org


_Attorneys for Plaintiffs_


By: _s/ Miriam Skolnik_

Miriam Skolnik
Wendy L. Prince
**HERZFELD & RUBIN, P.C.**
125 Broad Street
New York, NY  10004
Tel. 212-471-8500
mskolnik@herzfeld-rubin.com
wprince@herzfeld-rubin.com

_Attorneys for Defendant_