UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                        :

  MARIBEL BAEZ, *et al.*,                 :
                                        :
                     Plaintiffs,     :
                                        :       13cv8916
         -against-                :
                                        :      <u>OPINION & ORDER</u>
  NEW YORK CITY HOUSING        :
  AUTHORITY,                   :
                                        :
                   Defendant.      :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM H. PAULEY III, Senior United States District Judge:

         This class action concerns mold and excessive moisture in New York City Housing Authority ("NYCHA") apartments.  Various residents and community organizations move to enforce the operative consent decree under which NYCHA agreed to eliminate these hazardous conditions.  NYCHA opposes the motion.  The dispute boils down to the parties' disagreement over whether housing developments that NYCHA has transferred to private management remain within the scope of units NYCHA agreed to remediate.

         For the reasons that follow, this Court concludes that—as a matter of contract interpretation—the answer is no, and Plaintiffs' motion to enforce the consent decree is denied.  While literally consistent with the letter of the law, this result is nonetheless inconsistent with the spirit of the remedial relief this Court endorsed (and to which NYCHA agreed).  That gives rise to an inescapable problem: a portion of the class this Court certified is no longer covered by the consent decree.  This is an urgent issue the parties must address.

BACKGROUND

I.      This Action

On December 17, 2013, a putative class of NYCHA residents who suffer from asthma filed this action under the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, the Fair Housing Amendments Act of 1988, and Article 15 of the New York State Executive Law for NYCHA's alleged failure to remove mold and excessive moisture in their apartments.  (See ECF No. 1.)  Three days later, the parties submitted a proposed settlement agreement.  (ECF No. 11.)  On February 5, 2014, the parties resolved Plaintiffs' motion for class certification, (ECF No. 4), and agreed on language defining the proposed class as "[c]urrent and future residents of NYCHA who have asthma that substantially limits a major life activity and who have mold and/or excessive moisture in their NYCHA housing."  (ECF Nos. 15, 15-1.)  Six days later, this Court adopted the parties' class definition and certified a class of Plaintiffs.  (ECF No. 17.)  Following a fairness hearing pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, this Court approved the Stipulation and Order of Settlement (the "Original Consent Decree") and "so-ordered" the Original Consent Decree on April 17, 2014.  (See ECF Nos. 21, 22.)  In addition to setting forth time parameters for NYCHA to fulfill its mold abatement obligations, the Original Consent Decree included a standard procedure for remediation of mold and excessive moisture.  (See ECF No. 22 ¶ 9.)

Almost immediately after entry of the Original Consent Decree, NYCHA fell out of compliance.  See Baez v. N.Y.C. Hous. Auth., 2015 WL 9809872, at *2 (S.D.N.Y. Dec. 15, 2015).  On April 22, 2015, Plaintiffs moved to enforce the Original Consent Decree, (ECF No. 35), and in December 2015, this Court granted that motion and appointed a Special Master, see Baez, 2015 WL 9809872, at *4.  Over the next two years, the parties worked with the Special

Master to create, <u>inter alia</u>, the "Mold Busters" program which promulgated new procedures and protocols for remediating mold and excessive moisture and reducing mold reoccurrence rates.

However, in February 2018, NYCHA informed Plaintiffs that it could not fully implement the "Mold Busters" program until 2020—long after the Original Consent Decree's scheduled expiration on April 17, 2018.  (<u>See</u> ECF No. 170.)  Faced with NYCHA's continuing non-compliance and the prospect that NYCHA would simply wait until the Original Consent Decree expired without taking remedial action, Plaintiffs announced their intent to move for injunctive relief unless NYCHA agreed to an amended consent decree.

On April 6, 2018, the parties filed a proposed amended consent decree for this Court's consideration.  (<u>See</u> ECF No. 166.)  This Court rejected the proposal and ordered modifications because "the amended consent decree smack[ed] of a slapdash effort to present . . . a temporary truce that allow[ed] Plaintiffs to claim a victory in name and NYCHA to maintain a façade of action without any definite obligations apart from the status quo."  <u>Baez v. N.Y.C. Hous. Auth.</u>, 2018 WL 11304189, at *2 (S.D.N.Y. Apr. 16, 2018).  Among other issues, the proposed amended consent decree contained the same unworkable time parameters that NYCHA had already demonstrated it could not meet.  As this Court observed at the time, "the consent decree's treatment of these time parameters [was] amorphous and fertile ground for future disputes," which left this Court to "wonder[] why, after two years, workable time parameters ha[d] yet to be developed."  <u>Baez</u>, 2018 WL 11304189, at *1.  The proposal also conferred authority on the Special Master to appoint an independent data analyst, independent mold analyst, and an ombudsperson without further judicial approval.  <u>Baez</u>, 2018 WL 11304189, at *1.  In response to this Court's concerns, the parties submitted a further amended proposed consent decree on July 24, 2018.  (ECF No. 193.)

During an extraordinary hearing on September 26, 2018, this Court heard from scores of NYCHA tenants, elected officials, and representatives of community organizations concerning the fairness of the further amended proposed consent decree.  During that hearing, this Court also considered a sweeping proposed consent decree in a parallel action brought by the United States addressing NYCHA's systemic failure to provide any semblance of adequate housing.  See generally United States v. N.Y.C. Hous. Auth., 18-cv-5213.  Witnesses, "[o]ne after another, . . . rendered harrowing accounts of the squalid conditions in their apartments and the indifference of NYCHA management, called for the firing or prosecution of NYCHA officials, and urged greater tenant participation in the negotiation and enforcement of the proposed consent decree."  United States v. N.Y.C. Hous. Auth., 347 F. Supp. 3d 182, 187–88 (S.D.N.Y. 2018).  Prior to the hearing, this Court also reviewed "more than 700 written comments from the public that . . . underscore[d] the concrete and heart-breaking human element of these cases."  (Sept. 26, 2018 Hearing Tr., at 5.)

On November 29, 2018, this Court "so ordered" the revised consent decree,[1] (ECF No. 220 ("Revised Consent Decree")).  See Baez v. N.Y.C. Hous. Auth., 2018 WL 6242224, at *5 (S.D.N.Y. Nov. 29, 2018).  In addition to the Revised Consent Decree, the parties submitted a revised standard procedure, (NYCHA Standard Procedure Manual, ECF No. 222 ("Standard Procedure")).  The Standard Procedure "establishes responsive measures to [remediate] mold and its root causes in [NYCHA] public housing locations and creates protocols to protect the health of residents and staff when remediating mold and identifying and correcting its root causes."  (Standard Procedure, at 1.)

---

[1]    This Court declined to approve the proposed consent decree in the parallel United States action.  N.Y.C. Hous. Auth., 347 F. Supp. 3d at 217.  Thereafter, the Government voluntarily dismissed that action and entered into a private settlement agreement with NYCHA and the City of New York that largely tracked the proposed consent decree this Court rejected.  N.Y.C. Hous. Auth., 18-cv-5213, ECF No 75.

II.        Section 8 vs. Section 9 Housing

        The United States Department of Housing and Urban Development ("HUD") administers two major low-income housing programs that fund NYCHA: Section 8 and Section 9.  (Decl. of Gregory Russ in Opp'n to Mot. to Enforce, ECF No. 305 ("Russ Decl."), ¶ 5.)  The Housing Act of 1937, 42 U.S.C. § 1437 et seq., provides Section 9 federal funding for publicly owned and operated housing units.  (See Russ Decl. ¶ 6.)  The Housing and Community Development Act of 1974, 42 U.S.C. § 5301 et seq., provides Section 8 federal funding in the form of vouchers to low-income families who may subsidize their rent in privately owned and operated housing units.  (See Russ Decl. ¶ 7.)

        In 2012, HUD launched the Rental Assistance Demonstration program ("RAD") funded by Section 8.  (Russ Decl. ¶ 18.)  Instead of a voucher system for tenants, RAD disburses funding to public housing authorities to enter into long-term leases with private developers. Under RAD, HUD still subsidizes the tenants' rent payments and the local housing authority provides a subsidy to the developer.  Developers renovate housing authority-owned properties with their own capital, and retain private property management companies to operate the developments.  (See Russ Decl. ¶ 18.)  To utilize RAD funds, NYCHA launched the Permanent Affordability Commitment Together ("PACT") program in May 2015.  (Russ Decl. ¶ 25.)  Under the PACT program, NYCHA continues to own its housing portfolio but leases its buildings to private developers, who in turn renovate them and manage day-to-day operations.

III.        Transfer to PACT

        On May 19, 2015, NYCHA announced its first PACT project.  (Russ Decl. ¶ 28.) As part of that project, NYCHA converted its Ocean Bay Apartments in Far Rockaway, Queens—totaling 1,395 units—from a NYCHA-operated Section 9 development to a PACT-

funded Section 8 development.  (Russ Decl. ¶ 28.)  In January 2017, NYCHA announced that it would convert 1,700 additional units in Brooklyn and the Bronx to PACT housing.  (Russ Decl. ¶ 32.)  On November 19, 2018—eleven days before this Court "so ordered" the Revised Consent Decree—NYCHA announced its intention to transition one-third of its housing portfolio— approximately 62,000 units—to PACT.  (See Decl. of Erin M. Meyer in Supp. of Mot. to Enforce, ECF No. 295, Ex. B.)

 As of February 3, 2021, 9,517 units—approximately 5% of NYCHA's housing portfolio—have been converted to PACT.  (ECF No. 319, at 1–2.)  NYCHA plans to transfer an additional 12,000 units to PACT by the end of 2022.  (ECF No. 319, at 2.)

## IV. The Text of the Revised Consent Decree

 The parties spar over whether NYCHA's Section 8-funded PACT developments are covered by the Revised Consent Decree.  The Revised Consent Decree does not contain any explicit provisions including or excluding PACT housing.  However, language in the Revised Consent Decree offers some guidance.  First, one of the whereas clauses states:

> WHEREAS, this Court certified a class consisting of the following: Current and future residents of NYCHA who have asthma that substantially limits a major life activity and who have mold and/or excessive moisture in their NYCHA housing.

(Revised Consent Decree, at 2.)

 Second, the Revised Consent Decree contains the defined term "NYCHA public housing developments," which is defined as "public housing developments that receive Section 9 subsidies and are operated by NYCHA."  (Revised Consent Decree ¶ 1(o).)  This defined term explicitly appears in only one paragraph in the Revised Consent Decree, pertaining to the installation of roof fans.  Specifically, ¶ 11 requires:

Effective immediately, NYCHA shall run all building roof fans in all <u>NYCHA public housing developments</u> for twenty-four (24) hours per day where possible.

(a) NYCHA shall inspect the roof fans in all <u>NYCHA public housing developments</u> within forty-five (45) days of the Effective Date and shall use best efforts to repair or replace any malfunctioning roof fan identified during these inspections within twenty-one (21) days and shall repair every malfunctioning roof fan within six (6) months and NYCHA shall report on the inspections once completed.  Once a malfunctioning fan has been repaired, it shall be turned on and run for twenty-four (24) hours per day where possible.

(b) NYCHA shall inspect the roof fans in all <u>NYCHA public housing developments</u> at least once per month thereafter and shall repair or replace any malfunctioning roof fans within twenty-one (21) days of the inspection.  Once a malfunctioning fan has been repaired, it shall be turned on and run for twenty-four (24) hours per day where possible.

(Revised Consent Decree ¶ 11 (emphasis added).)  A term—strikingly similar to the defined term—appears in another portion of the Revised Consent Decree relating to implementation of the Standard Procedure.  Paragraph 7 states:

7. NYCHA shall implement the revised Standard Procedure and related activities in accordance with the following timeline:

. . .

(f) NYCHA shall fully implement the revised Standard Procedure and all other provisions of this Order across all of <u>NYCHA's public housing developments</u> by December 31, 2019.

(Revised Consent Decree ¶ 7 (emphasis added).)  Notably, the Revised Consent Decree does not mention Section 8-funded housing or the PACT or RAD programs.

V.     <u>The Text of the Standard Procedure</u>

The Standard Procedure is incorporated by reference into the Revised Consent Decree.  (Revised Consent Decree ¶ 5 ("That revised Standard Procedure is deemed a part of this

Amended Stipulation and Order of Settlement and is incorporated by reference as if fully set forth herein.").)  The first page of the Standard Procedure, in a section dubbed "Applicability," states that:

> This Standard Procedure applies to staff responsible for the operation and maintenance of public housing developments that receive Section 9 subsidies from the U.S. Department of Housing and Urban Development (HUD) and are operated by NYCHA.  <u>This procedure does not apply to privately managed developments including Permanent Affordability Commitment Together (PACT) developments</u>.

(Standard Procedure, at 1 (emphasis added).)  As discussed later, the Standard Procedure is the cornerstone of the Revised Consent Decree.  Notably, the parties did not formulate a standard procedure for PACT housing.

DISCUSSION

VI.    <u>Legal Standard</u>

"Consent decrees are a hybrid in the sense that they are at once both contracts and orders, they are construed largely as contracts, but are enforced as orders."  <u>Berger v. Heckler</u>, 771 F.2d 1556, 1567–68 (2d Cir. 1985) (citing <u>United States v. ITT Continental Baking Co.</u>, 420 U.S. 223, 236 n.10 (1975)).  A consent decree represents a compromise between parties who have waived their right to litigate in the interest of avoiding the risk and expense of continued litigation.  Each has "give[n] up something they might have won had they proceeded with the litigation . . . .  For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it."  <u>United States v. Armour & Co.</u>, 402 U.S. 673, 681–82 (1971).  "It is well recognized that in institutional reform litigation such as this, judicially-imposed remedies must be open to adaptation when unforeseen obstacles present themselves, to improvement when a better

8

understanding of the problem emerges, and to accommodation of a wider constellation of interests than is represented in the adversarial setting of the courtroom."  N.Y. State Ass'n for Retarded Children Inc. v. Carey, 706 F.2d 956, 969 (2d Cir. 1983).

When interpreting a consent decree, a court must apply "ordinary rules of contract interpretation."  United States ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cty., N.Y., 712 F.3d 761, 767 (2d Cir. 2013); see also Broad. Music, Inc. v. DMX Inc., 683 F.3d 32, 43 (2d Cir. 2012) (holding that consent decrees are construed as contracts).  This requires that "deference . . . be paid to the plain meaning of the language of a decree and the normal usage of the terms selected."  United States v. Broad. Music, Inc., 275 F.3d 168, 175 (2d Cir. 2001) (quotation marks omitted).

The primary objective of contract interpretation "is to give effect to the intent of the parties as revealed by the language of their agreement."  Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., 773 F.3d 110, 113–14 (2d Cir. 2014) (quotation marks omitted).  Courts should strive to give "words and phrases . . . their plain meaning," and the contract "should be construed so as to give full meaning and effect to all of its provisions."  Shaw Grp., Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003) (quotation marks omitted).

"Whether or not a writing is ambiguous is a question of law to be resolved by the courts."  W.W.W. Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990).  "If an ambiguity is found, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract."  In re Motors Liquidation Co., 943 F.3d 125, 131 (2d Cir. 2019) (quotation marks omitted); see also P.J. ex rel. W.J. v. Conn. State Bd. of Educ., 931 F.3d 156, 164 (2d Cir. 2019) ("[I]f a consent decree is deemed

ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent, including the circumstances surrounding the formation of the decree." (quotation marks omitted)).

       Extrinsic evidence of the parties' intent may only be considered where an agreement is ambiguous, and "is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." W.W.W. Assocs., 566 N.E.2d at 642 (quotation marks omitted); see also Charron v. Sallyport Glob. Holdings, Inc., 2014 WL 7336463, at *16 (S.D.N.Y. Dec. 24, 2014), aff'd, 640 F. App'x 80 (2d Cir. 2016) (summary order) ("[E]xtrinsic evidence may not be introduced in an attempt to create ambiguity."). "[A] contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011) (citing White v. Cont'l Cas. Co., 878 N.E.2d 1019, 1021 (N.Y. 2007)). Conversely, "the language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." Lockheed Martin, 639 F.3d at 69.

       In resolving whether an ambiguity exists, a court must determine whether a clause is ambiguous "when read in the context of the entire agreement." Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) (quotation marks omitted). "If the document as a whole 'makes clear the parties' over-all intention,' courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement." Lockheed Martin, 639 F.3d at 69 (alteration omitted) (quoting Kass v. Kass, 696 N.E.2d 174, 181 (N.Y. 1998)).

VII.        Whether the Revised Consent Decree is Ambiguous

The Revised Consent Decree neither explicitly includes nor excludes PACT

housing units.  Indeed, the Revised Consent Decree is bereft of any mention of PACT housing.

Nevertheless, Plaintiffs assert that the Revised Consent Decree unambiguously includes PACT

housing while NYCHA counters that the Revised Consent Decree unambiguously excludes these

units.  This Court agrees with NYCHA's reading of the Revised Consent Decree.

A.    The Standard Procedure

The Standard Procedure is central to the Revised Consent Decree.  Indeed, it

provides a blueprint for remediating mold and excessive moisture and describes specific

protocols that NYCHA is required to follow.  Because the Standard Procedure is explicitly

incorporated into the Revised Consent Decree, (see Revised Consent Decree ¶ 5), the Standard

Procedure's text is necessarily relevant to whether the Revised Consent Decree is ambiguous.

Critically, the first page of the Standard Procedure announces that "[t]his procedure does not

apply to privately managed developments including Permanent Affordability Commitment

Together (PACT) developments."  (Standard Procedure, at 1.)

That language is compelling for two reasons: (1) the Revised Consent Decree

incorporates it and (2) the Standard Procedure provides the roadmap for NYCHA to fulfill its

obligations.  The Standard Procedure is not peripheral to the Revised Consent Decree; rather, it

is the core remedy for which the parties bargained.  The Standard Procedure's outright exclusion

of PACT housing strongly suggests that the parties did not intend for the Revised Consent

Decree to reach Section 8 housing.  Notably, there is no separate document detailing mold

remediation protocols for PACT developments.  As such, were this Court to rule that PACT

developments are covered by the Revised Consent Decree, it is unclear how NYCHA would

fulfill its obligations.  Likely, the parties would have to devise an additional standard procedure to govern PACT housing.  Moreover, there may be good reason why the Standard Procedure only applies to Section 9 housing.  For instance, because private developers renovate, manage, and maintain PACT housing, the methodology and logistics for remediating mold and excessive moisture might logically differ between privately-managed and NYCHA-operated housing.

Plaintiffs attempt to sidestep the plain language of the Standard Procedure by arguing that NYCHA's obligations under the Revised Consent Decree do not emanate from the Standard Procedure.  Rather, they aver that the Standard Procedure stems from the requirements of the Revised Consent Decree.  However, Plaintiffs' argument misses two points.  First, as already noted, the Standard Procedure is incorporated by reference into the Revised Consent Decree.  (See Revised Consent Decree ¶ 5.)  Because this Court interprets contracts holistically, the Standard Procedure is relevant to whether the NYCHA's obligations extend to PACT developments.  And the Standard Procedure plainly applies only to Section 9 housing.  (Standard Procedure, at 1.)  Second, the fact that the parties contemplated and drafted specific protocols that applied only to Section 9 housing is directly probative of the parties' intent.  If the core obligations under the Revised Consent Decree apply to PACT housing, the parties' agreement is silent as to how NYCHA is to fulfill those obligations.  This gap lends significant weight to NYCHA's interpretation.

B.  The Defined Term "NYCHA public housing developments"

To be sure, the text of the Revised Consent Decree contains few clues as to the parties' intent.  However, a single defined term is limited to Section 9 housing.  The term, "NYCHA public housing developments," is defined as "public housing developments that receive Section 9 subsidies and are operated by NYCHA."  (Revised Consent Decree ¶ 1(o).)

The term explicitly appears in one paragraph which deals with roof fan installation.  (See Revised Consent Decree ¶ 11.)  The parties agree that this defined term applies to that paragraph. Nevertheless, they spar over (1) whether the term applies to a paragraph 7(f) and (2) its significance to the rest of the Revised Consent Decree.

    i. <u>The Meaning of "NYCHA's public housing developments"</u>

    Plaintiffs argue that the defined term "NYCHA public housing developments" does not have the same meaning as the disputed, possessive term "NYCHA<u>'s</u> public housing developments" which is present in ¶ 7(f) of the Revised Consent Decree.  Their argument is simple: had NYCHA intended to use the <u>defined</u> term in ¶ 7(f), it could have.  Instead, NYCHA chose to use the possessive term.  Plaintiffs contend the apostrophe infuses new meaning into the term.  Accordingly, Plaintiffs argue that the term "NYCHA<u>'s</u> public housing developments" should be afforded its plain meaning, reaching both Section 9 and Section 8 housing, and should not be cabined to Section 9 housing like the defined term "NYCHA public housing developments."

    Viewing the term "NYCHA<u>'s</u> public housing developments" in isolation would reasonably include PACT housing because those units are still part of NYCHA's housing portfolio.  (Revised Consent Decree ¶ 7(f) (emphasis added).)  However, this term cannot be wrenched out of context and read in isolation.  <u>See</u> <u>Shaw Grp.</u>, 322 F.3d at 121.  Given the similarity between "NYCHA<u>'s</u> public housing developments" and "NYCHA public housing developments," they should be read interpreted consistently.

    Moreover, ¶ 7(f) describes implementation of the Standard Procedure.  And the Standard Procedure itself is explicitly limited to Section 9 housing.  (<u>See</u> Standard Procedure, at

1.)  Implementation of the Standard Procedure should be congruent with the Standard Procedure's reach.  This militates in favor of NYCHA's preferred construction.

Plaintiffs rely on Tesfay v. HanesBrands Inc., to support their argument that this Court should not interpret the terms "NYCHA's public housing developments" and "NYCHA public housing developments" to be synonymous.  2019 WL 6879179, at *6 (S.D.N.Y. Dec. 17, 2019).  But Tesfay is inapposite.  There, the court declined to "substitute the defined term 'General Use[]' for the undefined term 'use.'"  Tesfay, 2019 WL 6879179, at *6.  On their face, "General Use" and "use" are entirely different.  Indeed, the former has a modifier and the latter does not.  In contrast, the difference between the terms in this case is an apostrophe—which denotes possession.  But the term "NYCHA public housing development" is implicitly possessive.  The addition of an apostrophe "s" does not alter the plain meaning of the term.

This does not mean that punctuation is irrelevant.  As Justice Scalia observed, "the body of a legal instrument cannot be found to have a 'clear meaning' without taking account of its punctuation."  Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, at 162 (2012).  However, as described above, the apostrophe does not fundamentally change the plain meaning of the term.  Further, "[p]unctuation is a most fallible standard by which to interpret a writing; it may be resorted to, when all other means fail; but the court will first take the instrument by its four corners, in order to ascertain its true meaning; if that is apparent, on judicially inspecting the whole, the punctuation will not be suffered to change it."  Ewing's Lessee v. Burnet, 36 U.S. 41, 54 (1837).  While punctuation may serve as a guide to resolve ambiguity, it cannot, standing alone, spawn ambiguity.  Such a granular review would fly in the face of interpreting contracts holistically.  In short, the outcome of this case does not turn on an apostrophe.

14

Even if this Court were to conclude that the term is ambiguous, the extrinsic evidence supports NYCHA's reading.  See Aramony v. United Way of Am., 254 F.3d 403, 410 (2d Cir. 2001) ("A contract that is ambiguous in one respect . . . need not be ambiguous in another.").  Plaintiffs argue that because NYCHA added the defined term "NYCHA's public housing developments," it should be construed against NYCHA.  See Cheng v. Modansky Leasing Co., 539 N.E.2d 570, 573 (N.Y. 1989).  However, the drafting history is more complicated.  Plaintiffs actively participated in the negotiation and drafting of the Revised Consent Decree.  See Flannigan v. Vulcan Capital Mgmt. Inc., 2008 WL 11517448, at *5 (S.D.N.Y. 2008).  Plaintiffs' draft of the Revised Consent Decree proposed, in part, that "NYCHA shall fully comply with the Standard Procedure and all other provisions of this Order across all of NYCHA's developments by December 31, 2019."  (Decl. of Erin M. Meyer in Supp. of Mot. to Approve Revised Consent Decree, ECF No. 203 ("Meyer Decl."), Ex. 14 ¶ 7(f).)  Plaintiffs' draft also stated that "NYCHA shall inspect the roof fans in all NYCHA developments . . . ."  (Meyer Decl., Ex. 14 ¶ 11(c).)  NYCHA then circulated a revised draft containing significant amendments.  (See Meyer Decl., Ex. 15.)  Among them, NYCHA added the defined term "NYCHA public housing developments – public housing developments that receive Section 9 subsidies and are operated by NYCHA."  (Meyer Decl., Ex. 15 ¶ 1(o).)

NYCHA also amended the paragraph pertaining to the Standard Procedure, changing, in part, as follows: "NYCHA shall fully implement comply with the Standard Procedure and all other provisions of this Order across all of NYCHA's public housing developments by December 31, 2019."  (Meyer Decl., Ex. 15 ¶ 6(f) [2] (emphasis added)[3].)

---

[2]      This was ¶ 7(f) in Plaintiffs' draft but became ¶ 6(f) in NYCHA's due to other changes.

[3]      Underline denotes addition and strikethrough denotes deletion.

Finally, NYCHA amended the provision requiring the installation of roof fans.  For example, NYCHA revised one sub-paragraph to read "NYCHA shall inspect the roof fans in all NYCHA public housing developments at least once a month thereafter . . . ."  (Meyer Decl., Ex. 15 ¶ 10(c) (emphasis added).)  Plaintiffs responded with further alterations but did not change any of these specific edits described above.  (See generally Meyer Decl., Ex. 16.)

> To summarize, in Plaintiffs' draft, they proposed "NYCHA shall fully comply with the Standard Procedure and all other provisions of this Order across all of NYCHA's developments by December 31, 2019."  (Meyer Decl., Ex. 14 ¶ 7(f).)  NYCHA substituted "implement" for "comply with" and—critically—added "public housing" in between "NYCHA's" and "developments."  (Meyer Decl., Ex. 15 ¶ 6(f).)  It appears that NYCHA was attempting to minimize track change edits and added "public housing" to conform to the defined term but failed to delete the apostrophe.  NYCHA offered this exact same substitution in ¶ 11, pertaining to roof fan installation.  For the Standard Procedure, NYCHA provided a draft that included the limitation to Section 9.  (Decl. of Gregory F. Laufer in Opp'n to Mot. to Enforce, ECF No. 307 ("Laufer Decl."), Ex. C, at 16.)  Subsequently, Plaintiffs made edits, but did not alter that provision.  (Laufer Decl., Ex. C, at 12–75.)  As such, the inclusion of an apostrophe "s" appears to be the product of a scrivener's error.  See Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A., 951 N.Y.S.2d 19, 19 (1st Dep't 2012) ("It is a cardinal principle of contract interpretation that mistakes in grammar, spelling or punctuation should not be permitted to alter, contravene or vitiate manifest intention of the parties as gathered from the language employed.").

ii.   <u>The Significance of the Terms</u>

Plaintiffs aver that even if this Court agrees with NYCHA's reading of ¶ 7(f), the Revised Consent Decree should not be limited to Section 9 housing.  They argue that the defined term only appears in two places: implementation of the Standard Procedure (¶ 7(f)) and installation of roof fans (¶ 11).  Plaintiffs' also argue that the defined term in ¶ 7(f) is surplusage because the Standard Procedure is already confined to Section 9 housing.  Obviously, the implementation would be as well.

Further, Plaintiffs assert that the remainder of the Revised Consent Decree is silent regarding PACT housing.  This is particularly important, they maintain, because ¶¶ 2 and 3 deal with NYCHA's core remediation obligations.  Similarly, those portions of the Revised Consent Decree requiring NYCHA to work with the independent mold analyst, and independent data analyst, and ombudsperson are not cabined to Section 9 housing.  (See Revised Consent Decree ¶¶ 14–27.)  Plaintiffs argue that the juxtaposition between limitations in ¶¶ 7(f) and 11 and the silence throughout the balance of the Revised Consent Decree demonstrates that the parties intended that the Revised Consent Decree apply to PACT housing everywhere except for ¶¶ 7(f) (Standard Procedure) and 11 (roof fans).

However, the importance of ¶¶ 7(f) and 11 cannot be minimized.  The Standard Procedure is key to measuring NYCHA's compliance with the Revised Consent Decree.  Likewise, the installation of roof fans is critical to the elimination of mold at its source.  (See ECF No. 246, at 11 ("Because excessive condensation resulting from inadequate ventilation has been shown repeatedly to be a primary cause of mold in NYCHA developments, the parties believe that the roof fan and ventilation repairs will—if done correctly—lead to a reduction in the rates of mold and excessive moisture.").)  If other provisions of the Revised Consent Decree

17

apply, as Plaintiffs argue, to both Sections 8 and 9 housing, NYCHA would not have to follow the Standard Procedure or install roof fans for Section 8 housing. This would fissure the class: class members residing in Section 9 housing would receive injunctive relief that class members in PACT housing would not. Such an anomaly is not tenable in a Rule 23(b)(2) class action. See Fed. R. Civ. P. 23(b)(2) (permitting a class action vehicle when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole" (emphasis added)).

C. Other Provisions of the Revised Consent Decree

Plaintiffs argue that a sunset provision in the Revised Consent Decree supports their position. That provision states that the Revised Consent Decree "shall remain in effect until such time as it is vacated by the Court." (Revised Consent Decree ¶ 28.) In deciding whether to vacate the Revised Consent Decree, this Court is to "consider whether NYCHA has effectively remediated mold and excessive moisture in accordance with Paragraph 2 and has completed repairs within the time periods set forth in Paragraph 3 . . . or in accordance with the Performance Parameters as modified pursuant to Paragraph 6 . . . ." (Revised Consent Decree ¶ 28.) If this Court accepts NYCHA's interpretation of the Revised Consent Decree, NYCHA could—in theory—unilaterally circumvent the Revised Consent Decree by transferring its entire housing portfolio to PACT. That would vitiate ¶ 28 and interfere with this Court's ability to judge whether the remedial purposes of the Revised Consent Decree have been achieved. And though hypothetical, such a result is not entirely beyond the realm of possibility.

Plaintiffs also harken back to the original standard procedure. They aver that this standard procedure—fleshing out NYCHA's remediation obligations under the Original Consent

Decree—is relevant.  Specifically, Plaintiffs assert that ¶ 12 of the Revised Consent Decree

incorporates ¶ 9 of the Original Consent Decree, (ECF No. 22).  In turn, ¶ 9 of the Original

Consent Decree requires compliance with the accompanying standard procedure, (ECF No. 22,

Ex. A).  That standard procedure did not contain an express limitation to Section 9 housing.  But

the attenuated connection Plaintiffs draw is not persuasive.  NYCHA did not launch the PACT

program until 2015, long after the parties inked the Original Consent Decree, so the lack of such

a limitation is not probative of the parties intent to include PACT housing.  Moreover, any

language in the operative Standard Procedure would control.  The parties negotiated and agreed

to these terms, supplanting the Original Consent Decree's standard procedure.  And for good

reason.  Several years of experience demonstrated that the original standard procedure was

inadequate.  Accordingly, with the help of the Special Master, and the independent mold analyst,

and independent data analyst, the parties determined to replace it.

Finally, Plaintiffs argue that the parties' failure to explicitly exclude PACT

housing from the Revised Consent Decree favors their interpretation.  They assert that there was

a straightforward path to cabining the Revised Consent Decree to Section 9 housing: simply say

so.  Indeed, a paragraph stating "this Revised Consent Decree only applies to NYCHA's public

housing developments funded through Section 9" would have obviated the need for judicial

intervention.  But the parties did not include such a provision.

* * *

The Revised Consent Decree contains few markers on the parties' intent with

respect to PACT housing.  But, in order for a contract to be ambiguous, there must be two

reasonable interpretations.  See White, 878 N.E.2d at 1021 ("[I]f the agreement on its face is

reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its

personal notions of fairness and equity." (quotation marks omitted)).  Here, Plaintiffs'

interpretation is not plausible.  The Revised Consent Decree contains no indicia that the parties

intended to include PACT housing in the Revised Consent Decree.  The parties' failure to draft a

standard procedure for PACT housing demonstrates that they did not intend to fold Section 8

units into the Revised Consent Decree.  It also highlights a functional issue.  Given the absence

of a standard procedure for PACT housing, it is unclear how NYCHA would remediate mold and

excess moisture in those units.

Finally, Plaintiffs' construction would result in an unbridgeable chasm between

class members.  Tenants in Section 9 housing would receive the salutary benefits of roof fan

replacement and the remediation methods outlined in the Standard Procedure, while PACT

housing tenants would not.

Accordingly, this Court finds that the Revised Consent Decree unambiguously

excludes PACT tenants and therefore, Plaintiffs' motion to enforce the Revised Consent Decree

is denied.

VIII.    Modification of the Consent Decree

In its opposition, NYCHA suggests that Plaintiffs are improperly seeking

modification of the Revised Consent Decree.  In their reply papers, Plaintiffs deny this assertion

but comment, that "in the event the Court deems modification necessary, modification is well

within the Court's powers."  (Reply Mem. of L. in Supp. of Mot. to Enforce, ECF No. 309, at

10.)  However, such a motion is not before this Court and would require full briefing.

IX.    Further Issues

While this Court denies Plaintiffs' motion to enforce the Revised Consent Decree,

this Opinion & Order unveils a latent defect in the Revised Consent Decree: a substantial number

of class members are no longer covered by the parties' agreement to injunctive relief.  Until now, the parties had a difference of opinion regarding class members in PACT housing and whether they fall within the ambit of the Revised Consent Decree.  In this Court's view, it is clear that not only are PACT tenants no longer covered by the parties' agreement, but they were never entitled to receive the full benefits of the Revised Consent Decree, including the Standard Procedure and roof fan replacement.  Despite the fact that the PACT program was well underway while this Court considered approval of the Revised Consent Decree, the parties failed to raise the issue until their pre-motion letters two years later.

In their Complaint, Plaintiffs sought, among other things, to "[p]rovide notice to all NYCHA tenants," (Compl. ¶ 4(b)), and to "[m]odify NYCHA's Reasonable Accommodation in Housing for Applicants, Section 8 Voucher Holders, and NYCHA Residents policy," (Compl. ¶ 4(e)).  In essence, Plaintiffs launched this action for the benefit of all NYCHA tenants afflicted by asthma, not just those in Section 9 housing.

This Court certified a class of "current and future NYCHA residents who have asthma that substantially limits a major life activity and who have mold and/or excessive moisture in their NYCHA housing."  (ECF No. 17, at 2–3.)  In certifying the class, this Court directed NYCHA to disseminate notice.  Specifically, NYCHA was required to:

> At least twenty-five (25) days prior to the hearing, Defendant shall cause the Notice, in English, Spanish, Chinese, Hatian-Creole, and Russian to be (a) posted in the lobby of housing units that it owns and/or operates and in such other locations that class members are reasonable likely to see.  The Notices posted in these locations shall be 8.5" x 11" or 8.5" x 14", if necessary; (b) mailed to all NYCHA residents with the February 2014 rent bills; and (c) posted on NYCHA's web site . . . .

(ECF No. 16 ¶ 3.)  When this Court certified the class back in February 2014, PACT did not exist.  Thus, those tenants whose units NYCHA subsequently transferred to PACT were

members of the original class.  However, transferring Section 9 units to PACT did not

disfranchise the tenants in those units from class membership.  As PACT tenants, they are still

"NYCHA residents."  As such, PACT tenants remain members of the class this Court certified.

Having adopted NYCHA's interpretation of the Revised Consent Decree, the

parties are confronted with a dilemma.  The Revised Consent Decree excludes tenants whose

units have been transitioned to PACT housing.  This lacuna means that the Revised Consent

Decree fails to resolve this action because those tenants are still part of the class this Court

certified.  See Kozlowski v. Coughlin, 871 F.2d 241, 245 (2d Cir. 1989) (holding that a consent

decree must "spring[] from and serve[] to resolve the remaining dispute").  With this Court's

interpretation of the Revised Consent Decree, "the purposes of the litigation as incorporated in

the decree . . . have not been fully achieved."  United States v. United Shoe Mach. Corp., 391

U.S. 244, 248 (1968) (citing United States v. Swift & Co., 286 U.S. 106, 113 (1932) (Cardozo,

J.)).  As such, the parties must propose either a further revised consent decree that includes all

class members or a proposed pre-trial schedule for litigating this action.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion to enforce the Revised Consent

Decree is denied.  However, the injunctive relief granted by the Revised Consent Decree now

fails to reach the whole class.  Accordingly, the parties are directed to meet and confer and

submit a joint letter memorandum on how they wish to proceed by May 12, 2021.  The Clerk of

Court is directed to terminate the motion pending at ECF No. 293.

Dated:  April 12, 2021
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

22